**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN W. COSTELLO, not individually, but as Litigation Trustee under the Comdisco Litigation Trust, | ) ) ) | **Honorable Robert W. Gettleman** |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Magistrate Judge Mary M. Rowland |
| v. | ) | |
| | ) | Civil Case No.  05-736 |
| MIKE J. POISELLA, | ) | Civil Case No.  05-740 |
| ROMAN BRUNNER, | ) | Civil Case No.  05-746 |
| JOSEPH J. SCOZZAFAVA, and | ) | Civil Case No.  05-764 |
| GREGORY A. WEISS, | ) | |
| | ) | |
| *Defendants.* | | |

**JOINT SUMMARY OF TRIAL RECORD AND TESTIMONY**

## TABLE OF CONTENTS

PREFATORY COMMENT REGARDING JOINT SUMMARY ............................................... 2

I.     BACKGROUND ............................................................................................ 4

     A.     The Bank and Winston & Strawn ....................................................... 4

     B.     Comdisco ............................................................................................. 6

     C.     McBride, Baker & Coles....................................................................... 8

     D.     The Defendants: Poisella, Scozzafava, Brunner, and Weiss .............................. 9

     E.     Plaintiff's Expert, Sabel ...................................................................... 9

     F.     The Federal Reserve System.............................................................. 12

         1.     The Structure of the Federal Reserve System......................... 12

         2.     Federal Reserve Bank of Chicago and Federal Reserve Bank Staff Personnel............................................................................. 13

         3.     The Custom and Practice of Regional Banks ......................... 14

         4.     Plaintiff's Expert's Overview of Margin Regulations ............................ 31

II.     THE BAXTER 1994 AND ALLEGIANCE SIPS (JUNE 1994 AND APRIL 1997) ....................................................................................................... 35

III.     DEVELOPMENT OF COMDISCO SIP TRANSACTION IN 1997 (MAY – JULY 1997) ................................................................................................ 41

     A.     Initiation of the SIP Transaction (May 1997) .................................... 41

     B.     Purposes of the SIP Transaction ........................................................ 42

     C.     Development of the SIP Transaction (June 1997)............................... 45

     D.     Development of the SIP Transaction (July 1997)............................... 53

         1.     McBride's Research and Diligence on Margin Regulations................... 54

         2.     McBride's Contacts with the FRBC ....................................... 58

         3.     Comdisco Activities................................................................. 60

         4.     The McBride Opinion Letter ................................................... 62

     E.     The Bank's and Winston's Work on the SIP Transaction ................................... 64

     F.     Underwriting and Syndication .......................................................... 66

     G.     Cessation of Work on the SIP after July 22, 1997 ............................... 72

IV.     DEVELOPMENT OF COMDISCO SIP TRANSACTION (DECEMBER 1997 – JANUARY 30, 1998)...................................................................................... 73

     A.     Comdisco's Financial Status................................................................ 73

B.     Work on the SIP ................................................................................ 74

C.     McBride's Solicitation of a Concurrence from the Federal Reserve Bank of Chicago in January 1998 ................................................................ 75

     1.     The January 16, 1998 Hale Letter to Lloyd of FRBC ............................. 75

     2.     Plaintiff's Expert's Testimony Regarding the January 16, 1998 Hale Letter ........................................................................................ 77

     3.     Handwritten Notations on copy of the January 16, 1998 Hale Letter ......................................................................................... 89

     4.     The January 29, 1998 Letter from McCauley of FRBC to the January 16, 1998 Hale Letter .................................................... 93

     5.     The Date and Delivery of the McCauley Letter ...................................... 98

D.     McBride's Overview to the Comdisco Board ................................................. 100

E.     The Bank's and McBride's Efforts to Confirm Whether the SIP Transaction Complied ......................................................................... 102

     1.     The Bank .......................................................................................... 102

     2.     McBride and Comdisco ...................................................................... 103

F.     Underwriting and Loan Approval by the Bank ................................................ 106

V.     STRUCTURE AND TERMS OF THE ADOPTED SIP AND RELATED TRANSACTION DOCUMENTS ................................................................ 109

A.     The Notes and Loans ................................................................................ 109

B.     The Facility Agreement ............................................................................ 114

C.     The 1998 Stock Option Program ............................................................... 118

D.     The Shared Investment Plan ..................................................................... 120

     1.     Purchase and Holding of Shares ......................................................... 121

     2.     Stock Powers .................................................................................... 123

     3.     Stockholder Rights and Dividends ...................................................... 125

     4.     Sale and Transfer of Shares ............................................................... 125

E.     Default ..................................................................................................... 129

VI.     PRESENTATION OF THE PROGRAM TO POTENTIAL PARTICIPANTS (JANUARY 30 – 31, 1998) ....................................................................... 130

A.     The January 1998 Meetings ....................................................................... 130

B.     The SIP Materials ..................................................................................... 138

C.     Comdisco's Beliefs and the Bank's Beliefs at the Time of the Presentation and Distribution of the SIP Binder ........................................................ 143

     1.     Compliance with Margin Regulations .................................................. 143

iii

2. Representations in the Facility Agreement ............................................ 145

3. Representations in the Questions & Answers ........................................ 146

4. Murray's Testimony Regarding Shareholder Approval ....................... 147

VII. PARTICIPATION IN AND CLOSING OF THE SIP TRANSACTION (FEBRUARY 1998) ........................................................................................... 152

A. Defendants' Participation, Reasons for Participating, and Related Testimony ............................................................................................... 152

B. Share Prices for Comdisco Common Stock at the Time of the SIP ................... 189

C. Documentation and Participant Financial Disclosures ..................................... 190

D. February 29, 1998 McBride Opinion Letter ....................................................... 197

E. Bank Fees for Arranging and Syndicating the SIP Loans ................................ 200

F. Syndication of the SIP Loans ............................................................................. 201

VIII. EVENTS BETWEEN FEBRUARY 1998 AND JULY 2001 ................................ 202

A. Merger of Regulation G into Regulation U ....................................................... 202

B. Murray's Letters to the Federal Reserve Board. ............................................... 203

C. Post-Comdisco ESPs ........................................................................................... 208

D. Project Horizon ................................................................................................... 214

E. Sales of Shares Prior to the Bankruptcy ........................................................... 219

F. Other Attempts to Use SIP Stock ....................................................................... 224

1. Frederick Louisy ...................................................................................... 224

2. Lawrence Mitzen ..................................................................................... 226

3. Rosemary Geisler ..................................................................................... 227

4. Edward Pacewicz ..................................................................................... 228

G. Anticipation of the Third Anniversary of the SIP ............................................. 229

H. Consideration of Proposals to Limit Participants' Risk .................................... 230

IX. COMDISCO'S BANKRUPTCY AND CREATION OF THE LITIGATION TRUST ............................................................................................................... 241

A. Comdisco's Suspension of Dividend Payments ................................................ 241

B. Comdisco's Bankruptcy Petition, the Bank's Notice of Default and Proof of Claim, and Comdisco's Opposition ............................................................... 242

C. Comdisco's Plan of Reorganization ................................................................... 246

D. The Trust Agreement and Amendments ............................................................. 247

X. SETTLEMENT OF THE BANK'S CLAIM AND ASSIGNMENT OF THE SIP NOTES ................................................................................................................ 252

iv

XI.     PROCEEDINGS IN THE NOTE ENFORCEMENT LITIGATION ............................ 264

XII.    CURRENT AMOUNTS OF PRINCIPAL AND INTEREST CLAIMED.................... 265

AM 27729383.6

Pursuant to the Court's Order of October 15, 2013, Plaintiff John W. Costello, not individually, but as Litigation Trustee under the Comdisco Litigation Trust (the "Plaintiff" or "Trustee"), and Defendants Mike J. Poisella, Roman Brunner, Joseph J. Scozzafava, and Gregory A Weiss (together "Defendants") submit the following summary of the record and testimony from the trial conducted in these cases in September and October of 2013.

## PREFATORY COMMENT REGARDING JOINT SUMMARY

The Plaintiff and the Defendants (collectively, the "Parties") file this Joint Summary of Trial Record and Testimony ("Joint Summary") pursuant to the October 15, 2013 and December 17, 2013 Orders of the Honorable Robert W. Gettleman in order to facilitate the preparation of post-trial briefs and the Court's review of same.

The Parties have undertaken a substantial effort to prepare this Joint Summary and will be citing to it in their respective post-trial briefs. However, the Parties agree: (a) that the Joint Summary is not intended to be either a stipulation of facts or a complete recitation of the evidence in these cases, (b) that any party can refer to and cite evidence in a post-trial brief that is not set forth, or referred to, in the Joint Summary, and (c) that no inference is to be drawn by the Court if one or more of the Parties does so.

In the Joint Summary, the Parties have attempted to distinguish between agreed summary of the record and testimony and "other evidence" that the Parties agree was presented to the Court, but for which the parties cannot agree on a form of paraphrase. The Parties have endeavored to identify the "other evidence" in the Joint Summary by noting that a particular witness "testified that…" or words to that effect. The other facts reflecting an agreed form of summary of the record, on the other hand, do not have that qualifier. The Parties agree that there may be one or more instances in the Joint Summary where the qualifying words "testified that…" or words to that effect do not appear through an oversight by, or inadvertence of, the Plaintiff or the Defendants. Accordingly, the Parties agree: (1) that each party reserves the right to argue that evidence presented in the Joint Summary as an agreed summary of the record and testimony should instead properly be considered as "other evidence", and (2) that any other party can oppose any such argument(s).

2

The Parties have endeavored generally to present the Joint Summary in a chronological order. The Parties agree that nothing in the sequence of the Joint Summary, or the manner in which particular evidence is presented or characterized, is intended to convey any view of any party as to the significance of particular evidence or the weight, if any, which should be accorded to it.

All article, section, and subsection titles, captions and headings in the Table of Contents to the Joint Summary, or in the body of the Joint Summary, are only for convenience and to facilitate organization, and are not part of, or to be considered part, of the Parties' agreement regarding the evidence.

Footnotes inserted in the Joint Summary are intended to set forth, or preserve, a party's position as noted in the footnote. The inclusion of a footnote does not indicate, and should not be construed as indicating, that the Parties are in agreement as to the substance or accuracy of the footnote. Each party expressly reserves the right to argue that a footnote is inaccurate, incomplete, misleading or improperly argumentative.

The respective Parties expressly preserve, and do not waive, any objection or argument that has been presented to the Court, by motion *in limine*, during the trial or otherwise, regarding the exclusion or admissibility of evidence—regardless of whether those objections are expressly cited or incorporated in this Joint Summary. At the same time, the Parties agree that the inclusion of an objection in a footnote does not preserve that objection if it was not timely and properly made at trial.

Each party reserves the right to supplement the Joint Summary, either by agreement of the Parties or by Order of the Court.

# I.    BACKGROUND

## A.    The Bank and Winston & Strawn

<u>Fact Testimony and Related Record Materials</u>

1.     The First National Bank of Chicago became part of Bank One, N.A. through a merger announced in April 1998.  In 2004, Bank One, N.A. merged with JPMorgan Chase, the current successor in interest to the Bank.  The First National Bank of Chicago and its successors are referred to herein, individually and collectively, as the "Bank."  (Jt. Pretrial Order, Schedule A ("Stmt. Uncontested Facts") ¶ 1.)

2.     During 1997 and the first eight months of 1998, Daniel Clarke was employed by the Bank as a relationship manager specializing in nonbank financials. Clarke testified that nonbank financials included commercial finance companies, consumer finance companies, captives, and family-owned finance companies.  Clarke testified that he generally acted as the main point person for the relationship with the internal managers at the client, who were typically the treasurer or CFO.  Clarke estimated that he handled about 18 accounts.  Comdisco Inc. ("Comdisco") was one of those accounts.  (9/25/13 Trial Transcript ("Tr.") at 207-209.)

3.     Clarke testified that his goal as relationship manager was business development. (9/25/13 Tr. at 209.)

4.     Clarke testified that John Vosicky, Comdisco's CFO, and Edward Pacewicz, its Treasurer, were his main contacts on the Comdisco Shared Investment Plan ("SIP") transaction. Clark testified that Pacewicz, as treasurer, was tasked with putting the transaction together and therefore was his primary contact. (9/25/13 Tr. at 229.)

5.     Clarke also testified that prior to the SIP program the Bank was a participant in Comdisco's core liquidity revolving credit, as part of the company's overall lender group, and provided three to five-year revolving credit. (9/25/13 Tr. at 210.)

4

6.      The Bank's outside legal counsel in connection with the Comdisco SIP was Winston & Strawn LLP ("Winston").  (Stmt. Uncontested Facts ¶ 4.)

7.      Gregory S. Murray is a partner at Winston in Chicago, where he has practiced law for the last 39 years, largely representing lenders in the area of corporate finance, basically commercial lending.  (10/9/13 Tr. at 830-831.)

8.      In 33 of the 37 matters listed in Murray's biography on Winston's website, the firm was representing JPMorgan Chase Bank, N.A. (DX 93.)

9.      Murray typically handles larger syndicated transactions where a borrower wants to borrow more money than a single lender wants to lend.  (10/9/13 Tr. at 831.)

10.      Murray testified that he has worked on at least 10 Executive Stock Purchase Programs ("ESP"), give or take.  Murray testified that in these transactions he consistently represented the lead bank making the loan, which was always the Bank and its successors. (10/9/13 Tr. at 833.)

11.      The individuals at the Bank, Comdisco and their respective law firms who worked on the implementation and financing of the proposed SIP were identified as members of the "Bulldog Team."  None of the current federal Defendants was part of the Bulldog Team for Comdisco.  (Stmt. Uncontested Facts ¶ 3.)

12.      Clarke testified that the name "Bulldog" was used to try to minimize the disclosure of what company was involved.  Clarke testified that it had to be confidential because you were talking about public shares.  He testified that typically when these programs are launched, the common stock moves upward and he imagines that has a lot to do with the fact that management is buying stock versus selling stock.  (9/25/13 Tr. at 249-250.)

13.      Clarke testified that he believed the Bank prepared a working deal team list for

5

the Comdisco SIP.  He testified that the list included bank personnel from financing and leasing, credit syndications, swap desk, private banking, operations, internal legal and external legal. Clarke testified that the Bank's list included Patsy Habicht-Legal-FNBC, in the Bank's commercial division, and she worked with relationship managers like Clarke.  Clarke testified that she decided whether outside counsel was needed and, if so, what counsel the Bank would retain.  Clarke testified that she controlled the legal hires for any transaction.  Clarke testified that the Bank's list, JX 18, also included Gregory Murray of Winston & Strawn.  JX 18 also listed Brian Hart from that firm. (JX 18; 9/25/13 Tr. at 251-253.)

14.    At the time of the trial in these cases, Debra DiPasquale was employed by JPMorgan Chase Bank, N.A. in the position of Manager II — CB Operations.  DiPasquale testified that she is familiar with the Bank's record keeping and has access to and has reviewed the business records of the Bank described in her testimony. She testified that she has personal knowledge of the matters described in her testimony, either in her own right or through her review of the relevant Bank business records. She testified to her understanding that the business records described in her testimony were created, stored and maintained in the ordinary course of the Bank's regular business activities.  (DiPasquale Decl. ¶¶ 1-2.)

<u>Testimony by Expert Witness</u>

15.    Sabel testified that the Bank in 1997-1998 was one of the largest, most sophisticated Chicago banks. (9/24/13 Tr. at 21.)

**B.    Comdisco**

16.    Comdisco was a technology service company, which provided solutions to help organizations reduce technology cost and risk.  Its businesses included continuity services emphasizing technology and data availability across data centers, network services for managing

6

data and voice networks, asset management service for information technology assets, Year-2000 testing, and equipment leasing. The company conducted business through its principal office in the Chicago area and approximately one hundred offices in the United States, Canada, Europe and the Pacific Rim. (PX[1] 382 at 2-3.)

17.     Philip A. Hewes was the Chief Legal Officer of Comdisco in the 1997-1998 timeframe. (1/10/13 Hewes Dep., 6.)

18.     Scott Harvey was Deputy General Counsel in the Comdisco law department in the 1997-1998 timeframe, reporting to the General Counsel, Jerry Fitzgerald, and to Hewes. Harvey was a 1980 law school graduate and licensed to practice law in Illinois. He started with Comdisco in 1983 and left in July 2002. His responsibilities during the time the Comdisco SIP was being prepared in 1997 and 1998 included overseeing the company's various stock purchase and option plans. (10/1/13 Tr. at 320-321.)

19.     Edward Pacewicz, a CPA, was Vice-President and Treasurer of Comdisco at the time the SIP transaction was introduced. At that time of the SIP, Pacewicz reported to John Vosicky, who was the CFO of the company. Pacewicz was a member of the Bulldog Team and had familiarity with the SIP plan as a member of the Bulldog team. (10/2/13 Tr. at 537-538.)

20.     Michael Salerno is currently employed by Comdisco Holding Company, Inc. Salerno has held various human resource positions and began at Comdisco in 1988. (9/25/13 Tr. at 268-269.)

21.     Salerno testified that he is generally familiar with the files and records maintained by Comdisco and that he has access to those files in the course of his duties. (9/25/13 Tr. at 270.)

22.     Salerno testified that he is not an attorney, did not have any involvement in

---

[1] Plaintiff's Exhibits are referenced to herein as "PX." Defendants' Exhibits are referenced to as "DX," and Joint Exhibits as "JX."

7

documenting or implementing the SIP transaction involved in these cases, and was not invited to participate in the SIP transaction. (9/25/13 Tr. at 271.)

> ### C.    McBride, Baker & Coles
>
> Fact Testimony and Related Record Materials

23.    Comdisco's outside legal counsel was McBride, Baker & Coles ("McBride"). (Stmt. Uncontested Facts ¶ 4.)

24.    McBride had been working with Comdisco since at least the time Harvey was hired in 1983. Lola Hale, a McBride partner, had been one of Comdisco's primary outside counsel for more than 15 years. Harvey had worked on between 15 and 20 transactions with Hale before the SIP and considered Hale to be a diligent and careful lawyer and believed that she had a very good reputation in the Chicago legal community. (10/1/13 Tr. at 394-395.)

25.    Hewes testified that McBride did an assortment of corporate legal work for Comdisco, including handling and reviewing the company's securities filings and bank agreements. Hewes testified that Hale was the responsible lawyer and engagement partner from McBride for Comdisco's legal work. (1/10/13 Hewes Dep. at 7-8.)

26.    Hewes testified that he thought Hale was a competent lawyer, and he was generally pleased with the work she did for Comdisco. (1/10/13 Hewes Dep. at 77-78.)

27.    Jerald B. Holisky was an associate attorney in the business law group of McBride in 1997. (10/2/13 Tr. at 605.)

28.    Corlene Cathcart Rhoades (as of 1997, Corlene Cathcart) ("Cathcart") is an attorney licensed in Illinois in 1995, and currently on inactive status. Cathcart last practiced law in January, 2000. Cathcart worked as an associate attorney at McBride from about mid-1997 until February, 1998. (5/7/13 Cathcart Dep. at 6-7.)

8

29.     Cathcart testified that she primarily worked on mergers and acquisitions during her employment at Sidley & Austin prior to McBride, but also did a very little bit of securities law work.  At McBride, Cathcart did some corporate work and a little bit of securities work. (5/7/13 Cathcart Dep. at 7-8.)

30.     Cathcart graduated from law school in 1995. (5/7/13 Cathcart Dep. at 7.)

<u>Testimony by Expert Witness</u>

31.     Sabel testified that he understood Cathcart was a very junior lawyer and a junior associate. (9/24/13 Tr. at 63, 96.)

**D.      The Defendants: Poisella, Scozzafava, Brunner, and Weiss**

32.     Defendant Roman Brunner was employed by Comdisco from 1988 to 2000 and held the positions of Managing Director and Vice-President for Comdisco Europe as of January 1998.  (10/3/13 Brunner Dep. at 6-7.)

33.     Defendant Mike J. Poisella was employed by Comdisco from 1981 to 2002 and was a salesman as of January 1998.  (10/8/13 Tr. at 753.)

34.     Defendant Joseph F. Scozzafava was employed by Comdisco for approximately 6 years and left in May or June 2001.  His final position was as a district manager for services sales.  (10/9/13 Tr. at 798.)

35.     Defendant Gregory A. Weiss was employed by Comdisco from 1988 to 2002 and held the position of Senior Vice-President as of January 1998. (10/10/13 Tr. at 908-909.)

**E.      Plaintiff's Expert, Sabel**

36.     Bradley K. Sabel is a partner in the law firm of Shearman & Sterling LLP in New York.  Sabel graduated from college at Vanderbilt University and from the Cornell Law School in 1975.  He also holds a Master's of Science degree in business policy from Columbia Business School.  He is licensed to practice law in New York.  (9/24/13 Tr. at 6, 8.)

9

37.     Sabel testified as an expert retained by the Plaintiff. (9/24/13 Tr. at 6.)

38.     Sabel testified that he initially was contacted about becoming involved in this matter by Reade Ryan, a former partner (now of counsel) at Shearman & Sterling, who had been contacted by someone at Citibank who in turn had been contacted by someone looking for an expert. Sabel testified that he believes the person looking for the expert was named Randy Thornton. Sabel testified he understands that Randy Thornton had worked at Citibank and knew Reade Ryan through that connection. (9/24/13 Tr. at 91-92.) Randy Thornton is the sole member of Comdisco's Board of Directors and the sole member of the Litigation Trust Advisory Board.

39.     Sabel started as a Staff Attorney at the Federal Reserve Bank of New York ("FRBNY") after graduating from law school in 1975. He became an officer of the FRBNY in 1980 and then served as Secretary of the FRBNY from 1981 to 1985. He returned to the legal department of the FRBNY in 1985 and continued there until he resigned to join Shearman & Sterling in 1994. When he returned to the legal department, Sabel began regularly working in the area of margin regulations. He initially worked with two other attorneys who had been experienced in margin regulations. After those attorneys stopped working on margin regulations, Sabel testified that he became the only person in the FRBNY legal department who really understood the margin regulations and that, through this work, became familiar with the history, purpose and application of the margin regulations. (9/24/13 Tr. at 9-10.)

40.     Sabel testified that there were about 25 attorneys at the FRBNY when he started in 1975 and approximately 40 when he left in 1994. (9/24/13 Tr. at 124.)

41.     Some of the regulatory guidance that Sabel offered while at the FRBNY was in connection with Regulation T. But a lot also related to Regulations U and G. (9/24/13 Tr. at

10

124.)

42.     While at FRBNY, Sabel regularly dealt with the Federal Reserve Board and Federal Reserve Board staff.  There were specialists on the margin regulations on the Federal Board staff.  Sabel also had dealings with other regional Federal Reserve banks while at the FRBNY and became familiar with the role that regional reserve banks played in the Federal Reserve System.  (9/24/13 Tr. at 10-11.)

43.     Since he arrived at Shearman & Sterling in 1994, Sabel testified that he has continued to work in the bank regulatory area, including on margin regulations, and has continued to have contact with people on the Federal Reserve Board staff and the FRBNY regarding margin regulations.  (9/24/13 Tr. at 11-12.)

44.     Sabel testified that over 90 percent of his clients are banks and that banks have accounted for 80 to 90 percent of the business he has originated at Shearman & Sterling over the past 19 years.  (9/24/13 Tr. at 89.)

45.     Sabel testified that he considers himself a bank regulatory lawyer.  (9/24/13 Tr. at 89.)

46.     Sabel testified that Citibank, Morgan Stanley and Bank of America are among Shearman & Sterling's largest clients. (9/24/13 Tr. at 92.)

47.     Sabel charged his regularly hourly rate of $1,195 for his services on this matter. Sabel believes his first invoice for his report was in the range of $80,000, and his second invoice for his supplemental report and deposition was approximately $25,000.  He estimated that through trial his additional time would be roughly $45,000 to $55,000.  (9/24/13 Tr. at 89-90.)

48.     Sabel testified that he met two or three times in New York with Plaintiff's counsel during the drafting of his original report.  He testified that he met once with Plaintiff's counsel in

connection with the preparation of his supplemental report.  (9/24/13 Tr. at 90-91.)

49.     Sabel spends most of his time designing or structuring transactions as opposed to documenting them.  (9/24/13 Tr. at 102.)

50.     Sabel testified that it is important to structure a transaction in a way that achieves the business purpose of the client. (9/24/13 Tr. at 102-103.)

51.     Prior to being retained as an expert in these cases, Sabel had no involvement with the Comdisco SIP.  He testified that he has never provided any professional services as an attorney in an ESP. (9/24/13 Tr. at 6, 93.)

**F.     The Federal Reserve System**

**1.     The Structure of the Federal Reserve System**

52.     Sabel testified that the "Federal Reserve System" consists of the Board of Governors in Washington, which is an agency of the government and is effectively the ruling body of the Federal Reserve System.  The rest of the System consists of the 12 Federal Reserve banks around the country.  (9/24/13 Tr. at 18-19.)

53.     Sabel testified that the Federal Reserve Board of Governors is the seven governors of the Federal Reserve appointed by the President, which are the governing body of the Federal Reserve System.  The Federal Reserve Board is an agency of the Federal government.  (9/24/13 Tr. at 34-35.)

54.     Sabel testified that the Federal Reserve Board has general supervisory authority over the reserve banks under the Federal Reserve Act and is also the agency that has been charged by Congress under a variety of statutes to take certain formal actions, such as issuing regulations.  The Board of Governors carries out these functions.  Sabel testified that the Federal Reserve Board staff provides an advisory function to the Board and, because of its expertise in

12

the matters for which the Board is responsible, provides advice to people who ask questions. (9/24/13 Tr. at 35-36.)

55.     Sabel testified that the regional Federal Reserve banks are separate corporate entities chartered pursuant to the Federal Reserve Act.  They are not government agencies, and their stock is owned by their member banks.  However, Sabel testified that they are subject to a wide variety of regulatory restrictions not applicable to normal banks, and he would not consider it accurate to call them "private."  Sabel opined that "Federal Reserve Banks function as the regional offices of the Federal Reserve Board with respect to implementing and enforcing regulations and are expected to act as a front line in responding to inquiries about interpretation and compliance."  Sabel testified that regional banks serve that function primarily because the United States is a big country, and if all the lawyers and bankers in the United States called the Board in Washington, they would overwhelm the staff; it is therefore to the benefit of Board staff to have knowledgeable people at the regional Reserve banks who field inquiries from bankers and lawyers.  (9/24/13 Tr. at 35-36, 115.)

56.     Sabel testified that each Federal Reserve Bank has a board of directors, president and vice-president. He testified that each Federal Reserve Bank is a functioning bank that has deposit accounts for funds and for securities for banks and financial institutions in the bank's district.  Sabel testified that the FRBNY carries out certain additional responsibilities because of its location in New York.  (9/24/13 Tr. at 35.)

### 2.     Federal Reserve Bank of Chicago and Federal Reserve Bank Staff Personnel

57.     Wu testified that the FRBC is a corporation with shareholders and with its own Board of Directors that is distinct from the Board of Governors of the Federal Reserve System. Wu testified that employees of the FRBC are not employees of the federal government and are

13

paid by the FRBC as opposed to the federal treasury.  (11/16/12 Wu Dep. at 92-94.)

58.     McCauley testified that the FRBC is a privately chartered bank. (10/2/13 Tr. at 520.)

59.     Angela Wu is an Assistant Vice-President and Assistant General Counsel at the FRBC.  Wu testified by deposition in a representative capacity on behalf of the FRBC. (11/16/12 Wu Dep. at 4-5.)

60.     Wu is licensed to practice law in Illinois. Wu's primary responsibility at the FRBC is assisting the supervision and regulation department, by providing examiners with guidance and helping them answer questions regarding the Board of Governors' regulations. (11/16/12 Wu Dep. at 6-7.)

61.     James Brent McCauley was an attorney at the FRBC.  McCauley testified that: his title was "Senior Attorney" around January of 1998, he was the most junior attorney during his entire tenure at the FRBC, and he was never employed by the Federal Reserve Board of Governors.  (10/2/13 Tr. at 520-521, 530.)

### 3.     The Custom and Practice of Regional Banks

Fact Testimony and Related Record Materials

62.     Wu testified that attorneys representing institutions contacted the FRBC for guidance.  (11/16/12 Wu Dep. at 34.)

63.     McCauley testified that during his time at the FRBC, he would from time to time respond to a third party who had requested an interpretation of certain Federal Reserve Board regulations.  (10/2/13 Tr. at 531.)

64.     McCauley answered "Specifically no.  But I know we did it from time to time" in response to a question asking whether he recalled writing a letter prior to January 29, 1998

14

during his employment with the FRBC interpreting a regulation in response to an inquiry by a third party. (10/2/13 Tr. at 527.)

65.     Wu testified that the FRBC will receive inquiries by phone often and by letter occasionally regarding whether a certain fact pattern would comply with the regulations.  Wu testified that the FRBC reviews these letters and often provides guidance by phone, which the FRBC considers informal guidance.  Wu testified that it is also the FRBC's practice to contact and consult with the Board of Governors when they run into fact patterns that either they have not encountered in the past or that they believe raises some unusual or complex issues, or when they are simply not comfortable opining or giving guidance on a particular issue.  (11/16/12 Wu Dep. at 9-10.)

66.     Wu testified that the FRBC considers a written interpretation or opinion in response to an inquiry from a lawyer or company to be informal guidance.  Wu testified that she thinks it is not the norm for the FRBC to send a written interpretation or response, except as to applications, the area in the FRBC "or the type of matter that requires submission by institutions when they are either acquiring or merging with another institution or trying to acquire some sort of control of an institution.  Membership in the Federal Reserve also requires an application, et cetera."  (11/16/12 Wu Dep. at 16-17.)

67.     Wu testified that it would be typical practice, both currently and in 1997-1998, for a private attorney first to contact the FRBC orally and then to follow up with a formal letter. Sometimes the FRBC would ask for written follow-up.  Wu testified that it is common for the FRBC to ask people making inquiries to memorialize them in writing.  (11/16/12 Wu Dep. at 52, 56-57.)

68.     Wu testified she believes that in many cases institutions will come to the FRBC

15

with proposals hoping to achieve a certain outcome. She testified that it is not uncommon for a party not to provide the FRBC with all of the relevant facts up front, but that is often due to the fact that the party is not necessarily sure what questions need to be asked or what the FRBC is expecting. Wu further testified that in FRBC's course of dealing with a party they will try to ask the party for the other information that FRBC believes either has not been provided or is inconsistent with other facts in the proposal or are relevant to FRBC's inquiry. (11/16/12 Wu Dep. at 97-99.)

69.     Wu testified that she thought there were occasions when written responses were requested by outside attorneys regarding whether a fact pattern complied with regulations, and there have been situations where institutions have asked for confirmation of an opinion in writing. (11/16/12 Wu Dep. at 10-11.)

70.     McCauley testified that, before delivering an interpretation of a Board regulation in response to a third party request, (a) he would hope that he undertook to offer interpretations based upon a well-researched basis, (b) it was the practice at the FRBC to review the Federal Reserve Regulatory Service, which McCauley referred to as "our primary source," and (c) it was his custom and practice to ensure that the interpretation he offered was consistent with those issued by the Federal Reserve Board. McCauley testified that he would from time to time consult with attorneys for the Federal Reserve Board concerning questions he might have about an interpretation that was brought to his attention. (10/2/13 Tr. at 528, 531-532.)

71.     Wu testified that when the FRBC provided a written response to an inquiry about compliance with regulations it was typical practice to consult with Board staff before providing a response. Wu testified that if the matter was something the FRBC had worked on before or gotten guidance from the Board before, they may not feel it was necessary to confirm with the

16

Board staff.  (11/16/12 Wu Dep. at 13-14.)

72.     Wu testified that the practice with respect to responding to inquiries, to her

knowledge, has not changed since 1998.  (11/16/12 Wu Dep. at 17-18.)

73.     Wu testified that in general the FRBC does not issue formal opinions or

interpretations related to Regulations G, U, or X.  Rather, if a request for an interpretation or

opinion came into the FRBC, Wu testified that the FRBC legal department would consult with

Board staff to get the request answered and that generally, for Regulation U issues, the FRBC

would consult with an attorney on the Board staff named Scott Holz.  (11/16/12 Wu Dep. at

28-30.)

74.     Wu testified that it was not the FRBC's practice to issue interpretations and

opinions on Regulation U and that the FRBC's legal department in its records did not have the

expertise for more complicated Regulations G, U and X situations. (11/16/12 Wu Dep. at 28-29.)

75.     Wu testified that she was unable to find anyone in the FRBC who views himself

or herself as an expert in Regulation U matters or knows of someone within FRBC with that

expertise. (11/16/12 Wu Dep. at 35.)

76.     Wu testified that she does not know if it is common practice, but it's not unusual

to have a law firm or company provide a summary in an inquiry asking about compliance with a

regulation in a non-applications process or context.  Wu testified that the level of documentation

provided could vary based on the circumstances and the fact pattern and the party making the

inquiry and FRBC also could ask somebody to provide more information and documents.

(11/16/12 Wu Dep. at 57-59.)

77.     Wu testified that if a person was looking for the final authoritative interpretation

on a regulation such as G or U or X, they would want to contact someone at the Board staff, who

17

would probably have referred the issue to Holz or consulted with Holz. However, Wu testified

that it was perfectly appropriate to contact the regional Reserve bank to obtain guidance because

that is routinely what regional Reserve banks do – they help facilitate matters and consult with

Board staff as needed. Wu testified that a lot of institutions routinely work with Board staff

through a regional Reserve bank. (11/16/12 Wu Dep. at 33-34.)

78.     Wu testified that when she referred to final authority or final interpreter of a

regulation, she was referring to the Federal Reserve Board, not specifically to Scott Holz.

(11/16/12 Wu Dep. at 122.)

79.     Wu testified that when attorneys at the FRBC provide guidance or interpretations

they: (i) take steps to ensure the guidance is correct, (ii) try to be diligent and complete in their

research and analysis, (iii) consult the materials they know are available, including internal

repositories, (iv) talk with other attorneys at other regional Federal Reserve banks, and (v)

consult with Board staff as they think appropriate. Wu testified that in providing guidance or

interpretations they have the objective that the interpretations or guidance they provide are

consistent with interpretations and guidance previously provided by the Board. (11/16/12 Wu

Dep. at 83-85.)

80.     Wu testified that the FRBC would consult Holz in the legal department at the

Federal Reserve Board with respect to questions about Regulation U because he was identified as

the Regulation U expert and the person they were all referred to at the Board. (11/16/12 Wu

Dep. at 30-31.)

81.     Wu testified that the Board of Governors of the Federal Reserve System, as

opposed to the Board staff, can issue a final authoritative interpretation that is official by

publishing the interpretation in the Federal Reserve Regulatory Service ("FRRS"). Wu also

18

testified that if the staff had a contrary view as to the Board, the Board of Governors could countermand a staff interpretation by publishing an interpretation in the FRRS. (11/16/12 Wu Dep. at 122-123.)

82. Wu testified that in its search in response to the Rule 30(b)(6) subpoena, the FRBC did not locate any documents in its files relating to interpretations of Regulations G or U for a company other than Comdisco. (11/16/12 Wu Dep. at 44-49.)

<u>Expert Witness Testimony</u>

83. Sabel opined that requesting advice from lawyers at regional Federal Reserve banks was consistent with custom and practice. "Custom and practice" referred to the custom and practice of bankers and their lawyers consulting with the local Federal Reserve bank and with Board staff in Washington when they had questions or concerns about particular regulations or issues under Federal Reserve rules. Sabel testified that, while he was at the FRBNY, the consistent practice was to respond to inquiries and provide guidance as necessary. Based on Sabel's experience, that practice continued after he left in 1994. (9/24/13 Tr. at 33-34.)

84. Sabel testified that part of the FRBNY legal department's job was to respond to inquiries from bankers, their lawyers, and outside people who were trying to understand the requirements of the margin regulations. The FRBNY got regular calls with requests regarding all aspects of the margin regulations, and Sabel generally fielded these. He provided advice in response to at least a few calls per week, occasionally several per day. (9/24/13 Tr. at 10.)

85. Sabel testified that a company or someone representing a company could elect to make an inquiry directly to the Federal Reserve Board. (9/24/13 Tr. at 137-138.)

86. Sabel testified that in his view, it was consistent with custom and practice to obtain an opinion from a regional Federal Reserve Bank rather than going to the Federal Reserve

19

Board staff.  (9/24/13 Tr. at 66.)

87.     Sabel testified that the margin regulations is a highly specialized area and not every transactional lawyer is a specialist or has expertise on the margin regulations.  He testified that there are not many people with a high degree of specialty or expertise on margin regulations. (9/25/13 Tr. at 179.)

88.     Sabel testified that for a transactional lawyer who is not a specialist, it is consistent with custom and practice to rely on a regional Federal Reserve Bank to help find the right answer and provide comfort that a transaction complies.  (9/25/13 Tr. at 179.)

89.     Sabel testified that in his experience at FRBNY, it depended on the expertise of the caller whether he or she would typically ask for concurrence as to specific legal theories or as to factual scenarios.  He said that he often received calls from lawyers he previously had spoken with regarding the margin regulations who knew the regulations almost as well as Sabel did.  In those circumstances, they would talk about the facts and focus on particular interpretations or sections.  Sabel testified that on other occasions, he would receive calls from people "who had just heard about the margin regulations and inquired what it was all about.  And there I'd have to basically tell them that, you know, I cannot give seminars on the margin regulations.  We expect them to do their homework and steer them in, you know, a direction that sounds like it's relevant to what they want.  And then there were people in between. My job as I saw it was to try to focus them on what sounded like the particular margin issues that they needed to deal with and suggest that they do more work if that's, in fact, what needed to be done and then call me back again." Sabel testified that he generally tried to work with people to get them to the right resolution on how to interpret the regulations.  (9/25/13 Tr. at 177-178.)

90.     Sabel testified that he has no idea how much knowledge the prospective SIP

20

participants would have had regarding the margin regulations and therefore cannot answer whether the prospective participants would be at the end of the spectrum of having a lot of knowledge about what was being presented to them or of having virtually no knowledge with respect to them as far as the structure of the transaction. (9/25/13 Tr. at 194.)

91.     Sabel testified that not every Federal Reserve Bank lawyer is a specialist in the margin regulations.  Generally, Federal Reserve Bank lawyers who wanted to get comfort whether a transaction they had been asked about complied with the margin regulations would call Federal Reserve Board staff in Washington.  In 1998, this would have been either Ollie Ireland or Scott Holz.  (9/25/13 Tr. at 179-180.)

92.     Sabel testified that it was his usual practice when he was at the FRBNY to have a verbal preview with a requester that would raise issues that go beyond what's included in a subsequent letter from a requester and that the verbal preview would eliminate certain issues from needing to be put in the letter.  Sabel testified that he did not have any direct knowledge whether the lawyers at the FRBC had the same practice.  (9/25/13 Tr. at 154-155.)

93.     Sabel testified that he did talk to his colleagues at the Board in Washington and was occasionally on telephone calls at the same time with them and a requester, and that the Board lawyers asked the same kinds of questions he did.  (9/25/13 Tr. at 154.)

94.     Sabel testified that he thinks the practice of the Staff attorneys of the Federal Reserve Board would have been the same as his practice, in terms of having a verbal preview with a requester involving issues that go beyond what's included in a subsequent letter from a requester and that the verbal preview would eliminate certain issues from needing to be put in the letter. (9/25/13 Tr. at 154.)

95.     Sabel testified that in many cases, inquiries are relatively simple and

21

straightforward and that regional Federal Reserve banks simply dealt with them. Sabel testified that the inquiries that required more thought are the ones the regional bank usually would consult about with the Board staff. (9/24/13 Tr. at 37.)

96.     Sabel testified that when he was at the FRBNY, one of his roles was to take phone calls from bankers and lawyers. He testified that some people would call him directly, while others would be referred to him by a receptionist if the caller was asking to speak to someone about the margin regulations. Sabel testified that the receptionist had a list of areas and the lawyers at the FRBNY who were knowledgeable about particular areas. (9/24/13 Tr. at 37.)

97.     Sabel testified that Wu's deposition confirmed to him that the FRBC effectively had the same practice. Sabel testified that while he was at the FRBNY, he knew the general counsel of the FRBC and a couple of the lawyers who worked there. Sabel testified that his general sense was that they functioned the same way the FRBNY did. (9/24/13 Tr. at 37-38.)

98.     Sabel testified that regional Federal Reserve Bank lawyers expected their advice to be relied upon in important transactions and took care to ensure that their guidance was correct and consistent with Federal Reserve Board interpretations. Sabel testified that, as lawyers for a Federal Reserve Bank, he and his colleagues recognized that they represented the Federal Reserve. Sabel testified that the Federal Reserve had and has, in his view, a very high opinion of its competence and expertise; he and his colleagues wanted to be sure that if someone asked questions about matters under the Federal Reserve's domain, that they advised them appropriately. Sabel testified that he and his colleagues wanted to avoid being second-guessed after they had given an opinion and that it was a matter of the FRBNY attorneys wanting to do their job correctly. Sabel testified that if a caller received an answer from a regional Reserve bank and then called a Board staff lawyer in Washington who disagreed with the answer, this did

22

not reflect well on the lawyer at the Reserve Bank. (9/24/13 Tr. at 38-39.)

99.     Sabel testified that it's important for Federal Reserve Banks to have knowledgeable people to field inquiries.  In response to a question whether he knows of anyone at the FRBC who had extensive knowledge of the margin regulations at the time McBride, Baker & Coles made its inquiry in mid-January 1998, Sabel testified that it "depends how you define extensive." Sabel testified that they apparently spoke to McCauley and he gave a deposition on what he knows, but apart from that deposition, Sabel does not know whether anyone at the FRBC had extensive knowledge of the margin regulations in mid-January 1998.  (9/24/13 Tr. at 138.)

100.     Sabel testified that there were primarily three lawyers on the Federal Reserve Board staff that he contacted with respect to margin regulation issues while he was at the FRBNY:  Laura Homer, Robert Plotkin, and Holz.  (9/24/13 Tr. at 39.)

101.     Sabel testified that during his 19 years at the FRBNY, he believes he probably did contact a staff member at the Federal Reserve Board regarding the issue of whether an extension of credit was indirectly secured by margin stock; it was an important issue to talk about.  He testified that he could not recall a specific transaction.  (9/24/13 Tr. at 124-125.)

102.     Sabel testified that he got to know Holz very well and talked to him a great deal. Sabel testified that Holz was very knowledgeable about the margin regulations and that there was no one at the Federal Reserve Board that Sabel considered more knowledgeable at the time. Sabel also testified that in his experience, Holz was very precise and particular, and that he often acted as a devil's advocate to make sure all relevant issues and possible characterizations were considered.  (9/24/13 Tr. at 39, 44, 48.)

103.     Sabel testified that he also knew Oliver Ireland of the Board staff very well and

23

that Ireland had expertise on the margin regulations. (9/24/13 Tr. at 47.)

104.    Sabel testified that in general Federal Reserve Bank guidance has to reflect Federal Reserve Board or staff published interpretations and be consistent with those interpretations. (9/24/13 Tr. at 124.)

105.    Sabel testified that when he provided oral opinions while at the FRBNY he wanted to be correct. If he was not absolutely sure something was true, he would talk to someone like Holz to get the benefit of his views. If he received a written inquiry, Sabel testified that he definitely talked to Federal Reserve Board Staff. Sabel testified that his recollection is that he would send a draft of his response letters to Holz or other staff members for review before Sabel issued the letter. (9/24/13 Tr. at 39-40, 118.)

106.    Sabel testified that he would not necessarily send the Board staff members a copy of the inquiry letter. In some instances he would; it would depend on the circumstances. (9/24/13 Tr. at 118-119.)

107.    Sabel testified as follows at his deposition: Question: "When you would fax letters down to the Federal Reserve Board staff under the circumstances that you have described, would you send the letter that you had received along with that or just your draft response?" Answer: "Oh, I'm sure I would have sent both." (9/25/13 Tr. at 148.)

108.    Sabel testified that the Code of Federal Regulations publishes regulations themselves plus formal interpretations of a government agency. The formal interpretations are the interpretations that have been adopted by the Federal Reserve Board and authorized to be published in the Code of Federal Regulations. (9/24/13 Tr. at 115-116.)

109.    Sabel testified that published opinions or interpretations of the Federal Reserve Board are published in a service called the Federal Reserve Regulatory Service ("FRRS"). There

24

are also separate formal Board staff interpretations published in the FRRS. (9/24/13 Tr. at 49, 116.)

110.    Sabel testified that staff interpretations are interpretations that the Staff did not take to the Board itself. Sabel testified that formal Staff interpretations can be published in the FRRS. (9/24/13 Tr. at 116.)

111.    Sabel testified that when he thinks of formal interpretations, those are the interpretations issued by the Board of Governors itself. Sabel testified that because of the structure of the Administrative Procedure Act and the significance that it gives to formal interpretations by the agency, all Board staff interpretations can be called informal because they do not rise to that level. Sabel testified that he does not think the distinction means much when referring to staff work. (9/24/13 Tr. at 117.)

112.    Sabel testified that the Board staff also issues interpretative letters. Currently, some of these are posted on the Federal Reserve Board's website, and some are not. (9/24/13 Tr. at 117.)

113.    Sabel testified that almost all of the Board staff interpretations are the result of interpretive letters that are sent to people who ask questions. (9/24/13 Tr. at 117-118.)

114.    Sabel testified that some interpretative letters of the Fed Staff never see the light of day in terms of being outside the Fed. (9/24/13 Tr. at 118.)

115.    Sabel testified that he understood, based on conversations with Holz and others, that the criteria for determining which Board staff interpretations to publish was that the staff made a judgment about the significance of a particular letter and determined whether it was worthwhile to put it in the FRRS. In many cases, letters were simply routine and repeated things that had been said before, and the staff saw no reason to include these letters in the FRRS. Sabel

25

testified that based on his experience at the FRBNY, published and unpublished opinions of the Federal Reserve Board staff generally were considered to be of equal weight. (9/24/13 Tr. at 49-50.)

116.    Sabel testified that he regularly consulted or looked at as precedent prior letters that had been generated by the FRBNY. Sabel testified that the FRBNY legal department had a very large file of these letters, maintained by the law library and that there was a system for breaking down subject areas, and every outgoing letter, internal memorandum, and just about any other document created by a lawyer went into that system. Sabel testified that part of his research diligence in preparing a response to an inquiry was to check the files to see if there was anything that had previously been issued by the FRBNY. (9/24/13 Tr. at 51.)

117.    Sabel testified that the FRBC's "Visual Memory" system described by Wu sounds to him very much like the system for filing letters at the FRBNY. Sabel testified that he believed the notation at the top of the FRBC's copy of the January 29 McCauley letter (PX 237), was the FRBC's way of indicating the subject matter topics under which the letter should be filed. According to Sabel, this was the same kind of notation he saw all of the time on documents in the FRBNY legal department files. (9/24/13 Tr. at 51-52.)

118.    Sabel believes that the indirect security concept has been and continues to be a difficult legal issue. (9/24/13 Tr. at 108.)

119.    Sabel testified that there are a whole range of consequences resulting from violations of financial regulations, including the margin regulations. Sabel further testified that depending on the structure, a transaction could be on the right side of the regulations or the wrong side of the regulations, or there could be uncertainty. Sabel testified that if he had concern that a proposed structure was or could be on the wrong side of the applicable

26

regulations, he would evaluate how the structure could be modified so that the transaction when documented would be compliant. (9/24/13 Tr. at 100-101.)

120.   Sabel testified that the range of consequences for violating margin or other financial regulations can include litigation, loans not being enforced, and enforcement action against the bank. He testified that the same is true as to a non-bank lender that extends credit where the margin regulations are involved. (9/24/13 Tr. at 100-101.)

121.   Sabel testified that prior to April 1, 1998, both Regulation G and Regulation U also carried prohibitions on arranging credit that banks or non-banks may not themselves extend. Sabel testified that it traditionally has been called the arranging prohibition and that a violation of this prohibition can be called an arranging violation. (9/24/13 Tr. at 122.)

122.   Sabel testified that a transaction might not be feasible from a business perspective if the 50 percent limitation on purpose credit applied and that, depending on the intent of the transaction, it might be necessary for the extension of credit to be for 100 percent of the purchase price of the stock to make the transaction viable. Sabel testified that he does not know whether the Comdisco SIP could have gone forward if participants had only been able to borrow 50 percent of the purchase price. (9/24/13 Tr. at 105-106.)

123.   Sabel testified that he has believed for many years that many loan documents contain provisions that serve no purpose other than as the basis for an argument that Regulation U does not apply. (9/24/13 Tr. at 109.)

124.   Sabel testified that he used the term "tweaks" at his deposition in reference to modifications to a proposed structure in an effort to make it compliant with the regulations. The general idea is minor changes to address a particular problem. He testified that lawyers working on a proposed transaction can tweak the structure of the transaction, the documentation of the

27

transaction, or both.  (9/24/13 Tr. at 102.)

125.    In Sabel's mind, there is no distinction between trying to structure a transaction in such a way that it complies with the margin regulations versus trying to structure a transaction in a way that the margin regulations do not apply.  Sabel testified that it is okay to try to structure a transaction in a way so that the margin regulations do not apply.  (9/24/13 Tr. at 113.)

126.    Sabel testified that one definition of "regulatory arbitrage" is "financial engineering that uses differences between economic substance and regulatory position to evade unwelcome regulation."  (9/24/13 Tr. at 109.)

127.    Sabel testified that trying to tell the difference between what's permissible and impermissible under Regulation U can be a very tricky exercise that can require "tweaking" by lawyers in terms of how the proposed transaction is structured.  (9/24/13 Tr. at 109.)

128.    Sabel testified that from the perspective of a lawyer evaluating the proposed structure of a transaction, one of the issues he would focus on under the margin regulations is whether the proposed extension of credit would be purpose credit as opposed to non-purpose credit.  Another issue would be whether the proposed extension of credit would be secured directly or indirectly by the stock being purchased.  Sabel testified that this issue is significant because the 50% limitation on purpose credit applies if the extension of credit is directly or indirectly secured by the stock.  Sabel testified that under Regulation U today, and under Regulations G and U prior to April 1, 1998, indirectly secured includes any arrangement with the customer under which the customer's right or ability to sell, pledge or otherwise dispose of margin stock owned by the customer is in any way restricted while the credit remains outstanding.  Sabel testified that Regulation G when it existed was a carbon copy of Regulation U in most important respects. (9/24/13 Tr. at 106-107.)

28

129.     Sabel testified that he was told by people at the Federal Reserve Board that the concept of indirect security was included in Regulation U, and ultimately Regulation G, because the Board did not believe lenders should try to do indirectly what they could not do directly. Sabel testified that the concept of indirectly secured does not apply to Regulation T, which applies to broker dealers.  (9/24/13 Tr. at 107-108.)

130.     Sabel testified that a pledge means a direct security interest.  He testified that you don't have to have a pledge to have an indirect security interest.  (9/24/13 Tr. at 137.)

131.     Sabel testified that he believes that almost any kind of contractual restriction can, at certain times, amount to an indirect security interest as the Federal Reserve has interpreted the concept.  Sabel testified that contractual restrictions on the sale of margin stock can be obvious examples of indirect security.  (9/24/13 Tr. at 108-109.)

132.     Sabel testified that as a general principle, contractual restrictions on the sale of margin stock are obvious examples of indirect security.  Sabel testified that he would take defendants' counsel's word for it, and believed him, that Sabel stated in an article he wrote in 1996 that contractual restrictions on the sale of margin stock are obvious examples of indirect security.  (9/24/13 Tr. at 108-109.)

133.     Sabel testified that a "negative covenant" is a restriction on the extent to which a borrower can use his own assets covered by the negative covenant, and that a negative pledge is an example of a negative covenant.  Sabel has stated that negative pledges of assets, including margin stock, are obvious examples of indirect security and considers Rechlin to be authoritative.  (9/24/13 Tr. at 110.)

134.     Sabel testified that one definition of a negative pledge is if you pledge something to Party A, you cannot pledge it to any other party. (9/24/13 Tr. at 110.)

29

135.    Sabel testified that in connection with work in this litigation, he reviewed relevant treatises and articles that have been published at various times describing and analyzing the regulations. (9/24/13 Tr. at 18.)

136.    Sabel considers the Charles F. Rechlin treatise, *Securities Credit Regulation*, to be reliable authority. Sabel is confident that the Rechlin treatise cites a negative pledge as an example of indirect security. (9/24/13 Tr. at 110-111.)

137.    Sabel testified that he believes he cited an excerpt from Rechlin's treatise in his report in this litigation. (9/24/13 Tr. at 111.)

138.    Sabel testified he is aware that Rechlin's treatise cites negative pledges and agreements prohibiting the sale or transfer of assets as the most common examples of provisions that create indirect security. (9/24/13 Tr. at 113.)

139.    The Rechlin treatise states:

> In this regard, the FRB staff has stated: "Purpose credit indirectly secured by [margin] stock complies with Regulation U if the total amount of the loan does not exceed the maximum loan value of the stock … indirectly securing the loan." Thus, the extension of a purpose credit of $50,000 that is indirectly secured—for example through a negative pledge covenant—by margin stock having a current market value of $100,000 complies with Section 221.3(a).

Sabel agrees with this statement. (PX 440; 9/24/13 Tr. at 112.)

140.    Sabel testified that, in general, it is proper in evaluating the issues before the Court for the Court to look at the transaction in its entirety. Sabel testified that is that is how he would do it. (9/24/13 Tr. at 137.)

141.    Sabel testified that it is not necessary for a lender to have been granted a security interest in margin stock in order to have an indirect security interest or for there to be a violation of the margin regulations. (9/24/13 Tr. at 137.)

142.    Sabel testified that in his experience as a bank attorney, a bank typically makes

30

loans only on the terms and subject to the conditions set forth in the loan documents.  (9/25/13 Tr. at 173-174.)

### 4.    Plaintiff's Expert's Overview of Margin Regulations

143.    Sabel testified that the margin regulations were created pursuant to the Securities Exchange Act of 1934 as part of the response to the Great Depression and the stock market crash of 1929.  Initially, the Federal Reserve issued Regulation T to limit the amount of credit that broker-dealers could extend to their customers on securities subject to Federal Reserve supervision.  After issuing Regulation T, Sabel testified that the Federal Reserve found that securities loans by banks had gone up substantially and issued Regulation U to impose restrictions on banks that were lending on equity securities.  In 1968, the Federal Reserve Board issued Regulation G to impose effectively the same requirements on non-bank lenders.  In 1970, the Federal Reserve Board issued Regulation X, which imposed certain the margin regulations on borrowers.  (9/24/13 Tr. at 25-26.)

144.    Sabel testified that beginning in the 1970s and extending into the 1980s, there were very great changes in the financial system of the country.  He testified that effectively credit was being obtained by borrowers from parties other than broker-dealers and banks; the corporate bond market and commercial paper market became much more significant; and these and other developments in the area of futures and options and then later on derivatives made it questionable whether the margin regulations as then structured were really having the kind of effect that Congress believed they would have in the 1930s.  (9/24/13 Tr. at 25-27.)

145.    Sabel testified that in the age of financial products, including derivatives and examples of derivatives such as swaps, concerns about limiting credit on equities "seems almost quaint" to him.  Sabel testified that one of the reasons he says this is, to him, margin

31

requirements cannot effectively limit leverage with all the investment alternatives that are available in today's world. This was getting to be true in 1996. (9/24/13 Tr. at 122.)

146.    Sabel testified that the Federal Reserve Board issued a report in 1984 discussing the efficacy of the margin regulations. (9/24/13 Tr. at 27.) The report refers to a Board staff study of the Federal Margin Regulations. The summary at the beginning of the report reads:

> The Federal Reserve Board has submitted its Review and Evaluation of Federal Margin Regulations, a study by the Staff of the Board of Governors of the Federal Reserve System. The study indicates that high governmentally set margins are not needed to help achieve balance in the distribution of available credit. Further, the study's findings cast doubt on the need to retain high initial margins to reflect excessive fluctuations of stock prices. Further, doubt is raised as to the need for continuing federal regulation to foster the objectives originally sought by Congress in passing legislation assigning authority for setting margins.

(PX 799.)

147.    Sabel testified that a fair reading of the 1984 Federal Reserve Board report (and one that the Federal Reserve staff internally thought was the case) was that the Federal Reserve Board had decided that the margin regulations were not really serving the purpose that was intended. Sabel testified that he was told, as someone trying to implement and give guidance regarding the margin regulations, that the Board's approach was that Congress had not repealed the margin regulations, therefore it was the Federal Reserve Board's job to keep them in place and to enforce them, but not to make them too great an impediment to parties trying to structure transactions. Sabel testified that this effectively meant to err on the side of liberality rather than strictness with interpretive questions. (9/24/13 Tr. at 27-28.)

148.    Sabel testified that in his view the great weight of economic evidence and reports that he read indicate that there was a mistaken view of how credit and the economy worked when the law was passed. Sabel testified that effectively, the Federal Reserve was officially acknowledging that trend in the 1984 report and indicating its agreement "that there is doubt

32

about whether this all makes sense." (9/24/13 Tr. at 31.)

149.     Sabel testified that before 1974, the Federal Reserve changed the percentages for the amount of credit that could be extended under the margin regulations from time to time. The last time the percentage was changed was when the Board changed it to 50 percent in 1974. The percentage has not changed since. (9/24/13 Tr. at 32, 104-105.)

150.     Sabel testified that purpose credit under Regulation U, and under Regulation G when it existed, is credit extended for the purpose of holding or maintaining margin stock. Sabel testified that the 50 percent limitation on the amount of purchase credit a lender can extend if the credit is secured directly or indirectly by margin stock applies to both bank lenders and non-bank lenders. (9/24/13 Tr. at 103-105.)

151.     Sabel testified that Regulation G covered extensions of credit by non-bank lenders. He testified that Comdisco's guarantee here would be an example of an extension of credit by a non-bank lender. (9/24/13 Tr. at 103-104.)

152.     Sabel testified that the concept of the company and the bank not being directly or indirectly secured by the stock was in both Regulations G and U prior to April 1, 1998 and continued in Regulation U after that date. (9/25/13 Tr. at 170.) Regulation G was merged into Regulation U effective April 1, 1998.

153.     Sabel testified that he considered Comdisco a lender because of the guaranty. Sabel testified that for margin purposes, it is very clear a guarantee is an extension of credit. (9/25/13 Tr. at 190.)

154.     Sabel testified that the lack of changes to the 50 percent rule since 1974 substantiates the view that the Federal Reserve Board did not believe that the margin regulations had any significant substantive effect on the economy, and there was no reason to adjust the

33

percentage based on economic developments. (9/24/13 Tr. at 31-32.)

155. Sabel testified that there were mechanisms put in place to permit the regional Federal Reserve banks to communicate with each other so they would act in a more or less uniform, or at least informed, manner. There was a Conference of Presidents, which met quarterly, consisting of the presidents of the regional banks. There was also a quarterly Conference of First Vice-Presidents and a semi-annual Conference of Counsel, which discussed an agenda of current topics. Sabel testified that the margin regulations received relatively little emphasis in comparison to other aspects of the banking regulations the Federal Reserve Board promulgated. Sabel testified that the margin regulations were not a topic that the reserve banks thought worthy of discussion at these meetings; there were always other topics of greater interest. (9/24/13 Tr. at 32-33.)

156. In stating that the margin regulations were not discussed, Sabel was not suggesting that the margin regulations are not important. Sabel testified that a purpose for the margin regulations has been stated to be the limitation of credit available for speculation in securities, and that it has been said that another stated purpose is protection of investors who might be induced into borrowing beyond their means in order to play the market. (9/24/13 Tr. at 114.)

157. Sabel testified that he stated in 1996 that the margin regulations almost seem quaint. He testified that it is true, in the age of financial products that include such things as derivatives and examples of derivatives like swaps, that concern about limiting credit on equities almost seems quaint in his mind. Sabel testified that in general, one of the reasons for saying this is that margin requirements in his mind cannot effectively limit leverage. (9/24/13 Tr. at 122-123.)

34

158.     Sabel stated in an article he wrote in 1996 about the proposed changes in the margin regulations that Congress could abolish the margin regulations if it saw fit.  Sabel agreed that the Federal Reserve Board could have abolished Regulation G or Regulation U at any time. (9/24/13 Tr. at 119-120.)

159.     Sabel testified that a reason that the Federal Reserve Board apparently decided not to repeal Regulation U is that Congress has not repealed the margin regulations.  (9/24/13 Tr. at 123.)

160.     Sabel testified that it is important to comply with the letter of the margin regulations, but he does not feel the same way about the "spirit" of the regulations.  Sabel testified that it is wrong to evade a regulation, but it is permissible to structure a transaction to avoid a problem under the regulation.  (9/24/13 Tr. at 123-124.)

161.     Sabel testified that to him, the margin regulations and interpretations of them are like rules of the road for driving. (9/24/13 Tr. at 123.)

## II.     THE BAXTER 1994 AND ALLEGIANCE SIPS (JUNE 1994 AND APRIL 1997)

162.     Prior to June 1997, the Bank was involved in a shared investment plan sponsored by Baxter International (in 1994) and in a shared investment plan sponsored by Allegiance Corporation (in 1997).  (Stmt. Uncontested Facts ¶ 2.)

163.     Hennelly testified that the Bank had worked closely with Baxter to establish the first ESP program and that he was involved with that program. (8/5/09 Hennelly Dep. at 91.)

164.     Baxter International Inc. implemented its shared investment plan (the "Baxter 1994 SIP") for certain eligible employees in or about June 1994.  PX 390 is entitled Baxter International Inc. Shared Investment Plan. Paragraph 15 states that the "Plan is governed by the provisions of the 1994 Program, except as otherwise expressly stated in the Plan." (PX 390.)

35

165.    Murray represented the Bank in connection with the Baxter 1994 SIP.  This was the first ESP program Murray handled. (10/9/13 Tr. at 833:18-21.)

166.    Murray testified that the structure for the Baxter 1994 SIP was developed by Baxter and its counsel, Skadden, Arps, Slate, Meagher & Flom ("Skadden"). (10/9/13 Tr. at 833-834.)

167.    Allegiance Corporation implemented its shared investment plan (the "Allegiance SIP") for certain eligible employees in or about April 1997.  PX 423 includes a document entitled Allegiance Corporation Shared Investment Plan.  (PX 423 at SIP00026205-208.) Paragraph 14 states that the Plan is governed by the provisions of the 1996 Program, except as otherwise expressly stated in the Plan.  Paragraph 1 states in part that to "the extent any of the terms and conditions of the Plan are inconsistent with the 1996 Program, the terms of the 1996 Program shall control."

168.    Murray testified that the Allegiance SIP was the second ESP transaction on which he worked, after the Baxter 1994 SIP.  (10/9/13 Tr. at 834.)

169.    Murray testified that the structure for the Allegiance SIP was "largely a replication" of the Baxter 1994 SIP and that "certain either executives or directors … who had been at Baxter had migrated to Allegiance … came to the Bank" desiring to implement a similar ESP program at Allegiance.  (10/9/13 Tr. at 834-835.)

170.    In both the Baxter 1994 SIP and the Allegiance SIP, the respective companies arranged full-recourse loans through First Chicago for 100 percent of the purchase price of the stock.  Both SIPs were identified as voluntary programs, which provided key employees an opportunity to purchase stock through a one day stock option.  (10/1/13 Tr. at 334-336; PX 242.)

171.    Both the Baxter and Allegiance SIPs were governed by the respective companies'

36

existing incentive compensation plans.  The Baxter 1994 SIP was adopted pursuant to a separate
1994 Incentive Compensation Program.  Likewise, the Allegiance SIP was adopted pursuant to
the Allegiance Corporation 1996 Incentive Compensation Program.  (PX 242 at SIP0040041; PX
390 at SIP-Group 1290; PX 423 at SIP0026205.)

172.    Both the Baxter 1994 and Allegiance SIPs provided that "[t]he Purchased Shares
will be registered in the name of the Participant and certificated.  Each certificate will bear a
legend referring to th[e] Plan and the agreements between the Participant and [the company]
relating to the Purchased Shares.  The certificates for the Purchased Shares will be held in [the
company's] Stockholder Services Department until all restrictions on the Purchased Shares have
lapsed."  (PX 390 § 5; PX 423 § 5.)

173.    Both the Baxter 1994 and Allegiance SIPs further provided that "[e]ach
Participant must deliver to the Stockholder Services Department a stock power endorsed in blank
with respect to the Purchased Shares."  (PX 390 § 5; PX 423 § 5.)

174.    With respect to sales of the purchased shares, both the Baxter 1994 and
Allegiance SIPs stated that "Each Participant is permitted to sell all or any portion of the
Purchased Shares" subject to certain listed restrictions.  The listed restrictions included in
Section 7 of both the Baxter 1994 and Allegiance SIPs included the following:  (i) "no
Participant may sell any portion of the Purchased Shares before the first anniversary of the
Exercise date" (except in the event of death, disability, termination due to a corporate
transaction, or a change in control); (ii) "no Participant may sell any portion of the Purchased
Shares unless all principal, interest and any prepayment fees due on the loan contemplated by
Section 4 of th[e] Plan have previously been paid or all proceeds of the sale are simultaneously
applied first to the payment of all such principal, interest and prepayment fees"; and (iii) the

[Compensation] Committee has the right to impose restrictions on the timing, amount and form of the sale of the Purchased Shares with respect to any Participant to the extent it determines that such restrictions are in the best interest of [the company]."  (PX 390 § 7; PX 423§ 7.)

175.    In addition, both the Baxter 1994 and Allegiance SIPs granted the companies a right of first refusal, providing that "[e]ach Participant must notify the Stockholder Services Department of his or her intention to sell the Purchased Shares before such a sale is implemented.  [The company] may elect to allow the Participant to sell the Purchased Shares in the open market, [the company] may repurchase the shares, or [the company] may take other actions as it deems appropriate."  (PX 390 § 7; PX 423§ 7.)

176.    The Baxter 1994 and Allegiance SIPs both provided that if a participant sells SIP shares before the third anniversary of the exercise of the option, the participant retained 50 percent of the gain realized on the sale.  Under the Baxter 1994 SIP, participants were only responsible for 50 percent of any losses on sales after the third anniversary.  (PX 390 § 8; PX 423 § 8.)

177.    Both the Baxter 1994 and Allegiance SIPs required the stock to appreciate in value in order to break even.  The Baxter 1994 stock had to increase by $8.25 or 36% and the Allegiance stock had to increase by $5.34 or 21%, respectively, to break even.  (PX 290 at SIP-Group 982.)

178.    PX 290 states that the Baxter 1994 and Allegiance SIPs had interest rates of 7.80% and 7.75%, respectively.  (PX 290 at SIP-Group 982.)

179.    Murray testified that the Facility Agreement and Note for the Baxter 1994 SIP were prepared by Winston and negotiated with the companies' counsel, Skadden.  (10/9/13 Tr. at 834.)

38

180.     Murray testified that the document he was involved in with the Baxter 1994 SIP was the Facility & Guaranty Agreement, which he described as an "agreement, whereby the bank said, subject to these conditions and your following these covenants and making these representations, I, the bank, will lend money to your employees." (10/9/13 Tr. at 834.)

181.     Murray testified that in connection with Baxter 1994 SIP, Winston primarily prepared the notes evidencing the relationship between the bank and the employees.  He testified that the notes were negotiated with Skadden Arps—it was kind of a joint venture.  (10/9/13 Tr. at 834.)

182.     In connection with the Baxter 1994 and Allegiance SIPs, Baxter and Allegiance each entered into a Facility and Guaranty Agreement with the Bank and other lenders.  Both Facility Agreements included representations and warranties by the companies that:

> (c)  The execution and delivery of, and performance by the Company of its obligations under each Loan Document to which it is a party will not result in a breach or violation of, conflict with, or constitute a default under the certificate of incorporation or by-laws of the Company or any law, regulation, order, judgment or agreement to which the Company is a party or by which the Company or any of its property is bound.
>
> ***
>
> (h)  No part of the proceeds of any Loan will be used in a manner which would violate, or result in a violation of, Regulation G, Regulation T, Regulation U or Regulation X. Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate or be inconsistent with the provisions of Regulation G, Regulation T, Regulation U or Regulation X.
>
> ***
>
> (k)  The Company Incentive Compensation Program has been duly adopted and approved by all requisite corporate action (including stockholder approval) on behalf of the Company, and the Restricted Stock, when issued on the Closing Date, shall have been duly issued, in compliance with all applicable laws.

(PX 422 § 4.01; PX 431 § 4.01.)

39

183.     In addition, both the Baxter and Allegiance Facility Agreements provided that the obligations of the lenders to make loans were expressly subject to conditions precedent, including receipt of a "written opinion of Skadden, Arps, Slate, Meagher & Flom (Illinois), counsel to the Company, … in form and substance satisfactory to the [Bank]." (PX 422; PX 431.)

184.     On June 22, 1994, Skadden issued an opinion letter in connection with the Baxter 1994 SIP. (PX 396.)

185.     On May 9, 1997, Skadden issued an opinion letter in connection with the Allegiance SIP. (PX 420.)

186.     Murray testified that the opinion letters that Skadden issued in connection with the Baxter 1994 and Allegiance SIPs were "clean opinions," as he understood the term, with respect to Regulations G, T, U and X compliance. (10/9/13 Tr. at 840.)

187.     Murray testified as follows regarding a "clean opinion letter:"

Q.  What do you understand a clean opinion letter to be?

A.  Well, there is a distinction between a clean and a reasoned opinion. A clean opinion say [sic]: Based on these assumptions, these facts are true – or excuse me – these legal conclusions are what we believe to be the case subject to, you know, eight pages of exceptions. But by and large they're not explanatory in any sense. They don't take – they don't make a lot of explanations.  So they're called "clean" because they say flat out, you know, this is true. The company is not a holding company. They limit it to that.

Q.  And by contrast, what would a reasoned opinion be?

A.  Reasoned opinions are given where the lawyers, party to the deal, do not feel comfortable giving a so-called clean opinion.  They feel that there may be uncertainty or nuances or risks associated with it. And they feel bound ethically or otherwise to alert the parties to it. So they will say: This is the case. We note that there could be some, you know, contrary view, and courts sometimes consider these factors, and depending on how court rules on these factors, then the legal proposition will will [sic] not be upheld. They tend to be longer and more detailed opinions.

40

(10/9/13 Tr. at 839-840.)

188.     Skadden opined in connection with both the Baxter 1994 and Allegiance SIP

programs that:

> Neither the execution, delivery or performance by the Company of the
> Documents to which it is a party nor the compliance by the Company
> with the terms and provisions thereof nor, in the case of Regulations G,
> U, X and Z of the Board of Governors of the Federal Reserve System,
> the consummation of the Loans as contemplated by the Documents and
> the Plans will contravene any provision of any Applicable Law (as
> hereinafter defined). "Applicable Laws" shall mean those laws, rules
> and regulations of the State of Illinois and of the United States of
> America (including, without limitation, Regulations G, U, X and Z of the
> Board of Governors of the Federal Reserve System) which, in our
> experience, are normally applicable to transactions of the type
> contemplated by the Facility Agreement and are not the subject of a
> specific opinion herein referring expressly to a particular law or laws.

(PX 396 at 4; PX 420 at 4.)

## III.     DEVELOPMENT OF COMDISCO SIP TRANSACTION IN 1997 (MAY – JULY 1997)

### A.     Initiation of the SIP Transaction (May 1997)

189.     On or about May 27, 1997, Scott Harvey, Comdisco's in-house counsel, drafted

and sent a memorandum to Nick Pontikes, Comdisco's Chief Operating Officer, containing a

"Shared Investment Plan ("SIP") Summary." The memorandum stated that Harvey had been

"asked to review and summarize key provisions of the SIP's offered by Allegiance Corporation

and Baxter Healthcare Corporation." (PX 242.)

190.     The memorandum further noted that in the Baxter 1994 and Allegiance SIPs:

> Participants may sell shares under the plans at any time after the first
> anniversary of the stock purchase provided the proceeds must first be
> used to repay the entire loan plus any early payment fees owed the bank.
> Although stock sale decisions are personal in nature the plans are
> structured to incent participants to hold shares for a minimum of three
> years from the purchase date. This is accomplished by requiring a
> participant who sells prior to the third anniversary to forfeit 50% of any
> gain from the sale of such shares to the company. In addition, at the time
> of sale the Companies reserve the right to acquire all shares from selling
> participants or permit the shares to be sold in the public marketplace.

41

(PX 242.)

191.     On May 30, 1997, Scott Harvey faxed the May 27, 1997 memorandum to Hale.

(PX 207.)

192.     McBride's May 1997 time records included the following time entries:

| | | | |
|---|---|---|---|
| 5/30/97 | LMH | .40 | CALL FROM HEWES AND HARVEY. |
| 5/30/97 | TJK | .50 | REVIEW OF STOCK INVESTMENT PROGRAM. |
| 5/31/97 | LMH | 5.00 | REVIEW ALLEGIANCE MATERIALS AND PREPAE [*sic*] CHECKLIST. |

(PX 240.)

### B.     Purposes of the SIP Transaction

193.     Harvey reported to Pontikes in his May 27, 1997 memorandum that "[t]he purpose of a SIP is to achieve the following: 1) more closely align key employees' financial rewards with the financial rewards realized by all other Shareholders; 2) increase key employees' motivation to manage the company as owners; and 3) increase the ownership of stock among key employees."  (PX 242.)

194.     Harvey testified that he understood that Comdisco would use at least some of the proceeds from the sale of the SIP stock to purchase Comdisco shares in the market.  He testified that Pontikes said that the SIP (i) gave the company free money; (ii) permitted the company to announce that X number of senior managers were buying Y number of shares, which would push the share price up; and (iii) provided money that allowed the company to re-buy shares, pushing the share price up further.  (10/1/13 Tr. at 448.)

195.     Harvey testified at his deposition that he understood the purpose of the SIP "was to promote ownership by the employees so that they would have skin in the game, the ability to participate in the profitability of the firm.  Also, it would be a way of retaining certain key

42

employees by giving them the opportunity to own more shares." He further testified that these continued to be the purposes that people talked about for the SIP program during his work on the Bulldog team leading up to the final adoption of the program. (10/2/13 Tr. at 507-508.)

196.    Harvey was asked at his deposition: "In terms of purposes, there was never a discussion in which a purpose of the SIP program was laid out to be as a mechanism for financing versus the other things you've told us?" Harvey answered: "That was never promoted to people as being a purpose. It was ancillary in discussions. And the company with Ed Pacewicz and John Vosicky and Nick and everybody else that, well, of course, this is successful, this company is going to raise a fair amount of capital." Harvey testified at trial: "if that's the context you're asking, then the raising of capital was ancillary as part of the purpose of the SIP. (10/2/13 Tr. at 509.)

197.    Harvey testified that another purpose of the SIP that was not included in his memoranda was to increase shareholder value by causing the price of the stock to increase upon public announcement of the SIP. (10/1/13 Tr. at 447.)

198.    Harvey testified he understood there was another purpose underlying the SIP transaction as well. When the Baxter and Allegiance programs were announced, there was a significant increase in the price of the company's stock. Harvey testified that certainly the Comdisco executives were aware of that as well. Nick Pontikes was particularly aware of it. Harvey testified that "although not stated upfront, Lola Hale would not permit that, it was certainly one of the other purposes behind there was to push the stock, which is absolutely fine." Harvey testified that Hale "specifically instructed Nick not to get into the discussion about the stock and its value." Harvey testified that he thought "if you go back and review the transcripts from the meeting [of the SIP presentation] that was had introducing the program to everyone,

43

you would see Nick [Pontikes] started to go there, and Jack [Slevin] quickly put him off."
(10/1/2013 Tr. at 329-330.)

199.     Harvey testified that there were discussions ancillary to the discussions of what the purpose of the SIP was that acknowledged that funds would be coming in to the company by virtue of the SIP but that was never promoted to people as being a purpose of the SIP. (10/1/2013 Tr. at 333.)

200.     Pacewicz testified that he viewed the SIP transaction as an off-balance sheet loan to Comdisco by the Bank.  Pacewicz testified that he was not aware of the SIP transaction ever being described as an off-balance sheet loan in any of Comdisco's public filings, and that the SIP transaction was not characterized to potential syndication participants as an off-balance sheet loan to Comdisco. (10/2/13 Tr. at 541, 591.)

201.     Pacewicz testified that he viewed the SIP transaction as a loan to Comdisco by the bank.  It was a footnote.  It was not reported on Comdisco's balance sheets.  Pacewicz further testified "So it was an off-balance-sheet loan." (10/2/2013 Tr. at 541.)

202.     Pacewicz testified that he viewed the purpose of the SIP as to raise money for Comdisco.  Pacewicz testified that no one in management ever said the words "We're doing this to raise money", but they were raising $109 million for the company.  Pacewicz further testified that he did not recall raising any objection to the language in the Facility Agreement stating "[t]he company believes that the ownership of restricted stock by the eligible employees which will be facilitated by the loans will provide incentive to the eligible employees in performing their jobs so as to more closely align the interests of the eligible employees with those of the stockholders of the company."  (10/2/13 Tr. at 575-576; JX 8.)

203.     Poisella testified that he was told that a purpose of the SIP program was to raise

44

capital for Comdisco, that was the corporate purpose that was labeled as the reason. Poisella further testified that what was not disclosed, looking back at it now, and what apparently drove the company to bankruptcy was Nick Pontikes' love affair with Prism and the ventures business, to which he ran up a billion dollar debt. (10/8/13 Tr. at 771.)[2]

204.    Clarke testified that his understanding was that the idea behind Executive Stock Programs, such as the Comdisco SIP, was to better align the interests of executives or senior management of a company with those of its larger shareholders. (9/25/13 Tr. at 211.)

205.    Murray testified that, in his understanding, an ESP is a program "which is intended to facilitate stock ownership where a company will help the employees by in effect arranging financing, which will be provided by a third-party lender so that the company will sell the stock.  The executives will get the stock.  If they need money, so they borrow the money from the bank, the bank will lend the money, but it wants to have a relationship with not just the executives, the company, so it will get a guarantee from the employer." (10/9/13 Tr. at 832.)

## C.    Development of the SIP Transaction (June 1997)

### Fact Testimony and Related Record Materials

206.    In and around June and July 1997, the Bank worked with Comdisco in connection with the potential SIP for certain employees of Comdisco or its subsidiaries.  (Stmt. Uncontested Facts ¶ 1.)

207.    In connection with considering the potential for developing its own SIP, Comdisco approached the Bank and ultimately chose to have the Bank become involved in the SIP because of the Bank's experience with shared investment plans for other companies.  (Stmt. Uncontested Facts ¶ 2.)

---

[2] The Trustee objected to the relevance of this entire line of questioning, and these relevance objections were sustained by the Court, though the Defendants were permitted to make a record on the issue.

208.    McBride's June 1997 invoices include (among others) a number of time entries related to Regulation U, indirect security, and other securities issues in association with the SIP transaction. (PX 240.)  A copy of McBride's June 1997 invoice is attached as Tab A in Volume 1 of the Appendix.

209.    At his deposition, Harvey was asked:  "Were you ever involved in conference calls or meeting[s] with personnel from the bank or from the bank's outside counsel?"  Harvey responded:

> Answer:  I attended a presentation that was given to us in the early stage when they first came out and presented the transaction.  There were, I believe, two individuals from the bank that were discussing this.  They were answering questions and laying out the basics of how the transaction would work, comparing how the transaction would be similar, if not identical to the other transactions they had done, explaining why they felt they were in the position to offer the best service to be able to go forward with a transaction of this type.
>
> The only other time I recall being specific on the phone on negotiations would have been with Lola talking about, we were giving comments, she was giving comments to the bank's attorney from Winston & Strawn.

Harvey believes the date of the meeting he referred to was June 5, 1997, a time when he believes the decision had not yet been made to use First Chicago or Citicorp.  The two people who attended from the Bank were not lawyers, to Harvey's knowledge, but relationship people from the Bank who were trying to convince Comdisco to use First Chicago. (10/2/13 Tr. at 511-513.)

210.    On June 6, 1997, Harvey sent a memorandum to Nick Pontikes requesting time to meet to discuss elements of a SIP program. (PX 250.)

211.    On June 10, 1997, Harvey sent Hale a diskette containing documents which he had obtained relating to the Allegiance program. (PX 208.)

212.    On June 11, 1997, Harvey's assistant, Liz Bewley, sent Hale a diskette by messenger that included Word documents regarding the Comdisco SIP including "Talking points

46

for Employee Leaders," "Notification Of Section 83(b) Tax Election," "SIP Option Exercise Form," "Initial Interoffice Memo to Managers," and "Information Initially Distributed to Potential Participants."  (PX 234.)

213.    On June 12, 1997, Hale sent Hewes her initial draft of the new Option Plan, S-8, and SIP Plan, with some open questions.  Hale's draft of the Option Plan was modeled after the Allegiance Incentive Plan, but was a pure stock option plan. (PX 209, 226.)

214.    Comdisco considered using Citibank as the agent for the lenders in connection with the SIP loans.  As of June 10, 1997, Comdisco was still in discussions with both Citibank and the Bank.  On June 13, the Bank's underwriting committee had a meeting regarding the proposed Comdisco SIP.  (10/1/13 Tr. at 356, 362; PX 368.)

215.    According to a Comdisco Shared Investment Plan Timeline, Hewes was responsible for determining if shareholder approval was required for the program.  This timeline indicates that no approval was required and the action was completed on June 12. (PX 275 at SIP 0049838.)

216.    Hewes testified that he only had a vague recollection discussing Regulation G and U in the 1997 – 1998 time frame.  (1/10/13 Hewes Dep. at 33-34.)

217.    Hewes testified that he did not have any recollection of discussing with Lola Hale the compliance of the SIP transaction with Regulations G and U.  (1/10/13 Hewes Dep. at 41.)

218.    Hewes testified that he was not aware of any communications with the Federal Reserve Bank of Chicago.  (1/10/13 Hewes Dep. at 54-55.)

219.    Clarke testified that at a certain point he considered working on an ESP for Comdisco and that the idea came about at a bank meeting, where the senior management of the company was providing a performance update to bank finance sources.  Clarke testified that

47

Vosicky, Comdisco's CFO, approached Clarke about whether the Bank knew about ESP's and that Comdisco would like to talk with the Bank if it did. (9/25/13 Tr. at 211.)

220.    Clarke testified that "Bulldog" was the project name for the Comdisco SIP and that the reason for having the name "Bulldog" was to try to minimize disclosure of the company involved and to keep the transaction confidential because public shares were involved. (9/25/13 Tr. at 249-250.)

221.    As of June 25, 1997, the Bulldog distribution list included Gregory Murray and Brian Hart from Winston & Strawn, and Lola Hale, Thomas Kinasz and Corlene Cathcart from McBride, Baker & Coles. (PX 249.) Patsy Habicht, listed on transaction directory as FNBC-Legal, subsequently was identified as one of the Bank's representatives on the Bulldog deal team. (JX 18.)

222.    On June 19, 1997, Clarke faxed a fully executed version of a Commitment Letter and Term Sheet to Pacewicz. The Commitment Letter contemplated a credit facility in the aggregate principal amount of up to $75,000,000. (PX 251 at SIP 0039724.)

223.    On June 20, 1997, Cathcart sent a memorandum to Hale regarding the Comdisco, Inc. 1997 Incentive Stock Option Program – Regulation U. A copy of Cathcart's Regulation U Memorandum is attached as Tab B in Volume 1 of the Appendix. This memorandum stated in part:

> I have reviewed the provisions of Regulation U of the Securities Exchange Act of 1934, as amended ("Regulation U"), to determine if a loan from a bank to purchase stock in a Company that is guaranteed by such Company is subject to the restrictions of Regulation U.
>
> Regulation U does not permit banks to extend credit, secured directly or indirectly by margin stock, in an amount that exceeds fifty percent of the current market value of the stock. Since the amount of the loan the individuals will be getting pursuant to the Shared Investment Plan will be 100% of the current market value of the stock, the loan will fall under Regulation U unless the loan is not indirectly secured by the stock.

48

> \*\*\*
>
> In determining whether a loan is indirectly secured by margin stock, the focus has centered on whether there is an agreement between the bank and the individual that gives the bank some form of a security interest in the stock. As long as the loan is a simple loan between the bank and the individual which does not contain any restrictions on the individual's rights in the stock, the loan does not create a security interest in the stock. Accordingly, the loan is not indirectly secured by the stock.
>
> Brent McCully [*sic*] at the Federal Reserve Bank in Chicago agreed with the analysis that as long as the agreement between the bank and the shareholder is a straight loan that is merely guaranteed by the Company, the loan is not indirectly secured by the stock, and therefore does not fall within the parameters of Regulation U.
>
> The restrictions relating to the shares to be purchased under the Shared Investment Plan are all contained in the agreement between the individual and the Company. The loan documentation between the individual and the bank does not contain restrictions on the individual's rights to the stock and does not restrict the individual's ability to sell the stock. Accordingly, the loan does not give the bank any security interest in the stock. The loan is not indirectly secured by the stock and, therefore, is not a transaction subject to Regulation U.

(PX 221.)

224. Cathcart testified that she has no independent recollection of preparing the memo dated June 20, 1997. (5/7/13 Cathcart Dep. at 74-75.)

225. On June 20, 1997, Cathcart also sent Hale a memorandum regarding Comdisco, Inc. 1997 Incentive Stock Option Program – Listing Requirements. A copy of Cathcart's Listing Requirements Memorandum is attached as Tab C in Volume 1 of the Appendix. This memorandum stated in part:

> I have reviewed the New York Stock Exchange Listed Company Manual (the "Manual") to determine if shareholder approval is a prerequisite to listing the shares that will be registered under the Comdisco, Inc., 1997 Incentive Stock Option Program (the "1997 Program") on the New York Stock Exchange.
>
> \*\*\*
>
> All officers and other full time employees of the Company are eligible to receive stock options under the 1997 Program. The Compensation

49

> Committee of the Company's Board of Directors will designate from time to time the employees of the company (including employees who are directors) who will receive incentives under the Plan.
>
> Since the 1997 Program is available to all officers and other full time employees, it falls within the exception for broadly-based plans described above. The 1997 Program does not require shareholder approval prior to listing the shares of [*sic*] the New York Stock Exchange.

(PX 225.)

226.    On June 20, 1997, Hale sent drafts of the following documents to Hewes and Harvey: interoffice memo to managers and feedback form; information initially distributed to potential participants (including a summary of the SIP, Q & A, participant checklist, SIP option exercise form, letter of direction, 1997 stock option plan, and the SIP); S-8 checklist; and miscellaneous legal memos. (PX 235.)

227.    In her letter of June 20, 1997, Hale also enclosed a copy of a checklist that she said she had faxed to Scott Harvey on Friday. She stated that the checklist highlights some of the open issues that you may want to discuss at the meeting of the Office of the President. (PX 235.)

228.    DX 11 is entitled "Confidential and Privileged Checklist." DX 11 does not identify the author of the document or whether it was ever faxed. The following question appears on page 5: "Are restrictions on stock sale reflected in valuation of stock for purposes of determining exercise price?" At page 7, the phrase "Choose Lenders" appears followed by "Allegiance and Baxter Lenders?" At page 8, the caption "Federal Reserve Board Margin Regs. G, T, U or X" appears followed by: "Verify no violation of Federal Loan not secured by stock but Company holds stock/proceeds can be used to pay loan—verify that sufficiently avoids margin limits of Margin Regulations." (DX 11 at SIP Group 5507, 5511, 5513 and 5514.)

229.    On June 20, 1997, Harvey sent a confidential and privileged memorandum to Jack Slevin, Hewes, Pacewicz, Pontikes, and Vosicky regarding the Comdisco Proposed Shared

50

Investment Plan.  The memorandum stated:

> A) Program Summary: The purpose of a Comdisco SIP Program would
> be to achieve the following: 1) more closely align key employees'
> financial rewards with the financial rewards realized by all other
> Shareholders; 2) increase key employees' motivation to manage the
> company as owners; and 3) increase the ownership of stock among key
> employees.

> The Plan would be a voluntary program which provides key employees
> an opportunity to purchase stock through a one-day stock option.  If an
> employee decides to participate, shares will be acquired with the
> proceeds of a loan granted by the First National Bank of Chicago.  To
> facilitate completion of the stock purchase, Comdisco would arrange full
> recourse loans through The First National Bank of Chicago.  The interest
> rate is fixed for the term of the loan.  However, the rate at which a
> participant is obligated to pay interest would be set below market until
> the final quarter of the loan.  All dividends eared would be paid directly
> to the bank to repay the interest on the loan.

> The loan requires payment of the entire principal and balloon interest
> payment when the loan matures, five years after the stock purchase date.
> It is anticipated that participants would likely sell shares of stock at the
> end of five years sufficient to fully repay the loan.  Comdisco would
> guarantee repayment of the loans to The First National Bank of Chicago
> in the event of default, but participants remain personally liable for the
> loan balance.

> Participants may sell shares under the plan at any time after the first
> anniversary of the stock purchase (the Program requires a one year hold
> period) provided the proceeds must first be used to repay the entire loan
> plus any early payment fees owed the bank.  Although stock sale
> decisions are personal, the plan is structured to incent participants to hold
> shares for a minimum of three years from the purchase date.  This is
> accomplished by requiring a participant who sells prior to the third
> anniversary to forfeit 50% of any gain from the sale of such shares to the
> company.  In addition, at the time of sale, Comdisco would reserve the
> right to acquire all shares from selling participants or permit the shares to
> be sold in the public marketplace.

> Since the stock was purchased for fair market value on the date of the
> grant, the amount to be included as taxable income to a participant is
> zero.  Provided a participant holds the stock for a minimum of one year,
> capital gains tax treatment will apply following the sale of the shares.

(PX 232.)

230.    In his memo, Harvey listed July 9, 1997 for the kickoff and July 11, 1997 for the

option grant and exercise. (PX 232.)

51

231.    On June 23, 1997, Harvey circulated a nearly identical version of this memorandum to a larger group which included: Jack Slevin, Alan Andreini, Bob Bardagy, Keith Hartley, Hewes, Rick Kash, Harry Kraemer, Carolyn Murphy, Tom Patrick, Bill Pontikes, Nick Pontikes, and John Vosicky. (PX 247.)

232.    On June 24, 1997, Harvey circulated a draft of the proposed 1997 Incentive Stock Option Program to be reviewed and approved at the Special Telephonic Board of Directors Meeting.  (PX 248.)

233.    At the Special Telephonic Board meeting on June 27, 1997, the Board reviewed the proposed SIP program and had a substantial discussion about the proposed program and agreed to further review the matter at a Board meeting on July 22, 1997.  (PX 254.)

234.    The SIP and the accompanying proposed stock option plan were presented to the Comdisco Board of Directors during a telephonic meeting on Friday, June 27, 1997.  Pontikes stated that the purpose of the program was to increase employees' motivation to manage Comdisco as owners; to align employee financial rewards with investors; and to increase employee stock ownership as a vehicle to continue to increase shareholder value.  The Board had a substantial discussion of the program and agreed to consider the program further on July 22, 1997.  (10/1/13 Tr. at 366-367; PX 254.)

235.    On June 27, 1997, Brian Hart of Winston, sent a draft of the Facility and Guaranty Agreement, including exhibits and schedules thereto, as well as drafts of a Form of Comdisco Acknowledgement, Form of Legal Opinion of McBride, Baker & Coles, and the closing memorandum to Pacewicz, Hewes, Harvey, Madonna Houser, Hale, Clarke, Bill Artz, Peter Bartol, and Pat Hennelly. (PX 255.)

236.    Hart copied Karl Ahlm and Jeff Peterson on his transmittal.  (PX 255.)

<u>Testimony by Expert Witness</u>

237.     Sabel testified that Cathcart's June 20 memo only addressed Regulation U and that Regulation G still existed at the time.  Sabel testified that Cathcart cited *Cooper v. Union Bank* on page 2 of her memorandum.  When Sabel looked at that opinion, he discovered that the decision had been reversed on appeal. (9/24/13 Tr. at 131.)

238.     Sabel testified he understood that Hale told Cathcart to perform research on the margin issue as well as some other Federal Reserve regulations that she apparently thought were relevant to the transaction.  (9/24/13 Tr. at 63, 97.)

239.     When asked whether more senior lawyers looked at the issues after Cathcart was done, Sabel testified that there was a reference to Holisky's review and work, and otherwise it appeared to be primarily Hale.  (9/24/13 Tr. at 63-64.)

240.     Sabel suggested in testimony that Holisky was not involved in research relating to any of the margin regulations.  Sabel testified that the only thing he saw evidence of Holisky having done was work on the draft of the opinion letter in the summer of 1997.  (9/24/13 Tr. at 127.)

241.     Sabel testified that he understood Holisky was also a junior lawyer "who worked on the transaction, on the preparation of the final opinion." (9/24/13 Tr. at 97.)

**D.     Development of the SIP Transaction (July 1997)**

242.     McBride's July 1997 invoices include  a number of time entries related to the SIP transaction, Regulations D, G, T, U, X, and Z, and preparation of a revised draft of a legal opinion in association with the SIP transaction. (PX 240.)  A copy of McBride's July 1997 invoice is attached as Tab D in Volume 1 of the Appendix.

53

### 1.      McBride's Research and Diligence on Margin Regulations

<u>Fact Testimony and Related Record Materials</u>

243.     On July 3, 1997, Cathcart sent another memorandum to Hale regarding

Regulations D, G, T, U, X, and Z.  A copy of Cathcart's Regulations D, G, T, U, X and Z

Memorandum is attached as Tab E in Volume 1 of the Appendix. This memorandum stated in

part:

> You asked me to review Regulations D, G, T, U, X and Z (the "Regulations") adopted by the Federal Reserve Board (the "Board") that impose restrictions on lending and borrowing, to determine whether actions taken by Comdisco, Inc. (the "Company") or the Borrowers pursuant to the transactions contemplated by the Facility and Guaranty Agreement between the Company and the First National Bank of Chicago (the "Facility Agreement") and the related loan documents violate or would violate any of the Regulations.
>
> \*\*\*
>
> The Company and the Borrowers do not in the ordinary course of business extend or maintain credit secured directly or indirectly by margin stock subject to Regulation G. . . . The Borrowers are obtaining credit within the United States and therefore are exempt from Regulation X.  The Company and Borrowers are not extending consumer credit subject to Regulation Z.  **The only Regulation that applies to the Company, the Borrowers and the Loan is Regulation U.**
>
> \*\*\*
>
> As the definition and interpretive releases indicate, the determination of whether a loan is indirectly secured by stock is fact based.  In reviewing the lending arrangements, the Board traditionally has focused on the relationship between the bank and the borrower and the existence of any agreement that gives the bank some form of a security interest in the stock.  As long as the loan is a simple loan between the bank and the borrower which cannot be interpreted as restricting the individual's rights in the stock, the loan does not create a security interest in the stock.  Even though a loan is guaranteed by a third party, the guaranty does not give the bank a security interest in the stock.
>
> Brent McCully at the Federal Reserve Bank in Chicago confirmed that as long as the agreement between First Chicago and each Borrower is a straight loan that is merely guaranteed by the Company, the Loan is not indirectly secured by the stock, and therefore does not fall within the scope of Regulation U.

54

> The restrictions relating to the shares to be purchased under the Company's Shared Investment Plan are all contained in the documentation between the Borrowers and the Company. The Master Promissory Note and the Facility Agreement do not contain restrictions on the Borrowers' rights to the stock and do not restrict the Borrowers' ability to sell the stock. Furthermore, the fact that First Chicago is requesting financial statements from each Borrower and has not placed any restrictions or demands on when the stock is to be sold indicates that First Chicago is relying on the financial strength of the Borrowers in granting the Loans and not on the stock. Accordingly, the Loans can not be construed as giving First Chicago a security interest in the stock. The Loan is not indirectly secured by the stock and, therefore, is not a transaction subject to Regulation U.

(PX 222.)

244.    Cathcart testified that she has no independent recollection of preparing the memo dated July 3, 1997, but that from the style and format, it was consistent with something that she would have prepared. (5/7/13 Cathcart Dep. at 74-75.)

245.    Cathcart testified that PX 222 was a memorandum she prepared in June or July of 1997 regarding Regulations D, G, T, U, X, and Z and that she would have read those regulations in preparing the memorandum. She did not have any recollection of doing the work on the memorandum, how she reached the conclusions in the memorandum, or what additional research or investigation Hale may have done in connection with the issues in the memorandum. (5/17/13 Cathcart Dep. at 41-43.)

246.    Cathcart testified that until she reviewed documents related to this case she had forgotten about her work on the Comdisco SIP program and had forgotten about Comdisco, but that the documents refreshed her recollection that Comdisco was a client. Cathcart testified that she did not remember anything else related to the matter except what she read in the documents. (5/7/13 Cathcart Dep. at 10-11.)

247.    Cathcart testified that she was required to record the time she spent on various projects at McBride. She made an effort to make her time entries as accurate as possible and to

record the description of her activities as accurately as she could. (5/7/13 Cathcart Dep. at 11-13.)

248. Cathcart testified that she did not feel comfortable asking Hale questions. Cathcart testified that Hale would mark up her written work product and would have her do further work based on the mark up. Cathcart testified that Hale was kind of a perfectionist and had a reputation for being tough on associates. Cathcart testified that Hale was concerned that Cathcart do her best work and provide correct answers. (5/7/13 Cathcart Dep. at 29-32.)

249. Cathcart testified that she had a poor working relationship with Lola Hale and that Hale was difficult to work with. Cathcart testified that she did not feel like she could ask Hale questions and that Hale did not welcome questions. Cathcart testified that Hale's instruction was very limited in scope. Cathcart testified that she could not get much insight into what she was doing. As an example, Cathcart testified that Hale wanted her to look at the regulations, but Cathcart did not feel like she really understood what she was doing. (5/7/13 Cathcart Dep. at 29-31, 59, 63, 69, 75.)

250. Cathcart testified that Hale had yelled at her and that Cathcart wanted to leave and extricate herself from the whole thing. Cathcart testified that she felt scared when she entered Hale's office and was reluctant to go to her office even to seek guidance. Cathcart testified that she referred to Hale as a bitch based on her feelings from working with Hale and how she treated her. Cathcart testified that Hale is the primary reason why she did not particularly enjoy working at McBride. Cathcart testified that she left McBride in February 1998 after her request for time off for her wedding and honeymoon was denied. (5/7/13 Cathcart Dep. at 7, 60-63.)

251. Cathcart testified that she did not consider her working relationship with Hale to be normal. Cathcart testified that the relationship was strained and that she could not produce

56

her best work product. (5/7/13 Cathcart Dep. at 71-72.)

252. Cathcart testified that she thought her work product in general would have been better if Hale gave her more guidance and if she had more experience with the regulations she was asked about. (5/7/13 Cathcart Dep. at 64-65.)

253. Cathcart did not recall doing any work on the definition of indirectly secured. She also did not recall any phone conversation or contact with anyone at the FRBC, though she believed she had the conversation and would not have written it in a letter if she had not. (5/17/13 Cathcart Dep. at 20-22.)

254. Cathcart testified that she does not recall what Regulation U is or what indirectly secured pertains to. She testified has no recollection of doing any sort of research or work regarding Regulation U or the definition of indirectly secured. Cathcart further testified that she had no reason to doubt her time entry indicating time for review SEC Rules and Regulations regarding Registration Form S-8 and Regulation U in connection with proposed 1997 Incentive Stock Option Program was reasonably accurate. (5/7/13 Cathcart Dep. at 18-20.)

255. Cathcart testified that she had no reason to doubt that she spent 37 hours, roughly, on the Comdisco SIP matter in July of 1997 and 16.9 hours in January of 1998. (5/17/13 Cathcart Dep. at 24-25.)

256. Cathcart testified that prior to working on the Comdisco SIP program she had no experience with the margin regulations, including Regulations G or U. Cathcart did not know one way or the other whether Hale had such experience. (5/17/13 Cathcart Dep. at 37.)

257. Cathcart testified that she considered herself to be a novice with respect to Regulations G and U. (5/7/13 Cathcart Dep. at 65.)

258. Cathcart testified that she believed Hale should have done her own review of

57

regulations and research based on what Cathcart gave her. (5/7/13 Cathcart Dep. at 68, 72, 76-77.)

259.     Cathcart testified that she did research for Hale with the understanding that Hale would take the research and apply her own knowledge to it.  Cathcart testified that she did not attempt to obtain guidance from Hale because she did not feel like she could. (5/17/13 Cathcart Dep. at 68-69.)

260.     Cathcart testified that she would be surprised if Hale violated Regulations because she viewed Hale as an honest person who would make sure that the transaction complied with the regulations.  (5/17/13 Cathcart Dep. at 66, 78.)

<div align="center">Testimony by Expert Witness</div>

261.     Sabel testified that he does not agree with Cathcart's statement in her July 3, 1997 memorandum that "[t]he only Regulation that applies to the Company, the Borrowers and the Loan is Regulation U."  (9/24/13 Tr. at 133.)

262.     Sabel did not review Cathcart's May 7, 2013 deposition transcript or Holisky's January 29, 2013 deposition transcript until the last couple of days before his trial testimony. (9/24/13 Tr. at 97.)

**2.     McBride's Contacts with the FRBC**

263.     By letter dated July 7, 1997, Cathcart corresponded with Brent McCauley at the FRBC. This letter stated:

> As we discussed, we would like a written determination regarding whether the following fact pattern will make the company subject to Regulation G or the bank subject to Regulation U.
>
> A company has arranged with a bank to provide employees of the company full-recourse loans to exercise options to purchase stock in the company.  The loans have a five year maturity.  The interest rate on the loans will be at a market rate.  Although the loans will bear a market interest rate, the interest payable in the first 4.75 years of the loans

<div align="center">58</div>

(except for the amount of dividends, if any, paid on the stock) will be deferred until the fifth year.

In the event of the death or disability of a participant, the loan accelerates. In such event, the company will bear 100% of any loss on the sale of the shares. In the event of a sale of the shares within three years after the purchase or if the employee voluntarily terminates his or her employment with the company 50% of any gain on sale will be allocated to the company. In all other instances, participants will be entitled to 100% of any gain and will bear 100% of any loss. In all instances sale proceeds must first be applied to repayment of the loan.

The company is guaranteeing the loans, but employees will remain personally liable for the loans. The company will retain custody of the stock until the loans are paid, but the employees will retain all rights in the stock.

The agreements between the employees and the bank do not contain any restrictions on the employees' rights in the stock.

The agreement between the company and the employees prohibits the sale of stock within one year after purchase, except in the event of death, disability or a "change in control" of the company. After one year, the employees may sell the stock at any time.

(PX 236.)

264.    Cathcart did not recall drafting a letter to the FRBC in 1997, but recognized her signature on the copy and testified that she had no reason to doubt that it was a letter she drafted and that it correctly reflected that she had a conversation with McCauley. (5/7/13 Cathcart Dep. at 22.)

265.    Cathcart testified that she would not have written that she had a conversation with McCauley in her memorandum if she had not had that conversation and that she would have accurately characterized what the conversation was about. Cathcart testified that she would not have said that McCauley agreed with her analysis if he did not. (5/7/13 Cathcart Dep. at 34-36.)

266.    Cathcart testified that in having the conversation with McCauley she would have attempted as best she could to describe accurately the facts and circumstances that were in her view relevant to the analysis. Cathcart testified that she has no recollection of anyone from the

59

FRBC or Hale ever telling her that they believed this SIP transaction would violate Regulation U or any other regulation. (5/7/13 Cathcart Dep. at 36-37.)

267.    Cathcart testified that she assumed Hale would have reviewed her letter to the FRBC before it went out. Cathcart testified that she also would have reviewed it as well and would have attempted to give a complete picture of the relevant facts and would not have included anything that she believed to be misleading. Cathcart did not recall what details were or were not important. (5/7/13 Cathcart Dep. at 39.)

### 3.    Comdisco Activities

268.    On July 9, 1997, Harvey provided John Vosicky, Comdisco's Chief Financial Officer, with a packet of materials related to Comdisco's proposed SIP, including the information proposed to be distributed to potential participants on the day the program is announced. The materials were provided to Vosicky in advance of the July 22, 1997 meeting to allow company officials time to answer any questions or provide additional information necessary to review the program at the upcoming board meeting. (PX 264 at SIP Group 5466.)

269.    As of July 9, 1997, Comdisco planned to announce the SIP plan to potential participants on July 23, 1997 and to have the pricing set and option exercise occur on July 25, 1997. (PX 264.)

270.    On July 14, 1997, Vosicky sent the Comdisco Board of Directors a memorandum on the ESP Effects of SIP and Repurchase. This Memorandum "analyzed the earnings per share impacts of a number of proposed common stock transactions." According to the memorandum, "[t]he results show that the total net impact of these transactions is an increase in EPS of 1.6 cents per share per year, even assuming a 10% increase in stock price as a result of the SIP announcement." The memorandum further states that:

60

> [t]here are two reasons for this small net impact.  First, we are buying back stock from the NatWest repurchase program at an average price of $18.34, which cushions any impact from buying back stock at higher prices after the SIP announcement.  Second, with our current stock price, Comdisco is now a $2 billion market cap company.  We are proposing transactions with involve selling and buying back $150 million worth of equity.  The transactions involve 7 1/2 percent or less of our market cap and zero net cash impact.  Price differences in the selling or buying price have only minor effects on EPS.  You can also see from the attached that changing the size of the SIP from $150 million to $50 million results in less than a one cent change in EPS.

(DX 36.)

271.    Harvey testified that he, Hale and Pontikes met before the July 22, 1997 Board meeting to discuss some of the specifics of the transaction.  (10/2/13 Tr. at 495-496.)

272.    Harvey testified that in both Baxter and Allegiance, the participants were given seven days to review the materials, to look at the materials, to ask questions of the company to the extent it was relevant, to talk to their outside advisors, and then had to submit their participation notices within seven days.  Harvey testified that Pontikes did not want to give the Comdisco people that timeframe, and so his initial plan, had Comdisco done the SIP in 1997, was to call a special sales meeting or to get everybody together and to then do a presentation.  Harvey testified that Pontikes wanted to make sure that that the presentation would occur on a Friday and that the participation option would have to be responded to by Sunday night so that Nick could make a statement on Monday or disclose the participation on Monday in the press.  And that is how it was ultimately implemented.  (10/2/2013 Tr. at 496.)

273.    Harvey testified that there was also a discussion in the same time period during which Pontikes determined that if there was a sale in the first three years (other than through death or certain other circumstances), the participant would bear 100 percent of the risk of loss.  (10/2/13 Tr. at 497.)

274.    Harvey testified that both the Baxter as well as the Allegiance plans provided if

61

there had been a sale or a forced sale during the first three years of the program, each of those companies would share the risk of loss with the participant. Harvey testified that Pontikes did not feel that Comdisco had to go along with that program or part of the program, and so Pontikes' determination was that no matter what, if there was a sale in the first three years other than through death or what have you, that there would be 100 percent risk of loss on the participant. (10/2/2013 Tr. at 497-498.)

### 4. The McBride Opinion Letter

275. Brian Hart of Winston distributed an initial draft of the form of legal opinion of McBride, Baker and Cole to Hale and others on June 27, 1997. (PX 255.) On July 10, 1997, Hart distributed a revised draft of the form of legal opinion of McBride, Baker and Cole and other documents to Pacewicz, Hewes, Harvey, Houser, Hale, Clarke, Artz, Bartol and Hennelly. Hart copied Karl Ahlm and blind copied Gregory Murray and Jeff Peterson on the transmittal. (DX 30.)

276. Harvey received drafts of the McBride opinion letter (or letters) being negotiated in the summer of 1997. He believes the initial draft came from Winston and that he received a mark-up from McBride that went back to Winston. (10/1/13 Tr. at 386.)

277. Harvey testified that he never commented with respect to the form of the opinion letter. (10/1/13 Tr. at 458.)

278. Harvey testified that he did not do a line by line comparison of the initial draft opinion letter and the final opinion letter, but looking at the comments that went back and forth, he believed there clearly had been some negotiation and language changes. (10/1/13 Tr. at 461.)

279. The majority of Holisky's work on the SIP in July 1997 was spent preparing a revised draft of the legal opinion that McBride Baker provided to the Bank in final form in

62

February 1998.  (10/2/13 Tr. at 612-613; DX 32.)

280.     Holisky testified he has a general recollection that, as of July 1997, the SIP

transaction was going to close relatively soon. (10/2/13 Tr. at 613.)

281.     Holisky testified that, while he was at McBride, he worked a fair amount with

Hale and knew her to be a diligent attorney.  Holisky testified that he would not have expected

Hale to send out an opinion letter if she believed that the legal research supporting the letter was

inadequate.  (10/2/13 Tr. at 623-24.)

282.     Holisky testified that when he worked on an opinion letter during his time at

McBride, his practice was to take a high degree of care to ensure that the legal opinion he was

rendering was correct.  He would not allow a legal opinion to go out under his name if he did not

believe that opinion was adequately supported by the law.  (10/2/13 Tr. at 624.)

283.     In the summer of 1997, Holisky worked on various issues pertaining to the SIP,

spending 1.3 hours of time in June and 26 hours in July.  (10/2/13 Tr. at 607-608, 612; PX 240 at

SIP2 004083, 4088.)

284.     Holisky testified that McBride's billing statements did not include any time

entries for him after July 1997.  (10/2/13 Tr. at 613-615, 621.)

285.     Holisky testified that he did not recall evaluating the federal reserve margin

regulations in connection with his work on the SIP.  (10/2/13 Tr. at 610.)

286.     Holisky testified that he did not have a specific recollection of whether he

reviewed two research memoranda addressing Regulations G and U that were prepared by

Cathcart.  (10/2/13 Tr. at 609-610; DX 13, 25.)

287.     On July 17, 1997, Holisky sent a letter to Murray, one of the Bank's attorneys at

Winston, in which he enclosed a "clean and marked copy" of the draft McBride opinion letter.

63

(DX 32.)

288.     Holisky testified that the revised draft of the opinion letter was in response to a draft of the legal opinion that Winston had provided to McBride. (10/2/13 Tr. at 615-618.)

289.     In his July 17 letter, Holisky noted that the revised draft he is enclosing "is the form of opinion letter which we are prepared to deliver to the Bank based on the results of our preliminary legal diligence with respect to the requested opinions.  If in the course of completing our diligence on this opinion letter we should discover additional legal concerns or difficulties on in connection with giving the requested opinions, we will promptly notify you."  (DX 32 at 1.)

290.     Holisky testified that he would have no way of knowing what stage McBride's preliminary legal diligence was at as of July 17, 1997. (10/2/13 Tr. at 619.)

291.     Holisky stated in the revised draft of the opinion letter enclosed with his July 17, 1997 letter that the McBride attorneys primarily responsible for the opinion letter were Hale, Holisky and Cathcart.  (10/2/13 Tr. at 620.)

292.     Harvey testified that the requirement for an opinion letter came from the Bank and was directed to McBride.  Harvey testified that McBride indicated that it could provide the opinion letter to the Bank, and Comdisco was satisfied with that.  (10/1/13 Tr. at 456.)

### E.     The Bank's and Winston's Work on the SIP Transaction

293.     Murray testified that the Comdisco SIP was the third ESP program on which he worked.  (10/9/13 Tr. at 835.)

294.     Murray testified that the structure of the Comdisco SIP followed the basic form of the Baxter 1994 and Allegiance SIPs.  (10/9/13 Tr. at 835.)

295.     Murray testified that Winston had an opportunity to review and comment upon the structure of the Comdisco SIP.  (10/9/13 Tr. at 835.)

64

296. Murray testified that Winston, on behalf of the Bank, took the lead in drafting the Note, Facility Agreement and Letter of Direction for the Comdisco SIP, but that no single party was responsible for any transaction document; rather, it was a negotiation between the parties. (10/9/13 Tr. at 836-837.)

297. Murray testified that Brian Hart was a junior partner at Winston whom Murray asked to work with him on the Comdisco SIP and that Hart and some associates handled large parts of the transaction. One of those associates was Matthew O'Meara. (10/9/13 Tr. at 836.)

298. Murray testified that he could not recall who would have prepared the stock power, but that Comdisco likely was more responsible for that document. He does not know that Winston would have commented on the stock power. (10/9/13 Tr. at 836-838.)

299. Harvey testified that the stock power came from the Bank. (10/1/13 Tr. at 347-348.)

300. At his Deposition Harvey was asked the question "Did McBride Baker put together the stock power or did that come from the bank?" and Harvey gave the answer "McBride Baker would have provided this to us. It's interesting you should ask, because I was just looking and thinking about the letter of direction that was prepared by the bank given to each of us. That was a bank document. But the stock power is Comdisco's benefit in the event that we needed to exercise our rights to sell the shares or dispose of them." (10/1/13 Tr. at 348-349.)

301. Harvey testified that the answer he gave at his deposition was correct. He testified that the Bank provided the original draft of the stock power and that McBride Baker ultimately provided the executable form of stock power. (10/1/13 Tr. at 347-349.)

302. Murray testified that he and his team considered the margin regulation implications for the Comdisco SIP. (10/9/13 Tr. at 838.)

303.     Harvey testified that he had telephone conversations with Dan Clarke from the Bank in connection with the proposed formation of the SIP, and in a general sense, Harvey was eliciting any comments from the bank relative to the draft of the program that Comdisco had put together, which included the plan. Harvey testified that Clarke had been provided a copy of the draft SIP plan. (10/2/2013 Tr. at 485.)

304.     Harvey testified that he was on the line for a telephone call between Hale of McBride and Brian Hart of Winston. During the call, Hale indicated to Hart that McBride's research showed that there would not be an issue with Regulation U in the SIP transaction and asked what Winston thought. Hart responded that Winston saw no problem with Regulation U in the transaction. (10/1/13 Tr. at 354-356.)

305.     Harvey believes the conversation between Hale and Hart occurred sometime during 1997 when Comdisco was negotiating the terms of the credit facility. (10/1/13 Tr. at 458.)

### F.     Underwriting and Syndication

306.     Clarke testified that, based on his experience, the sponsoring company's stock typically goes up when ESP programs are announced. This is because management is buying versus selling, and when executives purchase stock in the company they manage, the equity markets typically reward them with a higher price; this sends a signal to the market. (9/25/13 Tr. at 250.)

307.     Clarke testified that the Bank's syndication committee would decide how much of a loan transaction the Bank wanted to retain for itself versus syndicating to other lenders. As the lead bank in a transaction, the industry norm was for the Bank to hold the largest position. The idea of syndication would be to sell in the secondary market the portion of the loans beyond what

the Bank had decided to retain.  (9/25/13 Tr. at 213.)

308.    Clarke testified that the Bank sought to ensure that a loan was a "market"
transaction that the Bank could syndicate and readily sell.  If the syndication committee
approved a transaction, the transaction would be considered a "committed asset sale," which
would be considered saleable to the Bank's peers in the bank investor market.  (9/25/13 Tr. at
212.)

309.    The Bank prepared an underwriting memorandum regarding the Comdisco SIP
for its Underwriting Committee meeting scheduled for June 13, 1997.  The memorandum
indicated a Moody's rating of "Baa1" and an S&P rating of "BBB+" for the "Guarantor" on the
loans, *i.e.* Comdisco.  The underwriting memorandum also included a matrix showing
"Comparable Deals – Pricing and Ratios," which included information about the Allegiance SIP
and a February 1997 $300 million credit facility to Comdisco.  The memorandum indicated that
the Administrative Agent for the $300 million Comdisco facility was Citibank and that First
Chicago was one of the banks to which the loan was syndicated; the Bank's portion of that
facility was $21 million.  (PX 368 at JPM-VAL 01712-01714.)

310.    Clarke testified that probably the most important information in the underwriting
memorandum regarding comparable deals was the information regarding Comdisco's existing
$300 million credit facility.  Clark testified that the information regarding Comdisco's existing
credit facility provided a base case for pricing, collateral, and the basic structural components of
the SIP loans.  Clarke testified that the Allegiance SIP transaction was also important because it
was a similar transaction and therefore provided a market comparable.  (9/25/13 Tr. at 214; PX
368.)

311.    Clarke testified that the S&P BBB+ rating meant Comdisco was investment

67

grade. Clarke testified that this was a relatively high quality rating, particularly for a finance company. Clarke testified that this rating would be the basis for the Bank to price the loan to achieve market saleability and a successful syndication. Clarke testified that the general underwriting criteria the Bank used to evaluate the Comdisco SIP transaction was the credit strength or credit rating of Comdisco. (9/25/13 Tr. at 214-215; PX 368.)

312. Clarke testified that the Bank did not give any consideration to the financial condition of the individual participating executives in the syndication approval process and the underwriting and pricing of the transaction. (9/25/13 Tr. at 215-16.)

313. Harvey testified that the Bank was underwriting the loans based on the Comdisco guarantee and not the personal financial capability of the individual participants. (10/1/13 Tr. at 414.)

314. Clarke testified that the syndication underwriter meeting minutes of June 13, 1997 did not reflect any collateral being taken by the bank, and no underwriting consideration was given to taking collateral in connection with the proposed Comdisco SIP transaction. Clarke testified that he believed the underwriting evaluation reflected unsecured credit to a BBB+ rated company. (9/25/13 Tr. at 216; PX 368)

315. Clarke testified that the credit approval process for the proposed Comdisco SIP was based solely on the corporate ratings of Comdisco. Clarke testified that the Bank did not, in underwriting or considering the program, rely in any way rely upon the stock to be issued to the executives. (9/25/13 Tr. at 217.)

316. Clarke faxed a Summary of Terms and Conditions to Pacewicz on June 17, 1997 (PX 355). This summary reflected the outcome of negotiations between Clarke and his Bank teammates and Comdisco's management. The summary did not represent the final terms and

conditions of the deal, but was the first pass in early 1997 and represented the agreed upon basic terms up to that point in time.  (9/25/13 Tr. at 217-218; PX 355.)

317.    Clarke testified that after the Bank and Comdisco discussed the transaction, the company gave a rough estimate that it would need $75 million as part of the transaction, based on a combination of individual commitments and how many people were included. (9/25/13 Tr. at 218; PX 355.)

318.    The June 17, 1997 Summary of Terms and Conditions included certain conditions precedent, including "Customary Conditions" applicable to Comdisco.  The Comdisco conditions included:

> (a) absence of default under that certain $300,000,000 Fifth Amended and Restated Global Credit Agreement, dated December 16, 1996, among Comdisco, as borrower, NationsBank, N.A., as syndication agent, and Citibank, N.A., as administrative agent, and the financial institutions named therein, as amended (the "Existing Agreement");
>
> (b) absence of material adverse change since December 31, 1996 in the business, financial condition or prospects of Comdisco and its subsidiaries, taken as a whole;
>
> (c) delivery of the Facility and Guaranty Agreement, Loan and related documentation satisfactory to the Lenders;
>
> (d) the Loans shall be in compliance with Regulations G, T, U, and X and Comdisco will provide an opinion of outside counsel satisfactory to the Agent to that effect.

(PX 355 at SIP-Group 698.)

319.    Clarke testified that the "Customary Conditions" in the June 17, 1997 Summary of Terms and Conditions were the company's responsibility and that it was consistent with the market to treat these as borrower-side covenants.  (9/25/13 Tr. at 219-220; PX 355.)

320.    On June 19, 1997, Clarke faxed to Pacewicz a commitment letter from the company to the Bank, which included high level structural items including the basic terms of the commitment and compensation.  This version included and reflected a revised version of the

69

term sheet, up to that point in time, based on negotiations between the Bank and Comdisco, including negotiations on price and compensation. This version did not represent the final version of the terms. The pricing of the facility was again determined based on the corporate borrowing rate of Comdisco. (9/25/13 Tr. at 221-222:18; PX 251.)

321.     The summary of terms transmitted on June 19, 1997 included the addition of language "[p]rogram principal may be increased subject to underwriting and credit approval by the Arranger and Agent." (PX 251 at SIP 0039728.)

322.     Clarke testified that this language was added to assure that the Bank could increase the facility but that any increase was subject to the Bank's typical credit approval and syndications approval process, because Comdisco was seeking to determine how many managers or senior managers would participate. Clarke testified that all of the dialogue between the Bank and Comdisco focused on Comdisco perhaps desiring to take the transaction to a larger level and this flexible language would allow the company to come back to the Bank with a larger number. (9/25/13 Tr. at 222-224; PX 251.)

323.     The June 19, 1997 Commitment Letter included the language "[d]ividends related to the Stock will be paid by Comdisco on the normal dividend payment dates directly into an account with First Chicago, as Agent for the Lenders, which in turn will deduct the interest due on the Loans, with any overage being credited, or any shortfall being debited, to each Participant's account at First Chicago. Participants will be required to maintain an account at First Chicago explicitly for this purpose." (PX 251 at SIP 0039729.)

324.     Clarke testified that the language requiring payment of dividends directly into an account at the Bank was necessary because of the derivative involved. According to Clarke, the Bank needed to be 100 percent certain that on the due dates for interest payments it would have

70

the aggregate amount of the interest payment due, to the penny. Payment of dividends directly into accounts at the Bank was a means to ensure there were no overdraws or late payments. (9/25/13 Tr. at 224-225; PX 251.)

325. Clarke testified that the derivative component involved in the Comdisco SIP transaction was a floating-to-fixed interest rate swap through the life of the five-year transaction, which allowed the participants to have a fixed interest rate due and eliminate floating rate risk that the interest rates might rise. Clarke testified that the derivative mechanism balanced the fixed rate with the credit risk on the floating rate, that the floating rate is what banks would typically provide and that the syndication's approval was the floating rate debt. (9/25/13 Tr. at 225.)

326. Hennelly testified that an interest rate swap is a contract between two parties to exchange interest rates and that typically, it's a fixed rate, that one party pays a fixed rate and another party pays a floating rate based on a notional dollar balance for a specific period of time. (8/5/09 Hennelly Dep. at 11.)

327. Hennelly testified that he was familiar with, and involved with, a credit facility that was entered into by the Bank with Comdisco relating to the SIP. Hennelly testified that the SIP transaction was designed to pay interest to the banks at the dividend yield being generated by the SIP stock; that the dividend yield typically is a fixed yield over time that may or may not be a market equivalent fixed rate. Hennelly testified that in the case of Comdisco, it was a below market rate. Hennelly testified that the Bank typically funds itself on a variable rate basis and hence the need for an interest rate swap-like product to convert the variable rate from a fixed to a floating rate. Hennelly testified he was involved structuring the SIP transaction to ensure that the fixed rate that was received generated a market equivalent rate. The Bank effectively converted

71

the fixed rate component of the loan to a variable rate that could be syndicated to the marketplace. (8/5/09 Hennelly Dep. at 11-13.)

328.    Clarke testified that the limitation on legal fees included in the summary came from Comdisco.  Clarke testified that Comdisco did not want to agree to open-ended legal fees, and the limitation was an attempt to cap the amount of legal fees that were spent on the transaction. (9/25/13 Tr. at 226-227.)

329.    In July 1997, the Bank's syndications department had designed an offering memorandum to sell the facility to other banks in the syndications process.  Clarke testified that this memorandum was distributed to a list of banks, including most of Comdisco's relationship banks that participated in Comdisco's $300 million primary liquidating facility and any other banks that the syndications department deemed as potential buyers of the debt.  (9/25/13 Tr. at 227-228; PX 257.)

## G.    Cessation of Work on the SIP after July 22, 1997

330.    On July 22, 1997, Comdisco's Board of Directors again considered the SIP during a telephonic meeting.  At that meeting, the Board decided not to go forward with the program at the time but did not permanently reject it.  The program being presented on July 22 would have involved between 225 and 250 participants, some of which were making as little as $40,000 or $50,000 or $60,000 per year.  The Board was concerned about the risk that people would be taking on and whether or not those people could afford the risk that was going to be offered to them.  (10/1/13 Tr. at 367-369.)

331.    DX 33 and DX 34 are each entitled "Legal Opinion to First Chicago Regarding SIP Loan Transactions Diligence Checklist" DX 33 is stamped "DRAFT" with a handwritten date of 7-21-97, while DX 34 is stamped "DRAFT" with a handwritten date of 7-22-97.  Each

checklist states that the open issue as to Regulation U is "Fed staff confirmation on non-applicability (no indirect security for loan)". Each checklist states that the open issue for Regulation G is "not applicable because CDO is not a lender (are they indirectly for arranging loans?) or because 'not an ordinary course lender?'". (DX 33 and 34.)

332. Following the July 22, 1997 Board meeting, Comdisco and McBride did not do any work on the SIP until the program was restarted in early 1998. (10/1/13 Tr. at 371.)

333. Clarke testified that he did not recall having a discussion about Comdisco's Board putting the transaction on hold because of the elevated price of Comdisco's stock, but that if it was stated in Plaintiff's Exhibit 228 then that was passing on information the Bank thought to be true based on communications from Comdisco. (9/25/13 Tr. at 258-259.)

## IV. DEVELOPMENT OF COMDISCO SIP TRANSACTION (DECEMBER 1997 – JANUARY 30, 1998)

### A. Comdisco's Financial Status

334. Pacewicz testified that fiscal year 1997 was a good year for Comdisco. (10/2/13 Tr. at 579.)

335. Comdisco reported record revenues, earnings, equipment volume and cash flow from operating activities in fiscal year 1997 (which ended September 30, 1997). Comdisco's total revenue for fiscal year 1997 was $2.819 billion. Its earnings before income taxes, extraordinary loss and cumulative effect of change in account principle were $211 million, and its net earnings allocable to common stockholders were $123 million. (PX 382 at 24.)

336. Comdisco reported a market capitalization at the end of fiscal 1997 of $2.4 billion. The market capitalization had grown from $656 million in 1994 and $1 billion in 1995. (PX 381 at SIP2 003824.)

337. Pacewicz testified, based on reviewing the company's 10-K for 1997, that

73

Comdisco's total assets at the end of fiscal year 1997 were $6.3 billion. Pacewicz further testified that the company's credit lines as of September 30, 1997 were $1.6 billion, of which $729 million was unused. (10/2/13 Tr. at 576-578; PX 382.)

338.    At the conclusion of the quarterly period ending December 31, 1997, Comdisco reported assets of approximately $6.482 billion and liabilities of approximately $5.655 billion. It reported total stockholders' equity of $827 million. (PX 786.)

339.    Pacewicz testified that he thought that during 1997 Comdisco was involved in buying back some of its shares on the open market. (10/2/13 Tr. at 579-580.)

340.    In fiscal year 1997 (prior to the stock split referenced below), Comdisco purchased 2.5 million shares of its outstanding common stock at an aggregate cost of $45 million. (PX 382.)

## B.    Work on the SIP

341.    On December 31, 1997, Vosicky sent a memorandum to the Comdisco Board of Directors revisiting the Shared Investment Plan. The memorandum proposed that the SIP be added as an agenda item for the next Board meeting. It indicated that the proposed SIP had been modified to be offered only to 125 to 150 individuals, and to set the minimum and maximum commitments at $250,000 and $5 million, respectively. (DX 39.)

342.    In early January 1998, Hewes told Harvey that the SIP was going to be brought to the Board of Directors again and directed Harvey to tell Hale to begin updating the transaction documents. (10/1/13 Tr. at 371.)

343.    Harvey testified that the Board's concerns from the July 22, 1997 meeting were addressed by offering the program to fewer employees and capping the level of employees' participation depending on the employees' level at the company. (10/1/13 Tr. at 369-370.)

74

344.     McBride's January 1998 invoices included a number of time entries (among others) regarding work on the SIP transaction, including entries on drafting a letter to the "Federal Reserve Board" on Margin Issues; calls to the "Federal Reserve Board" on Margin Issues, preparation for the Board Meeting regarding the SIP transaction and call from "Federal Reserve Board" re purpose credit issues. (PX 240.)  A copy of McBride's January 1998 invoice is attached as Tab F in Volume 1 of the Appendix.

**C.     McBride's Solicitation of a Concurrence from the Federal Reserve Bank of Chicago in January 1998**

**1.     The January 16, 1998 Hale Letter to Lloyd of FRBC**

345.     By letter dated January 16, 1998, Comdisco's lead outside counsel at McBride, Hale, sent a letter to William Lloyd of the FRBC "requesting concurrence that under Regulations G or U the Loan described below would not be deemed to be, directly or indirectly, secured by the securities purchased."  The "Loan(s)" referred to in this letter were the participant' personal loans from the Bank.  Lloyd at the time was an attorney with the FRBC.  (Stmt. Uncontested Facts ¶¶ 6-7.) A copy of Hale's January 16, 1998 letter is attached as Tab G in Volume 1 of the Appendix.

346.     The January 16, 1998 letter from Hale to the FRBC stated as follows:

> Our client, a New York Stock Exchange listed company, is proposing to adopt a stock plan (the "Plan") providing a one day option to executives to purchase the Company's common stock.
>
> Payment for the purchase is to be made entirely through a full recourse, five year loan to be guaranteed by the Company (the "Loans"). In connection with the transaction the Company will enter into a Facility and Guarantee Agreement with the lender (a Bank) pursuant to which the lender will agree to make advances of 100% of the purchase price to each employee for shares to be purchased pursuant to the Plan. The Loan made to each Borrower will be evidenced by a single note issued by such Borrower to the bank, The Note is pre-payable at the option of the Borrower and such pre-payments are subject to early payment fees. The Company will agree to guarantee the prompt and complete payment of the principal and interest on the Loans. Dividends, if any declared on the

75

stock purchased pursuant to the Plan will be applied to quarterly interest payments.

Each participant Borrower will be required to deliver a Letter of Direction to the lender irrevocably directing the Company and its transfer agent to pay all future cash dividends on the shares purchased pursuant to the Plan to the Lender for deposit in the Borrowers account with the Lender. The Lender is authorized to charge the Borrower's account for each payment of principal, interest and other charges that become due under the note. The Letter of Direction also instructs the Lender to pay all proceeds of the Loan to the Company for the account of the Borrower in payment of the purchase price to be issued to the Borrower pursuant to the Plan.

The Plan, provides that a Letter of Direction must be executed providing that dividends be applied to the payment of interest on the loan. Under the Plan no sales, of the purchased shares except in the event of death or disability or a change in control may be made before the first anniversary of the exercise date and no sales may be effected unless all principal and interest and early payment fees due on the Loan have previously been paid or all proceeds of sale are simultaneously applied first to payment of all such principal, interest and early payment fees due on the Loans.

The certificates for the purchased shares will be held in the Company's legal department until all restrictions under the Plan as to the purchased shares have lapsed.  Each participant must deliver to the Company's general counsel a stock power  endorsed in blank with respect to the purchased shares.

There is no reference, other than as specifically set forth above, either in the note or in the Facility Agreement to any restriction on the transfer of the securities to be purchaser, pursuant to the Plan nor do those securities form collateral for the Note.

Should you require additional information regarding this transaction please do not hesitate to contact me. We are not aware of any Federal Reserve Board interpretations or rulings or judicial decisions dealing with a similar fact pattern, however, if any exist we would appreciate your bringing them to our attention.

(JX 2.)[3]

347.    Wu testified that the FRBC received a letter from Hale directed to William Lloyd

---

[3] The Court barred Scott Harvey from testifying regarding the substance of a conversation that he had with Robert Lackey in August or September 2001 regarding the Hale letter and a letter dated January 29, 1998 to Hale from Brent McCauley of the FRBC.  On October 15, 2013, Defendants filed a written offer of proof as to what the substance of Mr. Harvey's testimony would have been. Defendants preserve all of their arguments, objections and positions, and do not waive any of them.

76

in the January 1998 time period. (11/16/12 Wu Dep. at 53-54.)

**2.      Plaintiff's Expert's Testimony Regarding the January 16, 1998 Hale Letter**

**a.      Form of the Letter**

348.    Sabel testified that the level of detail regarding the SIP program that Hale provided in her January 16, 1997 letter, in general, was consistent with the types of letters Sabel received while at the FRBNY.  Sabel testified that parties requesting opinions from regional Federal Reserve banks did not typically provide deal documents in connection with requesting opinions.  Sabel testified that if he needed further information from a party requesting an opinion, he would call the party and tell them the letter was not clear or needed more detail. (9/24/13 Tr. at 74.)

349.    Sabel testified that there was a record in Hale's time records of a conversation with an FRBC lawyer preceding Hale's January 16, 1998 letter by one day.  (9/25/13 Tr. at 152-153.)  McBride's January 1998 invoices include the following time entry for Hale on January 15, 1998: "1/15/98   LMH   1.00   PREPARE NEW LETTER TO FEDERAL RESERVE BOARD RE: MARGIN ISSUES. CALLS TO FEDERAL RESERVE BOARD RE: SAME." (PX 240 at SIP2 004108.)

350.    Sabel testified that he does not know what was discussed during the conversation with the FRBC the day before the Hale letter was sent and does not know what salient aspects of the SIP program may have been discussed.  He testified that it depends on what the caller would have said and what he would have asked.  He testified that he suspects he would have gotten a listing of the kinds of rights that Hale was concerned about and may have given Hale a preliminary indication of which ones he though were important enough to state in a letter and which ones were not.  Sabel testified that the best thing would have been to "figure out which

aspects were significant to the margin analysis, and I would have suggested that that is the kind of thing that needs to be put into a letter describing the program." He testified that he has no idea what happened here, but his usual practice when he was at the FRBNY was to verbally preview issues with a person making an inquiry and to eliminate certain issues from needing to be included in a follow-up letter. (9/25/13 Tr. at 153-154.)

351. Sabel testified that he believes Hale provided adequate detail regarding the salient aspects of the SIP transaction. (9/24/13 Tr. at 75.)

### b. Specific Request for Concurrence Regarding Guaranty

352. Sabel testified that a guarantee is an extension of credit for margin purposes. (9/25/13 Tr. at 190.)

353. Sabel testified that the omission in Hale's January 16, 1997 letter of a specific request for an opinion regarding the guaranty did not trouble him because the letter contained a reference to Regulation G and a description of the terms of the guaranty. Sabel testified that he did not believe there was anything factually left out of the Hale letter regarding the guaranty that needed to be there. (9/24/13 Tr. at 79-80.)

354. Sabel testified that Hale's letter did not explicitly mention the concept of Comdisco's guarantee being a separate extension of credit. Sabel testified that the only reason he can think of to mention Regulation G in the letter is because of the guaranty, so in that sense he would say it covered the guaranty. Sabel agreed that the letter did not have words in it asking whether an extension of credit by Comdisco through the guarantee secured either directly or indirectly by the stock would violate Regulations G or U. Sabel testified that Hale's letter also did not mention the concept of whether the Bank would commit an arranging violation under Regulation U by arranging for Comdisco to extend credit through the guarantee on better terms

78

and conditions than the Bank could legally extend credit under Regulation U. (9/25/13 Tr. at 149-150.)

355.    In response to the question of whether the facts relating to the guarantee were explicitly disclosed in Hale's letter, Sabel testified: "Well, that's I think one of the issues being reviewed in this case. Every lawyer has their own style of writing things and of making judgments about what's important and what is not. You know, when I was at the Federal Reserve, I frankly tried to go along with, you know, what the caller wanted, and was not particularly interested in flyspecking every letter that came in. If I could generally understand what was going on, and I thought the important facts were there, then I thought I could respond to it. It was always better to get a letter that referred to particular sections and interpretations and showed a good understanding of all this material. But you can't expect everybody to do that and tell them to go away until they do. So you do the best you can as long as you're comfortable that you're giving the right advice." (9/25/13 Tr. at 180-181.)

356.    Sabel testified that, in his opinion, not asking specifically for a concurrence as to whether the extension of credit through the guaranty would constitute a violation of Regulation G was not a material omission from the January 16, 1998 Hale letter. Sabel testified that the reference to Regulation G along with a description would have told him that both the loan and the guaranty needed to be reviewed for margin compliance. (9/25/13 Tr. at 177.)

### c.    Right to Restrict Timing, Amount, Form of Sale under SIP §7(d)

357.    Sabel testified that it did not concern him that Hale's January 16, 1997 letter did not include a reference to the provision in the SIP giving the Compensation Committee the right to impose restrictions on the timing, amount, and form of sale to the extent it determines that such restrictions are in the best interest of Comdisco. Sabel testified that this was a very general

79

statement of rights retained by the company at this point without any substance. Sabel further testified that if he had been at the Federal Reserve and someone had brought this provision to his attention, he would have said he did not know what to make of it, and until someone said substantively how the right was going to be used, he could not give a view on whether it would amount to indirect security. (9/24/13 Tr. at 78-79, 157.)

358.    Sabel testified that the provision of the SIP program giving Comdisco the right to impose restrictions on the timing, amount, and form of sale to the extent Comdisco determines that such restrictions are in its best interest might have been discussed and dealt with in a preliminary conversation that preceded Hale's letter. (9/25/13 Tr. at 157-158.)

359.    Sabel testified that he did not see any evidence during his review of documents that the Comdisco Compensation Committee ever imposed a restriction under the provision in Section 7(d) of the SIP permitting the Compensation Committee to impose restrictions on the timing, amount, and form of sale. (9/24/13 Tr. at 79, 188.)

360.    Sabel testified that it is not necessarily true that a right should be disclosed in an inquiry letter where it is unknown how the right might be exercised in the future. Sabel explained that it is a matter of judgment on the part of outside lawyers to decide which facts are relevant to the particular analysis, and inquiry letters in his practice at the FRBNY were always preceded by a telephone call. Sabel testified that if someone had called him with the kind of question raised in Hale's January 16, 1998 letter, he would have probably discussed what the salient aspects of the transaction were. He would have asked questions based on his experience, gotten answers, and then given advice on what ought to be put in the letter. (9/25/13 Tr. at 151-152.)

### d.     Right of First Refusal

361.     Sabel testified that the omission of any discussion of a right of first refusal in Hale's January 16, 1997 letter did not trouble him because this provision was rather typical in transactions of this nature, and until it is actually exercised, he would not know how it was going to be exercised.  (9/24/13 Tr. at 80.)

362.     Sabel testified that he believes he would have said 20 years ago when he was at the FRBNY that a general right like the right of first refusal in the Comdisco SIP is there for other, corporate or securities law reasons, and sounds like it would not be relevant to the margin analysis.  (9/25/13 Tr. at 152.)

363.     Sabel testified that the language "Comdisco may take other actions as it deems appropriate" in the right of first refusal is the kind of boilerplate that you typically see in a loan agreement, but that he was not sure what it means.  Sabel testified it is very broad language that says what it says. (9/25/13 Tr. at 194-195.)

364.     Sabel testified that when issuers issue stock in certain limited types of cases, they may impose a right of first refusal on the stock in order to avoid some kind of legal or regulatory problems in the future, so it is not unusual to see that kind of provision.  Sabel testified that he did not attach all that much significance to it. In response to a question asking whether Sabel would need to know about the right of first refusal to give an opinion on margin regulations in the context of the Comdisco SIP transaction, Sabel testified that he would have been interested in it but does not think it would rise to the level where he would want to see it mentioned in a letter if he were still at the FRBNY.  (9/25/13 Tr. at 181.)

365.     Sabel testified as follows:

> THE COURT:  Why would you be interested in [the right of first refusal]?

81

THE WITNESS: Well, because it is a restriction on the owner's rights to get the full benefit of having purchased the stock. So you want to know that.

If I may? When you get into questions such as indirect security, there are often provisions that are there completely unrelated to the margin regulations. And our general approach was that there really was a valid business or regulatory reason apart from the margin regulations, that weighed in the direction of saying that it did not cause the stock to be indirectly secured.

THE COURT: And if there was a right of first refusal, would that tend to show that the stock was, in fact, securing the loan?

THE WITNESS: Depended on the explanation that we got for why that provision was in there. Again, you know, there are occasions where someone will sell stock on special terms and wants to avoid a situation where the buyer gets a windfall profit because that was not part of the original understanding.

THE COURT: So they might have purchased the stock at below market or something like that and, therefore, the issuer might want to protect themselves?

THE WITNESS: That's right, or protect, you know, undue dilution out in the market, things along those lines.

***

THE COURT: Because of those considerations, which I think I understand, wouldn't they be addressed either in the letter to or from the Federal Reserve Bank who is being consulted?

THE WITNESS: If I were the one who were discussed, who were presented with this question, I think I would have. But I can't say that everybody should or would.

THE COURT: Have you seen any evidence that that was discussed in this particular case?

THE WITNESS: Not that I recall, Your Honor.

(9/25/13 Tr. at 181-183.)

366. Sabel testified that, based on reading the right of first refusal provision in the SIP, the price Comdisco would pay if it exercised the right of first refusal would be the closing price on the New York Stock Exchange. Sabel testified, based on reading the provision, that the

participant is free to sell the shares, but "the company has five business days to make that determination, so I suppose that if I'm reading it correctly that would be a limitation on their right to sell." (9/25/13 Tr. at 184.)

367.    Sabel testified as follows regarding the right of first refusal:

> Q.  In any case, would the owner of the shares have a right to sell whether to Comdisco or to the market?
>
> A.  As I read this, yes.
>
> Q.  So this right of first refusal was not a right that could be used to prevent the sale of the shares?
>
> A.  I believe that's correct
>
>     ***
>
>     THE COURT:  Wait.  Excuse me.  Let me just follow up on that. So this wouldn't prevent a sale, but it would restrict the way it was sold?
>
>     THE WITNESS:  I think that's correct.
>
>     ***
>
> Q.  And the way you thought it might restrict it would be just a delay of five days?
>
> A.  A long as, possibly as long as five business days, yes.
>
> Q.  And there weren't any other ways in which it were restricted?
>
> A.  Not that I can recall.
>
> Q.  Having read this provision, does that change your testimony in any way about whether this is a provision that you would have been comfortable not seeing in a letter requesting a concurrence?
>
> A.  Now that you put it that way, I think that could be a basis for deciding it would not be sufficiently significant, that it should be put into a letter.

(9/25/13 Tr. at 184-185.)

368.    Sabel testified as follows:

THE COURT: I just have a couple questions. On that last point that Mr. Harris just made, you acknowledged that the regulations include any restriction on a customer's stock.

THE WITNESS: Correct.

THE COURT: Or any restrictions on the ability to pledge or dispose of the stock.

THE WITNESS: That's right.

THE COURT: You have identified some restrictions on the stock, however minor, correct?

THE WITNESS: Yes.

THE COURT: Such as the five-day restriction.

THE WITNESS: That's right.

THE COURT: Would that affect your opinion about whether or not the stock in question was, in fact, securing either the guarantee, the extension of credit on the guarantee, or the loan from the bank?

THE WITNESS: If I may separate that into two parts.

THE COURT: Okay.

THE WITNESS: I think it's clear it has nothing to do with the notes. Now, the guarantee is a different question, of course, because that is between Comdisco and the owner of the stock.

As I tried to say in my report, and I hope it came through in my testimony, the Federal Reserve views on indirect security and how strict the rules should be on interpreting that have changed over the years. The have erred on the side of being more liberal.

So what I see in the correspondence here is a reflection of that movement, if you will, where they were focused on the documents themselves, and seeing no specific restriction in the event of default, then they thought it was not indirectly secured.

I will tell you that in 20, 25 years ago, I would question whether Fed staff would have agreed with that. But I think there has just been a change. They're trying to avoid creating problems for parties.

THE COURT: What about 15 years ago?

THE WITNESS: Fifteen years? You know, here I think it's significant they got a letter confirming that, you know, Fed staff agreed that this was not indirectly secured. Now, the basis for that is one of the

84

things being discussed here, of course. And I don't know anything more than what the record shows.

(9/25/13 Tr. at 197-198.)

369.    Sabel testified as follows:

THE COURT: Right. So you don't know whether or not they actually saw this particular language that we were discussing earlier this morning?

THE WITNESS: That's correct.

THE COURT: In fact, the letter did not refer to that language?

THE WITNESS: Specifically, that's correct

THE COURT: The Hale, either the Hale letter or the response?

THE WITNESS: That's correct.

THE COURT: All right. And I think you said earlier that if it were you, you might indeed include that in a response at least if you had been told that orally, let's say.

THE WITNESS: I probably would have as a recitation of facts.

THE COURT: But you can't say whether or not—well, can you say whether or not it was customary in 1998 to do so?

THE WITNESS: I would not say that that would always occur. There would be different levels of specificity depending on the issue that the staff attorneys thought they were addressing. And, again, that would be in their judgment.

THE COURT: Now, your friend Mr. Holz was pretty picky.

THE WITNESS: Yes.

THE COURT: If he had known about this, what would your opinion be on how he would approach it?

THE WITNESS: Well, he's the one who started telling me while I was still at the Fed that the board was saying, you know, don't make these things real troublesome for the parties. And that's why when interpretive questions came up, we were, you know, being a little more liberal than we might have been in past times.

So I think he would have asked questions about these kinds of transactions, but I can see how he would have come out the way he is said to have come out in this case.

85

(9/25/13 Tr. at 198-200.)

        **e.**      **Right to Take Action Relating to Participant and Assets**

370.    Sabel agreed that Comdisco's reservation of the right "to take all action relating to the participant and his or her assets which the compensation committee deems reasonable and necessary to obtain full reimbursement for amounts Comdisco pays to the First National Bank of Chicago under its guaranty relating to the participant's loan" was not disclosed in Hale's January 16, 1998 letter to the FRBC. Sabel testified that this was another right where he would have thought at the time (and today, too) that he could not anticipate the substance of how the right might evolve in the future and, therefore, it was not important to him that this right was omitted from the Hale letter. Sabel also testified that this was a right that could have been raised in a preliminary telephone call and pushed to the side as not significant so that Hale did not have to disclose it in her letter. (9/25/13 Tr. at 158-159.)

371.    Sabel testified that he understands the provision in Section 12 of the SIP (JX 1, Tab 6) providing that "Comdisco may take all action relating to the Participant, and her or his assets, which the Compensation Committee deems reasonable and necessary, to obtain full reimbursement for amounts Comdisco pays to [the Bank] under its guarantee" to be the kind of reservation of right that a prudent lender gets when making a loan. Sabel testified that he does not believe a reference to this paragraph had to be included in the January 16, 1998 Hale letter. (9/25/13 Tr. at 189-190.)

372.    Sabel testified his general recollection was that Comdisco protected itself by being able to withhold the stock from the participant, but he would have to look at the document to see the precise terms. He testified he did not recall specifically whether Comdisco also protected itself by giving itself the right to go after any of the participants' assets in the event that

<div align="center">86</div>

Comdisco had to pay out on the guarantee, but would not be surprised to seek that type of provision in the document. (9/24/13 Tr. at 143-144.)

373.    Sabel testified he read the reservation of rights provision as being a general statement that "because these are their own senior executives, which may have the concept in their mind that, you know, they're going to have a lot more freedom than they would with a third-party loan, that if Comdisco finds it necessary to enforce its rights, it can go against any of the participant's assets," including presumably their home and any other kind of assets they would have.  (9/25/13 Tr. at 190-191.)

### f.    Pledging Shares

374.    Sabel testified that he reviewed the operative contractual documents between the borrowers and the Bank and Comdisco and does not recall seeing any contractual provision in any of the documents that prohibited borrowers from pledging their shares or giving a security interest in their shares.  Sabel testified that assuming that there was no such contractual provision, he does not view the omission of reference to such a provision from the January 16, 1998 Hale letter as a material omission.  (9/25/13 Tr. at 186-187.)

375.    Sabel testified that there was nothing in Hale's letter indicating that the SIP stock could not be pledged as collateral for any other loan.  (9/25/13 Tr. at 158.)

376.    Sabel testified he was not aware that during the SIP presentation on January 30, 1998, the prospective SIP participants were told that the SIP stock could not be used as security for transactions or as collateral for other types of loans.  Sabel testified that he had not seen the question and answer in the June 30, 1998 SIP meeting transcript where a participant asked whether the shares could "be used as security for other transactions or collateral for other type of loans?" and the following response was given:  "No.  And the reason being is they are restricted

87

from the standpoint that the company has certain rights with respect to that stock depending upon

your employment. And also there is restrictions under the terms of the bank loan that you have

that there are certain things that will happen with the proceeds to the extent that you'd sell it

before the bank loan is paid off. So while it is not technically a secured loan the company retains

the stock physically, and you cannot pledge that for other loans." (9/24/13 Tr. at 94-96.)

377. Sabel testified that the statement at the January 30, 1998 presentation that

participants could not pledge their stock does not affect his opinion about whether the stock was

providing indirect security for the loan. Sabel provided the following reason for his answer:

> THE WITNESS: As a practical matter, if loans – I'm sorry – if securities are subject to restrictions on sale, a bank lender at least is simply, you know, unless they have got a really, really good exceptional situation is not going to make a loan on that stock. They just don't want to be involved in the rights of other parties. They want to get, you know, if they're relying on the stock, they want to get clear rights to foreclose on that stock. And it just gets too messy if you have other rights available there.
>
> So whether or not there is a specific contractual prohibition or restriction on pledging, a restriction on sale is going to amount in real life to the same thing. So that's why I don't attach a lot of significance to that.
>
> Anyone who understood that they were buying stock that was subject to restriction on sale in my view ought to know that they're going to have a very difficult time getting someone else to give them a loan secured by that stock.
>
> THE COURT: But are you implying that the bank then was relying on this stock being available as security if they had to call the loan?
>
> THE WITNESS: The First National Bank of Chicago I think had no rights whatsoever to the stock. We're really talking about Comdisco.
>
> THE COURT: Okay. Let's talk about Comdisco then.
>
> THE WITNESS: Yeah. Well, from the point of view of the participants who bought the stock, you know, if they had gone to Citibank and asked for a loan and said "I have this collateral. I have this stock I own." And then Citibank said, "Okay. Would you please deliver

> it?" And then he would say, "Well, I can't deliver it. It's subject to
> Comdisco and, you know, all these other things." They'd just say, "We
> don't want to buy a lawsuit. We're not going to make a loan on the basis
> of that stock."
>
> THE COURT: All right. So you're basically saying that they
> would never be able to do that, so the right to pledge is irrelevant?
>
> THE WITNESS: Yes.

(9/25/13 Tr. at 201-202.)

378. Sabel testified that he did not see any documentary evidence of the Bank having a

lien or security interest in the stock held by Mellon. (9/24/13 Tr. at 23-24.)

### g.    Claw-Back Provision

379. Sabel testified that Hale's January 16, 1998 letter did not disclose that Comdisco

was entitled to 50% of any gain from the sale of SIP stock sold within three years of the purchase

date. Sabel testified that in general terms, he would describe a claw-back concept as someone

having an asset, such as stock, and if they sell it within a certain period of time, some amount of

the profits from the sale go to another party pursuant to a contract. (9/25/13 Tr. at 155.)

### 3.    Handwritten Notations on copy of the January 16, 1998 Hale Letter

#### Fact Testimony and Related Record Materials

380. The FRBC's file copy of the January 16, 1998 Hale letter contains a handwritten

notation on the bottom of page 2 reading as follows:

> Ollie said it was okay because the bank is relying on the guarantee of the
> company, not pledge of shares. S. Holz agrees unless the documents,
> note, or facility agreement establishes any rights in the shares in the
> event of default.

(PX 193.)

381. Wu testified that the handwritten notation on the January 16, 1998 Hale letter was

part of the original document located in the FRBC's Visual Memory system (PX 193), along

with a cover sheet indicating the author of the document was James B. McCauley. Wu testified

89

that she had no reason to believe the handwriting was not written at or around the time the letter was received in January 1998 and had no reason to believe that it was not written by McCauley or Lloyd.  Wu testified that she assumed Ollie referred to Oliver Ireland, an attorney that used to work at the FRBC legal department that she thought then went to the Board.  Wu testified that the reference to S. Holz was referring to Scott Holz, the Board's in-house expert on Regulations U and G. (11/16/12 Wu Dep. at 59-65.)

382.　Wu testified the FRBC has no institutional memory that any conversation occurred with Oliver Ireland or Scott Holz other than the existence of the handwritten note. (11/16/12 Wu Dep. at 136.)

383.　When asked whether the handwriting on page 2 of PX 193 was his, McCauley testified as follows:

> Q.  Is that your handwriting?
>
> A.  It could be.
>
> Q.  But you don't know?
>
> A.  I don't know.  I really don't.  It could be my handwriting.

(10/2/13 Tr. at 529-530.)

384.　McCauley testified that he cannot recall whether, in fact, there were conversations with Oliver Ireland or Scott Holz. (10/2/13 Tr. at 530.)  McCauley testified, "Exactly, yes.  I don't recall," in response to a question asking that his testimony was not that he did not consult with Oliver Ireland or Scott Holz, but just that he does not recall.  (10/2/13 Tr. at 532-33.)

385.　McCauley testified that he could not recall the circumstances under which he was assigned the task of responding to the Hale Letter.  He testified that it was not "out of the ordinary" for attorneys at the Federal Reserve Bank of Chicago to  "provide work to one another."  (10/2/13 Tr. at 521-523.)

90

386.     McCauley answered "Not specifically, no, I mean" to the question of whether he had any recollection of the Hale letter other than what may have been shown to him at his deposition. (10/2/13 Tr. at 522.)

387.     McCauley testified that, while he does not specifically recall, he assumes that he did have communications with Hale between January 16, 1998 and January 29, 1998.  McCauley testified that having a conversation with Hale would have been his custom and practice in January of 1998.  (10/2/13 Tr. at 522, 533-534.)

388.     McBride's itemized invoices do not reflect any oral or written communications between Lola Hale or any other attorney at the firm and Brent McCauley or any other representative of the FRBC between January 16, 1998 and January 29, 1998. McBride's itemized invoices do reflect calls on January 15, 1998 to "Federal Reserve Board" Re: Margin Issues and call on January 30, 1998 from "Federal Reserve Board" Re: Purpose Credit Issues. (PX 240.)

389.     McCauley testified that he does not remember talking with Hale, but that it would not surprise him if he did.  (10/2/13 Tr. at 533-534.)

390.     Wu testified that at this point in time the FRBC cannot say one way or the other whether any follow-up questions were asked during any such oral conversations.  (11/16/12 Wu Dep. at 130.)

391.     McCauley testified that the FRBC's general practice was to call lawyers making inquiries and to ask questions and tell them what you think.  McCauley said that was enough eight out of ten times.  McCauley testified that the FRBC's practice was not necessarily to give written responses.  McCauley testified he remembers that the FRBC wrote a letter to Hale which, by itself, was different. (10/2/13 Tr. at 533-534.)

392.     McCauley answered "Not specifically, no, I mean" to the question of whether he

91

had any recollection of having any communication with Hale prior to January 16, 1998. (10/2/13 Tr. at 522.)

393.    McCauley testified that he cannot recall whether he consulted with Board staff attorneys prior to writing his January 29, 1998 letter. (10/2/13 Tr. at 523-524, 532.)

394.    Wu testified that it was probably common practice in 1998 for a lawyer to record in handwriting on a letter like the letter from Hale to Lloyd a conversation he or she had with someone from the Board and that contacting the Board and having those types of conversations was a regularly conducted activity of the lawyers at the FRBC when they received inquiries like this. (11/16/12 Wu Dep. at 65-66.)

395.    Wu testified that the FRBC has no institutional knowledge as to whether the Hale letter of January 16, 1998 was transmitted by anyone at any time to the Board of Governors of the Federal Reserve System or its staff or any member of that staff. Wu also testified that the FRBC has no institutional knowledge as to whether a draft of the McCauley letter of January 29, 1998 was transmitted by anyone to the Board of Governors of the Federal Reserve System or its staff or any member of that staff before it was sent to Hale. (11/16/12 Wu Dep. at 115-117.)

<u>Testimony by Expert Witness</u>

396.    Sabel testified that he does not know whose handwriting appears at the bottom of the second page of the FRBC's copy of the January 16, 1998 Hale letter (PX 193). (9/24/13 Tr. at 138.)

397.    Sabel testified that the handwriting appears to be a notation from someone at the FRBC who spoke to the two lawyers referred to in the notation to discuss the proper response to the letter that the notation was written on. (9/24/13 Tr. at 46.)

398.    Sabel testified that the first sentence in the handwritten note on the second page of

92

the FRBC's copy of the January 16, 1998 Hale letter (PX 193), reading "Ollie said it was okay because the bank is relying on the guaranty of the company, not the pledge of shares," is talking about the Bank's extension of credit. (9/24/13 Tr. at 139.)

399.    Sabel interprets the second handwritten sentence, "S. Holz agrees unless the documents, note or Facility Agreement establishes any rights in the Shares in the event of default," to say that "Scott is agreeing with Ollie, but he's going on to mention the facility agreement because he knows a guaranty is an extension of credit. (9/24/13 Tr. at 139.)

400.    Sabel testified that Holz's reference to the "Shares" in the handwritten notation did not necessarily refer to both the stock and the proceeds from the stock. Sabel testified that the proceeds from stock can be important under the margin regulations. (9/24/13 Tr. at 142.)

### 4.    The January 29, 1998 Letter from McCauley of FRBC to the January 16, 1998 Hale Letter

#### Fact Testimony and Related Record Materials

401.    McCauley responded to Hale's letter by letter dated January 29, 1998. (Stmt. Uncontested Facts ¶ 8.) A copy of McCauley's January 29, 1998 letter is attached as Tab H in Volume 1 of the Appendix.

402.    McCauley testified that he has no idea whether, prior to January 29, 1998, he had written informal interpretations of the general nature of JX 3 relating to Regulation G or Regulation U in response to inquiries made by third parties. McCauley testified that he does not know whether he was familiar with the concept of an extending violation or an arranging violation as of January 1998. McCauley testified that the FRBC did not have approval authority over the proposed Comdisco SIP transaction. (10/2/13 Tr. at 527-529.)

403.    The January 29, 1998 McCauley letter stated that:

> This is in response to your letter of January 16, 1998 in which
> you requested an opinion confirming that a proposed loan would not be

93

considered "secured, directly or indirectly," by securities that will be purchased with the loan proceeds. As you noted, if Federal Reserve Regulations G (12 CFR Part 207, "Securities Credit by Persons Other than Banks, Brokers, or Dealers") and U (12 CFR Part 221, "Credit by Banks for the Purpose of Purchasing or Carrying Margin Stocks") apply to this transaction, the value of the stock as collateral may be subject to certain limitations and the company would be required to register as a Regulation G lender.

According to your letter, the proposed transaction involves a financing arrangement that will enable employees of your client, a New York Stock Exchange listed company, to purchase that company's stock. The purchase price of the shares will be paid by the employees through a credit facility established by the company on the employees' behalf at a bank. The company will enter into a "Facility and Guarantee Agreement" with the bank in which the company will "agree to guarantee the prompt and complete payment of the principal and interest on the loans." Your letter also details a number of other features of this arrangement that are designed to establish that the lending relationship between the employee/borrower and the bank is not secured by the purchased stock. but rather solely by the company's guarantee.

Based upon the facts and representations made in your letter, it is my opinion that this proposed transaction does not constitute a loan secured "directly or indirectly" by the purchased stock as contemplated by Regulations G and U. This opinion relies heavily upon your assertion that "[t]here is no reference ... either in the note or in the Facility Agreement to any restriction on the transfer of the securities to be purchased … nor do those securities form collateral for the Note."

As we discussed, Regulation G, at Section 207.2(f)(2)(iv), provides that the term indirectly secured does not include a tending arrangement where "the lender, in good faith, has not relied upon margin stock as collateral in extending or maintaining the credit." Therefore, any rights, not specified in your letter, that the bank has, or will gain, in the purchased shares in the event of default of an employee stock purchase loan will result in a different conclusion.

The legal staff of the Board of Governors has been consulted about the facts set forth in your letter. The staff members consulted have concurred in this opinion. This is, therefore, a staff opinion only, as the matter has not been presented to the Board and is limited to the facts presented in your letter. As noted above, different facts could compel a different conclusion.

(JX 3 at 1.)

404.     McCauley testified that, based on his experience at the FRBC, the phrase "staff

opinion only" referred to an "informal interpretation of the rules based on the facts that were

94

presented" to the FRBC. (10/2/13 Tr. at 524-525.)

405. Wu testified that the FRBC did not have any institutional knowledge of whether: the Bank would obtain a financial statement from each of SIP borrower; the Bank would extend credit to every SIP borrowers regardless of whether the borrower's financial statement would reasonably support his or her loan; whether Comdisco would obtain a financial statement from each SIP borrower; Comdisco would review each borrower's financial statements to determine if whether they could reasonably support their loans; the loans would mature upon the earlier of 5 years or change in control of Comdisco; the loans would have a repayment structure in which 19 quarterly interest payments of approximately 6/10 of 1 percent of the amount borrowed would have to be repaid followed by a balloon interest payment of approximately 37 percent of the amount borrowed plus principal; the loans would have a repayment structure custom designed by the Bank with the intention that quarterly dividends would cover the first 19 interest payments while the five-year appreciation in stock value would cover the final balloon payment; the Bank had offered any nonstock loan program similar to the proposed transaction; the Bank had originally proposed to Comdisco the structure of the transaction set forth in the Hale letter of January 16, 1998; and the structure would place restrictions on the right or the ability to sell, pledge, transfer or otherwise dispose of the stock or the purpose of any such restrictions. (11/16/12 Wu Dep. at 101-106.)

406. Wu testified that the FRBC did not have any institutional knowledge of the structure of the Comdisco SIP or whether that structure would violate Regulations G or U, except what was contained in McCauley's letter to Hale. (11/16/12 Wu Dep. at 107-108.)

407. Wu testified that none of the people she spoke to at the FRBC regarding the Rule 30(b)(6) subpoena issued to FRBC were familiar with the Comdisco matter or McCauley's

response to Hale's letter.  (11/16/12 Wu Dep. at 24.)

408.    Wu testified that the accuracy of McCauley's response to Hale's letter would depend upon whether the facts and representations in Hale's letter were true. (11/16/12 Wu Dep. at 100-101.)

409.    Wu testified that it is fair to assume that the FRBC had to rely entirely on the facts and representations made to it by McBride.  Wu testified that if those facts and representations were false or misleading, it is fair to say that the informational guidance provided by the FRBC could be inaccurate.  Wu testified that the FRBC does not have any institutional knowledge as to whether: (a) any of the facts in the Hale letter were false, (b) the facts represented in that letter were true, or (c) there were facts and representations that would have been relevant to the inquiry that were omitted from the letter.  Wu testified that she does know whether McCauley's opinion was correct or incorrect.  (11/16/12 Wu Dep. at 100-101, 109-110, 128-129.)

410.    A copy of the January 29, 1998 letter produced by the FRBC contains handwriting at the top which reads: "File V.M. Reg G, Reg U, margin regulations, securities credit."  This copy also has a routing stamp with illegible names and additional handwriting that states "then file."  (PX 237.)

411.    Wu testified that (i) the stamp on the top of the letter was so that other attorneys in the legal department could see it, (ii) that someone thought it was worth passing around or useful to know, and (iii) that it was common practice if attorneys found a document helpful that they would circulate it.  Wu testified that the stamp indicates that the letter was circulated to William Gram, Yurh Skorin, Liz Knospe, Anna Voytovich, Kathy Schrepfer, Brent McCauley, and Bill Lloyd.  Wu testified that all of these individuals were members of the FRBC legal department in 1998.  Wu testified that the notes at the top reading Reg G, Reg U, margin

96

regulations, and securities credit were search terms for the Visual Memory system. (11/16/12 Wu Dep. at 67-68, 70.)

<div align="center">Testimony by Expert Witness</div>

412.    Sabel testified that the reference to both Regulations G and U in the January 29, 1998 McCauley letter indicated to Sabel that McCauley was referring to both the guarantee in the Facility Agreement and to the Notes.  Because Regulation G would apply to a non-bank, and Comdisco was the only relevant non-bank, Sabel believes the reference to both Regulation U and Regulation G means the letter refers to both the Notes and the Guarantee.  (9/24/13 Tr. at 69-70.)

413.    Sabel testified that he had included language in written responses to inquiries he received at the FRBNY that was very similar to the concluding paragraph of the McCauley letter. Sabel testified that he understands "[t]he legal staff" referred to in the first sentence of the concluding paragraph of McCauley's letter to be at least one of the lawyers on the legal staff of the Board of Governors who was working in the margin regulations at the time, probably Holz or Ireland.  (9/24/13 Tr. at 42-44.)

414.    Sabel testified that he considered a letter ending with the language "this is, therefore, a staff opinion only" included in the conclusion of the January 29 McCauley letter to reflect the opinion of the Federal Reserve Board staff in Washington.  (9/24/13 Tr. at 44.)

415.    Sabel testified that if someone had asked him at the time, he probably would have said that the quoted language was referring to the staff of the FRBC and the Staff of the Board in Washington. (9/24/13 Tr. at 44.)

416.    Sabel testified that he understood the January 29, 1998 McCauley letter to be addressing the compliance of the Bank with the margin regulations and that he thinks the first sentence of the letter so states.  (9/24/13 Tr. at 68.)

<div align="center">97</div>

417.     Sabel testified that the third paragraph of the January 29, 1998 McCauley letter describes a theory that reflects what the handwritten notes at the bottom of the FRBC's file copy of Hale's January 16, 1998 letter (PX 193) indicated that Ireland or Holz said. (9/24/13 Tr. at 68-70.)

418.     Sabel testified that the fourth paragraph of the January 29, 1998 McCauley letter reflected the rationale provided in the handwritten notes at the bottom of Hale's January 16, 1998 letter (PX 193) and that the fourth paragraph "includes a reference to what we call good faith non-reliance, which is one of the provisions in the margin regulations that means you are not indirectly secured. (9/24/13 Tr. at 70.)

419.     Sabel testified that he believes McCauley was referring to both the notes and the guarantee in his January 29, 1998 letter, because it "talks about Regulation U and about Regulation G. Regulation U clearly would apply to a bank, G to a non-bank.  The only relevant non-bank here is Comdisco.  So that's why I believe that they're talking about both the bank notes and the guarantee." (9/24/13 Tr. at 70.)

420.     Sabel testified, having considered both the January 29, 1998 McCauley letter (PX 237) and the handwriting on the copy of the January 16, 1998 Hale letter (PX 193), that he "consider[ed] the handwriting to be an indication that they agreed with the substance of what McCauley's ultimate letter said." (9/24/13 Tr. at 48-49.)

421.     Sabel testified that his position is that the handwriting on PX 93 agrees with the substance of what McCauley said in his January 29, 1998 letter.  (9/24/13 Tr. at 140.)

**5.      The Date and Delivery of the McCauley Letter**

<u>Fact Testimony and Related Record Materials</u>

422.     The January 29, 1998 McCauley letter does not indicate how it was transmitted to

98

Hale.  (JX 3.)

423.    McCauley testified that he did not recall how he transmitted the FRBC Letter to

Hale.  (10/2/13 Tr. at 526-527.)

424.    The first time Harvey saw either the Hale letter to the FRBC or the McCauley

response was in or about August or September of 2001, after Comdisco's bankruptcy filing.

Harvey testified that he was not aware prior to seeing the letters that Hale intended to write a

letter to the FRBC or that the FRBC had written Hale.  (10/1/13 Tr. at 451, 455.)

<u>Testimony by Expert Witness</u>

425.    Sabel testified that the fact that the McCauley letter was dated January 29, 1998 –

one day before the SIP program was presented to participants – did not concern him in reaching

his opinions.  Based on his experience, Sabel testified that much of work on transactions is done

in anticipation that formal documents would arrive.  Sabel testified that here the indication was

that Hale had spoken to the FRBC, apparently gotten oral comfort that the FRBC would give a

confirmatory opinion, expected such an opinion to come and went forward on that basis.

(9/24/13 Tr. at 67, 192.)

426.    Sabel testified that McBride's time records referenced a call from Hale to the

FRBC on January 30, 1998. (9/24/13 Tr. at 64-65.)

427.    Sabel testified that he had not seen any evidence suggesting that Hale had any

communication with anybody from the Federal Reserve Board.  (9/24/13 Tr. at 128-129.)

428.    Sabel does not know whether anyone at Comdisco ever saw the January 29, 1998

McCauley letter and does not know when Hale received the January 29, 1998 McCauley letter.

(9/24/13 Tr. at 140.)

429.    Sabel testified that he believes it was consistent with custom and practice for

99

McBride to rely in part on the McCauley letter to go forward with the transaction. (9/24/13 Tr. at 80-81.)

430.     Sabel has not seen anything in his work suggesting that Comdisco was not going to go forward with the SIP program if a concurrence was not received from the FRBC.  (9/24/13 Tr. at 141.)

431.     Sabel testified that he knows the SIP presentation was on January 30, 1998.  He testified that he does not know whether all of the paperwork in connection with the proposed presentation, or the prospectus and other materials provided to the prospective participants, had been completed as of January 29.  Sabel testified that he does not know whether the prospectus and other materials had been provided to any prospective SIP participant prior to the presentation on January 30. (9/24/13 Tr. at 140-141.)

**D.     McBride's Overview to the Comdisco Board**

432.     Harvey testified that McBride prepared a summary and overview document that was provided to the Comdisco Board of Directors in connection with their consideration of the SIP.  (10/1/13 Tr. at 388-389.)

433.     On January 13, 1998, Hale faxed Harvey a ten-page document entitled "Overview of SIP and Adoption Process," which included an "Overview Applicable Legal Considerations." (PX 233.)

434.     Also on January 13, 1998, Lola Hale faxed Scott Harvey a table comparing the Baxter, Allegiance, and proposed Comdisco SIP programs. (PX 205.)

435.     PX 315, entitled "Overview of SIP and Adoption Process," is the final version of the Overview document that went to the Comdisco Board.  Harvey reviewed and edited this document before it went to the Board.  (10/1/13 Tr. at 390-391.)

100

436.    The Overview document presented to the Board indicated that the Board would need to adopt an underlying option plan in connection with the SIP.  The document stated as follows:

      **1.    Full Board Adopts New "Vanilla" Stock Option Plan**

- existing Company option plans do not have sufficient available authorized shares.

- Baxter and Allegiance did not have to adopt new option plan.

- SIP then adopted pursuant to the new option plan (the "Plan") by disinterested committee of the Board.

(PX 315 at SIP0040059.)

437.    The Overview document further noted that "[s]ince proposed Plan and SIP are broad based, no stockholder approval required by NYSE or [Chicago Stock Exchange]." (PX 315 at SIP0040060.)

438.    Harvey testified in connection with the statement that no stockholder approval was required by the stock exchanges that he believed there was a restriction requiring plans that did not have shareholder approval to be broad-based.  The idea was so that companies could not put plans in place without shareholder approval where the plan in essence distributed options to just one or two people in the company.  (10/1/13 Tr. at 392.)

439.    The Overview document presented to the Comdisco Board stated the following with respect to the margin regulations:

      **6.    Federal Reserve Board Margin Regulations.**

- As structured the Loan and program even though for 100% of the purchase price do not violate federal margin regulations regarding "purpose credit".  The Loan is not considered secured by the shares to be purchased.

(PX 315 at SIP0040061.)

440.    Harvey testified that he never discussed the Overview document with McBride.

101

He further testified that he did not consider it to be an opinion Comdisco had requested in connection with the SIP program and that, to him, "it was just a statement that they made." Harvey testified that if Comdisco had requested something less than a full opinion, he would have expected to receive a formal memo that outlined the issue, Comdisco's request, McBride's research and their conclusions; if Comdisco had requested an actual opinion, Harvey would have expected a formal opinion on letterhead in the format of an opinion. (10/1/13 Tr. at 459.)

### E. The Bank's and McBride's Efforts to Confirm Whether the SIP Transaction Complied

#### 1. The Bank

441.    Sabel testified that it was reasonable for the Bank to go forward with the SIP transactions on the basis of the opinion from McBride as confirmation of their own view that the transaction was consistent with the margin regulations.  (9/24/13 Tr. at 81.)

442.    Sabel testified that banks generally, and especially banks of the size and sophistication of the Bank, are conversant with regulations such as the margin regulations.  Sabel testified that in this case, the Bank was engaging in a transaction that it had engaged in before and apparently was comfortable on that basis that the structure was permissible.  (9/24/13 Tr. at 81-82.)

443.    Sabel testified that in his review of testimony and documentary evidence, he did not see any indication that Bank personnel did not believe the SIP loans and SIP transaction complied with the margin regulations. (9/24/13 Tr. at 84.)

444.    Sabel testified that, in addition, the Bank's counsel, Winston, was a highly reputable law firm with a lot of experience in bank finance, which would include the margin regulations.  Winston hired Sabel as an expert on Regulation U shortly after he joined Shearman & Sterling, and Sabel has dealt with Winston & Strawn in other contexts because it has a number

102

of bank clients. (9/24/13 Tr. at 82-83.)

445.    Sabel testified that he probably was retained as an expert on Regulation U by Winston's New York office, but he does not remember. He recalls that he has worked with Winston's New York office on various other matters, most recently a few years ago. (9/24/13 Tr. at 92-93.)

### 2.    McBride and Comdisco

#### Fact Testimony and Related Record Materials

446.    Harvey testified that he assumed that, in the run up to the SIP in the summer of 1997 and January 1998, McBride did whatever it needed to do in order to give a competent opinion to the Bank. Harvey testified that was McBride's obligation, they said they would provide the opinion, and so the legal department at Comdisco assumed that McBride did whatever was necessary. Harvey testified that he had no reason to believe McBride did not do adequate diligence or homework regarding compliance with the margin regulations. (10/1/13 Tr. at 394.)

447.    Harvey testified that he was not aware at the time that McBride sought an opinion from the FRBC regarding the compliance of the SIP transaction with Regulations G and U. Harvey testified that he does not recall seeing any of McBride's legal research memoranda. (10/1/13 Tr. at 395-396.)

448.    Harvey testified that he as an individual in Comdisco's legal department (i) did not understand that the issue of whether the SIP program complied with the law in particular the margin regulations was an issue that should be investigated by Comdisco prior to implementing the program (ii) did not do any independent inquiry as to whether the SIP program would violate Regulation G or U, (iii) never read Regulation G or U; (iv) never asked McBride to provide

103

Comdisco with an opinion as to whether the SIP program would violate Regulation G or U; and (v) never asked for any oral or written opinion or advice from anyone in advance of the SIP presentation on January 30, 1998 as to whether Regulation G or U would be violated. (10/1/13 Tr. at 456-458.)

449. Harvey testified that the Comdisco law department did not ask for an opinion from Hale as to whether the SIP violated the margin regulations. Harvey would have expected Hale to raise the issue if there was a problem with the margin regulations. (10/1/13 Tr. at 393-394.)

<u>Testimony by Expert Witness</u>

450. Sabel testified that in his opinion, "McBride's efforts to confirm that the Comdisco SIP conformed to margin regulations were consistent with custom and practice." (9/24/13 Tr. at 55.)

451. Sabel testified that the documents he reviewed indicated that attorneys at McBride conducted research and consulted with reserve bank staff to determine whether the margin regulations would be complied with in the particular structure they were looking at. (9/24/13 Tr. at 55.)

452. Sabel testified that he understands Hale is deceased and was not deposed. Despite not having a deposition, Sabel testified that he was able to obtain a satisfactory enough level of understanding of McBride's efforts to form his opinions. Sabel testified that it would have been helpful to have talked to her and to have seen "what she did in order to actually do the work, because there is not much file material that indicated exactly what she was doing, but I think there was enough to show that there was substantial work done." (9/24/13 Tr. at 57.)

453. Sabel testified that there were internal documents indicating that McBride had

104

done the research he previously referred to in his testimony. There is not much evidence as to what Hale said or did in January and February 1998 when this transaction was done. (9/24/13 Tr. at 85.)

454. Sabel testified that PX 791 fairly and accurately lays out a timeline of certain events that occurred within McBride. He testified that he prepared the timeline based on time records and memoranda and other documents that he reviewed from the McBride files. Sabel testified that there are separate columns for 1997 and 1998 on PX 791 to demonstrate that there were two different series of efforts working on the transaction. (9/24/13 Tr. at 61-62.)

455. Sabel testified that prior to his deposition in May 2013, he was unaware that Comdisco had sued Hale and McBride for legal malpractice in connection with the SIP. (9/24/13 Tr. at 98.)[4]

456. Sabel testified that a corporate non-bank entity such as Comdisco would not be expected to have a good deal of experience with provisions such as the margin regulations and would rely a great deal on outside counsel to confirm what the Bank was telling them was correct and to give them comfort that the transaction complied. (9/24/13 Tr. at 84.)

457. Sabel testified that the documents he reviewed indicated that "McBride did independent research to ascertain compliance rather than simply reusing documentation from prior transactions." Sabel testified that McBride did not simply accept what was given to them by the Bank but looked at the relevant legal documents to make their own judgment whether or not what they were given was consistent with the margin regulations. (9/24/13 Tr. at 55.)

458. Sabel testified that he reviewed available evidence to understand what McBride did in evaluating compliance of the SIP program with the margin regulations. He testified that

---

[4] The Trustee objected to questioning regarding the malpractice suit on the ground that the Court granted Motion *in Limine* #3, which specifically sought to exclude this evidence.

he was provided "not only their internal or backup, the diary entries that went into the invoices that went to Comdisco for the work they were doing, but also copies of internal memoranda and notes that were taken at the time." (9/24/13 Tr. at 56.)

459.    Sabel testified that after reviewing the material summarized in PX 791, he thought McBride's efforts were appropriate to the topic that they were trying to confirm and that they got the appropriate level of guidance from the Federal Reserve. (9/24/13 Tr. at 65.)

460.    Sabel testified McBride's February 10, 1998 opinion letter did not reference that McBride had obtained guidance from the FRBC, but stated that "you know, the indication is that that gave them the comfort that they needed in order to go forward with the opinion." (9/24/13 Tr. at 65.)

## F.    Underwriting and Loan Approval by the Bank

461.    Clarke testified that, between July 1997 and January 1998, the company decided to wait on the transaction, but at the end of 1997 or very early in 1998 he received a phone call from Pacewicz indicating the company wanted to move ahead with the transaction quickly. (9/25/13 Tr. at 230.)

462.    Clarke testified that he believes the call from Pacewicz came shortly after a Board meeting. (9/25/13 Tr. at 230.)

463.    On January 22, 1998, Peter Bartol and Mike Kingsley sent a memorandum to Dan Clark, Dan Lupiani, and Bill Artz regarding Project Bulldog. This memorandum stated:

> Following are the results of this morning's syndications underwriting:
>
>   1) The market has deteriorated since the June 12 underwriting.
>
>   2) The Guarantor had an unsuccessful renewal/increase in 4Q97 that
>      involved declines from 1/3 of its bank group.

3) The requested doubling of the commitment amount materially affects the underwriting. Underwriting approved a CAS commitment of up to $75MM, subject to

    a) FNBC to keep the greater of $25MM or 25% of the deal amount

    b) Banks to receive LIBOR plus 65 (an increase of 1/8th from 6/12)

    c) Banks to receive an up-front fee of 5 bps (non in 6/12)

(PX 228.)

464.    This January 22, 1998 memorandum was from representatives of the Bank's loan sales and syndications departments to Clarke and indicated to him that the general condition of the bank liquidity marketplace, the general economic situation as perceived by the syndications people had deteriorated and credit had tightened generally, independent of the transaction, especially to nonbank financials. Clarke testified that this would change the Bank's view of how it could sell the transaction. (9/25/13 Tr. at 230-231; PX 228.)

465.    Clarke testified that the January 22, 1998 memorandum also indicated that one-third of the bank group had dropped out of Comdisco's core liquidity facility. According to Clarke, that was a significant number; however, two-thirds of the banks stayed in the transaction. Clarke testified that having one-third of relationship banks drop out would send a very strong signal to the market. Clarke indicated that typically a bank likes to have a facility oversubscribed in a syndication so that in case potential lenders drop out, the bank can ask the core liquidity banks to take a larger amount. Clarke could not recall on an individual level if the banks who were part of Comdisco's credit facility increased their commitments to the company. (9/25/13 Tr. at 231-233.)

466.    Clarke testified that the January 22, 1998 memorandum reflected new market terms the Bank's syndications department thought necessary to sell the SIP bank facility into the syndications market. Clarke testified that these terms reflected Comdisco's operating results and

107

the tough liquidity market. Based on these factors, the Bank needed to increase compensation, among other things, to entice other banks to participate. (9/25/13 Tr. at 233; PX 228.)

467.    Clarke testified that the syndications underwriters' committee meeting minutes from January 22, 1998, included with the memorandum of that date, were for the same general committee that considered the transaction in the summer of 1997. This committee was evaluating the transaction again for purposes of syndicating it. (9/25/13 Tr. at 233-234; PX 228.)

468.    The syndications underwriters committee meeting minutes from January 22, 1998 indicated that Comdisco still had a BBB+ credit rating, which reflected the lower end of investment grade but still investment grade. (9/25/13 Tr. at 234; PX 228.)

469.    On or about January 30, 1998, the Bank issued a new Commitment Letter to Comdisco in connection with the SIP. (PX 361.)

470.    Clarke testified that the Commitment Letter was not an indication the loan ultimately was syndicated, but that it was an agreement of the updated terms by which there is enough information that the syndications department would have created a new offering memorandum updating it. (9/25/13 Tr. at 235.)

471.    By fax dated January 29, 1998, Michael Kingsley of First Chicago Capital Markets, Inc. sent Pacewicz, Brian Hart of Winston, and Dan Clarke a revised term sheet and drafts of the Bank's commitment and fee letters. (PX 301.)

472.    Clarke testified that the increased credit facility, from $75 million to $100 million, reflected in the January 30, 1998 Commitment Letter resulted from Comdisco's need to increase the dollar amount because of the increased number of participants and/or an increase in the individual commitment levels in the aggregate. (9/25/13 Tr. at 236; PX 361.)

473.    Clarke testified that the January 30, 1998 Commitment Letter reflected changes

108

since July 1997 in: how many points over LIBOR the interest rate would be, how many basis points would be charged, and the increased amount of the commitment. Clarke testified that beyond these changes, there were no other major changes in deal points between the initial consideration by the Bank's underwriting committee in July of 1997 and the issuance of the January 30, 1998 Commitment Letter. (9/25/13 Tr. at 236; PX 361.)

474. In addition to the new Commitment Letter, the Bank issued a Fee Letter to Comdisco on January 30, 1998. (PX 299.)

475. Clarke testified that the Fee Letter is a private letter distinct from the commitment letter, which outlines the economics of how much the Bank would be paid for the various duties it undertook. The Fee Letter included an arrangement fee paid to the Bank for being the originator of the transaction, an annual administration fee, an early payment fee if participants exited the program, and legal expenses. Clark testified that the fees were largely negotiated between Clarke and Pacewicz. Clarke testified that he believed these fees were consistent with the applicable market and that the fees shown in the Fee Letter reflect the agreement that he and Pacewicz ultimately reached. (9/25/13 Tr. at 237-238; PX 299.)

476. Clarke testified that he was aware that Comdisco submitted an opinion letter to the Bank in connection with the closing of the transaction; however, the legal opinion from outside counsel for Comdisco was very much outside of his bailiwick. (9/25/13 Tr. at 253.)

## V.   STRUCTURE AND TERMS OF THE ADOPTED SIP AND RELATED TRANSACTION DOCUMENTS

### A.   The Notes and Loans

477. Under the terms of the SIP, each participant in the SIP would take out a personal loan from the Bank (the "SIP Loan"), and would use the proceeds of that loan to purchase common stock in Comdisco. (Stmt. Uncontested Facts ¶ 6.)

109

478.     The Facility and Guaranty Agreement and the Promissory Notes were prepared by the Bank or its attorneys and reviewed by McBride and Comdisco.  (Stmt. Uncontested Facts ¶ 12.)

479.     As part of the SIP Program, each SIP Participant, including Defendants, signed a Promissory Note in favor of the Bank.  Each Promissory Note (and the SIP Loan to which it related) was in the amount of 100% of the purchase price of the stock purchased by such SIP Participant.  The Promissory Notes were dated February 10, 1998.  (Stmt. Uncontested Facts ¶ 24.)

480.     The stock being purchased was identified in the Promissory Notes as "Restricted Stock." (JX 10, 11, 12, 13 at § 5, 11.)

481.     The proposed SIP Loans to each of the Prospective SIP Participants were full recourse loans with a five-year term, and in an amount equal to 100% of the purchase price of the shares.  The SIP required Prospective SIP Participants to finance their SIP Loans through the Bank in connection with their purchase of the Comdisco shares.  (Stmt. Uncontested Facts ¶ 15, 24.)

482.     The Promissory Notes provided for an early payment fee if the borrower repaid the loan to the Bank prior to the maturity date.  (JX 10, 11, 12, 13 at § 7.)

483.     In order to participate in the SIP Program, Prospective SIP Participants were required to open an account at the Bank.  (Stmt. Uncontested Facts ¶ 17.)

484.     The Promissory Notes executed by each Defendant stated that the borrowers promised to repay the principal amounts of the loans extended to each defendant, plus interest on the outstanding principal at an interest rate per annum equal to 7.8054 percent per annum until the principal amount is paid in full.  (JX 10, 14, 11, 12 at 1.)

110

485.     Notwithstanding that interest accrued on the loans at the applicable 7.8054 percent interest rate (and subject to the default interest provisions in Section 1(b) of the Notes), during the periods up to but excluding the quarterly period ending December 9, 2002, Defendants were obligated to make periodic current interest payments only in an amount calculated at lower interest rates as follows: approximately .53 percent for two periods; approximately .57 percent for 16 periods; approximately .62 percent for one period; and approximately 1.9 percent for one period; all on a per annum basis.  Defendants' deferred interest payment for the final quarter of the loan, December 9, 2002 through February 10, 2003, was to be at a rate of 209.67 percent on a per annum basis.  (JX 10, 14, 11, 12 § 1.)

486.     Cumulative deferred interest over the five-year term of the Notes was 36.519% of principal.  Thus, for a $100,000 loan, the amount of deferred interest at maturity was $36,592.  Based on total loans aggregating approximately $109 million, the Bank estimated that the total amount of current and deferred interest due at maturity would approximate $40 million.  (DX 87-88.)

487.     Sabel did not examine the issue of whether the loans were not payable on demand or because of fluctuations in the market value of the stock, but instead were payable on one or more fixed maturities that were typical of maturities applied by the bank to loans otherwise similar, except for not involving any possible question of stock collateral.  (9/25/13 Tr. at 168-169.)

488.     The Notes provided that "[u]pon the occurrence and during the continuance of a matured event of default in the payment of any principal or interest under this Note, the outstanding principal amount hereof shall bear interest, payable upon each Interest Payment Date and upon demand, at the Corporate Base Rate plus two percent (2%) per annum." "Corporate

Base Rate" was defined to mean the per annum rate equal to the corporate base rate of interest announced by the Bank from time to time. (JX 10, 14, 11, 12 § 1(b).)

489.     In the Event a "Program Event of Default" (as defined in the Facility and Guaranty Agreement, discussed below) occurred and was continuing, the Notes permitted the Bank, by notice to Comdisco and the borrowers, to "declare the principal amount and interest and other amounts outstanding under [the Notes] to be forthwith due and payable, whereupon such principal amount[s], all such interest (including any interest the payment of which had been deferred pursuant to Section 1(a)) and all such other amounts shall become and be forthwith due and payable, without presentment, demand, protest or notice of any kind." (JX 10, 14, 11, 12 § 6(a).)

490.     Section 5 of the Notes provided that "[t]he Borrower hereby irrevocably directs the Lenders to disburse the proceeds of the Loan evidenced hereby directly to the Company for the account of the Borrower in payment (whether in whole or in part) of the Restricted Stock and agrees that any funds so disbursed (regardless of how applied by the Company) shall be considered received by the Borrower upon the receipt of such funds by the Company." (JX 10, 14, 11, 12 § 5.)

491.     The Notes provided that each Defendant "consents to be governed by the terms of the Facility Agreement to the extent the terms thereof are applicable" to the loans evidenced by the Notes. (JX 10, 14, 11, 12 § 11.)

492.     The Notes contained the following provisions regarding expenses and indemnification of costs, expenses and fees for collection and enforcement:

> 17.     Expenses: Indemnification. The Borrower agrees to reimburse the Agent and the Lenders for any costs, internal charges and out-of-pocket expenses (including reasonable attorneys' fees and time charges of attorneys for the Agent and the Lenders, which attorneys may be employees of the Agent or the Lenders) paid or incurred by the Agent or

112

any Lender in connection with the collection and enforcement of this Note. The Borrower further agrees to indemnify the Agent and each Lender, its directors, officers and employees against all losses, claims, damages, penalties, judgments, liabilities and expenses (including, without limitation, all expenses of litigation or preparation therefor whether or not the Agent or any Lender is a party thereto) which any of them may pay or incur arising out of or relating to this Note, the transactions contemplated hereby or the direct or indirect application or proposed application of the proceeds of the Loan evidenced hereby except to the extent that they arise out of the gross negligence or willful misconduct of the party seeking indemnification. The obligations of the Borrower under this Section shall survive the repayment of this Note.

(JX 10, 14, 11, 12 § 17.)

493.    The Notes stated the following with respect to the severability of provisions in the

Notes in the event a provision is held unenforceable:

19.    Severability of Provisions. Any provision in this Note that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of this Note are declared to be severable.

(JX 10, 14, 11, 12 § 19.)

494.    Each SIP participant, including Defendants, also had to sign a Letter of Direction

addressed to (i) The First National Bank of Chicago, Individually and as Agent; (ii) Comdisco,

Inc.; and (iii) Chase Mellon Shareholder Services.  The Letters of Direction provided as follows:

The undersigned hereby irrevocably directs (i) the Agent to pay all of the proceeds of the loans made by the Lenders to the undersigned in connection with the Shared Investment Plan (the "Loan") directly to the Company for the account of the undersigned in payment of the purchase price of the shares of the Company's common stock to be issued to the undersigned pursuant to the terms and conditions of the Shared Investment Plan (the "Stock") and (ii) the Company and its transfer agent to pay all future cash dividends (net of any taxes required to be withheld by the Company under applicable law) on the undersigned's Stock (and on all stock of the Company received as a dividend on or distribution of the Stock) directly to the Agent for credit to the deposit account established in the undersigned's name with The First National Bank of Chicago in connection with the Shared Investment Plan (the "Borrower Account") and further authorizes and directs The First National Bank of Chicago to charge the Borrower Account for the payment of principal,

113

> interest and other charges as such amounts become due under any
> promissory note(s) executed by the undersigned in connection with the
> Shared Investment Plan (the "Note").
>
> The undersigned agrees that, except as otherwise agreed in writing by
> Lenders holding at least 66-213% of the then aggregate unpaid principal
> amount of all loans made pursuant to the Facility Agreement. The
> foregoing directions and authorizations are irrevocable and shall remain
> in full force and effect until all amounts owing under the Note have been
> paid in full and the Note has been canceled.

(PX 779, 758, 767, 753.)

**B.      The Facility Agreement**

<u>Fact Testimony and Related Record Materials</u>

495.      The loans to the SIP Participants were guaranteed by Comdisco pursuant to the

terms and conditions of a Facility and Guaranty Agreement dated as of February 2, 1998 (the

"Facility Agreement") executed by Comdisco and the Bank, individually and as Agent. (Stmt.

Uncontested Facts ¶ 25.)

496.      In the SIP Binder, the Facility Agreement was described as "the agreement

between Comdisco and [Bank One] establishing the loan program. . . . By signing the Note, you

will represent that you have carefully reviewed the Facility Agreement." (JX 1, Tab 4, at

00033.) A copy of the SIP Binder is attached as Volume 2 of the Appendix.

497.      JX 8 was the final version of the Facility Agreement Pacewicz signed on behalf of

Comdisco. Pacewicz testified that before signing the Facility Agreement he had an opportunity

to review it and provide comments to it. Pacewicz further testified that because he signed it, he

was generally satisfied with the final document from the Treasurer's standpoint. Pacewicz

testified that he is not a lawyer and would not have reviewed the Facility Agreement or any

materials in the SIP binder from the perspective of legal issues and would have relied upon the

legal department for review of any legal issues. (10/2/13 Tr. at 573-575)

114

498.     The Facility Agreement defined "Restricted Stock" as "shares of [Comdisco's]

Common Stock issued to employees of [Comdisco] and its Subsidiaries pursuant to the terms and

conditions of the Shared Investment Plan."  (JX 8 at 9.)

499.     Sabel testified that the proceeds of the Bank loans could only be used to buy

Restricted Stock and that under the plan, Comdisco was to hold this stock until all restrictions

had lapsed.  (9/25/13 Tr. at 174.)

500.     Under the Facility Agreement, the Bank's and the other lenders' obligations to

make loans to the SIP participants were subject to the fulfillment of certain conditions precedent,

including receipt by the Bank of (among other things):  "(d) Legal Opinion.  A written opinion of

McBride, Baker & Coles, counsel to the Company, in form and substance satisfactory to the

[Bank]" and "(e) Letter of Direction.  A Letter of Direction in the form of Exhibit B hereto

executed by each Borrower …" (JX 8 § 3.01.)

501.     Under the Facility Agreement, Comdisco represented and warranted to the Bank

and each lender that (among other things):

> (c)     The execution and delivery of, and performance by the
> Company of its obligations under, each Loan Document to which it is a
> party will not result in a breach or violation of, conflict with, or
> constitute a default under the certificate of incorporation or by-laws of
> the Company, any Requirement of Law or any Contractual Obligation of
> the Company or any of  its Subsidiaries, and will not result in, or require
> the creation or imposition of, any Lien on any of their respective
> properties or revenues pursuant to any Requirement of Law or
> Contractual Obligation.
>
> ***
>
> (h)     No part of the proceeds of any Loan will be used in a
> manner which would violate, or result in a violation of; Regulation G,
> Regulation T, Regulation U or Regulation X. Neither the making of any
> Loan hereunder nor the use of the proceeds thereof will violate or be
> inconsistent with the provisions of Regulation G, Regulation T,
> Regulation U or Regulation X.
>
> ***

115

       (k)      The Company Incentive Stock Option Program has been duly adopted and approved by all requisite corporate action (including stockholder approval, if necessary) on behalf of the Company, and the Restricted Stock, when issued on the Closing Date, shall have been duly issued, in compliance with all applicable laws.

(JX 8 §4.01(c), (h), (k).)

502.    The Facility Agreement defined "Company Incentive Stock Option Program" as "the Comdisco, Inc. 1998 Incentive Stock Option Program adopted by the Board of Directors of the Company on January 20, 1998, as such Program may be amended, supplemented, restated or otherwise modified from time to time in the sole discretion of the Company." (JX 8 at 3.)

503.    The Facility Agreement defined "Shared Investment Plan" as "the Shared Investment Plan of the Company adopted pursuant to the Company Incentive Stock Option Plan, as such plan may be amended, supplemented, restated or otherwise modified from time to time in the sole discretion of the Company." (JX 8 at 9.)

504.    The Facility Agreement defined "Requirements of Law" to include any law, rule or regulation, including without limitation the Securities Act of 1933, the Securities Exchange Act of 1934, and Regulations G, U. and X of the Board of Governors of the Federal Reserve System. (JX 8 at 9.)

505.    The term "Loan Documents" in the Facility Agreement included the Facility Agreement, each Note, each Letter of Direction, and the term "Loan" referred to loans to the participants in the SIP Program. (JX 8 at 6, 10.)

506.    The Facility Agreement provided that a "Program Event of Default" would occur if "any proceeding shall be instituted by or against [Comdisco] … seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization … under any law relating to bankruptcy, insolvency or reorganization or relief of debtors …" (JX 8 § 6.01(e).)

507.    The Facility Agreement provided that if a Program Event of Default "occurs and

116

is continuing," the Bank "may, by notice to the Company and the Borrowers, declare the Notes, all interest thereon and all Obligations to be forthwith due and payable, whereupon the Notes, all such interest and all Obligations shall become and be forthwith due and payable, without presentment, demand, protest, or further notice of any kind." (JX 8 § 6.01.)

508.     The Facility Agreement provided that Comdisco guaranteed prompt, full and complete payment when due of the principal of  and interest on the loans and all other fees, reimbursements, indemnities and other obligations of the borrowers owing to the Bank or lenders under the Notes.  (JX 8 § 7.01.)

509.     In Section 7.01 of the Facility Agreement, the term "Guaranteed Debt" is defined to be the principal and interest on the loans to the Borrowers, plus any other fees of the Borrowers owing pursuant to the Notes.  (JX 8 at 21.)

510.     The phrase "collateral securing the Guaranteed Debt" appears in Sections 7.02 and 7.03 of the Facility & Guaranty Agreement Article VII. (JX 8 §§ 7.02, 7.03.)

511.     Section 7.06 of the Facility Agreement provided that, "[n]otwithstanding any reference herein to any collateral securing any of the Guaranteed Debt, it is acknowledged that, on the date hereof, neither the Company nor any Borrower has granted, or has any obligation to grant, any security interest in or other lien on any of its property (including, without limitation, the Restricted Stock) to the Lenders as security for the Guaranteed Debt." (JX 8 § 7.06.)

<u>Testimony by Expert Witness</u>

512.     Sabel testified that as a bank attorney, he agrees that one of the reasons why the Bank would want the representation and warranty in Section 4.01(h) of the Facility Agreement is so that the Bank would be able to use it against Comdisco if the representation and warranty was incorrect.  (9/25/13 Tr. at 164-165.)

117

513.    Sabel testified that the Bank would be able to sue for breach of the representation and warranty and that a breach of this representation and warranty would be an event of default under the Facility & Guaranty Agreement. (9/25/13 Tr. at 165.)

514.    In response to a question asking for an example of how the making of a loan or the use of the proceeds of that loan would be inconsistent with the provisions of Regulation G or U, Sabel testified that there could be circumstances in the future where margin stock might become collateral or indirect security for the loan and that the margin regulations would apply if the loan is a purpose loan.  (10/25/13 Tr. at 165.)

515.    Sabel testified that there are scenarios in his mind where a structure of a transaction could be on the right side of the margin regulations but still be inconsistent with the regulations because of subsequent events. (10/25/13 Tr. at 167.)

516.    Sabel testified that he does not recall having seen the precise words of the collateral provision in Section 7.06 of the Facility Agreement in an analogous provision in another transaction.  Sabel testified that if there were no collateral, Sabel would wonder whether the provision serves any purpose, but could probably come up with potential scenarios in the future where it might make some sense.  To Sabel's recollection, his law firm does not have any "analog" to this type of provision and would take the view that if the collateral issue is not a realistic concern, it is better not to clutter up the document with it.  (9/25/13 Tr. at 162-163.)

517.    Sabel testified that the phrase "collateral securing the guaranteed debt" appears in numerous places in the Facility & Guaranty Agreement. (9/25/13 Tr. at 163-164.)

C.    **The 1998 Stock Option Program**

518.    The SIP was promulgated pursuant to the Comdisco, Inc. 1998 Stock Option Program (the "1998 Option Program").  On January 20, 1998, Comdisco's Board of Directors

118

approved the Comdisco, Inc. 1998 Option Program and authorized the Compensation Committee of the Board of Directors, after distribution of a description of the terms and conditions of the SIP to proposed participants, to consider adoption of the SIP substantially along the lines reviewed at the January 20, 1998 Board meeting, with such changes and additions as the Compensation Committee deemed to be in the best interests of the corporation. (Stmt. Uncontested Facts ¶ 9; PX 1, Tab 6.)

519.    The 1998 Option Program provided for the Compensation Committee of the Comdisco Board of Directors to designate directors and employees to receive stock options. Subject to certain adjustments, the Option Program reserved 8,000,000 shares of Comdisco Common Stock to be made available for incentives under the Option Program. (PX 1, Tab 5 ¶¶ 2.1, 3, 4.1.)

520.    Section 6.11 of the 1998 Option Program stated as follows:

> **No Illegal Transactions.**  The Program and all Stock Options granted pursuant to it are subject to all laws and regulations of any governmental authority which may be applicable thereto; and notwithstanding any provision of the Program or any Stock Options, Participants shall not be entitled to exercise Stock Options or receive the benefits thereof and the Company shall not be obligated to deliver any Common Stock or pay any benefits to a Participant if such exercise, delivery, receipt, or payment of benefits would constitute a violation by the Participant or the Company of any provision of any such law or regulation.

(JX 1, Tab 5, § 6.11.)

521.    On January 23, 1998, Hale sent a letter indicating she was enclosing clean and marked up copies of the proposed disclosure packet to various individuals, including Brian Hart and Matthew O'Meara.  Hale also included the proposed schedule as she understood it, starting with the program being announced to the proposed participants on January 30, 1998. (DX 45.)

522.    At the time of the Comdisco SIP, there was already an existing stock option plan,

119

but that stock option plan did not have sufficient shares available for the SIP. Hale therefore suggested that Comdisco create the 1998 Option Program for purposes of the SIP. (10/1/13 Tr. at 352.)

523.    McBride advised Comdisco that shareholder approval was not required for the 1998 Option Program. McBride told Comdisco that shareholder approval could be required to qualify the plan for IRS purposes relative to deductibility for CFO compensation, but this was not a concern for the SIP. McBride also concluded that New York Stock Exchange rules did not require shareholder approval for the SIP. The issue of whether shareholder approval was required for margin regulation purposes never came up. (10/1/13 Tr. at 352-355.)

524.    The Comdisco, Inc. 1998 Stock Option Program was not adopted or approved by the shareholders of Comdisco, Inc. (Stipulation Regarding No Shareholder Approval of 1998 Stock Option Program or Shared Investment Plan ¶ 1.)

### D.    The Shared Investment Plan

525.    On February 1, 1998, after the SIP Option Exercise Forms were submitted, the Compensation Committee of Comdisco's Board of Directors approved and adopted the SIP, by resolution, in the form presented to the Compensation Committee. (Stmt.Uncontested Facts ¶ 19.)

526.    The SIP was not adopted or approved by the shareholders of Comdisco, Inc. (Stipulation Regarding No Shareholder Approval of 1998 Stock Option Program or Shared Investment Plan ¶ 4.)

527.    Hewes testified that the SIP program was presented to Comdisco's Board of Directors for approval. He further testified that he approved resolutions that acted on the program that the Board of Directors passed in connection with the SIP program. (5/1/07 Hewes

120

Dep. at 43.)

528.     PX 1 includes a document entitled Comdisco, Inc. Shared Investment Plan.  (PX

1, Tab 6)  Paragraph 14 states that the Plan is governed by the provisions of the 1998 Program,

except as otherwise expressly stated in the Plan.  Paragraph 1 states in part that to "the extent any

of the terms and conditions contained in this Plan are inconsistent with the 1998 Program, the

terms of the 1996 Program shall control."   (PX 1, Tab 6 ¶¶ 1, 14.)

### 1.     Purchase and Holding of Shares

<u>Fact Testimony and Related Record Materials</u>

529.     Under the SIP, each Prospective SIP Participant was given an opportunity to

purchase a minimum of 8,000 shares of Comdisco common stock through the exercise of a one-

day, non-qualified stock option.  Prospective SIP Participants who wished to participate in the

SIP were instructed to fax an Election Form ("SIP Option Exercise Form") to Comdisco's Legal

Department between 6:00 p.m. C.S.T. on Saturday, January 31, and 6:00 p.m. C.S.T. on Sunday,

February 1.  (Stmt. Uncontested Facts ¶ 13.)

530.     The minimum amount any SIP Participant could borrow under the SIP was

$276,000, i.e. 8,000 shares at a purchase price of $34.50 per share.  The purchase price of $34.50

per share was the closing price on January 30, 1998, for Comdisco's common stock on the New

York Stock Exchange.  (Stmt. Uncontested Facts ¶ 16.)

531.     The SIP provided that the shares purchased under the SIP would be registered in

the name of the participant and certificated.  It further provided that the certificates would be

held in Comdisco's Legal Department until all restrictions on the shares have lapsed.  (PX 1, Tab

6 ¶ 5.)

532.     The SIP Materials provided that the SIP Share certificates would be held in

Comdisco's legal department. Instead, the SIP shares were held by Comdisco's transfer agent (Mellon Investor Services LLC) as uncertificated shares in a separate book entry accounts for each SIP Participant. (Stmt. Uncontested Facts ¶ 30.)

533.    There were no printed stock certificates for the SIP stock. No one ever requested a paper certificate. (10/1/13 Tr. at 345, 347.)

534.    Harvey testified that in the mind of those in the law department at Comdisco it made no difference whether the shares were physical certificates or electronically maintained, because if the shares had been paper certificates they would have the shares locked away. (10/2/13 Tr. at 498-499.)

535.    Harvey testified that after discussing the issue with Mellon, Comdisco issued the shares into a special account so that each participant had their number of shares held electronically, and "there was an electronic legend on them restricting, with the restrictions, yes. There was a special restricted account." (10/1/2013 Tr. at 345-346.)

536.    Scozzafava testified that he never obtained from Comdisco or its transfer agent possession of the SIP stock and that his understanding was Comdisco was going to hold the stock. He signed the blank stock power. Scozzafava testified that in hindsight looking at that document full of blank spaces with a signature on it, it just seemed that it was a blind faith situation, that he needed to sign it, it was part of the program, and he signed it knowing that he was giving some power over the stock but did not know the specificity of it. Scozzafava further testified that he understood that the dividends on the SIP stock were going to be paid directly to the First National Bank of Chicago but that on the date of his testimony he had no idea as to his right or ability to receive any value in the future with respect to his stock. He further testified that he never voted his shares of stock. (10/9/13 Tr. at 817-818.)

537.     Weiss testified that he never obtained from Comdisco or its transfer agent possession of the SIP stock and that his understanding was the bank was going to hold the stock. He testified that he thought he would have access to it but never did because the bank held it. (10/10/13 Tr. at 917.)  Weiss testified that when he said "the bank" he was referring to "the bank that was the agent for the stock," that he could not remember the bank's name and that it was possible he was referring to Mellon.  (10/10/13 Tr. at 931-32.)

538.     Poisella testified that never obtained possession of the SIP stock from Comdisco or its transfer agent.  (10/8/13 Tr. at 773-774.)

539.     Brunner testified that he did not think he ever obtained possession of the stock from Comdisco or its transfer agent, Mellon, and that he understood physical possession of the stock was going to be with either Comdisco or its transfer agent.

540.     Harvey understood that participants could deduct the interest they paid on their SIP loans on their income tax returns.  (10/2/13 Tr. at 499.)

<u>Testimony by Expert Witness</u>

541.     Sabel testified that Mellon would have held the shares in the name of each participant, subject to contractual restrictions. (9/24/13 Tr. at 22.)

542.     Sabel testified that having the shares held in uncertificated form by the transfer agent in the name of each participant was roughly as restrictive to plan participants as having Comdisco hold physical share certificates.  (9/24/13 Tr. at 77.)

**2.     Stock Powers**

<u>Fact Testimony and Related Record Materials</u>

543.     Each SIP Participant, including the Defendants, executed a stock power in blank. (Stmt. Uncontested Facts ¶ 30.)

544.     Weiss testified that he signed a blank stock power and a letter of direction and

123

certain other documents.  He did not have the ability to negotiate the terms of the documents.
(10/10/13 Tr. at 914.)

545.    Scozzafava testified that he signed a blank stock power and a letter of direction.
Scozzafava testified that did not have the ability to negotiate the terms of the documents that had
to be signed. (10/9/13 Tr. at 805-806.)

546.    The SIP provided that each participant must deliver to Comdisco's General
Counsel a stock power endorsed in blank with respect to the purchased shares.  (PX 1, Tab 6 ¶
5.)

547.    Each SIP participant executed a stock power in connection with the SIP.  The
stock powers were blank except for the individual participant's signature and name.  (10/1/13 Tr.
at 347.)

548.    Comdisco held the stock powers.  Comdisco never used or attempted to use one
of the stock powers to sell stock without the consent of a participant.  Harvey testified that there
"were no defaults, so no exercise." (10/1/13 Tr. at 349-350.)

<u>Testimony by Expert Witness</u>

549.    Sabel testified he understood that the prospective SIP participants were told that
they would have to sign a blank stock power in order to participate in the program and were told
that the SIP stock would be held in Comdisco's legal department.  (9/24/13 Tr. at 133-134.)

550.    Sabel testified that, in his opinion, because the stock certificates to which the
stock powers would have related did not exist, the stock powers simply were no longer relevant
to the deal and of no legal effect.  (9/24/13 Tr. at 78.)

551.    Sabel testified that if stock certificates had been used instead of uncertificated
shares, he believes the stock powers would have given Comdisco the ability, though not

124

necessarily the legal right, to sell the shares.  Sabel testified that margin regulations talk about either the right or the ability.  (9/24/13 Tr. at 136-137.)

### 3.    Stockholder Rights and Dividends

552.    Under the SIP, each participant had all the rights of a stockholder with respect to the purchased shares, including the right to vote the shares.  (PX 1, Tab 6 ¶ 6.)

553.    The SIP provided for participants to direct Comdisco to deliver all cash dividends to the Bank for payment of interest on the SIP loans.  Any dividends in excess of required interest payments would be deposited to the participant's account at the Bank.  (PX 1, Tab 6 ¶ 6.)

### 4.    Sale and Transfer of Shares

#### Fact Testimony and Related Record Materials

554.    Section 7 of the SIP provided as follows:

> **7.    Sale of Purchased Shares**. Each Participant is permitted to sell all or any portion of the Purchased Shares, subject to the following restrictions:
>
> a)    except in the event of death or disability of the Participant or a Change of Control (as defined in the 1998 Program), no Participant may sell any portion of the Purchased Shares before the first anniversary of the Exercise Date;
>
> b)    no Participant may sell any portion of the Purchased Shares unless either (i) all principal, interest and any early payment fees due on the Loan have previously been paid or (ii) all proceeds of the sale are simultaneously applied first to the payment of all such principal, interest and early payment fees due on the Loan;
>
> c)    each Participant must notify the Secretary of Comdisco in writing (the "Sale Notice") of his or her intention to sell the Purchased Shares before such a sale is implemented. Comdisco may elect to allow the Participant to sell the Purchased Shares in the open market, Comdisco may re-purchase the shares, or Comdisco may take other actions as it deems appropriate. If Comdisco repurchases the Purchased Shares, the purchase price will be the closing price of a share of Common Stock on the New York Stock Exchange Composite Reporting Tape on the day Comdisco receives the Sale Notice. The Company will decide whether or not to purchase the Purchased Shares, as promptly as reasonably possible, but, in any event, within 5 business days after receipt of the Sale Notice. The Company's

125

ability to respond sooner than 5 business days will depend on a number of factors including the timing of the notice, the need for Board of Directors approval, the need for financing and/or compliance with applicable law.

d) the Compensation Committee has the right to impose restrictions on the timing, amount and form of the sale of the Purchased Shares with respect to any Participant to the extent it determines that such restrictions are in the best interests of Comdisco.

(JX 1, Tab 6 ¶ 7.)

555. Harvey testified that SIP materials, Tab 6, paragraph 12 entitled "Loan Guarantee" contains language that "Comdisco may take all action relating to the participant and her or his assets which the compensation committee deems reasonable and necessary to obtain full reimbursement for amounts Comdisco pays to First National Bank of Chicago under its guarantee relating to the participant's loan …"  Harvey testified that those assets at the time that the SIP program was implemented included the SIP stock.  (10/2/2013 Tr. at 516; JX 1, Tab 6 ¶ 12.)

556. The SIP provided that a participant who sells the purchased shares prior to the third anniversary of the exercise date shall contemporaneously pay Comdisco 50 percent of the balance of any gain realized on the sale after payment of principal, interest and early payment fees due on the loan, and brokers fees (except in cases of termination due to death or disability or a change of control).  (JX 1, Tab 6 ¶ 8.)

557. Except in the event of a sale following the death or disability of the participant, the SIP provided that a participant who sells purchased shares is responsible for 100 percent of the loss realized from the sale.  (JX 1, Tab 6 ¶ 8.)

558. During the course of developing the SIP, Harvey testified that he discussed all of the SIP's restrictions on the sale of shares with Hale.  (10/1/13 Tr. at 376.)

559. The prohibition in paragraph 7(a) of the SIP on selling any portion of the

126

purchased shares was also a provision of the Baxter 1994 and Allegiance SIPs. The concerns that led to this provision in the Comdisco SIP were that (i) there could be a quick run up in the stock price, causing participants to turn around and dump their shares quickly; or (ii) there could be a quick stock price drop, causing participants quickly to dispose of their stock, putting more pressure on the stock price. Harvey testified that dumping all the shares at once could flood the market. (10/1/13 Tr. at 374-375.)

560.     The Baxter 1994 and Allegiance SIPs included the requirement in paragraph 7(b) that a participant seeking to sell SIP shares either have previously paid off all principal, interest and early payment fees or use the proceeds to pay these amounts. Harvey testified that he was sure he probably discussed this provision with Hale, and everybody believed paragraph 7(b) should be retained. Harvey testified that Hale never discussed with him the whether this paragraph would cause the SIP to run afoul of the margin regulations. (10/1/13 Tr. at 376-377.)

561.     Harvey testified that he only recalls two circumstances in which he believed Comdisco exercised its right under paragraph 7(c) of the SIP to "take other actions as it deems appropriate" in the event of a Sale Notice. The first involved David Nolan, a SIP participant who left Comdisco. As part of Nolan's negotiated separation agreement, Nolan and Comdisco agreed that Comdisco would assume all of Nolan's obligations under his Note and the SIP program, and in return, would receive Nolan's shares. Nolan voluntarily agreed to this arrangement. The second involved Richard Frank, who was also a departing SIP participant. As with Nolan, Comdisco also offered to take over Frank's obligations under the loan and receive his stock in return. (10/1/13 at 378-380.)

562.     Harvey testified that he personally does not know if there were any circumstances where the Compensation Committee of the Board of Directors acted under the terms of

127

paragraph 7(d) to "impose restrictions on the timing, amount and form of the sale of the Purchased Shares."  (10/1/13 Tr. at 380-381.)

563.    Harvey testified that at the time the SIP was implemented the circumstances in which it was anticipated that Comdisco might invoke the provisions of paragraph 7(c) or 7(d) were:  (i) where the company was about to disclose sensitive information and would not want people trading in the stock because this might create a problem with insider trading; (ii) where Comdisco thought it could be acquiring another company or might be subject to an acquisition; (iii) where there was a severe downturn in the stock and the company did not want people fleeing the stock, particularly senior officers; and (iv) where there was a run-up in the price of the stock, causing people to want to dump it.  In addition, Harvey testified that Comdisco was concerned that there could possibly be a mass exodus from the stock when the requirement that 50 percent of gains from sale be shared with the company lapsed, and Comdisco wanted to reserve the right to offer different alternatives as to how to manage this, so as not to have large amount of dumping of the stock on the market on that date. Harvey also testified that the idea was that the stock was in Comdisco's control and all along Comdisco wanted the determination as to how it would be disposed of to be in Comdisco's control.  (10/2/13 Tr. at 486-487.)

<u>Testimony by Expert Witness</u>

564.    Sabel testified that his recollection was that there were provisions apart from the margin regulations that either made it advisable or required to prohibit sales of the SIP stock during the first year of the program.  Sabel testified that the securities laws may have been part of the reason, or it may have just been for business purposes to prevent immediate flipping. (9/25/13 Tr. at 174-175.)

128

E.    Default

Fact Testimony and Related Record Materials

565.    Harvey testified that based on conversations internally at Comdisco and with the Bank, it was his understanding that in the event a SIP participant defaulted and the Bank made a demand on Comdisco under its guaranty, Comdisco would tell the SIP participant that the SIP participant must either sell the stock and pay the proceeds to the Bank as payment of the default or Comdisco would exercise its rights and sell the stock and deliver the funds to the Bank.  If Comdisco paid out on a guaranty claim following a participant default, Harvey understood that Comdisco would tell the SIP participant that the SIP participant was going to sell the stock and reimburse Comdisco for the amount that Comdisco paid on its guarantee and if the SIP participant did not, Comdisco was going to take the stock and sell it and apply the proceeds to reimburse Comdisco for the amount that Comdisco paid.  (10/1/13 Tr. at 441-442.)

Testimony by Expert Witness

566.    Sabel was asked during trial to assume that a default had occurred with respect to an individual borrower, but Comdisco had not paid out on the guaranty.  Sabel testified that under that scenario, Comdisco would have and control the stock and the participant could not grab the stock and "run to the hills."  Sabel testified he would have to look at the documents but would accept that it is possible that the borrower could sell the stock in this scenario and the proceeds would be paid to the bank.  Sabel also testified that if Comdisco attempted to and did sell the stock that he thinks the money would go to the Banks.  (9/25/13 Tr. at 159-161.)

567.    Sabel testified that he recalled the condition in the Comdisco SIP program that the stock could not be sold without the proceeds first going to the Bank.  (9/25/13 Tr. at 160.)

568.    Sabel was also asked to assume a second scenario where there was a default and Comdisco paid out under the guaranty.  Sabel agreed that if the participant sold the stock or if

129

Comdisco sold the stock, the money would go to Comdisco. (9/25/13 Tr. at 161.)

569. Sabel was asked to assume a third scenario, where an individual participant defaulted and Comdisco refused to pay out on the guaranty. Under this scenario, Sabel testified to his understanding that the Bank has no rights to the stock. Sabel agreed that whether the Bank does or does not have any rights with respect to that stock, it does not matter if the stock has lost its value. (9/25/13 Tr. at 161-162.)

## VI. PRESENTATION OF THE PROGRAM TO POTENTIAL PARTICIPANTS (JANUARY 30 – 31, 1998)

### A. The January 1998 Meetings

#### Fact Testimony and Related Record Materials

570. In an internal correspondence dated January 28, 1998 re "Management Strategy Meeting/January 30, 1998" to Phone Conferees from Jack Slevin and Nick Pontikes, they advised that a Management Strategy presentation would be given in Palm Springs on January 30, 1998 and provided call-in information for the mandatory meeting/conference call that was set for 2:00 p.m. Pacific Time. Slevin and Pontikes further indicated that subject matter materials were being sent by express and that the recipients should not open the materials until the beginning of the meeting/conference call. (DX 46.)

571. The SIP Program was introduced to prospective SIP participants ("Prospective SIP Participants") at a meeting on the afternoon of Friday, January 30, 1998 during a weekend corporate retreat in California (the "SIP Presentation"). The Prospective SIP Participants, including each of Defendants Mike J. Poisella, Roman Brunner, Joseph J. Scozzafava, and Gregory A. Weiss, were either present at the meeting or listened to the presentation by telephone. Each Prospective SIP Participant was provided with a two-inch binder containing approximately 240 pages of materials relating to the SIP ("SIP Materials"). (Stmt. Uncontested Facts ¶ 10.)

130

572.     At the SIP Presentation, Comdisco's Chief Legal Officer, Hewes, and Chief

Operating Officer, Pontikes, presented parts of the SIP Program.  Other Comdisco

representatives were present. Comdisco's outside counsel, Hale from McBride was present and

also spoke periodically during the meeting.  A second meeting was held the next day on

Saturday, January 31, 1998.  Hale, Hewes and others answered questions during the January 31

meeting.  Bank representatives were not present at the January 30, 1998 SIP Presentation or the

January 31, 1998 meeting.  (Stmt. Uncontested Facts ¶ 11.)

573.     At the SIP Presentation, Chief Legal Officer Hewes stated that "this is

complicated and there is a lot of information here and you have to make a lot of decisions on a

very quick basis. We also have a lot of us around here that have the capability of answering a lot

of these questions, the technical questions.  Jerry Fitzgerald's here, I'm here.  We also have

availability of where you can call outside attorneys to the extent that you would desire to do

that."  (JX 4 at 18.)  Pontikes, Chief Operating Officer for the company, went on to say that "we

have to get this done very quickly," because the markets are closed and "obviously, if news got

out of this plan and it's very hard once lots of people . . . It's hard to keep that secret, and that's

what really precluded us from doing this plan if word got out" and Comdisco was planning to

announce the SIP Program and issue a press release on Monday, February 2.  (JX 4 at 19-21.) A

copy of the SIP Presentation transcripts, JX 4 and JX 6, are attached as Tabs I and J,

respectively, in Volume 1 of the Appendix.

574.     Mr. Pontikes stated during the SIP Presentation that "[t]his plan gives you a

chance to be an owner of the company like I'm an owner of this company.  Not everyone can

afford to go out and buy stock in the amounts that I would love you all to own."  (JX 4 at 3.)  Mr.

Pontikes and other Comdisco executives further stated, *inter alia*, that:

A.   they were chosen because they are the present or future leaders of the company;

B.   they were "the cream of the crop, the best of the best";

C.   Comdisco asked 147 individuals to participate and that the size of the offering could exceed $150 million, but management did not think they would even come close to that and that it would be a successful offering if they had about half of that;

D.   Comdisco was not soliciting this, there would be no peer pressure for people to join or not join, and individuals would not be judged because they refused to participate. This was purely optional, there would be no pressure whatsoever.

E.   Comdisco's Board of Directors had approved these 147 individuals;

F.   Participants will know about Jack Slevin's, Nick Pontikes's and Phillip Hewes's participation as it would be disclosed in the proxy statement ;

G.   Comdisco thought it was a good time to offer the SIP Program;

H.   the Prospective SIP Participants met a certain compensation threshold, while other employees at the company did not make a lot of money and could not take on this kind of financial risk, because it is a financial risk;

I,   to break even, the stock price has to go up. There is company risk, we have to hit our numbers, we have to perform. There's industry risk, computer services, leasing may go away. There's market risk, the market is now trading at almost an all time high, bull markets do not last forever, and the market may crash.

J.   Comdisco would have to grow in excess of 6.8% per year and the market would have to continue to give Comdisco reasonable multiples in the future.

K.   This is a personal decision, a very risky personal investment and an individual's decision to make.

L.   a lot of co-workers would be asking why they were not b included in the plan;

M.   the idea for the SIP Program had come from ESP's that had been done at Baxter International and Allegiance, but under very different auspices, as their companies were at all time lows and Comdisco is at its all time high and that their stock was in the black as to their programs;

N.   each Prospective SIP Participant was going to receive a customized envelope stating the maximum number of shares the participant could purchase;

O.   Participants are fully liable for the loan and have to pay it back. If for some reason a participant is not able to pay it back then Comdisco would guarantee it, but Comdisco would still come after the individual, and they wanted everyone to be aware that this is the participant's personal loan;

P.   Upon sale of the stock, 100% of the proceeds have to be applied to the loan until the loan is paid off and that "[a]ll the loan has got to be gone first, before, it's a roach motel, okay, before you get anything";

Q.   There would be a prepayment penalty if the loan was paid before the fifth year and that it was going to cost more to repay the money early;

R.   Comdisco's Compensation Committee would have a telephonic meeting to approve the transaction on Sunday, February 1, at 10:00 p.m.;

S.   there would be a public announcement on Monday, February 2, identifying how
   T.   many managers were participating in the SIP Program and the aggregate dollar amount of that participation;

      T.      Comdisco would be sending letters to all of its employees, shareholders and customers on that Monday disclosing the SIP Program and the reasoning behind it; and

      U.      Prospective SIP Participants would be prohibited by the law from trading Comdisco stock on that Monday or Tuesday.

(JX 4 at 1-2, 5-6, 8-9, 11-12, 19,21,-24, 25-26, 36-37, 42-43, 49-50, 55-56, 58-60.)

575.    Near the end of the SIP Presentation, the Prospective SIP Participants were told that they needed to read the SIP Binder because it really set out the plan; and that the Prospective SIP Participants had a twenty-four hour window to make the election to participate—"if your snooze, you lose."  (JX 4 at 54-57.)

576.    A total of 147 Prospective SIP Participants were offered the opportunity to participate in the SIP.  (Stmt. Uncontested Facts ¶ 14.)

577.    Hewes testified that the timing of the announcement of the SIP to eligible Comdisco employees, which occurred after the stock markets closed on Friday, January 30, 1998, was designed to comply with securities laws.  (1/10/13 Hewes Dep. at 29.)

578.    Hewes testified that the employees who went out to Palm Springs meeting did not know about the SIP program.  It was a sensitive subject involving senior management in Comdisco, a publicly traded company and once the program was set and the participants signed there was a public release of information and the stock went up significantly. (10/25/07 Hewes Dep. at 140-141.)

579.    Hewes testified that Comdisco was a very tight knit group that was very family oriented and was really part of your life.  Participation in that type of culture was encouraged and definitely was kind of a long time standing type of atmosphere which goes back to Ken Pontikes who founded Comdisco.  So that atmosphere and discussions with Nick Pontikes and the Board of Directors encouragement were some of the factors considered in participating in the SIP Program. (5/1/07 Hewes Dep. at 68-70.)

133

580.    The January 30 and 31, 1998 meetings were audiotaped and later transcribed.

Near the beginning of the January 30 presentation, potential SIP participants were told that the

SIP was not a "risk-free investment." Rather, it was up to participants and their spouses to

determine whether they wanted to "go on the line for the cash for five years, based on the

company." Participants were told that to make the investment pay off the company would have

to grow in in excess of 6.8 per year (minus dividends paid, which were normally a little less than

1 percent). They were also told that the company was not soliciting participation in the SIP and

that there would be no peer pressure to join or not join. (JX 4 at 1-2.)

581.    During the January 30, 1998 meeting, a potential participant asked whether the

SIP shares could be used as security for other transactions or collateral for other types of loans.

The presenters said that the shares could not, because the shares were "restricted from the

standpoint that the company has certain rights with respect to the stock, depending on your

employment. And also there's restrictions under the terms of the bank loan that you have that

there are certain things that will happen with the proceeds to the extent that you sell it before the

bank loan is paid off." The presenter concluded that, "So while it is not technically a secured

loan, the company retains the stock physically and you cannot pledge that for other loans." (JX 4

at 46.)

582.    Brunner testified that the SIP presentation was made on January 30, 1998 in the

late afternoon around 4:00 or 5:00 p.m. California time. (10/3/13 Brunner Dep. at 11.)

583.    Weiss testified that he attended the SIP presentation that occurred on January

30th, 1998 in California. It was part of the "President's Club" annual meeting reward ceremony

to honor people and recognize people that had performed well according to the company and its

goals and objectives from the prior year. Weiss had attended many of those meetings prior to

this one. The SIP presentation was in the afternoon.  Weiss testified that he did not know of the presentation in advance, and attendance was mandatory. (10/10/13 Tr. at 909-910.)

584.    Poisella attended in person the meeting in California on January 30, 1998 where the SIP program was introduced. Poisella testified that what brought him to the meeting was Comdisco's annual sales meeting which was fun and games for three or more days with your spouse.  (10/8/13 Tr. at 754-755.)

585.    Scozzafava testified that he attended the SIP presentation that occurred on January 30th, 1998 via an audio connection at his office in Norwalk, Connecticut.  He further testified that he received a package of information by Federal Express that afternoon. (10/9/13 Tr. at 799.)

586.    Scozzafava testified that he knew that some individuals were attending the presentation live in Palm Springs at an incentive trip and that other people like himself who were not included in that event who would be listening remotely. (10/9/13 Tr. at 800-801.)

587.    Brunner testified that he attended the SIP presentation in California as part of the Top Performers Club Weekend event which was held at the Marriott Hotel in California. He was invited by senior management at Comdisco and in particular, Nick Pontikes at the time through Brunner's direct boss, who was extending the invitation.  The Top Performer weekend was an annual event at Comdisco and Brunner had attended them in the past.  Brunner testified that in his experience business was not conducted at those Top Performer annual meetings and typically those meetings were regarded to be a reward for a good performance during the prior year.  He testified that it was normally held at a very nice resort, and all expenses paid and we were allowed to bring wives or partners, lots of dinners, options for recreation such as golf, whatever else was in the area, and very nice award sessions handing out Rolex watches and diplomas and

135

certificates and salesman of the year, rookie of the year stuff, lots of motivation. He testified that it was basically, a reward, very, very high level, making everybody feel good about the performance about the company, and mainly to foster the feeling of the Comdisco family and it was always -- the favorite song that was played at the award session was "We Are The Champions", everybody was feeling really pumped after the session. (10/3/13 Brunner Dep. at 12-14.)

588.    Scozzafava testified that at the presentation he was informed that he and others were a select group of senior managers within the company, people who had made a significant contribution to the success of the company in the past and who were in key positions to foster continued growth and success of the company moving forward, and that is why he and others had been invited to attend the meeting and listen to this presentation and this opportunity. (10/9/13 Tr. at 801-802.)

589.    Poisella testified that he did not know about the SIP presentation meeting in advance and it was by invitation, his sense was that it was mandatory. Poisella further testified that during the SIP presentation, he gained an understanding of the criteria that Comdisco used in deciding who would be invited to participate in the program to be the key people for the past and the future of the company. He testified that it was the invitees' understanding that there were directors and senior management and only managers being invited to participate, but they were critical to the success of the company both in the past and the future. Poisella further testified that the lead-off to the whole program was that we were building something and the invitees were going to be key to the building of Comdisco going forward, which was a theme that he had experienced for the 17 years up to that point that he was with the company. Poisella further testified that it was as if it was a reward for past activities as well as incentive to stay with the

136

company and help it grow. (10/8/13 Tr. at 756-757.)

590.    Brunner testified that he did not know in advance that the SIP presentation was going to be made that afternoon in California and it was a surprise to him.  He testified that it wasn't spelled out that the meeting was mandatory but he felt that the meeting was mandatory because people received a letter in the rooms that said be at this room at this time, and that was it and everybody showed up. (10/3/13 Brunner Dep. at 14.)

591.    Brunner also testified that during an event that was happening in Europe in 1997 with Nick Pontikes' presence in Munich in a hotel at the airport, Nick took Brunner aside and said "you know, look, I'm doing something really exciting. We're working on something. I can't tell you what it is, but I want to let you know that you will be one of the people that will be chosen to participate. It's going to be great for you guys. I just want to let you know that I appreciate everything you do for the company."  Brunner testified that was the extent of the indication that Nick gave to Brunner.  At the time, Brunner believes that Pontikes was Chief Operating Officer. (10/3/13 Brunner Dep. at 15-16.)

592.    Harvey testified that Comdisco made the statement that credit information had to be provided to the Bank for the Bank's review but he did not recall whether Comdisco did or did not state to people that the Bank would be making an assessment of whether they had the financial capability.  (10/1/13 Tr. at 411-413.)

593.    Hewes testified that he was supposed to be involved in the credit review process but does not recall any of the considerations, to what the parameters of eligibility were supposed to be, or having even reviewed the financial condition of any of the program participants. (1/10/13 Hewes Dep. at 74-76.)

594.    Murray testified that no one from Winston & Strawn attended the SIP

137

presentation. (10/9/13 Tr. at 841.)

595.     Clarke testified that he was aware a presentation of the Comdisco SIP program

was made to Comdisco executives but he was not given an opportunity to attend and to his

knowledge no one from the Bank attended that presentation. Clarke testified that Vosicky or

Pacewicz communicated the company's wish that the Bank not attend the presentation. (9/25/13

Tr. at 239-240.)

<div align="center">Testimony by Expert Witness</div>

596.     Sabel testified that Plaintiff's counsel did not provide him with a copy of the

transcript of the January 30, 1998 meeting and he was not aware that prospective participants

were told during the meeting that the SIP stock could not be used as security for transactions or

collateral for other types of loans. (9/24/13 Tr. at 93-94.)

597.     Sabel testified that he was not aware of the January 31, 1998 question and answer

session or that there was a transcript of that presentation. Sabel testified that Plaintiff's counsel

did not provide him with a copy of that transcript. (9/24/13 Tr. at 96.)

**B.     The SIP Materials**

598.     The SIP Binder distributed to each potential SIP participant included copies of

(among other things): (i) the Comdisco, Inc. 1998 Stock Option Program; (ii) the Comdisco,

Inc. Shared Investment Plan; (iii) an unexecuted version of the Facility and Guaranty Agreement;

and (iii) the form of Master Promissory Note. (JX 1, Tabs 5, 6, 11, 12.)

599.     At the SIP Presentation, the Prospective SIP Participants were encouraged to read

the SIP Binder, including the Question and Answer Section. (JX 4 at 54-55.)

600.     Murray testified that neither he nor anyone else from Winston had any

involvement in preparing the prospectus given to participants in connection with Comdisco's

<div align="center">138</div>

SIP.  (10/9/13 Tr. at 841.)

601.    Tab 1 of the SIP Binder was an introductory letter from Jack Slevin, Chairman,

President and Chief Executive Officer of Comdisco, and Pontikes, Chief Operating Officer.  The

letter stated that:

> The Shared Investment Plan is a voluntary plan that will allow you to
> invest in the company by purchasing a significant amount of Comdisco
> stock with a loan guaranteed by Comdisco.  We cannot stress enough
> that it is your personal choice whether or not to participate in the plan.
> We understand that, in most cases, the decision about whether to invest,
> and if so at what levels, will be based on existing personal financial
> commitments and not a reflection of your confidence in or commitment
> to the company. Whether or not you choose to participate will not, in any
> way, affect your future with the company.  It will also be private and
> disclosed only to the plan administrators.

(JX 1, Tab 1.)

602.    The SIP Binder also included a Shared Investment Plan Summary.  The Summary

stated (among other things) that "Comdisco will arrange with First Chicago to provide *full*

recourse loans to Comdisco executives to buy shares of Comdisco common stock (the "Loans").

The Loans, which will have a market interest rate over a five-year term, will be the personal

obligations of each participant. … Comdisco has agreed to provide its guarantee of the

repayment of the Loans to First Chicago in the event of default, but the **participants will remain**

**personally liable for the Loan balance**."  (JX 1, Tab 2 at 1.)

603.    The SIP Summary further stated that that "**there are no guarantees that the**

**stock price will appreciate, that any dividends will be paid or that, if paid the dividends will**

**be paid at the rates set forth above.**"  (JX 1, Tab 2 at 4.)

604.    The SIP Materials included a Loan Application and Account Application to be

used in connection with the transaction.  The SIP Materials also included a letter to "Comdisco

Executive" from the Bank, stating, among other things, that the loan application required a

139

completed personal financial statement, two years of federal income tax returns, and an account

application. SIP participants did not have to submit these documents until Friday, February 6.

(Stmt. Uncontested Facts ¶ 17.)

605.    The SIP Binder also included a "Risk/Sensitivity Analysis" and a presentation

with a "Break Even Analysis" examining participants' potential gains or losses in the SIP

program based on the performance of Comdisco's stock and other factors. The key "Break-Even

Factors" identified as affecting the performance of the program were (i) stock price appreciation;

(ii) dividend yield; (iii) interest rate; and (iv) tax benefits and costs. (JX 1, Tab 10 at SIP

GROUP 00065.) The Risk/Sensitivity Analysis calculated the pre-tax gain or loss on the

program at various stock prices after 5 years based on certain assumptions. (JX 1, Tab 3.)

606.    Pacewicz testified that the components of the break-even price analysis for the

SIP transaction were the purchase price of the stock, the interest rate over time, and what the

future value of that would be. Pacewicz testified that he thought that the purpose of the break-

even factor analysis in Plaintiff's Exhibit 316 was to figure out where the stock price would have

to go in order to pay off the SIP loan at maturity. Pacewicz further testified he did not know why

there were two different numbers on the break-even price. He testified that he agreed that some

of the factors in the break-even price associated with the transaction included the dividend that

would be generated by the stock, the early termination fee that would be owing to the Bank in

connection with an early payment of the loan, the ultimate price of the stock at maturity.

Pacewicz testified that the SIP participants were told that there would have to be appreciation of

the stock in excess of $10.00 a share in order to break-even on the transaction. (10/2/13 Tr. at

587, 590; PX 316; JX 1 at SIP Group 00065.)

607.    Pacewicz testified that the break-even analysis was based over the five-year

140

projected term of the loan. He further testified that the break-even analysis did not take into account if somebody wanted to sell, and did not include the prepayment fees that they would have to pay in order to exit the program. (10/2/2013 Tr. at 603.)

608.    The SIP Binder included a "Questions and Answers" section. That section included the following question and answer:

> 13.    Q.  Is the Loan secured by the stock purchased?
>
> A.  No, the Loan is not secured by the stock. The Loan will be full recourse obligation of each participant. However, Comdisco holds the actual stock certificates and the sale of the stock is restricted by the terms of the Shared Investment Plan such that proceeds must first be used to repay the Loan obligation. The Certificates representing the SIP shares will contain a legend reflecting the restrictions on transfer, use of sale proceeds and Comdisco's right of first refusal.

(JX 1, Tab 4 at SIP GROUP 00034.)

609.    The Questions and Answers section also included the following question and answer:

> 10.    Q.  If the price of Comdisco stock were to drop below the purchase price, would I receive a margin call?
>
> A.  No. Since the purchased SIP shares do not serve as collateral for the loan from The First National Bank of Chicago, the loan is not a margin loan."

(JX 1, Tab 4 at SIP GROUP 00037.)

610.    In the January 30, 1998 meeting, the presenters said that "the loan is not technically secured by the securities, because we get into a margin account and this is not a margin account. It is an unsecured loan that actually you could sell your house, who cares. It doesn't require that you sell the stock." (JX 4 at 36.)

611.    The Questions and Answers section stated that if dividends deposited into participants' accounts at the Bank exceeded interest payments, participants could withdraw the excess funds. (JX 1, Tab 4 at SIP GROUP 00032.)

141

612.    The SIP Binder included a memorandum regarding the Section 83(b) tax election participants could make in order to receive favorable tax treatment for capital gains, if any, in connection with the eventual sale of their SIP stock.  The memorandum stated that if the election was *not* timely made, as the value of the stock increased, the difference between the total fair market value of the stock on February 2, 1999 and the amount paid for the shares would be considered ordinary income and be reported on the 1999 Form W-2.  In addition, the capital gain holding period would not begin to run until February 2, 1999.  The SIP Binder included four election forms and directed that a copy be sent to Comdisco by March 3, 1998.  (JX 1, Tab 8 at SIP GROUP 00055.)

613.    The forms stated with respect to the fair market value of the stock:

> The fair market value at the time of transfer (determined without regard to any restrictions other than restrictions which by their terms will never lapse) of the property with respect to which this election is being made is 34.50 per share.

(JX 1, Tab 8 at SIP GROUP 00057; PX 769.)

614.    Harvey signed a form identical to Defendants' forms (except for the name and amount) and submitted it to the IRS.  Harvey testified that he believed at the time of the SIP, and continues to believe, that the statement made in Section 5 of the 83(b) election form regarding the fair market value of the SIP stock is correct because of the language "without regard to the restrictions, the fair value is $34.50."  (10/1/13 Tr. at 419-420.)

615.    Harvey testified that no disclosure was made to prospective SIP participants as to what the estimated fair market value of the stock might be with the restrictions in place.  (10/1/13 Tr. at 424-425.)

616.    Harvey testified that the restrictions and limitations that he believed might affect the value of the SIP shares were disclosed to SIP participants but not that they might effect the

142

value. (10/2/13 Tr. at 500-501.)

617.     Harvey testified that he thought the fair market value of the SIP shares without regard to the restrictions was $34.50 at the time of the transaction. (10/1/2013 Tr. at 420.)

618.     Harvey testified that Hale was aware of the issue of restrictions and limitations affecting fair market value.  That is why the 83(b) election form included the parenthetical "determined without restrictions that would never lapse" and the SIP document did not call the purchase price the fair market value.  (10/1/13 Tr. at 414-415, 417-419, 421.)

619.     Harvey testified that to deal with the problem, and that was the problem that Lola's firm had identified, was "not call it fair market value, just to call it and say the price of the shares to be sold will be this price, which we knew and certainly the law firm knew would be an inflated price relative to its true fair market value with those restrictions." (10/1/2013 Tr. at 425.)

620.     The SIP Binder included a copy of the Letter of Direction to be signed by each SIP participant.  (JX 1, Tab 13.)

**C.     Comdisco's Beliefs and the Bank's Beliefs at the Time of the Presentation and Distribution of the SIP Binder**

**1.     Compliance with Margin Regulations**

621.     Harvey testified that he has no information that anyone at the Bank or Winston believed in February 1998 that the SIP transaction violated any of the margin regulations. (10/1/13 Tr. at 384-385.)

622.     Hewes testified that at the time the SIP transaction was structured and at the time it closed and was implemented, he believed the SIP complied with applicable law, and he was not aware of any violation of the margin regulations.  (1/10/13 Hewes Dep., 25-26.)

623.     McBride never told Harvey or, to Harvey's knowledge, anyone else at Comdisco that there was an issue with respect to compliance with margin regulations.  (10/1/13 Tr. at

<div align="center">143</div>

387-388.)

624.    Harvey was not an expert in the margin regulations and does not know much about them.  Harvey testified that none of the other members of the Bulldog Team in-house at Comdisco were experts on margin regulations.  (10/1/13 Tr. at 394.)

625.    Based on his lack of expertise regarding margin regulations, Harvey testified that he had no reason to doubt the advice Hale was giving.  (10/1/13 Tr. at 394.)

626.    Harvey testified that he did not have any reason to believe the SIP violated the margin regulations at the time the SIP closed and believed that it did not.  (10/1/13 Tr. at 397.)

627.    Harvey testified that the first time that he heard the Comdisco SIP might violate the margin regulations was during the Comdisco bankruptcy.  (10/1/13 Tr. at 409-410.)

628.    Harvey testified that he is not aware of anyone at Comdisco who knew or believed that the transaction violated the margin regulations.  (10/1/13 Tr. at 396-397.)

629.    If any doubt had been raised with respect to compliance with the margin regulations, Harvey testified that he would have satisfied himself that there was not a problem before permitting the SIP to go forward.  (10/1/13 Tr. at 397.)

630.    Clarke testified that he is not a lawyer, he is not familiar with Regulation G, T, U, or X put out by the Federal Reserve Board, and he does not have the ability personally to determine what kinds of transaction comply with the margin regulations and what kinds do not.  (9/25/13 Tr. at 240.)

631.    Clarke testified that he was not personally involved in any review of the legal issues with the transaction and that Comdisco's outside counsel would ultimately be responsible for ensuring compliance with the margin regulations.  Clarke testified further that the Bank would be looking to its outside counsel with respect to what was provided by Comdisco's

144

outside counsel.  (9/25/13 Tr. at 240-241, 252.)

632.    Clarke testified that at the time the Comdisco SIP transaction closed and funded he was not aware of any unresolved margin regulation issues in connection with the transaction and that the Bank would never have closed the transaction if it did not receive all the appropriate legal documents and opinions.  Clarke testified that at the time the Comdisco transaction closed and funded, he believed the transaction was lawful and appropriate.  (9/25/13 Tr. at 242-243.)

### 2.    Representations in the Facility Agreement

633.    Harvey reviewed a couple drafts of the Facility Agreement as it was being negotiated and finalized.  Harvey testified that he was pretty comfortable with the terms and did not raise any objection to the Facility Agreement at the time it was provided to the SIP participants.  (10/1/13 Tr. at 397-398.)

634.    Harvey reviewed and signed off on the SIP Binder going to the prospective SIP participants.  (10/1/13 Tr. at 404.)

635.    At the time Harvey signed off on distribution of the SIP binder, including the draft Facility Agreement, to potential SIP participants, he testified that he did not know or have reason to believe there was anything false or misleading about Comdisco's representations in Section 4.01(h) to the Bank that "[n]o part of the proceeds of any Loan will be used in a manner which would violate, or result in a violation of, Regulation G, Regulation T, Regulation U or Regulation X" and that "[n]either the making of any Loan hereunder nor the use of the proceeds thereof will violate or be inconsistent with the provisions of Regulation G, Regulation T, Regulation U or Regulation X."  Harvey testified that he was not aware of anyone else within Comdisco who knew or believed at the time of the SIP that this representation was incorrect. (10/1/13 Tr. at 399-401.)

145

636.     Harvey testified that he has no information indicating that people at the Bank believed at the time of the SIP that Comdisco's representations in Section 4.01(h) were false. (10/1/13 Tr. at 402.)

637.     Before the SIP Binder was provided to the SIP participants, Harvey reviewed Comdisco's representations in Section 4.01(c) of the Facility Agreement that "[t]he execution and delivery of, and performance by the Company of its obligations under, each Loan Document to which it is a party will not result in a breach or violation of … any Requirement of Law …" (10/1/13 Tr. at 402-403.)

638.     Harvey testified that he did not know or have reason to believe the representations in Section 4.01(c) of the Facility Agreement were false or misleading at the time of the SIP.  He testified that he did not know of anyone at Comdisco who knew or believed at the time of the SIP that these representations were false or misleading, nor does he have any information indicating that anyone at the Bank or Winston knew or believed that these representations were false or misleading.  (10/1/13 Tr. at 403.)

### 3.     Representations in the Questions & Answers

639.     Harvey reviewed and signed off on the Questions and Answers appearing at Tab 4 of the SIP Binder before they went out to prospective SIP participants.  (10/1/13 Tr. at 404.)

640.     Hale put together the Questions and Answers and passed them by Comdisco. Harvey testified that he did not raise any objection to the Question and Answers going out to prospective SIP participants.  (10/1/13 Tr. at 405.)

641.     Through his work as a lawyer at Comdisco and elsewhere Harvey was generally familiar with securities laws and the importance of making accurate statements in connection with disclosures and prospectuses under those laws.  (10/1/13 Tr. at 404.)

146

642. At the time of the SIP, Harvey testified that he believed that Question and Answer No. 13, which stated that the SIP Loan was not secured by the stock, was not false and misleading. He testified that he had no reason to believe otherwise, and Hale had indicated to him that the Questions and Answers were okay. (10/1/13 Tr. at 405.)

643. There were never any security agreements pledging the SIP stock to Comdisco or the Bank. Harvey testified that Comdisco had liens on the stock, which is why they kept it, but that no liens were filed on the stock. (10/1/13 Tr. at 406.)

644. Harvey testified that Question and Answer No. 10 (on page 6) accurately stated that there would be no margin call if the price of Comdisco stock were to drop below the purchase price, and testified that because the purchased SIP shares did not serve as collateral for the loan from the Bank, the loan was not a margin loan. Harvey testified that "the bank had no ability to call on any additional funds under the loan unless there was a default. It had nothing to do with the stock price, the price of the stock, whether it was up or down. (10/1/13 Tr. at 407-408.)

645. At the time of the SIP transaction, Harvey testified that he did not believe Question and Answer No. 10 was a false or misleading statement. He testified that he has no information indicating that anyone else at Comdisco believed this statement was false or misleading, nor that anyone at the Bank or Winston believed it was false or misleading. To the contrary, Harvey testified that the Bank had told Comdisco that it was not allowed to have a margin loan and that it would not have "security interest in the stock". (10/1/13 Tr. at 409.)

**4.    Murray's Testimony Regarding Shareholder Approval**

646. Murray testified that, in order for a company to qualify as a "plan lender" under Regulation G, the company would need to "enact a plan, a stock plan, and the stock plan would

147

need to be approved by its shareholders." (10/9/13 Tr. at 854:15-21.)

647.    Murray testified at the time the Comdisco SIP transaction closed and funded in February 1998, he believed that Comdisco had enacted a stock plan and obtained shareholder approval for the stock plan. (10/9/13 Tr. at 854-855.)

648.    Murray testified that the following formed the basis of his belief that Comdisco had obtained shareholder approval for the stock option plan: the representations and warranties of Comdisco in the Facility Agreement, including §§4.01(c) and 4.01(k), and the legal opinion rendered by McBride. (10/9/13 Tr. at 860-861.)

649.    Murray testified that, with respect to § 4.01(k) of the Facility Agreement, this representation contributed to his belief that stock holder approval had been obtained because this section refers "to the fact that the plan had been adopted by all requisite corporate action including stockholder approval if necessary." (10/9/13 Tr. at 870.)

650.    Murray testified that his understanding of the facts and his interpretation of the law, which he had discussed with the Bank, led him to conclude at the time of the Comdisco SIP transaction in 1998 that Comdisco could not have made the representations as to compliance with all requirements of law, found in paragraph 4.01(c) of the Facility Agreement, without having shareholder approval for the stock option plan. (10/9/13 Tr. at 861-862.)

651.    In response to a question asking what facts he was talking about, Murray stated: "[t]he circumstances of the plan as I understood it and how it operated." In response to a question asking what circumstances he was talking about, Murray stated: "[t]he provisions relating to, different provisions relating to the stock and the relevant rights of the company and the executives in the stock." Murray further testified: "Well, the facts were that the plan said what it said, and that it placed, had various provisions relating to the rights of the company and the

148

rights of the executives in the stock." (10/9/13 Tr. at 862.)

652.    Murray testified that he could not identify what the plan said with respect to the

rights of the company and the rights of the individuals in the stock led him to believe that there

was shareholder approval without disclosing what his legal view was on how the law related to

those facts. (10/9/13 Tr. at 862-863.)

653.    Murray testified that the Comdisco plan he is referring to is at Bates Page 00048

of JX 1.  Murray testified that he would have looked at, but not prepared, this plan. (10/9/13 Tr.

at 863.)  In response to an inquiry as to what provisions of the plan Murray based his belief on

that shareholder approval had been obtained, Murray testified: "Among those would be

paragraph 7, possibly paragraph 8".  He testified that Paragraph 7 says "all purchased shares",

which "puts some restrictions on the ability of the executive to sell shares."  With respect to

Paragraph 8, Murray referred to "the gain or the loss on shares." In response to being asked

whether there were any other provisions in the plan that he based his belief on, Murray testified:

"Based on my review within the time that I have here, no." (10/9/13 Tr. at 864-866.)

654.    In response to a question as to what about those particular provisions contributed

to his belief that shareholder approval had been obtained, Murray testified: "I can say the issue is

whether Comdisco was so-called directly or indirectly secured by the stock.  That is the threshold

question here.  And the definition of "indirectly secured" is a somewhat broad one in the law.

And it includes, I forget the definition, but basically any kind of arrangement that restricts the

ability of the executive to have the benefit of the stock in effect." (10/9/13 Tr. at 865.)

655.    Murray testified that he does not believe Comdisco's representation and warranty

in Section 4.01(h) of the Facility & Guaranty Agreement had a bearing on him at the time of the

Comdisco SIP closing as to whether shareholder approval had been obtained. (10/9/13 Tr. at

149

903.)

656.     Murray testified that there was no physical evidence of shareholder approval that was ever part of the documentation of the SIP, and such evidence of shareholder approval was not called for by the Facility Agreement and was not delivered by Comdisco. (10/9/13 Tr. at 867.)

657.     Murray testified that he believed there would have been a Comdisco board resolution delivered with respect to authorization of the loan transaction. (10/9/13 Tr. at 868.)

658.     Page 1 of McBride's February 10, 1998 opinion letter delivered to the Bank stated that McBride had examined certain documents to its satisfaction, including resolutions of Comdisco's Board of Directors and Compensation Committee. (JX 14.) Murray testified that page 1 of McBride's opinion letter did not identify any shareholder approval as one of the documents that McBride had examined.  Murray testified that lawyers cannot list everything and that McBride had included a catch-all provision in the second full paragraph on page 2 of the opinion letter providing that McBride had examined "such other corporate records of the company, certificates of public officials and of officers and representatives and agreements, instruments, and documents as we have deemed necessary as a basis for the opinions hereinafter expressed." (10/9/13 Tr. at 869-870.)

659.     Murray testified that McBride's February 10, 1998 opinion letter delivered to the Bank provided at pages 5-6 that "[t]he execution and delivery of the loan documents by the company and the borrowers and the performance by the company and the borrowers of all the obligations under each such loan document do not require consent of the company's stockholders." Murray testified that this does not say anything about the plan and is a standard corporate opinion that basically the board of directors had the power to approve the loan

transaction.  (10/9/13 Tr. at 870, 904-905.)

660.    Murray testified that he was surprised when he first heard that Comdisco was not a plan lender.  (10/9/13 Tr. at 856.)

661.    Murray testified that the comment was "new news".  Murray testified that he does not recall what he said in response to the comment at the meeting that Comdisco was not a plan lender. (10/9/13 Tr. at 856-857.)

662.    Murray testified that he first heard Comdisco was not a plan lender at a meeting occurring sometime in 2002, after Comdisco had declared bankruptcy, which included Comdisco's lawyers, Bank lawyers and others.  (10/9/13 Tr. at 856.)

663.    In response to a question asking whether he did anything to investigate after learning in 2002 that shareholder approval may not have been provided, Murray testified "yes". (10/8/13 Tr. at 871-872.)

664.    Murray testified that Winston represented the Bank in its proof of claim in Comdisco's bankruptcy.  Murray testified that he does not recall Winston ever taking the position in connection with the proof of claim proceedings that Comdisco was a plan lender. Nor did Murray recall the Bank taking the position in the bankruptcy proceedings that Comdisco had obtained shareholder approval and therefore the loans could be for 100 percent of the purchase price.  Murray testified that the focus in the bankruptcy was on private cause of action and no one ever got into the merits of Regulation U issues.  (10/9/13 Tr. at 871-872.)

665.    Murray testified as follows, regarding the significance of a company qualifying as a "plan lender" under the margin regulations:

> Well, the significance would be that there would be restricted – the
> margin limitations placed on them would be loosened, that the general
> concept of margin lending was that you could only lend 50 percent loan
> to value. So if you were lending, you know, for $100 worth of stock, you
> could only lend $50, because there had to be 2 to 1 collateral coverage.

151

In the case of a plan lender, because Congress or the Fed or somebody
wanted to promote stock ownership, they had this notion that it was
pursuant to a corporate plan, corporation's plan that the credit extensions
could be secured 1 to 1, in other words, $100 for $100 worth of stock.

(10/9/13 Tr. at 853.)

## VII. PARTICIPATION IN AND CLOSING OF THE SIP TRANSACTION (FEBRUARY 1998)

### A. Defendants' Participation, Reasons for Participating, and Related Testimony

666.    Comdisco specified the maximum number of shares each Prospective SIP

Participant could purchase under the SIP.  The maximum number of shares each Defendant was

permitted to purchase under the SIP, the number of shares each Defendant purchased, and the

total purchase price of each Defendant's SIP shares is shown in the following chart:

| Defendant | Maximum Shares | Shares Purchased | Purchase Price |
|---|---|---|---|
| Brunner | 96,000 | 16,000 | $552,000 |
| Poisella | 32,000 | 24,000 | $828,000 |
| Scozzafava | 16,000 | 16,000 | $552,000 |
| Weiss | 32,000 | 16,000 | $552,000 |

(Stmt. Uncontested Facts ¶ 28.)

667.    Brunner testified that he understood the SIP program involved borrowing money

to purchase stock.  He testified that he had never before borrowed money to purchase stock.

(10/3/13 Brunner Dep. at 10.)

668.    None of the Defendants are attorneys, and each testified that they had no

experience or familiarity with Regulation G or U as of January 1998.  (10/3/13 Brunner Dep. at

10-11; 10/8/13 Tr. at 754; 10/10/13 Tr. at 909; 10/9/13 Tr. at 800.)

669.    Defendants testified that they did not consult with an attorney or a financial

advisor prior to their election to participate in the SIP. (10/3/13 Brunner Dep. at 18-19; 10/8/13

Tr. at 765-766; 10/10/13 Tr. at 911; 10/9/13 Tr. at 802.)

670.    Brunner testified that the reason he did not consult with an attorney or a financial

152

advisor was that it was a weekend with nine hours' time difference and he would have had to organize something in advance to have consulted his legal and financial advisors over the week-end.. (10/3/13 Brunner Dep. at 18-19.)

671.     Defendants testified that they had not seen an FRU-1 form as of January 30, 1998, and were not presented with an FRU-1 form by the Bank in connection with the SIP. (10/3/13 Brunner Dep. at 29-30; 10/8/13 Tr. at 754, 766; 10/10/13 Tr. at 909; 10/9/13 Tr. at 800, 813; Stmt. Uncontested Facts ¶ 27; DX 74.)

672.     None of the Defendants had seen an FRG-3 form as of January 30, 1998, and none of them were presented with an FRG-3 form by the Comdisco in connection with the SIP. (10/3/13 Brunner Dep. at 29-30; 10/8/13 Tr. at 754, 766; 10/10/13 Tr. at 909, 16; 10/9/13 Tr. at 800, 813; Stmt. Uncontested Facts ¶ 27; DX 73.)

673.     None of the Defendants had any reason to believe, at the time they elected to participate in the SIP, that Comdisco or the Bank knew the SIP was illegal.  (10/3/13 Brunner Dep. at 118, 125; 10/8/13 Tr. at 790-791; 10/10/13 Tr. at 927; 10/9/13 Tr. at 825.)

674.     Defendants testified (or would testify) that they would not have elected to participate in the SIP if they had been told beforehand that the program was not legal.  (10/3/13 Brunner Dep. at 28, 47-69; 10/8/13 Tr. at 762, 770; 10/14/13 Stipulation Regarding Testimony of Scozzafava and Weiss ¶¶ 1, 3.)

675.     Weiss testified that he relied on the SIP presentation and that he read the SIP materials and understood the basic concepts.  He testified that it was very complex. (10/10/13 Tr. at 912.)

676.     Scozzafava testified that he relied on the verbal description of the program and that he did go through the entire binder, but could not say that he read it word for word, and did

get the gist of it. He testified that it was very complex with a lot of legal documents. (10/9/13 Tr. at 803-804.)

677.    Scozzafava testified that during the SIP presentation weekend he read the letter in Tab 1 of the SIP Binder, which included the sentence "The shared investment plan is a voluntary plan that will allow you to invest in the company by purchasing a significant amount of Comdisco stock and with a loan guaranteed by Comdisco." He further testified that during the SIP presentation weekend he read the statements in the SIP Binder that "Participant remains personally liable," and "Comdisco cannot make any guarantees concerning stock performance." Scozzafava also testified that during the SIP weekend he read the section in the SIP Binder entitled "Risk of Loss." (10/9/13 Tr. at 820-823.)

678.    Scozzafava testified that during the SIP presentation he did not ask any questions about the documents or the program itself. (10/9/13 Tr. at 823.)

679.    Poisella testified that although the itinerary for the stay at one of the annual sales meetings was wall to wall, he did have a little bit of time and was instructed to review the material with his spouse, so he took the binder back to his room and went through it. Poisella testified that he understood much of it, but there was a lot of legal language that sounded more like assurances that everything was good, not only to prospective SIP participants, but to the bank. Poisella testified that he got the sense that much of what was in the SIP materials was for the prospective SIP participants' protection. (10/8/13 Tr. at 758-759.)

680.    Weiss testified that he did not have any prior legal training or experience with the margin regulation including Regulation G or U or any prior acquaintance with forms that are commonly called form FRU-1 or FRG-3. (10/10/13 Tr. at 909.)

681.    Scozzafava testified that he did not have any prior legal training or experience

154

with the margin regulation including Regulation G or U or any prior acquaintance with forms that are commonly called form FRU-1 or FRG-3. (10/9/13 Tr. at 800.)

682.     Weiss testified that he did not consult with his own legal or financial advisors because there was no time to do that. He did discuss it with his wife but that was very brief because his wife went into premature labor and that became the focus. (10/10/13 Tr. at 911-12.)

683.     Weiss testified that he understood that if the participants did not make their election by the deadline, they would not be allowed to participate. (10/10/13 Tr. at 912.)

684.     Scozzafava testified that he understood that if the participants did not make their election by the deadline, they would not be able to participate. (10/9/13 Tr. at 803.)

685.     Poisella testified that during the SIP presentation he was advised that Comdisco's board of directors had approved the individuals that were invited to participate in the program. (10/8/13 Tr. at 764.)

686.     Brunner testified that he learned at the SIP presentation that Comdisco's board of directors had approved the individuals invited to participate in the SIP. He further testified that it appeared to him from both the SIP materials and the SIP presentation that a significant amount of money and effort had been expended to create the SIP program. (10/3/13 Brunner Dep. at 25-26.)

687.     Poisella testified that based upon what he saw and heard it appeared to him that - an awful lot of time and thought and research went into the SIP materials and the SIP presentation. Poisella further testified that there was mention of the availability of outside attorneys and there may have been an outside attorney at the presentation, but he could not recall. Poisella testified that he did not consult with an attorney or financial advisor, although it was suggested, it was acknowledged that it's a weekend, and in the likelihood they were able to get a

155

hold of your financial advisor, which he was not, people might want to speak with the outside attorneys, and your attorney and financial advisor had to agree to the same level of confidentiality. (10/8/13 Tr. at 764-766.)

688. Poisella testified that the SIP program as presented both in the presentation and in the materials struck him as complicated. Poisella learned at the SIP presentation that the First National Bank of Chicago had provided financing for SIPs at other companies including Baxter and Allegiance. Poisella learned at the SIP presentation that Comdisco's chief executive officer, chief operating officer, chief financial officer, and chief legal officer were going to participate in the SIP program. Poisella testified that this information impacted his decision whether to participate. (10/8/13 Tr. at 762-764.)

689. Brunner testified that his general impression of the scope of information that was provided to him either in the SIP materials or during the SIP presentation was that it was well researched with lots of information, some of which was on legal and financial issues. Brunner testified that Comdisco had one of its outside lawyers available during the SIP presentation and that advice was potentially available. Brunner further testified that this was certainly a good offer to be able to go to someone and ask questions if there were any doubts. (10/3/13 Brunner Dep. at 26-27.)

690. Brunner testified that nothing in the SIP materials, the SIP presentation, or the manner of the presentation alerted him or gave him any pause to believe that the SIP program was an illegal transaction or contemplated any illegal transaction in any respect. Brunner testified further that nothing in the SIP materials, the SIP presentation, or the manner of the presentation alerted him or gave him any pause to believe that the SIP transaction violated, directly or indirectly, any applicable laws or other legal requirements. Brunner further testified

156

that nothing in the SIP materials, the SIP presentation, or the manner of the presentation alerted him or gave him any pause to believe that the SIP program had been designed to evade any such laws or other requirements. (10/3/13 Brunner Dep. at 27-28.)

691.    Brunner testified that if someone had told him at the time that the SIP program was illegal, he would not have participated.  Brunner further testified that if someone had told him at the time that the SIP program was illegal, he would not have expected it, and would have been very surprised.  (10/3/13 Brunner Dep. at 28.)[5]

692.    Brunner testified that nothing in the SIP materials, the SIP presentation, or the manner of the presentation that alerted him or gave him any concern that there was a risk that the structure or framework of the SIP program violated or might be found to violate applicable laws or other legal requirements. (10/3/13 Brunner Dep. at 31-32.)

693.    Brunner testified that nothing in the SIP materials, the SIP presentation, or the manner of the presentation alerted him or gave him any concern that there had not been a full or proper investigation and evaluation of whether the structure and framework of the SIP program complied with applicable laws or other legal requirements. (10/3/13 Brunner Dep. at 32.)

694.    Brunner testified that had the SIP materials or the SIP presentation disclosed to him or alerted him that Comdisco or the First National Bank of Chicago had been reckless in investigating or evaluating whether the structure and framework of the SIP program complied with applicable laws, it would have definitely affected his decision and he would not have gone ahead with signing up. (10/3/13 Brunner Dep. at 33.)

695.    Brunner testified that nothing in the SIP materials, the SIP presentation, or the

_____

[5] The Trustee objected at trial to questions and testimony regarding the Defendants' subjective belief as to the legality of the SIP transaction, as well as the Defendants' likely course of action had they known the transaction was alleged to be illegal on the grounds that this testimony is irrelevant and elicited from improper hypotheticals, and the Court sustained these objections on multiple occasions.

manner of the presentation alerted him or gave him any concern that information indicating a risk that the transaction contemplated by the program violated or might be found to violate applicable laws or other legal requirements had not been disclosed to you. (10/3/13 Brunner Dep. at 33.)

696.    Brunner testified that it was obvious, on the basis of the SIP materials, the SIP presentation, and the manner of the presentation and the manner of the presentation that Comdisco and the First National Bank of Chicago believed that the SIP program complied with all applicable laws and legal requirements. Brunner further testified that it was his expectation, at the time of the SIP presentation and through that weekend until he exercised his option, that Comdisco and the First National Bank of Chicago would have told him if either of them or their respective attorneys was aware of facts calling that belief into question. (10/3/13 Brunner Dep. at 33-34.)

697.    Brunner testified that he believed during that period of time, on the basis of the SIP materials, the SIP presentation, and the manner of the presentation that Comdisco and the First National Bank of Chicago had conducted an adequate legal inquiry to support their belief. Brunner further testified that he did not think that Comdisco or the First National Bank of Chicago would invite him to participate in a transaction that either of them thought might be illegal. (10/3/13 Brunner Dep. at 34.)

698.    Brunner testified that he was never told during the SIP presentation that one of the features of the SIP program was that Comdisco would be able to get a direct infusion of millions of dollars of capital without having to list corresponding debt on its books.  Brunner testified that he understood from either the SIP presentation or the SIP materials, that the loan proceeds on his loan and the loans made to other SIP recipients were going to be paid directly to Comdisco.

158

Brunner testified that he did not understand or perceive at any time before exercising his option to purchase the SIP stock or executing the promissory note that the SIP program had, as one of its design futures, enabling Comdisco to get a direct infusion of millions of dollars of capital without having to list corresponding debt on its books and that if that design been disclosed that disclosure would certainly have been a nice fact to know before making his investment decision. (10/3/13 Brunner Dep. at 36-37.)[6]

699.　　Scozzafava testified that he learned during the SIP Presentation that Comdisco's board of directors had approved the individuals invited to participate in the program.　(10/9/13 Tr. at 809.)

700.　　Scozzafava testified that from the SIP materials that he received and the presentation of the program it appeared like a great deal of effort had been put into this from the bank, Comdisco, the board of directors, the outside legal counsel, this massive binder of information so he had every reason to believe that a great deal of effort had gone into it.　He testified that outside counsel was referred to during the meeting and that he knew that they were available but he did not speak to any. (10/9/13 Tr. at 809.)

701.　　Scozzafava testified that there was nothing in the SIP materials that he reviewed that gave him any concern as to whether the SIP program was a legal transaction, but that he didn't really understand them thoroughly, there was a lot of legal and financial jargon that he was not intimately familiar with.　He testified that it seemed to him that all of the Is were dotted and Ts were crossed and this was a whole package of information that had been very well thought out, that the whole program had been very well constructed by experts in the field who knew what they were doing.　Scozzafava further testified that nothing alerted him to believe that

---

[6] The Trustee objected at trial to certain of the Defendants' characterizations of the SIP Program as an off balance sheet financing vehicle.

the transaction violated any applicable laws or other legal requirements, but to the contrary, there were even some clauses in some documents that referred to the fact that all appropriate law was being complied with and regulations. Scozzafava testified that nothing gave him any pause to believe that the transaction had been designed to evade any laws or requirements and his reaction would have been shock and disbelief if at the time someone has told him that the SIP program was illegal. (10/9/13 Tr. at 809-810.)

702.      Scozzafava testified that based upon the SIP presentation and the SIP materials that he had, he did not have any concern as to whether there was a risk that the structure or framework of the SIP program violated or might be found to violate applicable laws or other legal requirements.  He testified that he looked at it as really a no risk decision on his part the way it was presented and based on the character and history of the company, everything, all of his preceding knowledge.  He testified that he thought it was a very sound decision on his part. Scozzafava further testified that based on the SIP materials and the SIP presentation, based on all the material, the documentation, the people who were represented, at the meeting and who had seemingly been involved in it from the bank and lawyers and everything else that he did not have any concern as to whether there had been a full or proper investigation and evaluation of the structure and framework of the SIP program.  Scozzafava further testified that prior to deciding to participate in the program, he did not have a belief or any concern that information had not been disclosed to him with respect to either the underlying facts of the transaction or the risks that were involved, that he believed prior to electing to participate in the program that the program complied with all applicable laws and legal requirements. (10/9/13 Tr. at 812-813.)

703.      Scozzafava testified that he did not have any sense based upon the SIP materials and the SIP presentation as to whether or not Comdisco was going to receive an infusion of

capital as a result of the SIP program. (10/9/13 Tr. at 815.)

704.    Scozzafava testified that he did not have any information that at the time of the SIP presentation the Bank or Comdisco knew or thought that the SIP program was illegal. (10/9/13 Tr. at 825.)

705.    Scozzafava testified that there was nothing in the SIP materials that told him whether there was any impact on the value of the stock based upon the restrictions. (10/9/13 Tr. at 816-817.)

706.    Poisella testified that nothing in the SIP materials, the SIP presentation, or the manner of the presentation that alerted him or gave him any pause to believe that the SIP program was an illegal transaction.  He further testified that if it was, he would not have participated. (10/8/13 Tr. at 766.)

707.    Poisella testified that he did not see anything in the SIP materials, the SIP presentation, or the manner of the presentation that gave him any reason to believe that the transaction had been designed to evade any laws or legal requirements.  He further testified that if someone had told him at the time that the SIP program was illegal he would not have done it. (10/8/13 Tr. at 767.)

708.    Scozzafava testified that at the time of the SIP Presentation he did not have any information that Comdisco did not do adequate due diligence on the program. (10/9/13 Tr. at 825.)

709.    Scozzafava testified based on the SIP materials, the binder that he received, and the SIP presentation, he believed that the SIP program was legal.  He testified that there was nothing about either the materials or the presentation that caused him to wonder whether he was being deceived in any way and that based on the materials and the presentation, the program

161

struck him as being a fairly complex program in terms of h how it was orchestrated. He testified that that was the part that he did not really understand and what he understood was he was going to have all this equity, and he would not have to lay out any money, that he would not even have to pay any interest on the loan, that it was all being covered through dividends. He testified that it was just such a simple thing, just sign here and you're in. (10/9/13 Tr. at 807-808.)

710.    Scozzafava testified that he learned at the SIP presentation that the First National Bank of Chicago had provided financing for SIPs at some other companies. He knew that the program was based on other successful companies, other successful programs of this nature at other companies and he specifically remembered Baxter, and he thought there was another company, one that he was not familiar with, and that he believed that the bank had been involved in those transactions as well. He further testified that during the SIP presentation that the key, top three or four executives at Comdisco were going to participate in the program and that absolutely gave him tremendous confidence that if these people were doing it, that it made a great deal of sense and that he should be doing it as well. (10/9/13 Tr. at 808-809.)

711.    Weiss testified that there was nothing in the SIP materials that told him whether there was any impact on the value of the stock based upon the restrictions. (10/10/13 Tr. at 916.)

712.    Brunner testified that he was not told during the SIP presentation or in the SIP materials that the market price for Comdisco stock with the restrictions on the stock that were set forth in the program created a value for the stock that was significantly less than the $34.50, the price that he had purchased it, it never came up. Brunner further testified that he did not understand or perceive at any time before exercising his option to purchase SIP stock or executing his promissory note that the market price for Comdisco stock with the restrictions that the SIP program placed upon it was significantly less than $34.50. Brunner testified that if the

162

difference in market value had been disclosed to him, that disclosure would have been a fact important which would have caused him to seriously consider investing. (10/3/13 Brunner Dep. at 38-39.)

713.    Weiss testified that at the time he elected to participate in the SIP program he believed that it was legal and complied with all applicable law. (10/10/13 Tr. at 914.)

714.    Brunner testified that he understood from the SIP presentation and SIP materials that if you timely exercised your option that you would become the owner of the SIP stock on February 2 even though you had not yet executed the note or submitted financial statements or completed other materials that would be necessary for the transaction to be fully consummated. (10/3/13 Brunner Dep. at 23.)

715.    Weiss testified that based on the SIP presentation and the binder of materials, he understood that the purchase of the stock would be effective February 2, 1998. He further testified that after February 2nd, 1998 he submitted a financial statement in connection with participation in the SIP program. (10/10/13 Tr. at 913.)

716.    Scozzafava testified that based on the SIP presentation and the binder of materials, he understood that the purchase of the stock would be effective at the opening of the market on Monday morning. He further testified that after February 2nd, 1998 he submitted a financial statement in connection with his participation in the SIP program. (10/9/13 Tr. at 804-805.)

717.    Brunner testified that neither Comdisco nor anyone else informed him whether he had a right to cancel or withdraw from the SIP program after making the election to participate by submitting the Option To Exercise Form. (10/3/13 Brunner Dep. at 23.)

718.    Weiss testified that the reason why he elected to participate was that Comdisco

163

was like a very large -- even though it was a business, it was a very large family. And having worked there at that time for 10, 11 years, employees developed a sense of loyalty. He was a newly promoted sales manager and had gone from being a salesperson to a manager, just three months prior to this president's club meeting so when he was offered the SIP program, he thought it would be a nice benefit. He felt that the company had done well by him, and he trusted his managers. There was a real strong sense of loyalty there. And since he had just been promoted to a manager and was offered this program, he felt obligated to take it. Weiss further testified that more importantly, he was strongly advised by his manager, Rich Zane, to do this and that there was lots of scrutiny over who was doing it and to make sure that he did it if he wanted to keep his employment. At that time he had, three children, married, had a mortgage and the last thing he wanted to do was jeopardize his career. So he took it. He felt like the company -- based on all this large binder of information, he felt like the company had done its due diligence and had vetted this out and had done all the right things and that it would be a true benefit. Another reason he did it was because in all the documentation, what he heard that day was that as a participant, the company was going to value his opinion going forward in the decision making process of the business to help continue to grow that business. (10/10/13 Tr. at 917-918.)

719. Scozzafava testified that the reason why he decided to participate in the SIP was because he felt actually very special in that he was being included in a group of senior people within the company that had worked very hard to make the company successful. And the company had been successful for many years. With the exception of a few blips, there was just a steady track record of success for the company; and that he was being told that as a reward for his hard work and as an inducement to continue that and to be a part of the company, that he

164

would be allowed to have a significant equity position in the company that he ordinarily would not have.  He further testified that could never have taken that position on his own and he felt honored.  Scozzafava also testified that he felt like it was a no-brainer' type of decision for him to make, that here someone is saying to him, you know: Joe, we're going to let you participate in the equity of this company. You're going to have 16,000 shares. And he would say: "I can't afford to buy 16,000 shares of stock."  And they said: "Don't worry. First National Bank is going to loan you that money."  Scozzafava testified that he cannot afford to pay back that money.  He testified that he had submitted financial affidavits and that he had no assets that could justify that and that he had no income that could justify anyone loaning him that amount of money. Scozzafava testified that Comdisco said: "Don't worry. We're going to guarantee it."  He testified that he felt like this was just an incredible opportunity that the company was giving to this select group of individuals, and he was just really kind of blown away by it.  (10/9/13 Tr. at 806-807.)

720.     Poisella testified that the reasons he decided to participate in the SIP went back to 1981 when he joined the company.  It was the best company he ever worked for with the best leadership, and it was the last job he ever wanted to have and it was a mutual loyalty to each other. Poisella testified that the founder, Ken Pontikes knew it until he died in 1994, and Jack Slevin and Nick Pontikes knew it. Poisella testified that everybody knew it, because everybody in the company felt it.  They treated us special, they treated our families special, and we returned the favor. He testified that that's why he did it. (10/8/13 Tr. at 761-762.)

721.     Poisella further testified that in a conversation that evening after the SIP presentation that he overheard from Phil Hewes, some reasons why Hewes was doing it.  Poisella testified that Hewes explained there is no way the company would ever harm the people who were participating which came as positive news to Poisella. (10/8/13 Tr. at 764.)

<div align="center">165</div>

722.     Brunner testified that prior to deciding to participate in the SIP, if he had been aware or if he had known or believed that the SIP transaction violated, directly or indirectly, any applicable laws or other legal requirements he would have decided not to participate. (10/3/13 Brunner Dep. at 28.)

723.     Brunner testified that after he decided to participate in the SIP program, he would not have wanted to remain in the SIP program if he became aware or if he had known or believed that it was an illegal transaction in any respect or that it violated, directly or indirectly, any applicable laws or other legal requirements. (10/3/13 Brunner Dep. at 28-29.)

724.     Brunner testified that if he had been told that his promissory note could only be for 50 percent of the purchase price of the stock and that he would have to fund the remaining 50 percent with his own money Brunner would not have exercised his stock option to participate in the SIP program.  He did not think that he would have been able to afford to come up with 50 percent of that amount at that time.  (10/3/13 Brunner Dep. at 31.)

725.     Brunner testified that he did not consider himself to be in an adversarial relationship with either Comdisco or the First National Bank of Chicago at the time of the SIP presentation.  Brunner further testified that Comdisco was a tight group, and everybody was behind the company, and everybody was excited, and nothing was put in question.  Brunner testified that he did not have any prior relationship experience with the First National Bank of Chicago.  (10/3/13 Brunner Dep. at 35.)

726.     Brunner testified that if he had known, been aware, or believed that he was being deceived he would not have wanted to participate in the SIP program. (10/3/13 Brunner Dep. at 35.)

727.     Scozzafava testified that subsequent to his electing to participate in the SIP

166

program, neither Comdisco nor any successor of Comdisco nor First National Bank of Chicago nor any of its successors ever issued a correction or amendment to him to any of the statements set forth in the prospectus of SIP materials or any statements made at the SIP presentation. (10/9/13 Tr. at 817.)

728.    Scozzafava testified that he never received any of the money that the First National Bank of Chicago advanced to Comdisco as the purchase price for his shares. He testified that he did not ever retain any of the money that the First National Bank of Chicago advanced to Comdisco as the purchase price. (10/9/13 Tr. at 817.)

729.    Brunner testified that he executed a blank stock power in connection with the SIP program. Brunner further testified that he understood he had to execute the blank stock power in order to participate the SIP program. He testified that he did not receive any dividends and that the bank received the benefit of the dividends. Brunner further testified that he never voted the SIP shares. (10/3/13 Brunner Dep. at 40-42.)

730.    Brunner testified that neither First National Bank of Chicago nor any of its successors, Bank One or JP Morgan Chase, ever made any offer to him of any kind to surrender or cancel his note or to return or turn over to him any of the interest that Comdisco periodically paid to the bank as dividends on his stock prior to Comdisco's bankruptcy. Brunner further testified that the Plaintiff in the lawsuit has not made any such offers. (10/3/13 Brunner Dep. at 43.)

731.    Brunner testified while looking at Page 16 of the Facility and Guarantee Agreement Subparagraph C for reference, that if at any time before he exercised his stock option or purchased SIP stock a representation had been included in the prospectus of SIP materials that the execution and delivery by the company of the Facility and Guarantee Agreement would be

167

unlawful, that representation would have been very important and significant to him in deciding whether to exercise his SIP option and or invest in SIP stock. Brunner further testified that if that representation would have been made in the prospectus of SIP materials, that representation would have altered his investment decision and would not have participated. (10/3/13 Brunner Dep. at 47-48.)

732. Brunner testified that if at any time before he exercised his SIP stock option or purchased SIP stock a representation had been included in the prospectus of SIP materials that the execution and delivery by the company of the Facility and Guarantee Agreement would result in a violation of law or a violation of requirements of law as defined in the Facility and Guarantee Agreement by Comdisco, that representation would have been important and significant to him in deciding whether to exercise his SIP option and or invest in SIP stock. Brunner further testified that that representation would have altered his investment decision by causing him to not participate. (10/3/13 Brunner Dep. at 48-49.)

733. Brunner testified that if at any time before he exercised his SIP stock option or purchased SIP stock a representation had been included in the prospectus of SIP materials that the execution and delivery by the company of the Facility and Guarantee Agreement would result in a violation of Federal Reserve Board Regulation G or Section 7D of the Securities Exchange Act, that representation would have been important and significant to him in deciding whether to exercise his SIP option and or invest in SIP stock. (10/3/13 Brunner Dep. at 49-50.)

734. Brunner testified that if at any time before he exercised his SIP stock option or purchased SIP stock a representation had been included in the prospectus of SIP materials that the execution and delivery by the company of the Facility and Guarantee Agreement would result in a violation of the law by the First National Bank of Chicago, that representation would

have been important to him in deciding whether to exercise his SIP option and or invest in SIP stock. Brunner further testified that that representation would have altered his investment decision by causing him not to participate in the SIP program. (10/3/13 Brunner Dep. at 50.)

735. Brunner testified that if at any time before he exercised his SIP stock option or purchased SIP stock a representation had been included in prospectus of SIP materials that the execution and delivery by the company of the Facility Agreement would result in a violation by the bank of Federal Reserve Bank Regulation U or Section 7D of the Securities Exchange Act, that representation would have been important to him in deciding whether to exercise his SIP option and/or invest in SIP stock. Brunner further testified that that representation would have altered his investment decision by causing him to not participate in the SIP program. (10/3/13 Brunner Dep. at 50-51.)

736. Brunner testified that if at any time before he exercised his SIP stock option or purchased SIP stock a representation had been included in the prospectus of SIP materials that the bank's making of the loan to him would be inconsistent with Regulation U, that representation would have been important to him in deciding whether to exercise his SIP option and/or invest in SIP stock. Brunner further testified that that representation would have altered his investment decision by causing him to not exercise his SIP option. (10/3/13 Brunner Dep. at 52.)

737. Brunner testified that if at any time before he exercised his SIP stock option or purchased SIP stock a representation had been included in the prospectus of SIP materials that the bank's making of the loan to him or to other SIP participants would violate or result in a violation of Federal Reserve Board Regulation U, that representation would have been important to him in deciding to exercise his SIP option or invest in SIP stock. Brunner further testified that

169

that representation would have altered his investment decision by causing him not to exercise the SIP option. (10/3/13 Brunner Dep. at 52-53.)

738.    Brunner testified that if at any time before he exercised his SIP stock option or purchased SIP stock a representation had been included in the prospectus of SIP materials that the bank's making of the loan to him and to other SIP participants would be unlawful that representation would have been important to him in deciding whether to exercise his SIP option and/or invest in SIP stock.  Brunner further testified that that representation would have altered his investment decision by causing him to not exercise his SIP option. (10/3/13 Brunner Dep. at 53-54.)

739.    Brunner testified that if at any time before he exercised his SIP stock option or purchased SIP stock a representation had been included in the prospectus of SIP materials that the proceeds of the bank's loan to him would be used in a manner that would violate or result in a violation of Regulations G and U, that representation would have been important to him in deciding whether to exercise your SIP option and/or invest in stock.  Brunner further testified that that representation would have altered his investment decision by causing him not exercise his options. (10/3/13 Brunner Dep. at 54-55.)

740.    Brunner testified that if at any time before he exercised his SIP stock option or purchased SIP stock a representation had been include in the prospectus of SIP materials that half of the proceeds of the bank's loan to him would be used in a manner that would result in a violation by the bank of Regulation U, that representation would have been important to him in deciding whether to exercise his SIP option and/or invest in SIP stock.  Brunner further testified that that representation would have altered his investment decision by causing him not exercise his options. (10/3/13 Brunner Dep. at 55-56.)

170

741.     Brunner testified that if at any time before he exercised his SIP stock option or purchased SIP stock a representation had been include in the prospectus of SIP materials that half of the proceeds of the bank's loan to him would be used in a manner that would result in a violation by Comdisco of Regulation G, that representation would have been important to him in deciding whether to exercise his SIP option and/or invest in SIP stock.  Brunner further testified that that representation would have altered his investment decision by causing him not exercise his options. (10/3/13 Brunner Dep. at 56.)

742.     Brunner testified referring to Question 13 on Page 34 of JX 1, that it would have been important to him in deciding whether to exercise his SIP option and/or investment in SIP stock if Comdisco's representative had at that time also stated, furthermore, based on the restrictions on transfer and use of sale proceeds, the loan is considered indirectly secured by the securities within the meaning of Federal Reserve Board Regulation U such that it is unlawful for the bank to loan him more than 50 percent of the purchase price of the securities.  Brunner further testified that the additional statement would have altered his investment decision by causing him not exercise his options. (10/3/13 Brunner Dep. at 57-58.)

743.     Brunner testified still referring to Question 13 on Page 34 of JX 1, that it would have been important to him in deciding whether to exercise his SIP option and/or investment in SIP stock if Comdisco's representative had at that time also stated, furthermore, based on the restrictions on transfer and use of sale proceeds, Comdisco's guarantee is considered indirectly secured by the securities within the meaning of Federal Reserve Board Regulation G such that it is unlawful for Comdisco to guarantee repayment of more than 50 percent of the purchase price of the securities.  Brunner further testified that the additional statement would have altered his investment decision by causing him not exercise his options. (10/3/13 Brunner Dep. at 57-59.)

171

744.     Brunner testified, referring to Question 10 in the JX1, that it would have been important to him in deciding whether to exercise his SIP option and/or invest in SIP stock if Comdisco's representative had at that time also stated, however, based on the restrictions imposed by the SIP program on transfer and use of sale proceeds, the SIP shares are considered, within the meaning of Federal Reserve Board Regulation U, to be margin stock upon which the First National Bank of Chicago is relying as if the stock were collateral for the loan, the loan is considered indirectly secured by the SIP shares within the meaning of Federal Reserve Board Regulation U under these circumstances such that it is unlawful for the First National Bank of Chicago to loan him more than 50 percent of the purchase price of the SIP shares. Brunner further testified that the additional statement would have altered his investment decision by causing him not exercise his options. (10/3/13 Brunner Dep. at 59-60.)

745.     Brunner testified, still referring to Question 10 in the JX1, that it would have been important to him in deciding whether to exercise his SIP option and/or invest in SIP stock if Comdisco's representative had at that time also stated, however, based on the restrictions imposed by the SIP program on transfer and use of sale proceeds the SIP shares are considered, within the meaning of Federal Reserve Board Regulation G, to be margin stock upon which Comdisco is relying as if the stock were collateral for its guarantee obligation the guarantee is considered indirectly secured by the SIP shares within the meaning of Federal Reserve Board Regulation G under these circumstances such that it is unlawful for Comdisco to guarantee repayment of more than 50 percent of the purchase price of the SIP shares.  Brunner further testified that the additional statement would have altered his investment decision by causing him not exercise his options. (10/3/13 Brunner Dep. at 59-61.)

746.     Brunner testified, referring to Paragraph 6.11 labeled "Illegal Transactions" in the

172

JX1, that he believed he would have reviewed this provision before deciding whether to exercise his stock option.  He also testified that he had never borrowed money for the purpose of applying the loan proceeds to purchase securities, that he was unfamiliar with the laws that were involved, and had no legal training.  Brunner also testified that his understanding at the time of the SIP presentation was that the transaction proposed represented no illegal situation and that reading that provision gave him the confidence and belief that the transaction and the whole proposition was legal. (10/3/13 Brunner Dep. at 61-63.)

747.     Brunner testified that if it had been disclosed to him prior to the time he exercised his stock option and purchased your SIP stock that Scott Harvey had not read Regulation G or Regulation U, that disclosure would have been important piece of information to know in deciding whether to exercise your SIP option and/or invest in SIP stock. (10/3/13 Brunner Dep. at 64.)

748.     Brunner testified that if it had been disclosed to him prior to the time he exercised his stock option and purchased his SIP stock that Scott Harvey, prior to January 30, 1998, had not, on Comdisco's behalf, ever done an independent inquiry as to whether Regulation G or U or both of them would be violated, that disclosure would have been important to him in deciding whether to exercise his SIP option and/or investment in SIP stock.  Brunner further testified that such disclosure would have caused him to question whether or not this transaction had been vetted and is lawful.  He further testified that he thought it would have altered his investment decision knowing that the proper research has never been done as such; it would have probably led him to the same position, which is not to go ahead with the decision to exercise.  (10/3/13 Brunner Dep. at 65-66.)

749.     Brunner testified that if it had been disclosed to him prior to the time he exercised

his stock option and purchased his SIP stock that Scott Harvey had not asked Comdisco's outside

counsel, in connection with the SIP transaction, to provide Comdisco with an opinion as to

whether Regulation G or Regulation U or both of them would be violated, that disclosure would

have been important or significant to him in deciding whether to exercise his SIP option and/or

investment in SIP stock. Brunner further testified that it would have most likely driven him to

put a big question mark on the decision of going ahead and making the investment decision, and

he believed he would not have gone ahead and made the decision. (10/3/13 Brunner Dep. at 66-

67.)

750.    Brunner testified that if it had been disclosed to him prior to the time him

exercised his stock option and purchased the SIP stock that Scott Harvey, on Comdisco's behalf,

had not requested an oral or written opinion or advice from anyone as to whether Regulation G

or Regulation U or both of them would be violated in advance of the SIP presentation being

made on January 30, 1998 that disclosure would have been important to him in deciding whether

to exercise the option and purchase the stock. Brunner further testified that the information

would have altered his investment decision as before; understanding that the proper research had

not been done, if this would have been disclosed, he would not make the decision to exercise the

option. (10/3/13 Brunner Dep. at 67-68.)

751.    Brunner testified that if at any time after he exercised his SIP stock option or

purchased SIP stock it was disclosed to him that the First National Bank of Chicago's outside

counsel in a legal analysis that it had shared with the bank following the closing of Comdisco's

SIP understood Regulation U to prohibit the bank from receiving a company's guarantee of loans

that the bank would make to the company's employees to fund a hundred percent of the

employees purchase price of stock under the company's stock option plan, and it was disclosed to

174

him that the bank's outside counsel's legal analysis in which it is understood that the bank would violate Regulation U was for an executive stock purchase plan that was not materially different from Comdisco's SIP, and the bank disclosed to him that Comdisco's SIP, as structured, had resulted in a violation by the bank of Regulation U, and the bank disclosed to him that the statements set forth in the prospectus of SIP materials for Comdisco's SIP were materially false or inaccurate, that subsequent disclosure or those disclosures would have been important piece of information in deciding whether or not to sell his SIP stock at any time before Comdisco's bankruptcy. Brunner further testified that he could not state whether it would have caused him to do anything because he would have asked for legal advice before he would have formed an opinion on whether or not to sell his SIP stock. (10/3/13 Brunner Dep. at 68-69.)

752.    Brunner testified that in evaluating what would impact his decision to participate in the SIP program he could not really go down to the level of Regulations G and U, as one of more than 100 people who made the decision to sign up for the program, they really relied on the fact that the transaction was legal because it appeared to be 100 percent legal based on all the information that was provided to them and that was the basis.  He testified that they did not drill down into Regulation U and Regulation G and is this right or not, etc., they did not have the knowledge to do that. (10/3/13 Brunner Dep. at 124.)

753.    Brunner testified that if he had been aware in January of 1998 that Comdisco's counsel was about to provide an opinion letter to the bank stating that the SIP transaction did not violate the law, that he believes he would have elected to participate because "when the case was presented, everything in the case was confirmed that this was a legal transaction." (10/3/13 Brunner Dep. at 124-125.)

754.    Scozzafava testified that prior to deciding to participate in the program, if he had

known or believed that the program was an illegal transaction in any respect or that it violated

any applicable laws or other legal requirements he would not have participated in the program.

He also testified that if, after deciding to participate in the SIP program, he had known or

believed that it was an illegal transaction in any respect or that it violated any applicable laws or

other legal requirements, he would not have participated or would have tried to withdraw.

(10/9/13 Tr. at 810-811.)

755.     Scozzafava testified that if he had been told in connection with the SIP, the

proposed SIP program that the amount of money he was going to borrow could only be 50

percent of the purchase price of the stock, and he would have to come up with the other 50

percent, he could not have participated.  He testified that he could not afford to have put that kind

of money into it as he did not have it. (10/9/13 Tr. at 811-812.)

756.     Poisella testified that prior to deciding to participate, if he had been aware, known

or believed that the transaction violated any applicable laws, he might have left the room, but he

certainly would have not participated and expressed to a few managers his disappointment.

(10/8/13 Tr. at 767.)

757.     Poisella testified that if after he decided to participate in the SIP program, he

subsequently learned that the program was illegal, he would not have wanted to remain although

he did not know if he could have gotten out.  Poisella further testified that if after he decided to

participate in the SIP program, he subsequently learned that the transaction violated any

applicable laws or other legal requirements, he would not have wanted to remain although he did

not know if he could have gotten out. . (10/8/13 Tr. at 767-768.)

758.     Poisella testified that if he had been told that the amount of money he borrowed

from the bank could only be for 50% of the purchase price of the stock, he could not have

176

participated because he would not have the other half of it. (10/8/13 Tr. at 769.)

759.    Poisella testified that he assumed that between Comdisco's attorneys, who he knew well, Hewes, Harvey, and Jerry Fitzgerald, and the fact that they said that they had engaged outside counsel to be involved, that was enough for his legal comfort that the SIP program had been properly investigated.  Poisella testified that if he had a sense at the time that the program had not been properly investigated he would not have wanted to participate. (10/8/13 Tr. at 769.)

760.    Poisella testified that he thought everything was disclosed, including that the money was going to be used for corporate purposes and nothing gave him the feeling that something of significance had not been disclosed to him in connection with the transaction. Poisella further testified that he would have expected the bank and Comdisco would have told him if they were aware of any facts calling into question his beliefs that the SIP program had been properly investigated, that the program was legal and did not violate applicable laws or other legal requirements. (10/8/13 Tr. at 769-770.)

761.    Poisella testified that at no point did he think that Comdisco or the bank would have invited him to participate in a transaction that either of them thought might be illegal and he did not consider himself to be in an adversarial relationship with Comdisco or the bank in connection with the presentation of the SIP program until everything blew up. (10/8/13 Tr. at 770-771.)

762.    Poisella testified that the purchase price of the SIP stock was $34.50 per share may have been the all time high for the stock at the time. Poisella further testified that prior to having to decide whether to participate in the SIP program, he was not told whether the restrictions on the SIP stock impacted the fair market value of the stock.  Poisella further testified

177

that he was never told whether the restrictions on the stock would result in a price lower than the price that he paid for the stock, the $34.50 per share. He testified that if that had been disclosed to him, that would have been a fact important to him before making his investment decision and, though he finds it difficult to say how it would have impacted it, he testified that it would have impacted his decision. (10/8/13 Tr. at 771-773.)

763. Poisella testified that neither Comdisco nor anyone else informed him whether he had a unilateral right to cancel or withdraw from his exercise of the stock option. He testified that he understood that once he turned in his commitment, it was his commitment and the only thing he believed that would have prevented it from occurring is if the company did not get enough participation. Poisella further testified that he did not negotiate any of the terms of the documentation he executed in connection with the SIP program. (10/8/13 Tr. at 761.)

764. Poisella testified that if a representation had been included in the prospectus of SIP materials that the proceeds of the bank loan to him would be used in a manner that would violate or result in a violation of Federal Reserve Board Regulations G and U, that representation would have been important or significant to him in deciding whether to exercise his SIP option or invest in SIP stock. Poisella further testified that if he thought they were violating anything, he would not have done the SIP program. (10/8/13 Tr. at 776.)

765. Poisella testified that if a representation had been included in the prospectus of SIP materials that the bank's making of the loan to him would be inconsistent with Regulation U or would violate Regulation U, or would be unlawful, or the proceeds of the bank's loan would be used in a manner that would violate or result in a violation of Regulations G and U, and that half of the proceeds of the bank's loan to him would be used in a manner that would result in a violation by the bank of Regulation U, and half of the proceeds of the bank's loan to him would

178

be used in a manner that would result in a violation by Comdisco of Regulation G, each of those representations would have been important or significant to him in deciding whether to exercise his option and invest in the SIP stock and he would not have done it. (10/8/13 Tr. at 781-782.)

766.    Poisella testified that if a representation had been included in the prospectus of SIP materials that the execution and delivery by the company of the facility and guarantee agreement would be unlawful and would result in a violation of law by Comdisco and a violation of Regulation G or Section D of the Securities Exchange Act, and that the execution and delivery by the company of the facility and guarantee agreement would result in a violation of law by the bank and would result in a violation by the bank of Federal Reserve Board Regulation U or Section D of the Securities Exchange Act, each of those representations would have been important or significant to him in deciding whether to exercise his SIP option and invest in SIP stock and he would not have done the SIP transaction. (10/8/13 Tr. at 782-783.)

767.    Poisella testified that it would have been important or significant to him in deciding whether to exercise his SIP option and/or invest in SIP stock if Comdisco's representative had also stated, "Furthermore, based on the restrictions on transfers and use of sale proceeds, the loan is considered indirectly secured by the securities within the meaning of Federal Reserve Board Regulation U such that it is unlawful for the bank to loan you more than 50 percent of the purchase price of the securities" or had told him "Furthermore, based on the restrictions on transfer and use of sales proceeds, Comdisco's guarantee is considered indirectly secured by the securities within the meaning of Federal Reserve Board Regulation G such that it is unlawful for Comdisco to guarantee repayment of more than 50 percent of the purchase price of the securities," each of those representations would have been important to him and would have altered his investment decision and he would not have done the SIP transaction. (10/8/13

179

Tr. at 783-784.)

768.    Poisella testified that it would have been important or significant to him in deciding whether to exercise his SIP option and invest in SIP stock if Comdisco's representative had at that time also stated[7], "However, based on the restrictions imposed by the SIP on transfer and use of sale proceeds, the SIP shares are considered within the meaning of Regulation U to be margin stock upon which the First National Bank of Chicago is relying as if the stock were collateral for the loan. The loan is considered indirectly secured by the SIP shares within the meaning of Regulation U under these circumstances such that it is unlawful for the First National Bank of Chicago to loan you more than 50 percent of the purchase price of the SIP shares," or if the Comdisco representative had at that time stated, "However, based on the restrictions imposed by the SIP on transfer and use of sales proceeds the SIP shares are considered within the meaning of Regulation G to be margin stock upon which Comdisco is relying as if the stock were collateral for its guarantee obligation. The guarantee is considered indirectly secured by the SIP shares within the meaning of Regulation G under these circumstances such that it is unlawful for Comdisco to guarantee repayment of more than 50 percent of the purchase price of the SIP shares" each of those representations would have been important or significant to him in deciding whether to exercise his option and each would have altered his investment decision. (10/8/13 Tr. at 784-785.)

769.    Poisella testified that if he knew the in-house attorney at Comdisco with primary responsibility for working on the SIP did not fully examine the implications of the program as it related to regulations and violations, it would have impacted what Poisella chose to do.  (10/8/13 Tr. at 785-786.)

---

[7] The Trustee objected at trial to the extensive use of objectionable hypothetical questions that were posed to the Defendants and the Court sustained these objections.

AM 27729383.6

770.     Poisella testified that if he had thought there were unanswered questions as it related to regulations and following the regulations it would have impacted him and had been disclosed to him prior to the time he exercised his stock option that the in-house attorney at Comdisco with primary responsibility for working on the SIP had not read Regulation G or Regulation U, that disclosure would have been important or significant to him in deciding whether to exercise his SIP option and , it would have impacted him and would have altered his investment decision.  (10/8/13 Tr. at 786.)

771.     Poisella testified that if it had been disclosed to him prior to the time he exercised his stock option that the in-house attorney at Comdisco with primary responsibility for working on the SIP had not asked Comdisco's outside counsel to provide Comdisco with an opinion as to whether Regulation G or Regulation U or both of them would be violated, that disclosure would have been important or significant to him in deciding whether to exercise his SIP option and/or invest in SIP stock and would have altered his investment decision. (10/8/13 Tr. at 786-787.)

772.     Scozzafava and Weiss would have testified that if a representation had been included in the prospectus of SIP materials that the proceeds of the bank loan to each of them would be used in a manner that would violate or result in a violation of Federal Reserve Board Regulations G and U, that representation would have been important or significant and would have had an effect on each of them in deciding whether to exercise their SIP option or invest in SIP stock. Scozzafava and Weiss would have further testified that if they thought they were violating anything, they would not have done the SIP program.  (10/14/13 Stipulation and 10/8/13 Tr. at 776.)

773.     Scozzafava and Weiss would testified that if a representation had been included in the prospectus of SIP materials that the bank's making of the loan to them would be inconsistent

181

AM 27729383.6

with Regulation U or would violate Regulation U, or would be unlawful, or the proceeds of the

bank's loan would be used in a manner that would violate or result in a violation of Regulations

G and U, and that half of the proceeds of the bank's loan to them would be used in a manner that

would result in a violation by the bank of Regulation U, and half of the proceeds of the bank's

loan to them would be used in a manner that would result in a violation by Comdisco of

Regulation G, each of those representations would have been important or significant to them in

deciding whether to exercise their option and invest in the SIP stock and they would not have

done it.  (10/14/13 Stipulation and 10/8/13 Tr. at 781-782.)

774.    Scozzafava and Weiss would have testified that if a representation had been

included in the prospectus of SIP materials that the execution and delivery by the company of the

facility and guarantee agreement would be unlawful and would result in a violation of law by

Comdisco and a violation of Regulation G or Section D of the Securities Exchange Act, and that

the execution and delivery by the company of the facility and guarantee agreement would result

in a violation of law by the bank and would result in a violation by the bank of Federal Reserve

Board Regulation U or Section D of the Securities Exchange Act, each of those representations

would have been important or significant to them in deciding whether to exercise their SIP

option and invest in SIP stock and they would not have done the SIP transaction.  (10/14/13

Stipulation and 10/8/13 Tr. at 782-783.)

775.    Scozzafava and Weiss would have testified that it would have been important or

significant to them in deciding whether to exercise each of their SIP options and/or invest in SIP

stock if Comdisco's  representative had also stated, "Furthermore, based on the restrictions on

transfers and use of sale proceeds, the loan is considered indirectly secured by the securities

within the meaning of Federal Reserve Board Regulation U such that it is unlawful for the bank

to loan you more than 50 percent of the purchase price of the securities" or had told them "Furthermore, based on the restrictions on transfer and use of sales proceeds, Comdisco's guarantee is considered indirectly secured by the securities within the meaning of Federal Reserve Board Regulation G such that it is unlawful for Comdisco to guarantee repayment of more than 50 percent of the purchase price of the securities," each of those representations would have been important to them and would have altered their investment decision and they would not have done the SIP transaction.  (10/14/13 Stipulation and 10/8/13 Tr. at 783-784.)

776.     Scozzafava and Weiss would have testified that it would have been important or significant to them in deciding whether to exercise their SIP option and invest in SIP stock if Comdisco's representative had at that time also stated, "However, based on the restrictions imposed by the SIP on transfer and use of sale proceeds, the SIP shares are considered within the meaning of Regulation U to be margin stock upon which the First National Bank of Chicago is relying as if the stock were collateral for the loan. The loan is considered indirectly secured by the SIP shares within the meaning of Regulation U under these circumstances such that it is unlawful for the First National Bank of Chicago to loan you more than 50 percent of the purchase price of the SIP shares," or if the Comdisco representative had at that time stated, "However, based on the restrictions imposed by the SIP on transfer and use of sales proceeds the SIP shares are considered within the meaning of Regulation G to be margin stock upon which Comdisco is relying as if the stock were collateral for its guarantee obligation. The guarantee is considered indirectly secured by the SIP shares within the meaning of Regulation G under these circumstances such that it is unlawful for Comdisco to guarantee repayment of more than 50 percent of the purchase price of the SIP shares" each of those representations would have been important or significant to them in deciding whether to exercise their option and each would

have altered their investment decision. (10/14/13 Stipulation and 10/8/13 Tr. at 784-785.)

777.    Scozzafava and Weiss would have testified that if the in-house attorney at

Comdisco did not fully examine the implications of the program as it related to regulations and

violations, it would have impacted what Scozzafava and Weiss would have chosen to do.

(10/14/13 Stipulation and 10/8/13 Tr. at 786.)

778.    Scozzafava and Weiss would have testified that if it had been disclosed to them

prior to the time they exercised their stock option that the in-house attorney at Comdisco with

primary responsibility for working on the SIP had not read Regulation G or Regulation U,  this

disclosure – if they thought there were unanswered questions as it related to regulations and

following the regulations–would have impacted them and those disclosures would have altered

their investment decision.  (10/14/13 Stipulation and 10/8/13 Tr. at 786.)

779.    Scozzafava and Weiss would have testified that if it had been disclosed to them

prior to the time they exercised their stock option that the in-house attorney at Comdisco with

primary responsibility for working on the SIP had not asked Comdisco's outside counsel to

provide Comdisco with an opinion as to whether Regulation G or Regulation U or both of them

would be violated, that disclosure would have been important or significant to them in deciding

whether to exercise their SIP option and/or invest in SIP stock and would have altered their

investment decision. (10/8/13 Tr. at 787.)

780.    Scozzafava testified that he read the question "Can I vote my shares prior to the

loan being paid?" and the answer to that question "Yes. You will have all of the same rights as a

shareholder" in the SIP Binder during the SIP presentation weekend. (10/9/13 Tr. at 822-823.)

781.    Pacewicz was a participant in the SIP program and his original principal amount

was $1,518,000.00.  Pacewicz testified that the maximum number of shares he was told he could

purchase was 32,000, but he ultimately elected to purchase 44,000 and needed special approval

from Hewes to do so.  Pacewicz testified that he observed Nick Pontikes commenting on

people's level of participation and because of what he overheard he decided to ask for a higher

number of shares than he was initially authorized to purchase. (10/2/13 Tr. at 573, 593, 601-602.)

782.    Pacewicz testified that he was at Rosemont office of Comdisco to communicate

with the Bank the amount of the commitment the night the SIP participants were to make their

elections.  He testified that when he was there, up in the legal department of Comdisco, Nick

Pontikes, the CEO of Comdisco, was standing at the fax machine watching the faxes come in for

people's participation levels. Pacewicz testified that Pontikes started making some very

derogatory and vulgar comments about some people's participation levels and that he had some

nice comments about others.  Pacewicz testified that at that point in time is when he filled out his

election and asked to go higher than the amount that he was authorized initially to purchase.

This was because of what he overheard Pontikes saying that night. (10/2/2013 Tr. at 601-602.)

783.    Harvey testified that Pontikes and Slevin were told directly by Hale that they were

not to exert any pressure on people, that they should not be present, make themselves scarce,

even out during the time in California when people were trying to make their determinations, and

not to be present that evening when we were tallying up what the totals would be.  Harvey

testified that when he saw Pontikes and understood what was happening, he made two phone

calls. Harvey testified that he called Hale and told her Pontikes is out here. Harvey testified that

Hale said, "Oh, dear, that's a travesty. I have told him not to do that."  Harvey testified that prior

to that he called Hewes, who was still in California, and told him the same.  Harvey testified that

Hewes said, "Well, I'm not sure what we can do about it. The kid owns 27 and a half percent of

the stock of the company. So I'm not sure who would tell him to leave. But let me think about it."

<div align="center">185</div>

Harvey testified that Pontikes stayed through the entire evening. (10/2/2013 Tr. at 445-446.)[8]

784.     Harvey testified that during that evening he sat down just before the close, and Pontikes asked him if he had submitted the document. Harvey testified that he told Pontikes that he had not as of yet.  Harvey testified that Pontikes was keeping his own tally sheet. Harvey testified that Pontikes looked at Harvey and asked him, "How much do I put you down for?" Harvey testified that that may sound like a question to most people, but that was not a question, it was "How much." (10/2/2013 Tr. at 446.)

785.     Brunner testified that in addition to the SIP Option to Exercise Form, he had to execute a note and other documentation in order to participate in the program.  Brunner further testified that he was not allowed to negotiate the terms of any of the documentation. (10/3/13 Brunner Dep. at 23-24.)

786.     Brunner testified that it was made clear at the SIP presentation that Comdisco's chief executive officer, chief operating officer, chief financial officer and chief legal officer were going to participate in the SIP program.  Brunner further testified that this information reinforced the correctness and the legality of the whole transaction and it was a confirmation that it was a good thing to do.  (10/3/13 Brunner Dep. at 25.)

787.     Pacewicz testified that he knew there was a financial risk in the SIP transaction. (10/2/13 Tr. at 593.)

788.     Prospective SIP Participants who sought to participate in the SIP, including each Defendant, transmitted completed SIP Option Exercise Forms to Comdisco's Legal Department before 6:00 p.m. C.S.T. on Sunday, February 1, 1998.  (Stmt. Uncontested Facts ¶ 18.)

789.     A total of 106 senior managers, including 100% of the company's executive

---

[8] Plaintiff objected to admission of evidence regarding the purported Pontikes fax machine incident for the reasons set forth in Motion *in Limine* #1, which the Court granted on October 3, 2013.

officers, purchased over three million shares, or approximately $109 million, of the company's common stock at a price of $34.50 per share. The average loan was for approximately $1,030,000, and some employees signed up for loans with principal amounts as high as $3,300,000. The transfer of the SIP stock became effective on February 2, 1998. (Stmt. Uncontested Facts ¶ 21.)

790.    Weiss testified that in 1998 he did not have sufficient funds to purchase the stock that was being offered to him as part of the SIP program. He further testified that he did not have sufficient funds to pay 50 percent of the purchase price of the stock that was being offered. (10/10/13 Tr. at 917.)

791.    Weiss testified that he signed the "Letter of Direction" which stated in part "The undersigned hereby irrevocably directs, small letter I, the agent to pay all of the proceeds of the loans made by the lenders to the undersigned in connection with the shared investment plan directly to the company for the account of the undersigned in payment of the purchase price of the shares of the company's common stock" and agreed that he thereby directed the Bank to pay the loan proceeds to Comdisco pursuant to the Letter of Direction. (10/10/13 Tr. at 928.)

792.    Weiss testified that he signed the "Letter of Direction" and that he directed Comdisco to pay the stock dividends to the Bank if that is what the letter implies. (10/10/13 Tr. 929.)

793.    Weiss testified that he understood that the dividends were going to be paid directly to the First National Bank of Chicago but today he has no idea as to his right or ability to receive any value in the future with respect to the SIP stock. He has never voted his shares of stock. (10/10/13 Tr. at 918-919.)

794.    Scozzafava testified that on the financial affidavit submitted with the SIP program

187

he listed $320,800 as his annual income, $1,284,000 for total assets, and $516,000 for liabilities. Scozzafava further testified that that worked out to roughly $768,000 as his net worth at the time, primarily in real estate, and that the amount of his note in this case was $552,000. (10/9/13 Tr. at 824.)

795.    Poisella testified that as of February 2nd, 1998, the stock transferred to him but he had not executed the promissory note nor submitted any sort of financial statement. (10/8/13 Tr. at 760-761.)

796.    Brunner testified that neither Comdisco, nor any successor in interest to Comdisco, ever issued a correction or amendment that he was aware of to any of the statements set forth in the prospectus of SIP materials or any statement made at the SIP presentation that he is aware of.  Brunner further testified that neither the First National Bank of Chicago, nor any successor in interest, like Bank One or JP Morgan Chase Bank, to his knowledge, ever issued a correction or amendment to any of the statements set forth in the prospectus of SIP materials. (10/3/13 Brunner Dep. at 39-40.)

797.    Brunner testified that he never received any of the money that the First National Bank of Chicago advanced to Comdisco as the purchase price for his shares of SIP stock. Brunner further testified that he never retained any of the money that the First National Bank of Chicago advanced to Comdisco as the purchase price for his shares of SIP stock and he understood that Comdisco had the benefit of the cash. (10/3/13 Brunner Dep. at 40.)

798.    Weiss testified that subsequent to his electing to participate in the SIP program, neither Comdisco nor any successor of Comdisco nor First National Bank of Chicago nor any of its successors ever issued a correction or amendment to him to any of the statements set forth in the prospectus of SIP materials or any statements made at the SIP presentation. (10/10/13 Tr. at

188

916.)

799.    Weiss testified that he never received any of the money that the First National

Bank of Chicago advanced to Comdisco as the purchase price for his shares.  He testified that he

did not ever retain any of the money that the First National Bank of Chicago advanced to

Comdisco as the purchase price. (10/10/13 Tr. at 916.)

800.    Over 100 potential participants participated in the SIP, while the remainder of the

147 potential participants opted not to participate.  (10/1/13 Tr. at 369-370.)

**B.    Share Prices for Comdisco Common Stock at the Time of the SIP**

801.    The closing price of Comdisco common stock on the New York Stock Exchange

on Friday, January 30, 1998 was $34.50.  Two weeks earlier, on January 16, 1998, the price had

been $32.125, and one week earlier, on January 23, the price was $31.3125.  The closing price

for Comdisco's common stock on the Monday following the SIP, February 2, 1998, was

$36.9375.  The price rose to $40.9375 one week later, on February 9, and to $41.9375 two weeks

later, on February 17, 1998. (PX 789; PX 797.)

802.    Harvey testified that Pontikes referred to purchasing shares with a portion or all of

the $109 million as his trifecta.  Harvey testified that Pontikes said "Geez, it's a wonderful thing

here. I get free money. I get to announce that X number of my senior managers are buying Y

amount of shares that will push the price up. And I have money in my pocket that I can then go

out, re-buy those shares, and push the price up further." (10/2/2013 Tr. at 448.)

803.    The price of the stock purchased as part of the SIP program was set based on the

closing price of the stock on the New York Stock Exchange on the Friday prior to closing.

Pacewicz testified that because of the restrictions on the sale of the stock he did not believe that

189

the SIP share price reflected its fair market value. (10/2/13 Tr. at 543; 544.)[9]

### C.    Documentation and Participant Financial Disclosures

<u>Fact Testimony and Related Record Materials</u>

804.    On February 1, 1998, after the SIP Option Exercise Forms were submitted, the Compensation Committee of Comdisco's Board of Directors approved and adopted the SIP, by resolution, in the form presented to the Compensation Committee.  (Stmt. Uncontested Facts ¶ 19.)

805.    Harvey testified that the Compensation Committee met telephonically on the night of February 1.  There was no comment or presentation at the Compensation Committee meeting regarding the margin regulations.  (10/1/13 Tr. at 480.)

806.    On February 2, 1998 Comdisco issued a press release regarding the SIP program. (Stmt. Uncontested Facts ¶ 20.)

807.    That same day, Jack Slevin and Nick Pontikes sent an internal correspondence to all Comdisco employees regarding "New Shared Investment Plan." (DX 69.)

808.    Sabel testified that he saw a few participant financial statements, but he is not a bank underwriter and did no analysis of whether the statements were sufficient from an underwriting standpoint to support the amounts of the loans that were made.  (9/24 Tr. at 99-100.)

809.    Sabel did not examine the issue of whether the Bank had obtained a reasonably current financial statement of the borrowers and whether these statements could reasonably support the loans.  (9/25/13 Tr. at 99-100, 168.)

810.    On February 2, 1998 the Bank's lawyers sent each SIP Participant a packet of

---

[9] The Trustee objected to Pacewicz having any foundation or basis to opine as to the value of the SIP shares and the Court sustained this objection.

materials, including their individual Promissory Note, conformed copy of the executed Facility

and Guaranty Agreement, a blank Stock Power Agreement and a return envelope, along with a

memorandum instructing the SIP Participants, including the Defendants, to execute the

Promissory Note, Letter of Direction, Election Form, Stock Power Agreement, First Chicago

Personal Financial Statement, and First Chicago Account Application. These documents were

required to be received at Comdisco's offices by Friday, February 6, 1998. (Stmt. Uncontested

Facts ¶ 22; JX 9.)

811. Along with these documents, the Bank's lawyers at Winston sent a cover

memorandum to each SIP participant. The memorandum directed participants to review the

Promissory Note, fill in and confirm certain information in the Note, and sign the Note before

returning it. The memorandum also directed participants to execute the blank Stock Power. It

stated that "[t]his Agreement will be held in safekeeping by the Secretary of Comdisco in the

Rosemont office until disposition of the stock on a future date." Finally, the memorandum stated

that in order to facilitate a timely closing, each participant needed to include a copy of the

following documents with their original signature (except tax returns) in the enclosed return

envelope: (1) Promissory Note; (2) Letter of Direction (if not previously provided); (3) Election

form (if not previously provided); (4) Stock Power Agreement; (5) First Chicago Personal

Financial Statement (including 1995 and 1996 Income Tax Returns with all tax schedules); and

(6) First Chicago Account Application. The memorandum stated that it is important that all of

these documents be included in the return envelope and that Madonna Houser of Comdisco

receive them no later than Friday, February 6, 1998. (JX 9.)

812. Defendants did not disclose their assets and liabilities to Comdisco. Instead, each

SIP Participant, including the Defendants, were required to submit to Comdisco, for delivery

191

unopened to the Bank, a personal financial statement, federal income tax returns and their loan application.  Defendants and the remaining SIP Participants were required to open an account at the Bank into which dividends on the purchased shares were to be deposited and applied to pay the interest on the SIP Loans.  (Stmt. Uncontested Facts ¶ 23.)

813.    Each Defendant signed and submitted to the Bank a personal financial statement on a form provided by the Bank, which contained the following representation: "I represent that this is a true statement of my financial condition as of the date of valuations."  (PX 727, 728, 729, 694.)

814.    Defendants separately reported the following information to the Bank on their personal financial statements as of the date submitted:

| Defendant | Date Submitted | Total Income (for preceding year) | Net worth |
|---|---|---|---|
| Brunner | 2/2/1998 | $346,500 | $2,809,000 |
| Poisella | 2/3/1998 | $484,900 | $2,138,438 |
| Scozzafava | 2/1/1998 | $320,800 | $516,000 |
| Weiss | 2/7/1998 | $476,000 | $1,107,000 |

(PX 727, 728, 729, 694.)

815.    The loans' principal amounts ranged from $276,000 to $3,312,000.  Loans were made to four borrowers who did not report their net worth to the Bank; to another borrower with a negative net worth; to another borrower for almost ten times his net worth; and to one other borrower for more than five times his net worth. (DX 76-77, 154.)[10]

816.    Harvey testified that Comdisco was concerned about inviting participants to join the SIP program and then having the Bank reject them.  Comdisco understood that the Bank would only review individual financial circumstances in order to look for bankruptcies and other

---

[10] The Trustee objected on the grounds of  relevance to the admission of the financial statements submitted by program participants other than the Defendants.

192

dire financial circumstances.  (10/1/13 Tr. at 415.)

817.    Comdisco decided that it should not review its employees' financial information. Comdisco made its decisions regarding the maximum level at which prospective participants would be permitted to participate in the SIP based solely on compensation information.  Harvey testified that participants understood that their financial information was not being used to determine their maximum level of participation because they had not yet provided it.  (10/1/13 Tr. at 416-417.)

818.    Pacewicz testified that he did not think that Comdisco ever suggested to him that it was going to do a credit review of the SIP participants beyond looking at their level of compensation.  Pacewicz testified that Comdisco took the position that it was not going to review the financial statements of any participants. (10/2/13 Tr. at 595.)

819.    Harvey prepared a memorandum on or about January 30, 1998 memorializing the agreement Comdisco reached with the Bank regarding the Bank's review of individual participant financial information.  The memorandum stated:

> A.  Comdisco will receive the required financial information from participants and will forward each package directly to the Bank without reviewing the contents.
>
> B.  The Bank will open the packages and, as part of their due diligence, review the income statement, balance sheet and tax returns for each participant.
>
> C.  If a participant's financial information indicates that he or she is in bankruptcy, dire financial straits or otherwise may have provided inconsistent, misleading information, Dan Clarke at the Bank will contact either me or Phil Hewes to discuss the situation.  Initial discussions will not include disclosure of the participant's name, but only the circumstances surrounding the Bank's concerns.
>
> D.  If the situation surrounding a participant is not one in which the Bank or Comdisco is comfortable with following the initial conversation, then the issue is to be elevated for review by the following Comdisco executives: Jack Slevin, Nick Pontikes and Phil Hewes.

193

> E. If the above named executives, after reviewing a credit situation, determine it is in the best interest of the company and the individual to discuss the situation, the Bank will provide Comdisco with the name of the participant in order that the executives may communicate directly with such participant in order to make a final decision.

(PX 287.)

820.    At the time the SIP Binders were circulated to prospective participants, Harvey understood that his memorandum reflected Comdisco's agreement with the Bank regarding the review of individual participants' financial information. Harvey did not stop the circulation of the SIP Binders based on any concern that misrepresentations were being made to prospective participants. (10/1/13 Tr. at 417.)

821.    Clarke testified that he was in charge of looking over the packages from the individuals to make sure they were complete and that the Bank had received a financial statement and all the forms for a credit request. Clarke testified that he could not recall whether a financial statement was required, but it sounds like a signed financial statement would have been required. Clarke testified that in terms of analyzing the individuals' financial statements the Bank was seeking to use its best efforts to make sure that none of the participants were in financial ruin and that would somehow cause a problem to the final execution of the transaction. He testified that by "financial ruin" he meant that the participant was in bankruptcy or something along those lines. Clarke further testified that the Bank was not underwriting the transaction based on the financial strength of these individuals and was not providing these individuals with any financial counseling or advising these individuals in any way regarding the suitability of this transaction for them. Clarke testified that he was not in touch with more than a handful of the participants, and those were only the senior executives with whom he dealt. (9/25/13 Tr. at 238-239, 244-245.)

822.    Clarke testified that so long as an individual was not in bankruptcy, that satisfied

194

the standard of not being in financial ruin in terms of what the Bank was looking for but that the Bank was not underwriting the individuals as part of the transaction and it was not a thorough underwriting process that a consumer bank would do. (9/25/13 Tr. at 247.)

823. Clarke testified that he and a private banker reviewed the financial packages relating to the participants over a weekend and responded back with respect to completion of the credit review process. He testified that he believes there were more than one hundred packages and that they wanted to complete the credit review process and launch the transaction the following Monday. (9/25/13 Tr. at 245.)

824. Clarke testified that if someone listed a net worth on their financial statement that was less than the amount they were borrowing that would not be within his definition of "financial ruin." Clarke testified that he could not recall incidences of unsigned or blank financial statements, or financial statements where the net worth reflected was less than the principal amount being borrowed, and did not remember any of the individual financials. Clarke testified that the Bank was not in a position to be financially advising the individual participants and was looking for completeness of the package. This was because the Bank was not underwriting the individuals in aggregate, and it was not a thorough underwriting process as to the individuals, like a consumer bank would do, as the Bank viewed Comdisco as the borrower. (9/25/13 Tr. at 245-246, 247.)

825. Clarke testified that the purpose for having the SIP participants sign a credit application was because he believed there was credit being provided. (9/25/13 Tr. at 247.)

826. Clarke testified that he did not know whether the concept of having a credit application signed was an administrative requirement or an internal requirement. Clarke testified that he typically was not involved in doing individual retail and that it was not like he was acting

195

on behalf of the individuals. (9/25/13 Tr. at 248.)

827. Harvey prepared a file memo dated February 12, 1998 indicating that he had received a call from Clarke confirming that no issues arose with regard to the credit review of participants' financial information. (PX 309.)

828. On February 10, 1998, Pacewicz executed an Acknowledgment on behalf of Comdisco, Inc., that Comdisco received the letters of direction executed on behalf of each borrower and received the proceeds of the loans in payment of the purchase price of the Restricted Stock purchased by the Borrowers. (PX 286; DX 83.)

829. On February 10, 1998, Vosicky executed an Officer's Certificate in connection with the Facility and Guaranty Agreement, certifying the representations and warranties of the Company specified in Article IV of that Agreement. (PX 306.)

830. On February 10, 1998 the Bank and Comdisco closed the Facility and Guaranty Agreement in association with the SIP Program. Included with the Closing Schedule were The Facility and Guaranty Agreement dated as of February 2, 1998 by and among the Company, the Agent and the Lenders, and Exhibits thereto including: the Promissory Note, the Letter of Direction, the Schedule of Interest Payment Dates, the Schedule of Fixed Reference Rates, the Schedule of Zero Coupon Methodology, the Schedule of Environmental Compliance, the List of Borrowers and Loan Amounts, the Legal opinion of McBride, and the Closing Memorandum. (PX 192 at JPM-VAL 01119.)

831. The Bank funded the SIP Loans on or about February 10, 1998. Pursuant to a Letter of Direction signed by each Defendant, the Bank remitted the proceeds of each Defendant's SIP Loan to Comdisco, in payment of the purchase price of the SIP Shares issued to each Defendant. (Stmt. Uncontested Facts ¶ 29.)

196

832.     In February of 1998, Comdisco had received $109 million in SIP Note proceeds and applied these monies to the purchase price for the SIP Shares. (Stmt. Uncontested Facts ¶ 43.)

833.     On February 12, 1998, Harvey prepared a memorandum indicating that he had received a call from Clarke at the Bank confirming that no issues arose with regard to the credit review of participants' financial information.  In essence, this meant everyone had passed the Bank's credit review.  (PX 287; 10/1/13 Tr. at 425-426.)

<div align="center">Testimony by Expert Witness</div>

834.     Sabel testified that he did not know the transfer of the SIP stock became effective on February 2, 1998.  He testified that he did not know why the Facility & Guaranty Agreement was dated as of February 2, 1998.  (9/24/13 Tr. at 135.)

**D.     February 29, 1998 McBride Opinion Letter**

835.     McBride's February 1998 invoice include a number of time entries regarding work on the SIP transaction and preparing for closing the SIP transaction. (PX 240.) A copy of McBride's February 1998 invoice is attached as Tab K in Volume 1 of the Appendix.

836.     By facsimile dated January 28, 1998, Matthew O'Meara at Winston sent Hale a marked up draft of McBride's opinion letter.  O'Meara copied Brian Hart and Daniel Clarke on the facsimile. (PX 220.) 501.2. By facsimile dated February 6, 1998, Hale sent Brian Hart a clean and marked up draft of McBride's opinion letter.  (DX 81.)

837.     By facsimile dated February 9, 1998, Hale sent Brian Hart copies of the Comdisco Board of Directors Resolutions at January 20th Board meeting  and Resolutions Adopted by The Compensation Committee Of The Board Of Directors Of Comdisco, Inc. on Sunday February 1, 1998. (PX 216.)

<div align="center">197</div>

838.    On or about February 10, 1998, McBride delivered its signed opinion letter to the

Bank, individually and as Agent, pursuant to Section 3.01(d) of the Facility Agreement.

McBride's opinion letter stated that the firm was of the opinion that:

> 3. The execution and delivery of the Loan Documents by the
> Company and the Borrowers and the performance by the Company and
> the Borrowers [of] all of the obligations under each such Loan
> Document:
>
>> a) do not require consent of the Company's stockholders;
>>
>> b) do not violate any applicable provision of statutory law or
>> regulation (including, without limitation, Regulations G, T, U
>> and X of the Board of Governors of the Federal Reserve System)
>> …

The term "Loan Documents" was defined to comprise three documents:  (i) the Facility

Agreement; (ii) the form of the Promissory Notes to be executed by each of the borrowers; and

(iii) the form of Letter of Direction to be executed by each of the borrowers.  (JX 14 at 5-6.)

839.    McBride's opinion letter was based on approximately 20 assumptions, as well as

other qualifications and limitations, as set forth in the letter.  (JX 14.)  The letter also stated,

"without limiting in any way any of the exceptions, qualifications and limitations explicitly

stated in this opinion letter", that the opinions set forth in the letter were "subject to all the

exceptions, qualifications and limitations disclosed as exceptions, qualifications and limitations

to the representations and warranties of [Comdisco] in the Loan Documents and in any exhibits,

schedules or references thereto, and in giving the opinions set forth above, we are specifically

relying, without further investigation, on the accuracy of all such representations and

warranties." (JX 14 at SIP-Group 1100.) The letter further stated: "No opinions not specifically

addressed herein shall be implied." (JX 14 at SIP-Group 1097.)

840.    The McBride opinion letter stated that the opinions set forth in the letter were

"expressed solely for [the Bank's] benefit and for the benefit of any other parties which may

subsequently become Participating Lenders under the Facility Agreement and is not to be used, circulated, quoted or otherwise referred to for any other purpose without our prior written permission." (JX 14 at 8.)

841.    Holisky testified that the McBride opinion letter was a third-party opinion letter because it was a legal opinion being provided to the Bank, a third party who was not McBride's client. He testified that if the opinion letter had been addressed to Comdisco, it would have been a primary opinion letter and that this distinction existed as of both July 1997 and January 1998. The opinion letter dated February 10, 1998 stated that the McBride attorneys primarily responsible for the opinion letter were Hale and Holisky. (10/2/13 Tr. at 621-622.)

842.    Murray testified that it would be correct to describe paragraph 3(b) of the McBride opinion letter as a "clean opinion." (10/9/13 Tr. at 841.)

843.    Murray testified that paragraph 3(a) of the McBride opinion letter does not refer to shareholder approval for the stock option plan, but rather, "is a standard corporate opinion that the board of directors basically had the power to approve the loan transaction, and it doesn't take shareholder approval …" (10/9/13 Tr. at 904-905; JX 14 at 6.)

844.    Murray testified that representations as to corporate authority, shareholder approval, or regulatory compliance were borrower-side representations. (10/9/13 Tr. at 905.)

845.    Harvey testified that he understood the February 10, 1998 McBride opinion to be an opinion the Bank was entitled to rely upon. The Bank had requested this opinion as part of their checklist of required documents from Comdisco's outside counsel, and Harvey thought the opinion letter was compliance with that requirement. (10/1/13 Tr. at 460.)

846.    Comdisco received a copy of the final McBride opinion letter along with the final documentation that it received on the SIP. (10/1/13 Tr. at 386.)

847.    Harvey testified that Comdisco did not ask for the McBride opinion, the opinion was not addressed to Comdisco, and it was nothing Comdisco was looking at.  (10/1/13 Tr. at 460.)

848.    Hewes testified that he did not recall Lola Hale or anyone from McBride Baker and Coles issuing an opinion letter in connection with the SIP transaction.  (1/10/13 Hewes Dep. at 53.)

### E.    Bank Fees for Arranging and Syndicating the SIP Loans

849.    The Bank received a fee of $150,000 for arranging the loan, $40,000 from Comdisco for payment of the Bank's upfront legal fees, and a "syndication fee" for subsequently syndicating the loans to participating lenders.  (Stmt. Uncontested Facts ¶ 26.)

850.    On or about January 30, 1998, Pacewicz, on behalf of Comdisco, agreed to the terms of the Fee Letter, with the Bank, providing for an arrangement fee of 0.20% of the Aggregate Commitment minus the $25,000.00 paid by Comdisco on June 20, 1997, but not to be less than $150,000.00.  The terms of the Fee Letter also provided for an Annual Administrative Agent's fee of $125,000.00, reducible by $500.00 per participant if the number of participants decreased, but in no case less than $100,000.00.  The Fee Letter also provided that Comdisco would reimburse the Bank for $47,500.000 plus reasonable out-of-pocket expenses for legal expenses related to the transaction. (PX 299.)

851.    Clarke testified that at some point he was probably told that fees for the Bank on the derivative were $1.9 million but that he was not in charge of that and while $109 million worth of stock purchased as part of the program sounded right, he could not recall whether the $1.9 million would dwarf the other fees the Bank made on closing the transaction at that he was not sure whether $1.9 million was the right number. (9/25/13 Tr. at 255-257.)

### F.     Syndication of the SIP Loans

852.     Pacewicz testified that he understood that the actual syndication of the SIP transaction was going to occur after the closing on the SIP program. (10/2/13 Tr. at 568:3-8.)

853.     Clarke testified that the Bank's syndications department found additional banks to participate in the facility and in the end it was a successful asset sale.  He guessed that as many as ten banks participated. (9/25/13 Tr. at 235-236.)

854.     Clarke testified that the participant banks hand an opportunity to review the transaction structure before they executed and that they would involve their own advisors and attorneys.  He testified that some of the banks chose to have their own counsel and others would rely on the agent's counsel, or both. (9/25/13 Tr. at 236.)

855.     Clarke testified that to the best of his recollection he was not certain whether the syndication took place after the closing of the transaction, but that the syndication appeared to still be in process according to a syndication report as of March 4, 1998. (9/25/13 Tr. at 260-262; DX 89.)

856.     Murray testified that the Bank syndicated its ESP programs for Comdisco, Baxter 1994 and Allegiance and that multiple banks were involved in each program.  (10/9/13 Tr. at 842.)

857.     Murray testified that he believes the syndication for the Comdisco SIP occurred right after the deal, while in the Allegiance deal, the other banks were directly involved initially. (10/9/13 Tr. at 842.)

858.     Murray testified that he was aware of the Bank's efforts to syndicate the Comdisco transaction, and he believes there were eight or ten banks involved in the syndication, which banks he would describe as larger and more sophisticated.  (10/9/13 Tr. at 842.)

859.     Murray testified that Winston did not represent the other banks involved in the Comdisco transaction, and these banks had their own counsel.  (10/9/13 Tr. at 843.)

860.     Murray testified that the other banks involved in the Comdisco transaction had an opportunity to review and comment upon the structure of the Comdisco SIP and the documents used therein.  (10/9/13 Tr. at 843.)

861.     Murray testified that none of the other banks involved in the Comdisco syndication expressed any concerns or issues with respect to margin regulation compliance of the Comdisco transaction at the time the banks chose to participate in the syndication, and he is not aware of any bank that declined to participate in the Comdisco syndication due to concerns with regulatory compliance.  (10/9/13 Tr. at 843.)

862.     Murray testified that the Comdisco SIP was the last ESP before the merger of Regulation G into Regulation U. (10/9/13 Tr. at 883.)

## VIII.   EVENTS BETWEEN FEBRUARY 1998 AND JULY 2001

### A.     Merger of Regulation G into Regulation U

863.     Regulation G merged into Regulation U effective April 1, 1998.  (9/24/13 Tr. at 104.)

864.     Sabel testified that the Federal Reserve Board's final adoption of the amendments that resulted in the merger of Regulation G and Regulation U occurred sometime in 1997. (9/24/13 Tr. at 104, 121.)

865.     Sabel testified that he wrote an article in 1996 about proposed amendments to the margin regulations, including the proposed merger of Regulation G and Regulation U.  Sabel testified that he wrote a second article in 1997 after the Board of Governors finalized those regulations. (9/24/13 Tr. at 12, 120.)

866.     On December 23, 1997, the Federal Reserve Board issued a press release

202

announcing adoption of the final amendments, including for the merger of Regulation G into Regulation U. The press release stated that the final amendments would be effective April 1, 1998. In the press release, there was a link to the Board's final rule. (DX 242.)

867.    Sabel testified that he is familiar with the concept of a final rule in the context of regulations being issued. He testified that under the Administrative Procedure Act, an agency that wants to amend a regulation must, with certain exceptions, issue the proposed change for public comment to explain the why they want to make the change and exactly how they would change it. Once comments have been received and reviewed, the proposed regulations are taken, in this case, to the Board of Governors for review and final approval. Final approval is final adoption of a rule or regulation. (9/24/13 Tr. at 120-121.)

868.    Sabel testified that he does not recall any portions of the regulations being deleted when the Federal Reserve Board merged Regulation G into Regulation U, but there were some interpretations deleted. (9/25/13 Tr. at 176.)

**B.      Murray's Letters to the Federal Reserve Board.**[11]

<u>Fact Testimony and Related Record Materials</u>

869.    On June 29, 1998, Murray sent a letter to attorney Holz at the Federal Reserve Board staff "[o]n behalf of a client which is a bank subject to Regulation U," that requested "a staff opinion to the effect that the bank's participation in the lending transaction described below … does not fall within the 1969 Board Interpretation referenced below and is not violative of the 'arranging' restrictions of Regulation U (Section 221.3(a)(3))." (DX 244.)

870.    Murray testified that he sent a blind copy of his letter to Holz to Patsy Habicht, an in-house attorney at the Bank. Holz testified that Habicht was his primary in-house contact at

---

[11] Plaintiff objected to the facts set forth in this section based on FRE 401, 403 and 407 for the reasons detailed in Plaintiff's Motion *in Limine* #6, which the Court granted on October 3, 2013.

the Bank with respect to ESP transactions, that she was involved in the Comdisco SIP and that he

believes she was a member of the Bulldog Team for the Comdisco SIP. (10/9/13 Tr. at 880.)

871.    Murray testified that he was raising the following issues in the June 29, 1998 Holz

letter for the following reasons:

> [B]asically the issue was whether if in a situation like this both the bank
> and the company were in compliance with the respective obligations they
> had under the law, whether their coming together could somehow give
> rise to a violation of the law and the so-called arranging provision,
> because there were restrictions on the arranging of credit.
>
> And in Regulation T, it was clear that if both sides were okay, then
> coming together was okay.  It that [*sic*] didn't apply here. And it
> especially was sort of relevant in the context raised here of a plan lender,
> and where if the bank was in compliance with Regulation U and the plan
> lender was in compliance with Regulation G, then this 1969
> interpretation didn't address the same facts. It didn't speak specifically to
> a situation where the company giving the guarantee was a plan lender.
> But it suggested that the bank would somehow have an arranging
> problem.
>
> That is a problem, that was an interpretation that seemed inconsistent,
> and it was inconsistent with a 1986 staff opinion that looked at the same
> situation and talked about a plan lender on the one hand and an
> unsecured lender on the other and said, well, that's all okay.
>
> And so the letter points out the possibility that this 1969 interpretation
> could, might possibly be read to create restrictions on activities that
> seemed as the rest of the letter said to be consistent with what was going
> on in other areas of the law, especially the so-called plan lender
> exceptions.

(10/9/13 Tr. at 846-847.)

872.    Murray testified that his letter to Holz sought guidance on future transactions that

were under consideration.  Murray testified that, in his communications with Holz and the

Federal Reserve Board staff, Murray did not seek concurrence regarding the legality and

compliance of any prior ESP transactions on which he had worked.  (10/9/13 Tr. at 847, 852.)

873.    In the June 29, 1998 letter to Holz, Murray referred to an "April 29, 1969 Board

interpretation," which the letter describes as "promulgated under Regulation G as interpretation

204

No. 207.103" and "repromulgated under Regulation U as interpretation No. 221.118," as of

April 1, 1998.  (DX 244 at 2.)

874.    Murray testified that an important issue under Regulation G or Regulation U is

whether the extension of credit is directly or indirectly secured by the stock. (10/9/13 Tr. at 882.)

875.    Murray testified that what he pretty much meant by the term "repromulgated" was

"republished."  He further testified:  "As I recall, when they did this in 1998, they gathered up

the regulations and the interpretations and things and put them in one place so that people could

find them and not have to go back to disparate ones under the two regulations.  That process or

the outcome of that is what I'm referring to as repromulgated." (10/9/13 Tr. at 881.)

876.    Murray gave the following testimony regarding the reasons why a regulation

promulgated under Regulation G would have been repromulgated under Regulation U:

> When people talk about the margin regulations, they're talking generally about a number of different regulations that apply to different groups of lenders, borrowers, and so forth. And there was Regulation U, which is commonly associated with bank lenders. I'm now talking about at the time the Comdisco deal was done. There was also a Regulation G that related to other types of lenders. And then there was a regulation T that dealt with brokers and dealers.
>
> And what happened was in April of 1998, the Federal Reserve Board made some major changes in the regulations and decided to just consolidate those two Regulations G and U, because I think there was a trend to try and get everybody on the same page. So they brought them together. Before when Regulation G and U were distinct, there were different issues that arose under them. And there were interpretations, board interpretations and things that applied to one, to that particular one. And what happened I think when they combined G and U is they sat down, and they looked at both the interpretations under G and the interpretations under U and said: Hey, now that we've combined these two things, you know. Does make sense, do these still make sense? Do they apply? Do they not apply? And they went and they pulled out the ones that they thought were still relevant and published them again. The word "repromulgated" under Regulation U, because in April of 1998, Regulation G disappeared and Regulation U lived on.

(10/9/13 Tr. at 845-846.)

877.    Murray testified that his June 29, 1998 Holz letter contemplated that the

companies involved in a proposed ESP transaction would be plan lenders.  (10/9/13 Tr. at 874.)

878.    Murray testified that he had a telephone conversation with Holz prior to sending

him the June 29, 1998 Holz letter and that Holz knew Murray would be sending the letter.

(10/9/13 Tr. at 878.)

879.    In the June 29, 1998 letter to Holz, Murray states:

> I have separately forwarded to William W. Wiles a letter proposing
> certain changes to Regulation U to conform it to the more liberal
> "arranging" provisions of Regulation T. A copy of that letter is enclosed.
> While the changes proposed therein would address the issue raised
> above, I understand that changes to Regulation U may not become
> effective for six months or more. I am requesting this staff opinion now
> rather than waiting for such changes to become effective because my
> client is anxious to proceed with the Proposed Transaction in the very
> near future. For the reasons stated above, the Proposed Transaction
> should be permitted under Regulation U even as it exists today."

(DX 244 at 4.)

880.    Murray testified that Holz declined to provide the staff opinion requested in the

June 29, 1998 Holz letter.  (10/9/13 Tr. at 851, 879.)

881.    On June 29, 1998, Murray wrote a letter to William W. Wiles, Secretary of the

Federal Reserve Board.  (DX 243.)

882.    Murray testified that in his letter to Wiles, he requested that Regulation U be

amended to conform it to the more liberal arranging provisions of Regulation T.  (10/9/13 Tr. at

878.)

883.    Murray testified as follows regarding the June 29, 1998 letter to Wiles:

> Well, this letter came out of a conversation with Scott Holz, which is
> where the June 29, 1998 Holz letter came from. Scott Holz was a senior
> attorney at the board who when they publish regulations, there is always
> a contact lawyer that you can call, and it's a person who knows
> specifically about whatever the topic of whatever has been published is.
> And I had after seeing, you know, this matter, had called Scott. And
> when I say "Scott," it's not like he was my friend. I called Mr. Holz, but

206

> I called Scott Holz and had described to him by phone what was in the
> June 29, 1998 Holz letter.
>
> [Holz] indicated that at the time he wasn't clear on whether as mentioned
> they could give some kind of interpretation. But he noted that at the time
> the board was independently about to start or was in the process of
> accepting comments for additional changes to Regulation U, and he felt
> that it would be a productive or useful, potentially useful thing to do to
> submit this as a comment in anticipation of it being as noted in the letter
> consistent with Regulation T and likely cranked in when the new
> changes came around, which would I think frankly take it off his plate
> and put it on someone else's plate. So that is the origin. We started the
> question of where did this letter to William Wiles come from, that being
> the letter with a comment on pending regulations. It came out of the
> suggestion of Mr. Holz.

(10/9/13 Tr. at 848-850.)

884.    Murray testified that he spoke to Holz after sending the June 29, 1998 Wiles and

Holz Letters, and described the conversation as follows:

> What [Holz] said was that he was sympathetic. It was sort of something
> that no one had thought of or focused on before. He recognized and
> appreciated the disconnects that were identified in my letter to him . . .
> So basically he was empathetic. He got it. He said though that there were
> issues with the staff, you know, kind of defining or refining the board
> interpretation, and that basically he didn't think that it would be
> appropriate for them to render an opinion on this and encouraged me to
> follow up with, you know, David Wiles, which is -- well, actually I guess
> he encouraged me earlier to follow up with David Wiles. And that was
> the end of it.

(10/9/13 Tr. 850-851.)

885.    Murray testified that his conversation with Holz after sending the June 29, 1998

letters happened several weeks later, in July or August of 1998.  (10/9/13 Tr. at 879-880.)

886.    Murray testified that it "was several weeks at a minimum. Certain government

employees don't turn those letters around real quickly." (10/9/13 Tr. at 879-880.)

887.    Murray testified that the change to Regulation U that he requested in the June 29,

1998 Wiles Letter never occurred because the Federal Reserve Board was "kind of getting into it,

and then long-term capital came up, was kind of the first big government bailout. It was a big

<div align="center">207</div>

hedge fund and had preoccupied the regulators in '98 and '99, [and] [t]he topic just went away."
(10/9/13 Tr. at 879.)

888.    Murray testified that he does not recall whether he was aware that the Federal
Reserve Board published the final form of the proposed merged Regulation U in December
1997, prior to the proposed change going into effect.  (10/9/13 Tr. at 900-901.)

<u>Testimony by Expert Witness</u>

889.    Sabel testified that he first saw Murray's June 29, 1998 letter to Holz and
Murray's separate June 29, 1998 to William Wiles, Secretary of the Federal Reserve Board,
within the week or so prior to Sabel's trial testimony.  The confidential supervisory information
privilege had initially been invoked on those letters.  Sabel testified that he did not ask for, and
was not given, the opportunity to review Murray's deposition transcript.  (9/25/13 Tr. at 172-
173.)

**C.      Post-Comdisco ESPs**

890.    Clarke testified that after the Comdisco SIP Plan, he did not have any
involvement in any other ESP plans created by or worked on by the Bank. (9/25/13 Tr. at 241.)

891.    Murray testified that there were changes in the structure of ESPs after the
Comdisco transaction. (10/9/13 Tr. at 883.)

892.    Murray testified that he believed one of the changes in the structure of the ESPs is
that each participant was permitted to sell, pledge or otherwise dispose of the purchased stock at
any time.  Murray testified that he believed there was no restriction on the right to sell, pledge or
otherwise dispose of the stock. That was the concept but he does not know whether those words
exactly were used.  (10/9/13 Tr. at 883-884, 889.)

893.    Murray testified that it sounds "conceptually correct" to say that another change

208

in the structure of the ESPs was that the Bank required a provision that the obligation of the

participants in the ESP to the guarantor in respect of the guarantee not be directly or indirectly

secured by the stock within the meaning of Regulation U. (10/9/13 Tr. at 889-890.)

894.    Murray testified that another change in the ESPs may have been that "Restricted

Stock" was no longer a defined term in the Facility & Guaranty Agreement. Murray testified

that it doesn't matter how you define the stock—you can call it "Herman". (10/9/13 Tr. at 890.)

895.    Murray testified that he believed another change in the structure of the ESPs was

that a reimbursement agreement was included in the transaction. Murray testified that the

reimbursement agreement was a specific contractual undertaking by the borrowers to reimburse a

company in the event that the company had to make good on the guarantee. Murray testified that

there was a common law subrogation right independent of anything in the reimbursement

agreement. (10/9/13 Tr. at 891-892.)

896.    Murray testified that the reimbursement agreement gave the company a

contractual right of set-off against the participants. Murray testified that Winston prepared a

form of reimbursement agreement "which had provisions in it, and the company had, you know,

did with it what it wished." (10/9/13 Tr. at 893-894.)

897.    Murray testified that he would accept counsel's representation, but did not recall,

that the reimbursement agreement included a provision that if at any time prior to payment in full

of a participant loan, the company guarantee may be secured by the purchased stock without

violating or resulting in a violation of any law, rule or regulation, including Regulation U, then

upon request of the company, the participant shall grant the company a security interest in the

purchased stock to secure the participant's obligations under the reimbursement agreement.

Murray testified that he liked this provision because "it was more bank legal on legal, you know,

if this happens, if that happens. I mean, it's imaginative drafting." (10/9/13 Tr. at 894.)

898.     Murray testified that he believed another change in the structure of the ESPs was the concept that the company was required to make a specific representation and warranty to the Bank that no margin stock has been or will be pledged by any borrower or any other person to secure the reimbursement obligations of such borrower and no reimbursement obligations of any borrower are or will be indirectly secured as defined in Regulation U by any margin stock. (10/9/13 Tr. at 892.)

899.     Murray testified that another change in the structure of the ESPs was that the notes participants/borrowers had to sign included a representation and warranty that the borrower had not caused his or her obligations under the note or any other obligations to the company or any other guarantor relating to the guarantee to be secured directly or indirectly as defined in Regulation U by the company stock or any other margin stock. (10/9/13 Tr. at 893.)

900.     Murray guessed that the Bank did between six and 10 ESPs after the Comdisco ESP in February 1998. In those ESPs, Murray testified that the Bank continued to loan 100% of the purchase price of the stock and continued not to provide U-1 forms to the participants. Murray is not sure when the Bank stopped doing ESPs. 10/9/13 Tr. at 896-897.)

901.     DX 123 is a copy of a May 3, 1999 letter, with enclosures, to Richard Wohlmacher of the New York Stock Exchange from Lynn Kaye, Managing Director of First Chicago Capital Markets "Re: Executive Stock Purchase ("ESP") Programs". Murray testified that he received a copy of this letter. (10/9/13 Tr. at 884-885.) DX 123 was admitted into evidence subject to Plaintiff's objections. In the letter, Ms. Kaye referenced the Bank's ESP program and enclosed materials "more fully describing" the ESP. She further stated that the enclosures and the Bank's ESP structure were "proprietary" to the Bank. The letter stated that it

210

enclosed "standard materials for offering an ESP program to managers," "a summary of the Facility & Guaranty Agreement" and a "standard form of Reimbursement Agreement." (DX 123 at 003425-3430.) Pages 15 and 22 of the materials enclosed with the letters stated, among other things, that a participant may sell his stock at any time subject to the restrictions that normally apply to the participant's sales of the company's stock. (DX 123 at pp. 15, 22 of exhibit.)

902. Documents relating to seven of these ESPs were admitted into evidence subject to Plaintiff's objections.[12] The companies, the dates of the pertinent Facility & Guaranty Agreements, and the exhibit numbers relating to each company are as follows: Developers Diversified Realty Corporation ("Developers"), as of November 10, 1998 (DX 95-98.); Sun Communities, Inc. ("Sun"), as of December 10, 1998 (DX 101-107.); Amerus US Life Holdings, Inc."("Amerus"), as of February 12, 1999 (DX 108-110.); Josten's, Inc.("Jostens"), as of February 26, 1999 (DX 115, 117-118, 120-121.); Baxter International, Inc.("Baxter II"), as of May 3, 1999 (DX 127-138.); Masco Corp.("Masco"), as of July 10, 2000 (DX 146-147.); and Dominion Resources, Inc. ("Dominion") as of October 2, 2000 (DX 140-143.)

903. The financing term sheet issued by the Bank for the Developers ESP was dated July 31, 1998 and included a provision at page 2 that the "Facility & Guaranty Agreement will include, among things, an indemnity against claims by Participants and will require that the obligations of the Participants to the Guarantors in respect of the guaranty not be directly or indirectly secured (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System) by the Stock." (DX 95.) Terms sheets subsequently issued by the Bank on September 22, 1998 to Sun, on December 1, 1999 to Dominion and in July 2000 to Masco

---

[12] Plaintiff objected to the facts relating to other ESP programs implemented after Comdisco's SIP based on FRE 401, 403, and 407 for the reasons detailed in Plaintiff's Motion *in Limine* #6, which the Court granted on October 3, 2013.

contained virtually identical language.  (DX 101 at 000272; DX 140 at 000744-000745; DX 146 at 00521-00522.)

904.    The plans or prospectuses for the ESPs of Amerus, Jostens and Baxter II are included in DX 108, 115 and 136, respectively.  Each of them provides that the participant shall be permitted to sell all or any portion of the purchased stock at any time, and the Josten's plan contains the provision that this right is subject to restrictions that normally apply to sales of common stock.  (DX 108 at 004038; DX 115 at 015, 023; DX 136 at 003449, ¶ 7). A Questions and Answers document relating to the Dominion ESP states that the participant may sell his or her shares of the purchased stock at any time subject to the restrictions that normally apply to sales of common stock.  (DX 142 at 000749.)

905.    The Baxter II plan included a provision, at Section 16, providing that as of May 3, 1999, the law did not allow Baxter or the Bank to restrict the timing or the method of sale of the purchased stock or to require that possession of the purchased stock be maintained by Baxter or the Bank. Section 16 further provided that if the law changed to allow Baxter to require its possession of the stock or to restrict the sale of the stock, then each participant agrees to surrender possession of the stock to Baxter and to allow Baxter to restrict the timing and the method of sale of the stock.  (DX 136 at 003451-3452.)

906.    The Facility & Guaranty Agreements for the Developers, Sun, Amerus, Jostens, Baxter II, Masco and Dominion ESPs included a definition of "Margin Stock."  These same agreements did not contain a definition of "Restricted Stock".  (DX 96, 102, 109, 117, 130, 141 and 147.)

907.    Article I of the Facility & Guaranty Agreements for the Developers, Sun, Amerus, Jostens, Baxter II, Masco and Dominion ESPs included definitions of "Reimbursement

212

Agreement" and "Reimbursement Obligations." (DX 96, 102, 109, 117, 130, 141 and 147.)

908. The Facility & Guaranty Agreements for the Diversified, Sun, Amerus, Jostens, Masco and Dominion ESPs included a representation and warranty that "[n]o Margin Stock has been or will be pledged by any Borrower or by any other Person to secure the Reimbursement Obligations of such Borrower. No Reimbursement Obligations of any Borrower are or will be 'indirectly secured' (as defined in Regulation U) by any Margin Stock." (DX 96, § 4.01(n); DX 102 § 4.01(h); DX 109, § 4.01(k); DX 117 § 4.01(k); DX 141 § 4.01(s); and DX 147 § 4.01(o).) The Facility & Guaranty Agreement for Baxter II provided that "[a]s of the Closing Date, no Reimbursement Obligations of any Borrower are secured or 'indirectly secured' (as defined in Regulation U) by any Margin Stock." (DX 130, § 4.01(j).)

909. The form of note used in the Developers, Sun, Amerus, Jostens, Baxter II, and Dominion ESPs contained a representation and warranty by the participant stating in substance that the Borrower has not caused and will not cause the Borrower's obligations hereunder or any obligations to the Company relating to the Guaranty to be secured or 'indirectly secured' (as defined in Regulation U) by the Common Stock or any other Margin Stock. (DX 96, Ex. A, § 10 (ix); DX 102, Ex. A, § 10 (ix); DX 109, Ex. A, § 10 (ix); DX 117, Ex. A, § 10 (ix); DX 130, Ex. A, § 10 (ix); DX 141, Ex. A, § 10 (ix).)

910. Defendants' exhibits included Reimbursement Agreements for Developers, Sun and Baxter II. (DX 96, Ex. E at 000113; DX 102, Ex. C at 000872; and DX 132.) The "Reimbursement Obligations" in each of them included all amounts paid by the company pursuant to the Guaranty with respect to the loan from the Bank. (DX 96, Ex. E, § 1; DX 102, Ex. C § 1; and DX 132. § 1.) The right of setoff expressly granted to the company in the Sun and Baxter II Reimbursement Agreements did not extend to the purchased stock or any other

213

Margin Stock. (DX 102, Ex. C § 2; and DX 132, § 2.) The Sun and Baxter Reimbursement

Agreements included a representation that, if prior to repayment of the loan, the law permits the

Guaranty to be secured by the purchased stock, then the employee shall grant a security interest

in the stock to secure the employee's obligations. (DX 102, Ex. C § 3; and DX 132, § 4(c).) The

Baxter Reimbursement Agreement also contained a provision stating that it did not restrict in any

way the right or ability of the employee to sell, pledge or otherwise dispose of the stock. (DX

132, § 4(c).)

911.    Sabel testified that during the week prior to his trial testimony, he was provided

with some documents relating to a Baxter International SIP that was implemented in May 1999.

(9/25/13 Tr. at 173.)

### D.    Project Horizon[13]

### Fact Testimony and Related Record Materials

912.    Pacewicz testified that about a year after the SIP program, he was present when

the Bank and presented Project Horizon, a service the Bank was trying to sell Comdisco, during

one meeting at Comdisco's offices in Rosemont, Illinois. Pacewicz testified that the Bank

requested the meeting at a point in time when the Comdisco stock price was below the price at

which the shares were sold to the participants. Pacewicz was not aware of any lawyers from the

Bank having been invited to the Project Horizon presentation by the Bank. Pacewicz was not

aware of any follow up discussions except that Comdisco told the Bank it was not going to

pursue anything at that point in time. (10/2/13 Tr. at 545-546, 597-598.)

913.    Hennelly testified that Project Horizon was a code name for a potential add-on to

the original SIP Program and that he was involved in preparing the Project Horizon materials

---

[13] Plaintiff objected to the facts set forth in this section based on FRE 401, 403 and 407 for the reasons detailed in Plaintiff's Motion *in Limine* #6, which the Court granted on October 3, 2013.

that were presented to Comdisco. Hennelly testified that the Project Horizon program was a new program and was not intended to modify the existing Comdisco SIP. Hennelly testified that what he meant by referring to Project Horizon as a potential add on to the original SIP was that Comdisco may have wanted to do an additional dollar amount for new employees to participate or to increase the holdings for existing employees. Hennelly testified that in addition to himself, the names of Lynn Kaye and Todd Ritz at the Bank appeared on the Project Horizon materials. Hennelly testified that Lynn Kaye was a managing director in the Bank's capital markets group who had taken the SIP programs under her wing a little bit to centralize the marketing and sales process for the specific type of product. Hennelly testified that Todd Ritz had taken over Dan Clarke's position covering Comdisco. As of the time the Project Horizon document was created, Hennelly testified that he played the same role that he had in the initial transaction with Comdisco in terms of structuring. (8/5/09 Hennelly Dep. at 80-84, 114-115.)

914. Hennelly testified that he, Lynn Kaye and Todd Ritz were at a meeting at Comdisco's corporate headquarters in Rosemont on behalf of the Bank where the Project Horizon proposal was submitted to Comdisco and that he would draw the assumption based on a document he was shown at his deposition that the meeting was in late February 1999. Hennelly testified that he believed that Ed Pacewicz was present and cannot recall if John Vosicky or Scott Harvey was there. Hennelly testified that he recalls the Bank handing out a booklet relating to Project Horizon at the meeting. (8/5/09 Hennelly Dep. at 88-91, 103.)

915. The Project Horizon materials stated that the Bank continues to be the market leader in executive stock purchase programs. Hennelly testified that Lynn Kaye drafted this statement as setting forth the Bank's position and that he was fairly confident the Bank was leading the market. Hennelly testified that the Bank had expertise and experience based on the

deals the Bank had closed and would bring that expertise and experience to prospective clients in terms of potential ESP programs. (8/5/09 Hennelly Dep. at 84-90.)

916.    In response to a question asking whether he had any knowledge as to why Project Horizon was not implemented, Hennelly testified that he believed he had some notes that Comdisco's stock price had rebounded, had moved higher from where it was in February 1999. (8/5/09 Hennelly Dep. at 112-113.)

917.    Pacewicz testified that at the Project Horizon meeting the Bank laid out different scenarios where the SIP program could be restructured and that the Bank went through the Project Horizon presentation (DX 122) page by page discussing the different points. Pacewicz testified that in addition to representatives of the Bank, he thought Hewes or Harvey, and perhaps Vosicky, were present. (10/2/13 Tr. at 547-548.)

918.    Pacewicz testified that the Bank came out for the purpose of making a presentation. Their view was that because of this deficiency between the current selling price of the stock and the price the stock was sold to the participants, that there was an issue, because people were going to have bad morale, and it would be a concern to the people. Pacewicz testified that the Bank laid out different scenarios where the current plan could be restructured, a new plan could be in place, and that he thought they talked about giving option awards to people to alleviate that. Pacewicz further testified that the Bank talked about changing the new program to make it have different restrictions. (10/2/2013 Tr. at 545, 547-548.)

919.    Clarke testified that Todd Ritz succeeded him when he moved on to a new role at the Bank in August 1998. Clarke testified that he transitioned his accounts to Ritz and that he remembers walking through the basics of the Comdisco SIP Program with Ritz because he had never done a SIP before, and as an observer for the Bank he needed to understand at least

rudimentary. (9/25/13 Tr. at 241-242.)

920.    Pacewicz testified that his understanding of what the Bank and the Project

Horizon brochure (DX 122) described was that ideally ESP balances the equity markets' reaction

versus the managers' reaction, for example there was a favorable reaction in the marketplace,

because investors will say senior employees of Comdisco are buying this stock at this high price

level. So that's attractive to them from their standpoint. It's not attractive from the participants'

standpoint. You'd rather buy at a lower price. So that's what they're trying to demonstrate there,

in other words. (10/2/2013 Tr. at 550-551.)

921.    Pacewicz testified that his understanding was that the Project Horizon brochure

was really a way for the Bank to toot their own horn, so to speak. He further testified that

Project Horizon was saying the experience the Bank had in these programs in the past and what

they have been able to accomplish, who they put these programs in place with and that the Bank

could advise us and structure a program and assist with the transaction from inception through

maturity that in summary they say the Bank provides the highest level of service to our clients.

Pacewicz testified that Project Horizon was really a marketing ploy. (10/2/2013 Tr. at 551.)

922.    DX 122 included the following statements: "Regulation U changed, impacting

ESP loan structures: The company and the bank can no longer be directly or indirectly secured

by the stock. Companies now execute reimbursement agreement with their managers to provide

for reimbursement of any amounts paid by the Company under the ESP loan guaranty." (DX 122

at SIP0040140.)

923.    Pacewicz testified that he does not have any specific knowledge or understanding

of the margin regulations and did not know who specifically authored the statement on the last

page of the presentation that "Regulation U changed impacting ESP loan structures." He does

217

not know what reasoning or analysis the person who wrote it used, whether a lawyer reviewed it, or whether it is accurate. Pacewicz further testified that he did not have any understanding as to what was meant by the phrase "[t]he company and the bank can no longer be directly or indirectly secured by the stock" and that the phrase was not discussed. (10/2/13 Tr. at 552; 599-600.)

924. Hennelly testified that he does not know who was responsible for including the statements "Regulation U changed impacting ESP Loan Structures" and "The company and the bank can no longer be directly or indirectly secured by the stock" in the Project Horizon materials that the Bank presented to Comdisco. (8/5/09 Hennelly Dep. at 97-98.)

925. Hennelly testified that he does not recall anyone telling him anything about the specific statement "Companies now execute reimbursement agreement with their managers to provide for reimbursement of any amounts paid by the company under the ESP loan guarantee" that was included in the Project Horizon materials. Hennelly testified that Lynn Kaye was the point person for the ESP product and that he believes the Project Horizon materials were from her desk directly. (8/5/09 Hennelly Dep. at 101-102.)

<u>Testimony by Expert Witness</u>

926. Sabel testified that he does not understand the statements in the Project Horizon presentation (DX 122 at SIP 0040140) that "Regulation U changed, impacting ESP loan structures" and "[t]he company and the bank can no longer be directly or indirectly secured by the stock." Sabel testified that one of the reasons he does not understand these statements is that the law relating to extensions of credit being directly or indirectly secured by the stock did not change as a result of the merger of Regulation G into Regulation U. (9/25/13 Tr. at 170.)

927. Sabel testified that the Plaintiff's attorneys provided him with a copy of the

Project Horizon presentation to review.  (9/25/13 Tr. at 169.)

928.    Sabel testified that the second subpart under the bullet "Regulation U changed impacting ESP loan structures" was "Companies now execute reimbursement agreement with their managers to provide for reimbursement of any amounts paid by the company under the ESP loan guarantee."  He testified that he does not know why this was done, but read it as a statement of practice at that time.  (9/25/13 Tr. at 170-171.)

### E.    Sales of Shares Prior to the Bankruptcy

#### Fact Testimony and Related Record Materials

929.    Salerno testified that PX 454 comprises documents from Comdisco's files relating to SIP participants who sold their SIP shares. (9/25/13 Tr. at 274-275.)

930.    Harvey testified that PX 454 included at least some of the paperwork Comdisco required of somebody who wanted to sell their stock. (10/1/2013 Tr. at 430.)

931.    Salerno testified that the documents reflect that Tammi Frank made approximate $81,000 from the sale of her SIP shares.  That amount was calculated as of July 1, 1999.  Salerno testified that when Frank left the company on July 31, 1999 she was a vice president of business development, and there was nothing in her employment file reflecting either that Comdisco took an adverse employment action against her based on her sale of her SIP shares or that there were special circumstance governing the sale of her SIP shares. (9/25/13 Tr. at 275-276.)

932.    Salerno testified that Comdisco's records reflect that Dennis or Donald Goodline made approximately $289,000 on the sale of his SIP shares, calculated on March 21, 2000.  Salerno testified that when Goodline left the company on January 15, 2000 he was a director of equipment remarketing for the Asia Pacifica and Japan regions and there was nothing in his employment file reflecting either an adverse job action against him based on the sale of his SIP

shares or any special circumstance governing the sale of his SIP shares. (9/25/13 Tr. at 277-278.)

933.    Salerno testified that as to John Scanlon, Glenn Liss, Jeanne Matz, Christopher Noe, William Stuckert, Louis Haboush and Stephen Hamilton, he reviewed their employment files and nothing in those files reflected any adverse job action being taken by Comdisco based on the sale of their respective SIP shares or any special circumstances governing the sale of those shares. (9/25/13 Tr. at 278-280.)

934.    Salerno testified that Michael Tobin's employment file also did not contain anything reflecting an adverse employment action based upon Tobin's sale of his SIP shares. Salerno testified that Tobin had a separation agreement, providing that by accepting the agreement Tobin would transfer his SIP shares and SIP obligation to Comdisco, and his SIP loan would be forgiven. Salerno further testified that this transfer never happened, and Tobin's file reflects an addendum to the separation agreement as well as an e-mail which indicate Tobin changed his mind and reverted to maintaining ownership of his SIP obligation. (9/25/13 Tr. at 280-281.)

935.    Salerno testified that David Nolan was a participant in the SIP and was an executive vice president when he left the company on October 16, 1998. Salerno testified that Nolan had a separation agreement and release, which reflects that Nolan would transfer his SIP obligation to Comdisco, and Nolan's employment file confirms this transfer was consummated. Salerno was not aware of any reason or basis why Nolan would have been offered those terms nor was he aware of any policy or procedure that required the company to offer Nolan those terms. (9/25/13 Tr. at 283-284.)

936.    Salerno testified that Richard Frank was a participant in the SIP and was a vice-

president of product marketing when he left Comdisco on January 6, 1999. Salerno testified that Richard Frank's file contained a separation agreement with Comdisco which, on a general businessperson's level, provided for Frank to transfer his SIP obligation to Comdisco. Salerno was not aware of any obligation of Comdisco to include that provision in the agreement nor of any practice or procedure that required the company to offer Frank those terms. (9/25/13 Tr. at 284-285.)

937.    Salerno testified that the following were the dates of termination for each of the following individuals: Scanlon, 7/31/03; Liss, 1/30/04; Matz, 7/19/01; Noe, 11/26/99; Stuckert, 1/14/00; Haboush, 5/12/00; Hamilton, 9/30/99; and Tobin, 1/15/99. (9/25/13 Tr. at 282-283.)

938.    Salerno testified that he does not have any understanding as to why there was a gap between when Scanlon made a request to sell and the date of the close-out calculation. Salerno testified to the extent there are other similar time gaps he would not know the reason for those time gaps. (9/25/13 Tr. at 287.)

939.    Salerno testified as to the dates of termination for the ten SIP participants who sold their SIP shares at a profit in the 1999 to 2000 time period, as well as dates of instruction to the transfer agent, that information is as follows: :

| Comdisco SIP Participant | Number of Shares Sold | Termination Date | Date of Instruction to Transfer Agent | Net Profit to Individual |
|---|---|---|---|---|
| Stephen Hamilton | 20,000 | September 30, 1999 | May 3, 1999 | $77,132.50 |
| Tammi Franke | 32,000 | July 31, 1999 | May 12, 1999 | $81,660.74 |
| Michael Tobin | 32,000 | January 15, 1999 | June 8, 1999 | $91,408.39 |
| Louis Haboush | 64,000 | May 12, 2000 | December 22, 1999 | $482,918.15 |
| Donald Goodline | 32,000 | January 15, 2000 | January 26, 2000 | $289,427.18 |
| Christopher Noe | 24,000 | November 26, 1999 | March 7, 2000 | $344,836.56 |

221

| | | | |
|---|---|---|---|
| William Stuckert | 32,000 | January 14, 2000 | March 9, 2000 | $492,078.76 |
| Jeanne Matz | 32,000 | July 19, 2001 | March 10, 2000 | $571,782.56 |
| John Scanlon | 32,000 | July 31, 2003 | June 30, 2000 | $61,422.14 |
| Glenn Liss | 16,000 | January 30, 2004 | July 14, 2000 | $42,592.32 |

(9/25/13 Tr. at 282-283,285, 287, 288; PX 798; PX 454.)

940.    Harvey testified that Hamilton, Franke, Tobin, Haboush, Goodline, Noe and Stuckert had left or were in the process of leaving Comdisco when they sold.  He further testified that Scanlon had indicated to Comdisco before submitting his request to sell that he was in the process of leaving, but his manager worked something out with him to that he did not leave. Harvey testified that Matz was looking at another company and told him she would be leaving, but she did not ultimately leave.  (10/1/13 Tr. at 427-428.)

941.    Harvey testified that Liss wanted to get out of the SIP during the first year, but Harvey and Hewes told him he could not.  After the first year ended, Liss sought to sell his stock. Harvey requested that Hewes look into whether Liss could sell.  Hewes came back a day or two later and told Harvey Comdisco was going to let Liss sell his stock.  (10/1/13 Tr. at 428-429.)

942.    Hewes testified that if a SIP participant would have sold their SIP shares around March 2000 he thought that would have been a "positive outcome" to the SIP participant, and the SIP participant generally would have made money on the SIP shares, depending on their tax situation and on a number of other situations.  (10/25/07 Hewes Dep. at 8-9.)

943.    Harvey testified that Comdisco sold the stock to the participants, and there was a large amount of money that was owed under the SIP loans.  Harvey testified that Comdisco had retained an interest, because of its guarantee in place.  Harvey testified that there was sharing, on the one hand, if there was a sale in the first three years; Comdisco had prohibited sales of any

stock in the first year and had the first right of refusal to acquire any stock that was going to be sold; and, lastly, Comdisco had reserved the right to restrict the sales of the stock as Comdisco deemed appropriate. Harvey testified that Comdisco's view of the stock was that "we were holding it. It was ours. We had an interest in it. And we were going to maintain that interest and keep it as our security. The company felt it's our stock to hold until all of the restrictions lapse." (10/2/2013 Tr. at 494.)

944.    None of the Defendants ever tried to sell their SIP Shares.  (10/3/13 Brunner Dep. at 103; 10/8/13 Tr. at 790; 10/10/13 Tr. at 926-927; 10/9/13 Tr. at 825.)

945.    Weiss testified that he spoke with Nazneen Razi who was the vice president of human resources at the time about making an effort to exit the SIP program.  Weiss testified that she told him there was nothing she could do even though others that stayed on and were not terminated so he did not have the option to exit the program.  (10/10/13 Tr. at 923.)

946.    Scozzafava testified that he did not believe that he was able to sell his SIP shares. (10/9/13 Tr. at 825.)

947.    Scozzafava testified that he never attempted to sell his SIP shares, no one ever told him not to sell his SIP shares, and that no one at Comdisco ever prevented him from selling his SIP shares.

948.    Brunner testified that there were comments made at Comdisco about selling the company stock along the lines of "I would think about it very carefully because it could potentially be a career limiting move as you would be demonstrating that you did not believe in the future success of the company."  Brunner testified that such comments were at one time made by his boss, Thomas Flor, and similar comments were made in a discussion with Jeff Kohane and it was a topic of discussion amongst some of his friends at Comdisco.  He

223

speculated that at times Otto Harder and Peter Huber were present for such discussions. Brunner testified that other conversations suggested that stock sales were being watched and you wanted to make sure that you stick with the belief. (10/3/13 Brunner Dep. at 105-109)

949.    Brunner testified that he had a couple of situations before the SIP where he was approached by Jack Slevin once when he sold options and Slevin basically walked up to him and said, "oh, you sold some options, what the matter with you?" Brunner further testified that he knew that Nick was watching who sold what shares because Nick was bringing it up a few times in situations and in a flip comment in 1999. (10/3/13 Brunner Dep. at 109-110.)

950.    Brunner testified that he was present in one conversation where Nick Pontikes was describing that Pontikes had instructed someone, and "had his sources" to know what the sign up was, basically about who signed up to how many. Brunner further testified that he was present when Nick Pontikes made derogatory statements directed at individuals who sold Comdisco stock but he could not say specifically it was about the SIP shares. (10/3/13 Brunner Dep. at 115.)

<u>Testimony by Expert Witness</u>

951.    Sabel has no knowledge of any SIP participant who wanted to sell SIP stock or pledge SIP stock for another loan and was told he or she could not. (9/25/13 Tr. at 156.)

**F.      Other Attempts to Use SIP Stock**

**1.      Frederick Louisy**

952.    Frederick Louisy, a SIP participant in France, sent an e-mail to Harvey on or about August 17, 2000 proposing to pay off his SIP loan with a loan from a bank in Paris and that in order to do so, Comdisco needed to transfer his SIP shares to be held as security by a bank in Paris from which he sought to borrow money. (10/1/13 Tr. at 436; DX 149.)

953.    Hewes sent an e-mail to Harvey on or about August 15, 2000 regarding Louisy's

224

proposal.  Hewes advised Harvey that "[w]e should not deviate from the original deal.  If

Frederick wants to pay off the loan, he is welcomed to do so whatever way he can, but the stock

should stay with the company until Feb 2001 or whenever he pays of the loan in its entirety,

whichever is the later date."  (DX 149.)

> 954.    Harvey sent a response to Louisy on or about August 17, 2000 stating that:
>
>> [U]nder the terms of the SIP program Comdisco is entitled to retain 50%
>> of the profits generated from the sale of the stock, if the sale occurs prior
>> to February 2nd, 2001.  Comdisco's position is that in order to protect its
>> interests it will retain control of the stock until the <u>later</u> to occur of:  (a)
>> the time the loan is paid, or (b) February 2nd, 2001.  Also Comdisco has
>> reserved the right generally to restrict the sale or timing of the sale at any
>> time.  Therefore, although a bank which gives you a loan to pay off the
>> existing SIP loan with the current US bank could receive a security
>> interest in the stock, the stock and security interest would have to be
>> subject and subordinate to Comdisco's interests (including Comdisco's
>> right to restrict the sale and/or the timing of a sale) and the new bank
>> would not have possession of the stock until after the February 2nd, 2001
>> date.

(DX 149 at SIP-Group 583.)

> 955.    Harvey testified that Christian Geilbot, another French participant, sought to do

the same thing Louisy proposed.  (10/1/13 Tr. at 440.)

> 956.    Harvey testified that Comdisco did not allow Louisy or Geilbot to pledge their

SIP stock for another loan.  Harvey further testified that Comdisco did not ever allow any SIP

participant to pledge their SIP stock for another loan.  (10/1/13 Tr. at 440.)

> 957.    Louisy did not ask Comdisco if he could sell his SIP shares.  Harvey testified that

if Louisy had wanted to sell his shares, he could have, assuming Comdisco allowed it, which

Harvey thought that they would not, but there was never any indication in the email to Louisy

that Comdisco would not allow Louisy to sell his shares.  (10/2/13 Tr. at 503-04.)

> 958.    Harvey testified that in Louisy's case, because the Loan would have already been

paid off, Comdisco wanted to continue to hold the stock in order to protect its interest in

<div align="center">225</div>

collecting 50 percent of the proceeds from the stock sale. Harvey testified that Comdisco would not have been looking to the stock to assure payment or reimbursement of amounts paid under the guaranty because the loan to the bank would have been paid off. (10/2/13 Tr. at 505.)

959.    Harvey testified that if Louisy had actually paid off his SIP loan, the exposure under Comdisco's guarantee would have been extinguished relative to his loan, so Comdisco would not need to look to the SIP stock to assure payment or reimbursement of anything. (10/2/2013 Tr. at 505.)[14]

## 2.    Lawrence Mitzen

960.    Lawrence Mitzen testified that he was employed by Comdisco, Inc. for six years and was a participant in the SIP Program. (10/8/13 Tr. at 745.)

961.    Mitzen testified that he wanted to sell his SIP stock in mid-2000. (10/8/13 Tr. at 746.)

962.    Mitzen testified that in mid-2000 he was interested in selling his Comdisco stock because he was concerned about the risk that he was involved with, the direction of the company, the market, and the performance of the stock. Mitzen testified that he approached the office of Scott Harvey multiple times to see about what recourse he would have in order to exit from the program. (10/8/13 Tr. at 746.)

963.    Mitzen testified that he spoke with Harvey regarding the recourse he would have in order to exit from the program. (10/8/13 Tr. at 746.)

964.    Mitzen testified that Harvey indicated that selling SIP shares was difficult, complicated, and there were certain time periods during which participants were able to sell and

---

[14] The Court barred Kathryn Chapman from testifying and excluded DX 158 and 159 from evidence. On October 15, 2013, Defendants filed a written offer of proof stating that Ms. Chapman would have authenticated and testified to emails she authored dated July 21, 2001 and August 5, 2001 that are included in DX 158 and 159. Defendants preserve all of their arguments, objections and positions, and do not waive any of them.

the time when he approached Harvey was not one of those time periods. (10/8/13 Tr. at 746.)

965.    Mitzen testified that he did not make any attempts to sell his stock after this time and that he did not ask Harvey why this was a blackout period. Mitzen testified that Harvey did not tell him he was prohibited from selling his shares, and Harvey did not cite any provisions of the SIP Program which prohibited him from selling his shares. (10/8/13 Tr. at 747-748.)

966.    Mitzen testified that he was not able to get the information as to why that time period was not one of those when he could sell and he was given no further recourse as to what other direction he might have.  (10/8/13 Tr. at 746-747.)

967.    Mitzen testified that based on his conversation with Harvey, he did  not attempt to sell his SIP stock  and  he had no idea how to do so.  (10/8/13 Tr. at 747.)

### 3.    Rosemary Geisler

968.    Rosemary Geisler testified that she was employed by Comdisco, Inc. for 23 years and was a participant in the SIP Program.  (10/8/13 Tr. at 736.)

969.    Geisler testified that in the first quarter of 2000 she approached Comdisco and spoke with Madonna Hauser about collaring her SIP stock and was told that she could not collar the stock.  (10/8/13 Tr. at 736.)

970.    Geisler testified that in the first quarter of 2000 after she had spoken to her investment banker about some options on the stock she decided that she wanted to collar her SIP stock.  Geisler testified that she understood "collar" meant to protect herself on both the potential down side risk as well as the upside of the stock.  Geisler testified that  as the stock was the most expensive stock she had and it had a margin loan against it she thought a collar would be prudent.  (10/8/13 Tr. at 736-737.)

971.    Geisler testified that she first approached either Phil Hewes or Scott Harvey about

227

her desire to collar the stock and that one of them directed her to Madonna Hauser. Geisler testified that she knew Hauser was a paralegal in the Comdisco legal department who specifically worked with stock and stock options. Geisler testified that Hauser told her at that time that she did not own the stock, and really did not have any rights to it so Geisler could not collar it. (10/8/13 Tr. at 737, 738, 739.)

972.    Geisler testified that she went back to either Hewes or Harvey after her conversation with Hauser and one of them validated that and it was confirmed.. (10/8/13 Tr. at 738-739.)

Geisler testified that she did not recall if she reviewed any of the SIP plan documents to confirm Hauser's advice, and did not recall if anyone pointed her to any specific language in the SIP plan to confirm that advice. (10/8/13 Tr. at 739.)

973.    Geisler testified that Hauser was not a lawyer but a paralegal. Geisler testified that she took the word of Hauser. (10/8/13 Tr. at 738, 742.)

974.    Harvey testified that he had a conversation with Rosemary Geisler in the hallways at Comdisco in December, 2000. She asked about collaring the SIP stock. Harvey testified that he had not dealt with that issue personally and told her he suspected that given the trajectory of the stock and where Comdisco was right then, there would be a hesitation to allow her to do that, but that she needed to speak with Phil Hewes. (10/1/2013 Tr. at 433-434.)

975.    Geisler testified that after being told she could not collar her stock she did not explore other hedging strategies like calls or puts, or purchasing options on comparable equities. (10/8/13 Tr. at 740.)

### 4.    Edward Pacewicz

976.    Pacewicz testified that he attempted to sell his shares in 2000 and spoke to Hewes

228

about doing so. Pacewicz testified that Hewes told Pacewicz that he could not sell the stock. Pacewicz testified that Hewes previously discouraged him from selling his shares but did not forbid him from doing so at that time and directed him to Harvey for the form to do so. Pacewicz testified that he attempted to see Harvey but Harvey was not in the office. Pacewicz testified that the day after he discussed selling his shares with Hewes he learned that UBS was not going to renew its participation in Comdisco's credit facility, and after that point Hewes told him he could not sell the stock. (10/2/13 Tr. at 593-595.)

977. Hewes testified that around December 2000 or January 2001, Pacewicz came to him regarding the possibility of selling Comdisco stock. Hewes could not recall if Pacewicz was specifically asking about SIP shares or Comdisco stock he owned "outright." (10/25/07 Hewes Dep., 209.)

978. Hewes testified that he told Pacewicz that he could not sell his Comdisco shares. Hewes testified that at the time Pacewicz was the treasurer of the company and had insider information about the company that would subject him to "a blackout period." (10/25/07 Hewes Dep. at 210.)

979. Hewes testified that he did not recall telling Pacewicz that it would "look bad if someone in his position sold stock," but that he may have said that. (10/25/07 Hewes Dep. at 210.)

### G. Anticipation of the Third Anniversary of the SIP

980. On or about June 7, 2000, Hewes sent an e-mail to Richard Finocchi, Jerry Fitzgerald, and Harvey asking to get together the following morning to talk about the SIP. The e-mail stated that Hewes "talked to Nick [Pontikes] yesterday and he wants us to come up with some ideas and approaches for next February. It would be good to be able to present some ideas

229

to Nick and John soon so we get the Board thinking about this at the July meeting." (DX 145.)

981.   On August 29, 2000, Hewes sent an email to Nick Pontikes, John Vosicky, Jerry Fitzgerald and others at Comdisco. In the email, Hewes said that February 1, 2001 was the "the date our 'clawback' provision expires and there is the possibility of a number of participant [sic] going to the market to sell to pay off debt/ or reduce there [sic] risk to the market. Rick Finnochi has put together some thoughts about what steps we could take to deal with the possibilities." Attached to Hewes' email was a document entitled "DEALING WITH THE SIP UNWIND". (DX 150.)

**H.     Consideration of Proposals to Limit Participants' Risk**

982.   Hewes testified that around the fall of 2000, winter of 2001, Comdisco's management, including Hewes, Pontikes and members of the board of directors, discussed restructuring the SIP program. (10/25/07 Hewes Dep. at 6-7.)

983.   Hewes testified that Comdisco management considered restructuring the SIP around the end of 2000 because the atmosphere at the company was difficult. Individuals involved in the SIP and other equity programs were concerned about the drop in the market value of the company's stock, from its all time high of over $50 per share in March 2000 to around $10 per share in late 2000. (10/25/07 Hewes Dep. at 7-8.)

984.   Hewes testified that one way of restructuring the SIP that Comdisco's management discussed in late 2000, early 2001 was "a program of derivatives to put a collar around the stock prices." Hewes testified that this alternative never developed into an actual program. (10/25/07 Hewes Dep. at 12-13.)

985.   Hewes testified that when he became CEO of Comdisco in late December 2000, he was directed by the company's Board of Directors to go out and calm all the employees and

people that were involved in the company about the transition. One of the items was to speak with this very important employee group to at least send the message that the board understood the problem with the SIP and "was looking at ways to ameliorate the problem and that the people that are important to the continuous success of Comdisco were important." (10/25/07 Hewes Dep. at 14-15.)

986.    Hewes testified that he was directed by the Board to go out and calm all of the employees and people that were involved in the company about the transition of plans that were occurring with Nick stepping down.  One of the items of discussions was how to deal with the SIP. We told them that they were a very important employee group and we were to send the message that the board understands the problem, the board is looking at ways to ameliorate the problem, and that the people that are important to the continuous success of Comdisco were important. (10/25/07 Hewes Dep. at 14-15.)

987.    Hewes testified that he told groups of employees and specific employees that the board of directors was aware of the situation and was definitely trying to find ways to ameliorate the situation and that they were too important a group of people not to fix this problem.  Whether that is a promise, Hewes did not know.  Hewes further testified that there was certainly an assurance by the board that they were aware, and they were working towards a solution. Hewes was authorized by the Comdisco Board to make that commitment. (Hewes 10/25/07 Hewes Dep. at 21.)

988.    Hewes testified that he "never gave a specific guarantee saying that the board of directors was going to guarantee absolutely payment" .  (10/25/07 Hewes Dep. at 15.)

989.    On January 3, 2001, Hewes sent an internal memorandum to the SIP participants, in which he stated:

<center>231</center>

> As we start the new year, we are quickly approaching the 3 year anniversary of Comdisco's Shared Investment Program (SIP). Obviously, the SIP has been a failure to date. Senior management has not been able to provide the return on Comdisco's stock price during the last three year period that we have historically provided, on average, prior to that.
>
> We are aware of the personal hardship that this has created for you. While we have no magic bullet that will make everyone whole on their investment today, we are evaluating alternatives that would help your personal financial situation as it relates to the SIP. There is no guarantee that we will arrive at any alternative. However, I have asked both John Vosicky and his management team and Jerry Fitzgerald and his management team to begin to evaluate any and all alternatives.
>
> We will keep you updated as to any alternatives that may develop. Thank you.

(PX 327.)

990.    At the time of Hewes' January 3, 2001 memorandum, Harvey testified that Hewes was acting chief executive officer.  (10/2/13 Tr. at 490.)

991.    On or about March 12, 2001, Frank Ziegler, a member of the Comdisco law department, sent a memorandum to Hewes, Harvey and Fitzgerald attaching "a listing of 35 employees who enrolled in the Shared Investment Plan and whose status has changed, either with respect to their Comdisco employment or with respect to the SIP."  (DX 152; 10/2/13 Tr. at 491.)

992.    In February or March 2001, Norm Blake became CEO of Comdisco.  Blake asked Harvey to prepare a summary of the SIP program its status.  (10/2/13 Tr. at 491-92.)

993.    On April 5, 2001, Harvey sent a memorandum to Blake describing the SIP program and its status as of April 5, 2001, stating that 95 participants remained in the SIP and they were "quite concerned with their stock position."  The memorandum proposed four methods by which Comdisco could "assist or ameliorate the risk" to SIP participants.  The alternatives outlined in the memorandum were: (1) an "earn out" program which would "let employees earn

232

credit towards paying off the loans through a compensation program"; (2) negotiate now or in the near future with the Bank to extend or amend the loans to provide time for the stock to recover; (3) a "hedging" program to "permit individuals to use different type of derivatives to protect risk or enhance value"; (4) Comdisco subsidizing all or part of the losses to assist individuals. Harvey indicated in the memorandum that alternative (1) should be explored, alternative (3) was probably not open at the time because of the stock decline this week, and he did not believe the Board had considered alternative (4) because of the perceived long time span until the maturity date. Harvey stated in conclusion that "[i]f you direct me to pursue these alternatives, I would like to use a lawyer from our internal staff (Camille Cribaro), along with our internal Stock administration people (Madonna Houser was key in assisting me in creating the program in 1998) in assisting me. In addition, I believe we should have some assistance from Skadden, Arps and Goldman Sachs." (DX 154.)

994. Hewes testified that in 2001 Comdisco's management and board considered restructuring alternatives for the SIP program including a program of derivatives to put a collar around the stock prices. (10/25/07 Hewes Dep. at 12-13.)

995. Hewes testified that in early 2001 he believed that Comdisco had the wherewithal to continue on. Hewes testified that he, John Vosicky, Ray Seagle, Goldman Sachs and financial staff put together strategic plans to move forward with a daily plan, 30 day plan, 60 day plan, 120 day plan and Hewes was optimistic that Comdisco was going to make it. (10/25/07 Hewes Dep. at 71-72.)

996. Harvey testified that Blake did not direct him to pursue any of these alternatives. (10/2/13 Tr. at 492.)[15]

---

[15] The Trustee objected to the entire line of questioning concerning Comdisco's operations and financial affairs in the months leading up to its bankruptcy proceeding on the ground of relevance.

997.    Harvey testified that, to his knowledge, there were no options further evaluated after April 5, 2001 with respect to assisting or reducing the risk to SIP participants in the SIP program.  (10/2/13 Tr. at 493-94.)

998.    Hewes testified that as a public company, if it was discovered that a transaction implemented by Comdisco violated applicable law, there is probably a corrective action and corrective filing that needed to be done and depending on the situation and facts, including an appropriate corrective filing with the SEC.  Hewes further testified that he did not participate in the preparation of an SEC filing disclosing the margin violations of the SIP transaction. (1/10/13 Hewes Dep. at 37-40.)

999.    Pacewicz testified that Comdisco purchased Prism without Board approval. Pacewicz testified that Prism[16] was a company that was trying to develop high speed Internet connectivity with voice over Internet ability and that Prism's business was a drastic departure from Comdisco's business.  He testified that Prism was a business that was trying to compete against the large telecommunications companies. Pacewicz testified that at the time that Comdisco acquired Prism, Prism did not have any customers and that the approximate purchase price for Prism was approximately $53 million. (10/2/2013 Tr. at 555, 557)

1000.   Pacewicz testified that for fiscal year ending September 30th, 1999, Comdisco's revenues were approximately $4.2 billion, and the net earnings were approximately $70 million, that for fiscal year ending September 30th, 2000, Comdisco's revenues were approximately $3.9 billion and the earnings from continuing operations in 2000 were approximately $255 million. Pacewicz testified that Comdisco had a loss from discontinued operations, which was writing off the Prism investment and after tax the loss was $355 million. (10/2/2013 Tr. at 557.)

---

[16] Plaintiff objected in Motion *in Limine* #1  to the facts set forth in this section and all facts related to Prism based on FRE 401 and 403.  The Court granted MIL #1 on October 3, 2013.

1001.   Mitzen testified that he participated in conversations among Comdisco executive leaders over concerns of what recourse they would have to limit their risk in this SIP program from an exit strategy. Mitzen testified that they were never offered any alternatives on how to exit the program.  Mitzen testified that these conversations included Scott Harvey and Phil Hewes.  Mitzen testified that by the time Phil Hewes was involved in the conversation the stock price was so low that there was a lot of concern over the executives over the amount of liability, and there it was indicated to these Comdisco executive leaders at a meeting that they should not be concerned over that, because the company would not let these Comdisco executives be hurt by the SIP program, because they needed the leadership to stay with the organization and continue to help move it forward out of the issues that Comdisco was facing.  Mitzen testified that Hewes made the statement about not being hurt.  (10/8/13 Tr. at 750-751.)

1002.   Pacewicz testified that Comdisco shut down Prism in October 2000 and at that point Prism had not generated any revenue for Comdisco.  (10/2/2013 Tr. at 557-558.)

1003.   Pacewicz testified that the announcement with respect to Prism had an impact on Comdisco's credit rating in that Moody's Investor Services downgraded Comdisco's long-term credit ratings, but maintained the short-term credit ratings. (10/2/2013 Tr. at 558.)

1004.   Pacewicz testified that after the Prism write-off, he participated in an effort to develop a plan that would enable Comdisco to meet its debt obligations over the next year or two.  He testified that it was put together by the Comdisco finance department to demonstrate to the marketplace, the bank, the bank groups and the bond holders, the rating agencies and fixed income investors that Comdisco could fund or take care of all the maturing debt obligations of the company. Pacewicz further testified that Comdisco had extensive meetings with the bank groups, that he went over to Europe and met with the European banks, met with all the banks

235

here in the States in that time frame and had a teleconference call with all the major investors,

public debtholders of Comdisco, rating agencies, fixed income analysts. (10/2/2013 Tr. at 558-

559.)

1005.   Pacewicz testified that Comdisco had bank lines that were scheduled to expire at

the end of 2000.  He testified that Comdisco had two major facilities and a portion of those

facilities were expiring in December of 2000 and those facilities or lines were renewed for about

$250 million. (10/2/2013 Tr. at 559.)

1006.   Pacewicz testified that there was a change in the CEO position in Comdisco in

late 2000.  The then-current CEO, Nick Pontikes, the son of the founder, was pushed out by the

board in December of 2000 and then they named Phil Hewes, who was the head of the legal

department, in-house counsel, as interim CEO while they started to search for a new CEO.

(10/2/2013 Tr. at 559.)

1007.   Pacewicz testified that the first quarter of the fiscal year for 2001 ended on

December 31st, 2000 and for the end of that particular quarter, Comdisco had record earnings of

$909 million of revenue and $88 million in net earnings. (10/2/2013 Tr. at 559.)

1008.   Pacewicz testified that in early 2001 Comdisco had a senior note offering or

outstanding senior note offering, net offering notes outstanding that were $250 million that

matured in February of 2001.  He further testified that the company redeemed those bonds with

cash flow from operations without refinancing those in the marketplace, and it was done to

demonstrate to the marketplace that we had sufficient capabilities to retire the debt. (10/2/2013

Tr. at 560.)

1009.   Pacewicz testified that in the very early part of April 2001, Vosicky called

Pacewicz to come back from vacation to corporate headquarters. He testified that the  reason for

interrupting his vacation was that Norm Blake, the new CEO and a partner from Skadden, Jack Butler, decided to draw down all of Comdisco's committed bank lines that were not currently utilized in the amount of $880 million. Pacewicz further testified that they sent a fax, they didn't call the banks, just sent a fax to draw those lines down.  He testified that he and John Vosicky, CFO, were instructed by Norm Blake not to talk to the banks or for that matter anybody else in the fixed income community and no reason was provided as to why the uncommitted amounts of the lines had been drawn down. (10/2/2013 at Tr. 560-562.)

1010.   Pacewicz testified that on or about April 2nd of 2001, he attended a meeting where representatives of Moody's, the investment service, were present.  He testified that the meeting was held to update Moody's on the progress we were making since their downgraded after the Prism announcement. He testified that we had them come out to update them on where we were going and also to have them meet the new CEO of Comdisco, Norm Blake and during the meeting Blake said that part of his plan was to sell off some of the assets of, some of the business units of Comdisco to raise some cash. Robert Young, the analyst from Moody's in charge of rating Comdisco asked Blake, "Well, if you're unable to do that, what is your plan?" And Blake said, "I'll take the company into bankruptcy." Pacewicz testified that Blake's statement was the first time had heard that bankruptcy was a possibility.  (10/2/2013 Tr. at 562-563.)

1011.   Pacewicz testified that Robert Young was astonished by the comment, and he made the comment he had never heard that at a meeting like that in his life with the company before.  Pacewicz testified that the next morning Moody's downgraded Comdisco two notches, took them out of investment grade ratings, both commercial, both senior and short term, which put it out of the marketplace in commercial paper issuances. (10/2/2013 Tr. at 563.)

237

1012.   Pacewicz testified a week or two weeks later, Norm Blake had a conversation with Standard and Poor's, the other main rating agency, and he told them the same thing, that he would take the company into bankruptcy.  Pacewicz testified that they downgraded the company to non-investment grade.  (10/2/2013 Tr. at 563.)

1013.   Pacewicz testified that when Mr. Blake became CEO of Comdisco in late February of 2001, Pacewicz understood that Blake was entitled to receive a bonus after the fiscal year ended, on September 30th of that year.  Pacewicz testified that he understood Blake had his plan restructured to get an upfront bonus of $2 million.  Pacewicz testified that he learned this because he was required to put through the wire transfer, he thought it was in April, 2001 on a Friday afternoon. (10/2/2013 Tr. at 568-569.)

1014.   Weiss testified that in the period late 2000 or early 2001, Phil Hewes was the CEO of the company at that time and Weiss was working out of San Ramon, California, and San Francisco, California.  Weiss testified that Hewes came to the San Francisco office of Comdisco after he had been named interim CEO and attended a meeting in the conference room in the 101 California office in San Francisco.  Other Comdisco employees in attendance included Jeff Knaus, Nazneen Razi, Lisa K. Paul, Jeff Schwering, Dave Sanborn. There might have been one other.  Weiss understood the  purpose of that meeting  so that Hewes could meet with the employees as kind of the sales leaders in northern California to, you know, make sure they understood the direction of the company, to talk about how the business was running, what was happening and also to address questions we had about the SIP.  Weiss testified that Hewes assured Weiss and the other employees that the company was going to take care of the SIP and that they did not have to worry about the SIP because it was on everybody's mind, as to what is going to happen. The stock price had been going down and the company was under a little

238

pressure. Weiss testified that Hewes said, "No, you don't have to worry about it, Comdisco will take care of it. Don't worry. Go back to work and keep charging hard." (10/10/13 Tr. at 920-922.)

1015. Brunner testified that he resigned from Comdisco effective December 31, 2000 because of disagreements with certain strategic directions that Nick Pontikes was pursuing and trying to involve him in certain aspects of it. He testified that at the time of his resignation Brunner was not aware that Mr. Pontikes was going to be ousted as the chief executive officer of Comdisco. Brunner testified that prior to the effective date of his resignation, he was not aware of any evaluations that were ongoing within Comdisco with respect to the SIP program as to what steps could be taken to potentially mitigate the risk or otherwise manage the risk to the participants in the SIP program. (10/3/13 Brunner Dep. at 70- 70-71.)

1016. Brunner testified that it is not possible for him to pay the plaintiff the principal amount of his note without deduction from the proceeds of his SIP stock. Brunner further testified that if he were required to pay the amount the trustee seeks to recover on the Trustee's note enforcement claim, Brunner does not know where the money will come from. Brunner further testified that if he were required to pay the Trustee the principal amount of his note, that in today's situation he would not know where that money would come from either.. (10/3/13 Brunner Dep. at 44.)

1017. Scozzafava testified that neither the Bank nor the Litigation Trustee has ever made any offer to him of any kind to surrender or cancel his note or to return or turn over to him any of the interest that Comdisco periodically paid to the bank. Scozzafava further testified that is it not possible for him to pay the plaintiff the principal amount of his note without any deduction from the proceeds of his stock and if he was required to pay the amount the trustee seeks to recover on his note enforcement claim, he does not know where would that money come

from. (10/9/13 Tr. at 818-819.)

1018.    Poisella testified that neither Comdisco nor any successor of Comdisco nor the bank nor any successor to the bank ever issued a correction or amendment to any of the statements set forth in the prospectus of SIP materials or any statements made at the SIP presentation. Poisella further testified that he never received any of the money that the Bank advanced to Comdisco as the purchase price for his shares of SIP stock and he did not retain any of the money that the Bank advanced to Comdisco as the purchase price for his shares of SIP stock.  Poisella further testified that he did not retain or receive the value of any dividends that Comdisco paid on the SIP stock.  Poisella testified that his understanding is that there is no right or ability to recover any value with respect to the SIP stock and he does not recall ever voting the shares. (10/8/13 Tr. at 773-774.)

1019.    Poisella testified that neither the Bank nor Comdisco nor the litigation trustee has ever made any offer to surrender or cancel his note or to return or turn over to him any of the interest that Comdisco periodically paid to the Bank as dividends on his SIP stock prior to Comdisco's default.  Poisella further testified that it is not possible for him to pay the Litigation Trustee the principal amount of his note from the proceeds of the SIP stock and whatever benefit he may have received, if any from the purchase of the SIP stock does not remain. (10/8/13 Tr. at 774-775.)

1020.    Weiss testified that neither the Bank nor the Litigation Trustee has ever made any offer to him of any kind to surrender or cancel his note or to return or turn over to him any of the interest that Comdisco periodically paid to the bank.  Weiss further testified that is it not possible for him to pay the plaintiff the principal amount of his note without any deduction from the proceeds of his stock and if he was required to pay the amount the trustee seeks to recover on his

note enforcement claim, he does not know where would that money come from. (10/10/13 Tr. at 919-920.)

1021.   Weiss testified that he had made an effort to settle.  He further testified that he was aware that there was a time came when SIP participants were offered pursuant to the plan that was undergoing bankruptcy the opportunity to settle out and settle their obligations under the Note.  He further testified that he had no idea what the terms were and that he did not elect to participate.  (10/10/13 Tr. at 929-30.)

## IX.   COMDISCO'S BANKRUPTCY AND CREATION OF THE LITIGATION TRUST

### A.   Comdisco's Suspension of Dividend Payments

1022.   On May 18, 2001, Madonna Houser sent a memorandum to SIP participants stating that, as of May 3, 2001, Comdisco had suspended making dividend payments and advising SIP participants of their obligation to continue making interest payments on the Notes, even though Comdisco would no longer be paying dividends.  (DX 155.)

1023.   On or about May 21, 2001, Roger Innes, a SIP participant, sent the following email to Jerry Fitzgerald, and copied Scott Harvey and Michael Herman:

> Jerry,
>
> Why is the company not making these payments (even if not through the dividend), at least for SIP participants still employed with the company? Notwithstanding anything in the agreement itself, the original solicitation to everyone by the then current management about this program ALWAYS conveyed that these payments would be covered by Comdisco, albeit through the dividend. Had it ever been conveyed otherwise, I'm sure participation would have been lower.
>
> What happens now if the employee doesn't pay this would not the obligation revert immediately to Comdisco? Have there been discussions with Bank One about this? Is the company not considering any kind of assistance to employees involved in SIP?

(DX 156.)

241

**B.** **Comdisco's Bankruptcy Petition, the Bank's Notice of Default and Proof of Claim, and Comdisco's Opposition**

Fact Testimony and Related Record Materials

1024.  On or about July 16, 2001, Comdisco and certain of its affiliates filed petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois.  (Stmt. Uncontested Facts ¶ 33.)

1025.  Comdisco's bankruptcy filing constituted a "Program Event of Default" under the terms of the Facility Agreement.  (Stmt. Uncontested Facts ¶ 34.)

1026.  On or about July 16, 2001, the Bank sent a Notice of a "Program Event of Default" (the "Bank Notice") to each Defendant.  (Stmt. Uncontested Facts ¶ 35.)

1027.  The Bank Notice included the following language:

> Reference is made to (a) the Facility and Guaranty Agreement dated as of February 2, 1998 (the "Facility Agreement") among Comdisco, Inc. (the "Company"), Bank One, NA (f/k/a The First National Bank of Chicago) as Agent, and the lenders party thereto (the "Lenders") and (b) your promissory note (the "Note") dated February 10, 1998 in the original principal amount of $552,000.00 payable to the Agent and issued in connection with the Facility Agreement. At the direction of the "Required Lenders" under the Facility Agreement, the Agent hereby gives notice that a "Program Event of Default" has occurred by virtue of the recent filing by the Company of its bankruptcy case under Chapter 11 of the U.S. Bankruptcy Code and that, pursuant to Section 6(a) of the Note, the principal amount and all interest (including any interest the payment of which has been deferred pursuant to Section 1(a) of the Note) and other amounts outstanding under the Note are declared to be, and now are, forthwith due and payable.
>
> Although the Note is being accelerated and the Agent and the Lenders reserve all rights and remedies against you with respect thereto, the Agent and the Lenders presently intend to further assess the situation prior to commencing any collection procedures against you.

(PX 695, 696, 697, 698)

1028.  The Bank filed a Proof of Claim based on Comdisco's guaranty of the Notes in the Comdisco bankruptcy proceeding.  Comdisco filed a specific objection to the Bank's Proof

242

of Claim.  (Stmt. Uncontested Facts ¶ 36.)

1029.  William J. Raleigh ("Raleigh") testified that In the Spring of 2002, Comdisco, through its Chief Legal Counsel, Robert Lackey ("Lackey"), retained Raleigh's legal services to see whether Comdisco had a good faith basis to file an objection to the Bank's claim. Raleigh testified that at a meeting with Lackey on or about May 8, 2002, Raleigh gave him a copy of a draft memorandum that was a "very rough preliminary legal analysis" which he had drafted for Lackey's review.  (Stipulation Regarding Use Of Declarations Of William J. Raleigh; 2/18/13 Raleigh Decl., ¶¶ 1-4; 4/12/13 Raleigh Decl., ¶¶ 1-6.)[17]

1030.  Raleigh testified that during the May 2002 meeting, Lackey instructed Raleigh to meet with some of the other in-house counsel at Comdisco to review some of the supporting background documentation for the SIP.  Raleigh testified that he subsequently received a number of emails from in-house counsel at Comdisco containing background documentation, and then he researched the current law and at the specific request of Lackey prepared a detailed forty-nine page memorandum dated June 4, 2002 that was delivered to Lackey.  Raleigh testified that this memorandum contained his opinion work product as to the validity of legal and factual objections that Comdisco could make to the Bank's claim in the pending bankruptcy. On the first page of the Memorandum, in large bold letters, Raleigh noted that it contained protected attorney work product.  Raleigh testified that he and Lackey met concerning the contents of this memorandum and that, based on their discussion and Lackey's review of the memorandum, Lackey instructed Raleigh to prepare formal objections on behalf of Comdisco to the Bank's claim.  Raleigh testified that when he gave the June 4, 2002 Memorandum to Lackey he advised

---

[17] Prior to trial, the Court excluded this memorandum and Mr. Raleigh's 49-page memorandum referenced in paragraph 1030 from evidence.  On October 15, 2013, Defendants filed a written offer of proof as to the memoranda (DX 163-164); William Raleigh and Robert Lackey, the individuals that Defendants would have called as witnesses with respect to these memoranda; and what the memoranda and testimony would have shown.  Defendants preserve all of their arguments, objections and positions, and do not waive any of them.

243

Lackey of the sensitive and confidential nature of the analysis. Raleigh further testified that Lackey advised him that Lackey never transmitted or gave these two Confidential Memoranda to anyone representing the Defendants. (Stipulation Regarding Use Of Declarations Of William J. Raleigh; 2/18/13 Raleigh Decl., ¶¶ 5-10; 4/12/13 Raleigh Decl., ¶¶ 22.) Comment—par. 23 is outside of the Stipulation.

1031. On July 29, 2002, Comdisco filed Debtors' Objection to Claim Filed by Bank One Under 11 U.S.C. Secs. 102(1), 105(A) and Fed. R. Bankr. P. 3007 in Comdisco's bankruptcy. (DX 168.)

1032. Raleigh testified there is no question that during the period June 2002 through October 2002, he was sharing certain factual information with Marziani and one of her partners, legal counsel representing various former and current senior executives at Comdisco. Raleigh testified that he met with Marziani, a number of her clients and one of Comdisco's bankruptcy attorneys on or about October 1, 2002. At this meeting, he informed Marziani and her clients that Comdisco intended to pursue certain objections to the Bank's proof of claim, including potential violations of Regulations U and X as to the SIP Program. Raleigh testified that by this time, Comdisco already had filed a Form 10-Q notifying the public that Comdisco believed there may be violations of those regulations. Raleigh testified that he was working together as of October 1, 2002 with Marziani and her clients. (Stipulation Regarding Use Of Declarations Of William J. Raleigh; 4/12/13 Raleigh Decl., ¶¶ 25-30.)

1033. On or about January 23, 2003, Comdisco filed Debtors' Amended Specific Objection to Claim Filed by Bank One Under 11 U.S.C. Secs. 102(1), 105(A) and Fed. R. Bankr. P. 3007 in Comdisco's bankruptcy. (DX 174.)

1034. Plaintiff John W. Costello, as trustee ("Costello"), testified that between his

appointment as trustee in 2002 and prior to the assignment of the notes to him in December 2004, he was fully aware that Comdisco had accused the Bank of violating certain regulations, "G and U I believe." Costello testified that he certainly knew Comdisco had asserted in the bankruptcy proceedings that the violation of the regulations voided the guarantee. Costello testified that he requested his counsel, Jonathan Young, to monitor the matter on a limited basis and that Mr. Young from time to time kept him up to date on the ongoing nature of the issue. (10/8/13 Tr. at 698-700, 728-729.)

1035.   Murray testified that the Bank did not take the position in Comdisco's bankruptcy proceedings that Comdisco had obtained shareholder approval, because the focus in the bankruptcy was on whether Comdisco had standing to raise Regulation U issues, and no one ever got into the merits of Regulation U.  (10/9/13 Tr. at 872.)

1036.   Brunner testified that he was not one of the individual SIP participants who subsequent to Comdisco's bankruptcy filed a petition to intervene in the proceedings relating to a proof of claim that the First National Bank of Chicago or one of its successors had made in the bankruptcy court. (10/3/13 Brunner Dep. at 70.)

1037.   Brunner testified that it was subsequent to Comdisco's bankruptcy when he first learned that Comdisco and the First National Bank of Chicago may have violated federal margin regulation promulgated by the Federal Reserve Board. (10/3/13 Brunner Dep. at 71-72.)

<u>Testimony by Expert Witness</u>

1038.   Sabel testified that prior to his deposition in May 2013, he was unaware that in legal proceedings arising out of Comdisco's bankruptcy, Comdisco asserted that the Bank had violated Regulation U and that Comdisco had violated Regulation G in connection with the Comdisco SIP. (9/24/13 Tr. at 98.)

245

### C.    Comdisco's Plan of Reorganization

1039.    In July of 2002, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law, and Order ("Confirmation Order") confirming the First Amended Joint Plan of Reorganization of Comdisco, Inc. and Its Affiliated Debtors and Debtors in Possession (the "Confirmed Plan").  (Stmt. Uncontested Facts ¶ 37.)

1040.    The Confirmed Plan authorized the creation of the Comdisco Litigation Trust and the appointment of the Litigation Trustee.  Plaintiff was appointed as the Litigation Trustee on July 31, 2002.  (Stmt. Uncontested Facts ¶ 38.)

1041.    Section 12.2 of the Confirmed Plan states: "On the Effective Date, the Debtors shall transfer and shall be deemed to have irrevocably transferred to the Litigation Trust, for an on behalf of the beneficiaries of the Trust, with no reversionary interest in the Debtors, the Trust Assets."  (PX 488 at A-33.)

1042.    Section 1.151 of the Confirmed Plan defines "Trust Assets" as "those assets to be transferred to and owned by the Litigation Trust pursuant to <u>Article XII</u> and <u>Section 14.9(d)</u> of this Plan, which are comprised of the SIP Subrogation Claims."  (PX 488 at A-15.)

1043.    Section 12.3(a) of the Confirmed Plan states: "Without any further action of the directors or shareholders of the Debtors, on the Effective Date, the Trust Agreement for the Litigation Trust, substantially in the form of Exhibit G to this Plan and any other Trust Agreement, shall become effective.  The Trustee shall accept the Litigation Trust and sign the Trust Agreement on the Effective Date and the Litigation Trust will then be deemed created and effective." (PX 488 at A-33.)

1044.    Section 12.3(b) of the Confirmed Plan states, in part: "The Trustee shall have full authority to take any steps necessary to administer the Trust Agreement, including, without

246

limitation, the duty and obligation to liquidate the Trust Assets …."  (PX 488 at A-34.)

1045.   Following the confirmation of Comdisco's bankruptcy plan, each share of common stock in Comdisco, including each Defendant's SIP Shares, was cancelled.  Holders of these shares received Contingent Distribution Rights ("CDRs") in Comdisco Holdings Company, pursuant to the terms of the Confirmed Plan.  (Stmt. Uncontested Facts ¶ 40.)

### D.    The Trust Agreement and Amendments

1046.   A trust agreement dated August 12, 2002 was executed between Comdisco, Inc. and the Litigation Trustee (the "Trust Agreement"). A copy of the Trust Agreement and Amendments thereto is attached as Tab L in Volume 1 of the Appendix.  (JX 15.)

1047.   The settlor of the Trust Agreement was Comdisco, Inc.  Costello testified that he understands the Trust Agreement was created by the creditors' committee and Comdisco, as debtor, and was created because of Comdisco's confirmed plan of reorganization and the orders confirming the plan.  (10/8/13 Tr. at 688-689.)

1048.   The Trust Agreement states that the "Trust is organized for the primary purposes of (x) liquidating the Trust Assets, (y) litigating SIP Subrogation Claims,  and (z) making distribution of Net Trust Recoveries (as defined below) as set forth in the Plan." (JX 15 at 5.)

1049.   The Trust Agreement defines "SIP Subrogation Claims" as "the claims of Comdisco against any SIP Participant resulting from payments made to the SIP Lenders under the SIP Guarantee Agreement, or otherwise in respect of the SIP Notes, against any SIP Participant."  (JX 15 at 7.)

1050.   The Trust Agreement defines "Trust Assets" to be the SIP Subrogation Claims to be transferred to and owned by the Trust.  The Trust Agreement defines "Trust Recoveries" to be any and all proceeds derived by the Trust from the SIP Subrogation Claims. (JX 15 at 8.)

247

1051.   Costello testified that the definitions of SIP Subrogation Claims, Trust Assets and Trust Recoveries were never formally changed and the wording of the plan was not changed to his knowledge.  (10/8/13 Tr. at 690-691.)

1052.   Costello testified that he does not believe the plan of reorganization provided for any contractual rights to assignment of the notes. Costello testified that Comdisco only had subrogation rights at the time of the plan confirmation and that assignment rights were not in any document relating to the original plan.  Costello saw in 2002 that he did not have a contractual right to sue.  (10/8/13 Tr. at 693, 711-712.)[18]

1053.   Section 4.1 of the Trust Agreement, titled "Liquidation of SIP Subrogation Claims" states:

> (a)    The Trustee shall take such steps as it deems necessary to investigate, pursue, collect, litigate, settle and/or compromise the SIP Subrogation Claims, to reduce the SIP Subrogation Claims to cash proceeds and to make distributions of the cash proceeds as required under this Agreement, but the Trustee's actions with respect to disposition of the SIP Subrogation Claims should be taken in a manner so as reasonably to maximize the value of the SIP Subrogation Claims.
>
> (b)    The Trustee may transfer, sell, dispose of, settle or otherwise compromise the SIP Subrogation Claims on the authorization of the Trust Advisory Board, if any, by majority vote or if there is no Trust Advisory Board, with the approval of the Board of Directors, which approval shall not be unreasonably withheld.  In determining whether to compromise any SIP Subrogation Claim, the Trustee, Trust Advisory Board, and the Board of Directors may in their discretion take into consideration the ability of any SIP Participant to pay.  In the event the Trustee believes a SIP Subrogation Claim should be transferred, sold, disposed of, settled or otherwise compromised, but authorization for such action is not given, within 30 days after requested by the Trustee, the Trustee may file a motion requesting such authorization from the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction over such issue.

(JX 15 at 8-9.)

---

[18] Plaintiff objected to the testimony in this paragraph, and all testimony that offers an interpretation of the Confirmed Plan, the Trust Agreement and related amendments, or the Assignment Agreement, on the grounds that this testimony constitutes an inadmissible legal conclusion.

1054.   Section 7.1 of the Trust Agreement, titled "Establishment of The Trust Advisory Board" states:

> On or prior to the Effective Date, the Creditors' Committee may elect to create a Trust Advisory Board through the procedures established in the Plan.  If the Creditors' Committee fails to appoint a Trust Advisory Board on or before the Effective Date, the power to create the Trust Advisory Board shall be vested in the Board of Directors.  The members of the Trust Advisor Board, if any, shall disclose to the Trustee and all other members of the Trust Advisory Board whether any general unsecured claim or equity interest (relating to the Debtor) that is held by them personally, by any relative or by any entity with which they are employed or affiliated, has been sold, transferred or otherwise assigned, disposed of or satisfied by any entity other than the Trust.  The Board of Directors may negotiate with and authorize the payment of reasonable compensation from the Trust Assets to the Trust Advisory Board for services rendered and expenses incurred in fulfilling its duties pursuant to this Agreement.

(JX 15 at 17.)

1055.   Section 7.4 of the Trust Agreement, titled "Litigation of SIP Subrogation Claims" states:  "The Trustee, in his sole discretion, shall determine whether it is necessary or advisable to file judicial or administrative proceedings on any SIP Subrogation Claim."  (JX 15 at 18.)

1056.   Section 8.1 of the Trust Agreement, titled "Duty to Cooperate" states:

> Reorganized Comdisco, its Affiliates and the Disbursing Agent shall cooperate with the Trustee in pursuing SIP Subrogation Claims and administering the Trust and shall make available reasonable access during normal business hours, on reasonable notice, to personnel and books and records of the Reorganized Debtors to representatives of the Trust to enable the Trustee to perform the Trustee's tasks under the Trust Agreement and the Plan; but the Reorganized Debtors will not be required to make expenditures in response to the requests determined by them to be unreasonable.  The Reorganized Debtors shall not be entitled to compensation or reimbursement (including reimbursement for professional fees) with respect to fulfilling their obligations as set forth in this Section, except for repayment of loans made pursuant to a written loan agreement to the Trust to pay Trust Expenses.

(JX 15 at 19.)

1057.   Costello testified that, in his mind, Comdisco has fulfilled its obligation to cooperation under Section 8.1 of the Trust Agreement.  (10/8/13 Tr. at 720.)

249

1058.    Section 8.2 of the Trust Agreement, titled "Duty of Reorganized Comdisco with

Respect to the SIP Notes" states in part:

> (a) Reorganized Comdisco shall use its reasonable best efforts to
> effectuate the Transfer Date, concluding to resolve its obligations (if any)
> under the SIP Guarantee Agreement by acquiring the SIP Notes or
> otherwise obtaining an acknowledgement or agreement from the SIP
> lenders of its right to enforce the SIP Notes for their full amount against
> each SIP participant, including, if necessary, by paying the full amount
> owed in respect of the SIP notes in excess of the distributions to which
> the holders of the SIP Notes would otherwise be entitled in respect of
> their Allowed Claims in Class C-4 under the Plan, provided that,
> notwithstanding the foregoing, (i) nothing herein shall constitute an
> admission that Reorganized Comdisco has any liability in respect of the
> SIP Notes or the SIP Guarantee Agreement; (ii) nothing herein shall
> waive, release, diminish or impair any defense, claim, counterclaim, or
> right of setoff or recoupment that Reorganized Comdisco may have or
> assert in respect of any claim against it under the SIP Guarantee
> Agreement or otherwise in respect of the SIP Notes, and (iii) nothing
> herein shall obligate Reorganized Comdisco to waive, release, or settle
> any defense, claim, counterclaim or right of setoff or recoupment it may
> have in respect of the SIP Notes or the SIP Guaranty Agreement.

(JX 15 at 19.)

1059.    Section 11.10 of the Trust Agreement, titled "Amendments," states:

> This Trust Agreement may be amended from time to time by the Trust
> Advisory Board, if any, by majority vote.  If no Trust Advisory Board
> exists, the Trust Agreement may be amended from time to time by the
> Board of Directors, provided however, Bankruptcy Court approval shall
> be required for such amendments if a majority of the Board of Directors
> is comprised of members who were not members of the Board of
> Directors on the Effective Date.

(JX 15 at 23.)

1060.    The First Amendment to the Comdisco Litigation Trust Agreement was dated as

of August 12, 2004.[19]  (Stmt. Uncontested Facts ¶ 39.)

1061.    Costello testified that he does not remember whether the First Amendment to the

Trust Agreement was approved or otherwise confirmed by the Bankruptcy Court. (10/8/13 Tr. at

---

[19] The parties have corrected this date as it was listed incorrectly in the pretrial order.

703-704.)

1062.   The First Amendment was passed "with a resolution unanimously approved on

August 12, 2004 by the Board of Directors … of Comdisco Holding Company, Inc. . . . pursuant

to Section 11.10 of the [Trust Agreement]" and amended the Trust Agreement as follows:

- Section 7.2 of the Trust Agreement was "amended to provide that the Trust Advisory Board shall be comprised of one member who shall be the Initial Disbursing Agent . . . ."

- Sections 7.2, 7.3, 7.5, 7.7, 7.8, 7.9 and 11.10 were "amended to provide that any action or decision by the Trust Advisory Board shall be at the sole and absolute discretion of the Initial Disbursing Agent . . . acting as its sole member."

(JX 15 at 24.)

1063.   The First Amendment is signed by Ronald C. Mishler, William A. McIntosh,

Jeffrey A. Brodsky, Randolph I. Thornton and Robert M. Chefitz, all of whom were members of

the Board of Directors of Comdisco Holding Company, Inc. as of August 12, 2004. (JX 15 at

24.)

1064.   Costello testified that after the First Amendment went into effect, Thornton

became the "sole member of the board of directors of Comdisco Holding Company or actually

the Trust Advisory Board."  (10/8/13 Tr. at 702.)

1065.   DX 191 includes an email dated October 28, 2004 re "Comdisco: Settlement

Issues: Subject to Common Interest Privilege" from Jonathan Young to William Raleigh, with

copies to the Trustee, Comdisco's Robert Lackey, and John Frey, another attorney representing

the Plaintiff.  In the email, Young states that the Trustee would like to be able to proceed against

each SIP participant on two alternative legal theories—a claim under the Note as assignee of the

Bank, and a claim under the Note, as subrogee of the Bank and as assignee of Comdisco.  Mr.

Young states it is clear that the Trust contemplates the transfer of the subrogation claims, but that

251

the Trust was less clear whether it likewise contemplated the assignment claims.  Mr. Young

further states that they would like to modify the Trust Agreement, and to the extent necessary,

Comdisco's bankruptcy plan, to expressly include the assignment claims as part of the Trust res.

Mr. Young also stated that they did not want Comdisco or its affiliates to be a party in any way

to the documentation transferring the promissory notes to the Trust.  (DX 191.)

1066.   On November 20, 2003, the bankruptcy court entered an order allowing the

Bank's Proof of Claim.  (DX 183.)

## X.   SETTLEMENT OF THE BANK'S CLAIM AND ASSIGNMENT OF THE SIP NOTES

1067.   On or about November 5, 2004, Comdisco and the Bank reached agreement to

settle Comdisco's objections to the Bank's claim ("Settlement Agreement").  (DX 194).

1068.   The amount of the Bank's allowable claim, including attorneys' fees, was, at the

time of the Settlement Agreement, $133,000,000.00.  The allowable claim, excluding attorneys'

fees, was comprised of $103,569,000.00 in principal, $26,012,899.43 in pre-petition interest, and

$2,242,491.67 in "breakage" losses.  (DX 194.)

1069.   The Settlement Agreement provided, in part, as follows:

2.      Settlement Arrangements.

c.      Assignment of Promissory Notes.  In exchange for a cash payment out of the Disputed Claim Reserve of $122,893,503.26, plus such additional amounts as may be payable pursuant to Section 2(e) below (the "Settlement Payment"), and the other consideration described herein:

i)      At the Effective Time, the Creditors shall assign all or a portion of the Notes and all rights against the Borrowers attendant thereto (the "Note Assignments") to Comdisco Holding or to the Litigation Trustee;

(DX 194.)

1070.   The Settlement Agreement provided that the parties thereto agreed to settle for a

252

cash payment to the Bank "in the discounted amount of $122,893,503.26, which is comprised of an aggregate settlement of $126,350,000.00, less the Dresdner Offset in the amount of $3,456,496.74. (DX 194.)

1071.   Section 19 of the Settlement Agreement, titled "Cooperation" sets forth the terms and conditions upon which the Bank is required to cooperate with Comdisco Holding and the Litigation Trustee. (DX 194 at 15-16.)

1072.   Costello testified that, in connection with the Bank's obligation to cooperate under Section 19 of the Settlement Agreement, there is an obligation for the Litigation Trustee to reimburse the Bank for certain of its costs incident to cooperating, including reasonable attorneys' fees incurred by the bank. (10/8/13 Tr. at 721-722.)

1073.   Costello testified that he could only remember one instance where Section 19 came up and that was in connection with an affidavit from the Bank, regarding amounts due under the Notes and background, that the Litigation Trust obtained for its summary judgment motion. (10/8/13 Tr. at 722.)

1074.   Costello testified that the Litigation Trust has, from time to time, reimbursed Comdisco Holding for its legal expenses in connection with needing a witness in Europe. (10/8/13 Tr. at 722.)

1075.   Costello testified that Comdisco was obligated to cooperate with him, as Trustee, and that Comdisco has fulfilled its obligations. (10/8/13 Tr. at 720-721.)

1076.   On or about November 5, 2004, Comdisco filed a motion to approve its settlement of its objections to the claim of the Bank and filed a motion to dismiss Comdisco's appeal regarding its objections to the claim of the Bank in the Seventh Circuit Court of Appeals. (Stmt. Uncontested Facts ¶ 41.)

1077.   The Second Amendment to the Comdisco Litigation Trust Agreement was dated as of December 7, 2004 ("Second Amendment"). (JX 15 at 25.)

1078.   The Second Amendment states:  "Pursuant to ¶ 11.10 of the [Trust Agreement], this Trust Agreement may be amended at any time by a majority of the Trust Advisory Board. Randolph I. Thornton is currently acting as sole member of the Trust Advisory Board.  Therefore pursuant to the power reserved to Randolph I. Thornton under ¶ 11.10 of the Trust Agreement, the Trust Agreement is hereby amended, effective December 7, 2004, as follows".  (JX 15 at 25.)

1079.   The Second Amendment states, in part:

1.      The third WHEREAS clause on page 1 is hereby deleted and replaced with the following language:

WHEREAS, upon the first date when all of the following events have occurred: (i) entry of a Bankruptcy Court order approving the assignment of the SIP Notes to the Litigation Trustee, (ii) execution and delivery to the Trustee of documentation assigning the SIP Notes to the Litigation Trustee and (iii) delivery to the Trustee of the SIP Notes (the "Transfer Date"), the SIP Lenders shall be deemed to have granted, transferred, conveyed, and delivered to the Trustee, on behalf of, and for the benefit of, the Claimholders, control of, and all of the rights, title and interests in and to, the SIP Note Claims; and the Debtor shall be deemed to have granted, transferred, conveyed, and delivered to the Trustee, on behalf of, and for the benefit of, the Claimholders, control of, and all the rights, title and interests in and to, the SIP Subrogation Claims; and

2.      ¶ 2.1 of the Trust Agreement is hereby amended to include the following definition:

SIP Note Claims shall mean any and all claims of the holders of the SIP Notes (other than those SIP Notes previously compromised and/or transferred to Comdisco Holding Company) against the makers thereof, and against any other person or entity primarily or secondarily liable under these instruments.

3.      SIP Subrogation Claims shall be amended to insert at the end of the definition the following parenthetical:  (other than those claims related to, or arising from, those SIP Notes previously compromised and/or transferred to Comdisco Holding Company).

4.      The definition of Trust Assets contained in ¶ 2.1 of the Trust Agreement is deleted, and replaced with the following definition:

254

Trust Assets shall mean (i) the SIP Note Claims and (ii) the SIP Subrogation Claims to be transferred to and owned by the Trust pursuant to Article XII and Section 14.9(d) of the Plan and by virtue of section 1123(b)(3)(B) of the Bankruptcy Code.

5.      All references to the SIP Subrogation Claims contained in the Trust Agreement are hereby amended to reference both the SIP Note Claims and the SIP Subrogation Claims.

6.      The first sentence of ¶ 3.1 is hereby deleted and replaced with the following two sentences:

On the Transfer Date, the SIP Lenders shall transfer and shall be deemed to have irrevocably transferred to the Trust, for and on behalf of the Beneficiaries of the Trust, with no reversionary interest in the Debtor, the SIP Note Claims.  Also on the Transfer Date, the Debtor shall transfer and shall be deemed to have irrevocably transferred to the Trust, for and on behalf of the Beneficiaries of the Trust, with no reversionary interest in the Debtor, the SIP Subrogation Claims.

The balance of ¶ 3.1 is unchanged.

The Second Amendment was signed by Thornton and by Costello on December 8, 2004.  (JX 15 at 25-26.)

1080.   Costello testified that his understanding is that the purpose of the Second Amendment was to implement in part the assignment of the Notes from the Bank to the Litigation Trust.  (10/8/13 Tr. at 704.)

1081.   On the morning of December 9, 2004, there was email correspondence among counsel for the Bank, counsel for the Trustee and counsel for Comdisco.  One of these emails was from Jonathan Young and stated, among other things, that after consulting with the Trustee, they had decided to remove certain findings and rulings relating to subrogation from the proposed settlement order.  In a subsequent email that morning, which was in a separate email chain and was not in response to Mr. Young's email, outside counsel for the Bank, Gregory Murray, asked if someone could tell him why the proposed settlement order now says that all notes are being assigned to the Trustee.  Murray stated that, as written, paragraphs 8 and 9 of the

255

order were "at odds with the agreement (which says that the notes will go where Comdisco says they go)." (DX 199-200.)

1082.   Costello testified he thought that Bankruptcy Judge Black approved the Second Amendment to the Trust Agreement and that he would be surprised if Judge Black did not approve it.  Costello testified that he did not believe such approval was necessary.  (10/8/13 Tr. at 709-710.)

1083.   Robert E.T. Lackey, Authorized Representative of Comdisco Holding Company, Inc. testified that he believed the proposed settlement between the Bank Group and Comdisco was fair, reasonable, equitable and was in the best interests of the bankruptcy estate. (Stipulation Regarding Use of Proffer by Comdisco Holding Company of Robert E.T. Lackey, Exhibit A ¶ 2.)

1084.   Lackey further testified that "[g]iven this bankruptcy court's ruling that Comdisco did not have legal standing to assert the Regulation U objection to Bank One's Master Chain, and the quick affirmance in the Memorandum Opinion rendered by District Court Judge Bucklo on March 29, 2004, it appeared to me to that a successful legal resolution of this matter before the Seventh Circuit is a questionable proposition." (Stipulation Regarding Use of Proffer by Comdisco Holding Company of Robert E.T. Lackey, Exhibit A ¶ 2(a).)

1085.   Lackey further testified in support of the settlement that:

> Even if Comdisco was successful in its appeal pending the Seventh Circuit Court of Appeals, a reversal would only remand the case for purposes of further complex and protracted litigation concerning whether the entire Shared Investment Plan ("SIP") transaction violated Regulation U and the available remedies afforded to a victim in these situations.  Legal counsel advised me that the prevailing law for such a regulatory violation, usually is an equitable rescisionary remedy.  As such, even if Comdisco was successful, in all likelihood Comdisco would have to return the remaining principal amount received in this transaction of over $103 million, and perhaps pay a "reasonable rental value" for the use of these funds since February 1998 until the date of payment.

256

(Stipulation Regarding Use of Proffer by Comdisco Holding Company of Robert E.T. Lackey, Exhibit A ¶ 3(a).)

1086.   Lackey testified that:

> f) Bank One has agreed to assign the Notes and all rights attendant thereto , to either the Litigation Trustee or to Comdisco as provided for under the respective Assignments to facilitate recoveries for Comdisco and this estate in terms of the guaranteed obligations that were the subject matter of this Master Proof of Claim;

(Stipulation Regarding Use of Proffer by Comdisco Holding Company of Robert E.T. Lackey, Exhibit A ¶12f-g.)

1087.   Lackey further testified that the settlement with Bank One also provides certain benefits to Comdisco including "g) Comdisco was able to secure cooperation from Bank One for Comdisco Holding and the Litigation Trustee concerning any potential actions on the Notes against the respective borrowers." (Stipulation Regarding Use of Proffer by Comdisco Holding Company of Robert E.T. Lackey, Exhibit A ¶12 f-g)

1088.   In Comdisco's bankruptcy, the bankruptcy court entered a Stipulation, Findings and Agreed Order on December 9, 2004 (the "SFAO").  In the SFAO, the bankruptcy court allowed the Bank's Claim in the aggregate amount of $133,000,000 and approved a settlement of that claim for $126,350,000.  (Stmt. Uncontested Facts ¶ 42.)

1089.   The SFAO includes the following findings and conclusions:

> I.      The Settlement Agreement, and the assignment of the SIP Notes pursuant to subsequent agreements, were (or when executed will be) made and entered into in good faith and are in the best interests of Comdisco Holding and Comdisco Group.

> J.      It is the express intent of the Parties that nothing contained in the Settlement Agreement or the Settlement Order shall release the Borrowers from any liability with respect to the SIP Notes.

> K.      Sufficient consideration to Comdisco Holding and the Comdisco Group exists for execution of the Settlement Agreement, and all releases contained therein, as the Creditors have agreed, in exchange for the Settlement Payment (defined below) to: . . . (d) assign all rights associated with the SIP Notes against the Borrowers to Comdisco

257

Holding or the Litigation Trustee (as directed by Comdisco Holding) for the benefit of the holders of Allowed Class C-4 General Unsecured Claims, as provided in the Plan.

(JX 16.)

1090.    Pursuant to the SFAO, the bankruptcy court ordered (among other things) the following:

> 1. This Court has reviewed the Settlement Agreement and such Settlement Agreement is hereby approved.
>
> ***
>
> 3. Comdisco Holding, the Comdisco Group and the Litigation Trustee shall be bound by the terms of the Settlement Agreement . . . and this Settlement Order; provided however that nothing contained in either document shall be deemed to release, discharge, modify, impair or affect in any way the Litigation Trustee's rights (whether now existing or to be acquired in the future) to enforce the SIP Notes, or such other claims against the Borrowers as have been or will be conveyed to the Litigation Trustee and the Litigation Trust.
>
> ***
>
> 5. The Disbursing Agent shall make the Settlement Payment to Bank One pursuant to the Settlement Agreement and other considerations set forth in the Settlement Agreement.
>
> ***
>
> 7. The consideration provided under the Settlement Agreement shall constitute satisfaction and payment in full of the Allowed Claim, without releasing, modifying, discharging or impacting in any way the SIP Notes.
>
> 8. The Creditors shall assign all of their right, title and interest to the SIP Notes evidence the obligations of individual Borrowers with respect to loans made, and guaranteed by Comdisco, Inc. under the Facility Agreement in connection with the Shared Investment Plan dated January 30, 1998 to Comdisco Holding or the Litigation Trustee (as directed by Comdisco Holding).
>
> 9. The assignment of the SIP Notes pursuant to the Settlement Agreement shall effectuate bona fide transfers of all right, title, and interest of the Creditors in and to the SIP Notes to either Comdisco Holding or the Litigation Trustee (as directed by Comdisco Holding) and either Comdisco Holding or the Litigation Trustee (as directed by Comdisco Holding) shall hold the SIP Notes free and clear of all liens, claims and encumbrances and shall be entitled to exercise and enforce all such rights as may exist in favor of the holder thereof.  Good and valuable consideration supports the assignment of the SIP Notes.  Neither the Litigation Trustee nor the Litigation Trust shall be deemed a Lender or a Participant under the Facility Agreement.
>
> ***

258

AM 27729383.6

12. Nothing contained in this Settlement Order or the Settlement Agreement shall have the effect of (a) enlarging, reducing, diminishing, modifying or impairing any claim, defense, right or remedy which any party (including the makers of the SIP Notes, the Creditors, the Comdisco Group or the Litigation Trustee) may have arising under or relating to any SIP Note or SIP Loan or (b) vesting in the Litigation Trustee or the Comdisco Group any greater rights relative to the enforcement or collection of any SIP Note or SIP Loan than presently held by the Creditors.

(JX 16.)

1091.    The following language was removed from the end of Paragraph 12 of the SFAO

before it was entered: "provided however, that the entry of the Settlement Order shall extinguish

any defenses to the SIP Notes based upon: (i) validity and/or enforceability of the assignment of

these SIP Notes, and (b) the standing and capacity of the Litigation Trustee and/or the Comdisco

Group to enforce the SIP Notes."  (JX 16.)

1092.    In December of 2004, Comdisco paid the Bank and the other SIP Lenders

approximately $123 million by wire transfer (which was net of an agreed setoff), which monies

were received by the Bank on December 22, 2004.  (Stmt. Uncontested Facts ¶ 43.)

1093.    On December 22, 2004, pursuant to the Settlement Agreement, Comdisco sent

funds in the amount of $123,095,269.74 to the Bank by wire transfer. (Stipulation Regarding Use

of Declaration of Phillip Martin, Ex. 1 ¶ 10.)

1094.    Out of the total amount of $123,095,269.74 paid by Comdisco, $121,999,517.42

was distributed to the Bank and to the eight participating banks. Of this $38,245,994.89 was

distributed to the Bank and $83,753,522.54 in the aggregate was distributed to the eight

participating lenders.  The remainder – $1,095,752.32 – was distributed to the Bank's law

department in payment of the legal fees incurred by the Bank during the course of the litigation

over the Master Proof of Claim. (Stipulation Regarding Use of Declaration of Phillip Martin, Ex.

1 ¶¶ 15, 17.)

1095.    Costello testified that he knew that the notes were not fully paid when they were

259

transferred to him.  Costello testified that he thinks he knew at the time that he was receiving the notes after their maturity date. (10/8/13 Tr. at 727-728.)

1096.   Phillip Martin declared that:

> [p]ursuant to the Facility and Guaranty Agreement, the Settlement Agreement and the Assignment, the Bank and the participating lenders received payment from Comdisco as described herein and delivered the SIP Notes to the Trustee.  Consequently, thereafter, the books and records of the Bank reflected that Mr. Hewes and the other SIP Plan Borrowers no longer owe any amounts to the Bank in connection with the SIP Plan, either on the Bank's own behalf or as agent for the participating lenders.

(Stipulation Regarding Use of Declaration of Phillip Martin, Ex. 1 ¶ 19.)

1097.   Thereafter, pursuant to an Assignment Agreement dated December 22, 2004, the Bank and the other SIP lenders assigned the SIP Notes (including Defendants') to the Litigation Trustee (the "Assignment").  Comdisco, Inc. and Comdisco Holding Company, Inc. were not signatories to the Assignment.  (Stmt. Uncontested Facts ¶ 44.)

1098.   Costello testified that he believed the original SIP notes were delivered to him sometime in January 2005. (10/8/13 Tr. at 726.)

1099.   The Assignment provides, in part, as follows:

> 1.      Each Creditor hereby irrevocably conveys, transfers, set over and assigns to Assignee, all of such Creditor's right, title, and interest in and to all of the Loans set forth in Schedule A and in all Notes evidencing the same, and all of the benefits arising thereunder of therefrom.

> 4.      Contemporaneously herewith, the Agent is delivering to Assignee (a) all original Notes evidencing the Loans and (b) all related loan applications, financial statements, tax returns and letters of direction delivered by each of the Borrowers to the Agent in connection with the financing contemplated by the Facility Agreement.

> 8.      This Assignment is being made contemporaneously with, and shall only be effective upon, the "Settlement Payment" being made to the Agent by or on behalf of Comdisco, Inc. pursuant to Section 2(d) of the Settlement Agreement in satisfaction of its guarantee obligations under the Facility Agreement in respect of the Loans.  This Assignment is intended to effectuate the subrogation of Comdisco, Inc. to the rights of Assignor relative to Loans and Notes arising from such guarantee payment and to facilitate the exercise by Assignee of such subrogation rights.

260

16.    Subject to the making of the Settlement Payment referred to in Section 8 above, this Assignment shall become effective upon its execution and delivery by all parties hereto.

(DX 208.)

1100.    Schedule A of the Assignment shows the principal amount of each SIP Note that was assigned to the Litigation Trust, totaling $74,106,000.00.  (DX 208.)

1101.    Costello testified that the principal reason he desired for the Litigation Trust to acquire the Notes via an assignment was standing, and so that he knew the Litigation Trust has a contractual right to sue on the Notes.  (10/8/13 Tr. at 694.)

1102.    Costello testified that he proposed the concept of taking an assignment of the notes.  Costello and his attorneys were also exploring at the time whether they could make a holder in due course argument, because that status would have eliminated a lot of defenses and given him a lot of leverage. (10/8/13 Tr. at 693-695.)

1103.    Costello testified that he believed that the contractual right of assignment of the Notes gave him a better argument for standing than being a subrogee.  (10/8/13 Tr. at 697-698.)

1104.    Costello testified that Illinois law on standing based on a claim of subrogation has a lot of holes in it that he did not want to be faced with.  He testified that if the full amount of debt is not paid, it raises a lot of standing questions that you do not have when there is an assignment of the notes themselves.  (10/8/13 Tr. at 695-696.)

1105.    Costello testified that his desire as Litigation Trustee to secure an assignment of the Notes did not have anything to do with the objections that Comdisco had raised in the bankruptcy court that the Bank had violated regulation U.  (10/8/13 Tr. at 701.).

1106.    Costello testified that he believed he had a summary judgment motion in light of the fact that Comdisco's objection to the Bank's proof of claim based on Regulations G and U has been defeated twice and was going to get defeated a third time in the Seventh Circuit.

261

(10/8/13 Tr. at 700-701.)

1107.   Costello testified that, from the moment he saw the Trust Agreement, it was his desire that when and if Comdisco settled with the Bank he would be able to get an assignment of the Notes, in addition to the rights he already had in the Trust Agreement.  (10/8/13 Tr. at 701-702.)

1108.   Costello testified that his understanding was that, under the Assignment, the Litigation Trust "received both subrogation rights and the assignment of the contractual rights under the notes and "received all right, title and interest of both Comdisco and the Bank in those notes, whether it be subrogation rights or assignments rights.  Whatever rights that came with it."  (10/8/13 Tr. at 49, 708-709.)

1109.   Costello testified that he ultimately received subrogation rights and the assignment of contractual rights from Comdisco and the Bank.  (10/8/13 Tr. at 708,712.)

1110.   Costello testified that he did not want Comdisco or its affiliates to be a party in any way to the documentation transferring the promissory notes to the trust.  (10/8/13 Tr. at 712.)

1111.   Costello testified that he wanted to obtain an assignment directly from the Bank.  Costello testified that he wanted to obtain an assignment directly from the Bank.  Costello testified that it was fair to say that Comdisco Holding directed that the Notes be assigned to the Litigation Trust.  (10/8/13 Tr. at 717-719.)

1112.   Costello testified that, at the time the Litigation Trust took physical possession of the Notes in 2004 that Comdisco had previously asserted that Bank One had violated Regulation U in connection with the SIP transaction.  (10/8/13 Tr. at 728.)

1113.   Prior to acquiring and taking possession of the Notes, the Trustee or his attorneys reviewed: a copy of the "Debtors' Objection to Claim Filed by Bank One Under 11 U.S.C.

§§ 102(1), 105(A) and Fed. R. Bankr. P. 3007" that was filed on or about July 29, 2002, in the case *In re Comdisco, Inc.*, Case No. 01-24795 (Bankr. N.D. Ill.) [DX 168]; a copy of the "Debtors' Amended Specific Objection to Claim Filed by Bank One Under 11 U.S.C. §§ 102(1), 105(A) and Fed. R. Bankr. P. 3007" that was filed on or about January 23, 2003, in the case *In re Comdisco, Inc.*, Case No. 01-24795 (Bankr. N.D. Ill.) (DTX 174); a copy of the "Certain CIP Participants' Petition for Declaratory Relief" that was filed on or about February 14, 2003, in the case *In re Comdisco, Inc.*, Case No. 01-24795 (Bankr. N.D. Ill.) (DTX 177); a copy of the "Brief of Reorganized Debtor-Appellant" that was filed on or about January 4, 2004, in the appeals of *In re Comdisco, Inc.*, Case Nos. 03-3095 & 03-6948 (N.D. Ill.) (DTX 184); an executed version of the letter dated October 8, 2004, from William J. Raleigh to Jonathan W. Young, and a copy of the Facility Agreement and prototype Promissory Note referenced therein, (DTX 187); and a copy of the unfiled "Brief and Required Short Appendix of Appendix of Appellant Comdisco, Inc." [DTX 188]. (Stipulation as to Subpoena to Jonathan W. Young ¶ 2.)[20]

1114. The Trustee is the holder of the SIP Notes. The Trustee did not remit any payment for the assignment of the SIP Notes. (Stmt. Uncontested Facts ¶ 45.)

1115. Costello testified that Comdisco paid the dollars set forth in the settlement agreement. (10/8/13 Tr. at 729.)

1116. Costello testified he has never pled that he is a holder in due course. (10/8/13 Tr. at 729-730.)

1117. According to the 10-K report of Comdisco Holding Company, Inc. for the fiscal year ending September 30, 2005, gross distributions through December 1, 2005 of approximately

---

[20] Plaintiff objected based on FRE 401 and 403 to the consideration of any facts or documents regarding what he or his attorneys reviewed prior to taking assignment of the Notes in deciding this action for the reasons detailed in Motion *in Limine* #2.

$3.757 billion had been made to initially allowed claimholders, which equated to a present value of $3.591 billion. The report stated that the "associated percentage recovery was approximately 99% as of December 1, 2005." (DX 246 at pp. 20-21.)

## XI. PROCEEDINGS IN THE NOTE ENFORCEMENT LITIGATION

1118.   On or about October 14, 2008, this Court entered judgments in favor of the Plaintiff and against each of the Defendants. In November or early December 2008, Plaintiff issued Citations to Discover Assets on Comdisco Holding, Inc. and Mellon Investor Services, then the Stock Transfer Agent and Registrar for Comdisco Holding, Inc.[21] (Stipulation Regarding CDR Assets Turned Over to Plaintiffs ¶ a.)

1119.   On or about December 10, 2008, the Plaintiff filed a Motion For Turnover Of CDR Assets against Defendants Poisella, Scozzafava and Weiss. Plaintiff filed the same motion against Defendant Brunner on March 16, 2009. (Stipulation Regarding CDR Assets Turned Over to Plaintiffs ¶ b.)

1120.   On or about December 23, 2008, this Court entered an Order Authorizing Turnover of CDR Assets in the Poisella, Scozzafava and Weiss cases, directing Comdisco Holding, Inc. and Mellon Investor Services to immediately turnover and assign to Plaintiff all of Poisella's, Scozzafava's and Weiss' respective right, title and interest in any Contingent Distribution Rights issued by Comdisco, Inc. or Comdisco Holding Company, as well as any distribution rights accrued on account of said Contingent Distribution Rights. On or about March 19, 2009, this Court entered an Order Granting Litigation Trustee's Motion For Turnover Of CDR Assets in the Brunner case, directing Comdisco Holding, Inc. and Mellon Investor

---

[21] In the parties Stipulation Regarding CDR Assets Turned Over to Plaintiffs, the Trustee objected based on FRE 401 and 403 to the consideration of any facts or information regarding the turnover of CDR assets in deciding this action . (*See* Stipulation Regarding CDR Assets Turned Over to Plaintiffs, ¶ 2.)

Services to immediately turnover and assign to Plaintiff all of Brunner's right, title and interest in any Contingent Distribution Rights issued by Comdisco, Inc. or Comdisco Holding Company, as well as any distribution rights accrued on account of said Contingent Distribution Rights. (Stipulation Regarding CDR Assets Turned Over to Plaintiffs ¶ c.)

1121.   Pursuant to the Orders referenced in Paragraph 1(c) of the Stipulation Regarding CDR Assets Turned Over to Plaintiffs, the Contingent Distribution Rights issued by Comdisco, Inc. or Comdisco Holding Company for the account of each of the Defendants, as well as any distribution rights accrued on account of said Contingent Distribution Rights, were turned over to Plaintiff and have remained in his possession or control since the dates of the respective turnovers.  (Stipulation Regarding CDR Assets Turned Over to Plaintiffs ¶ d.)

## XII.   CURRENT AMOUNTS OF PRINCIPAL AND INTEREST CLAIMED

1122.   Dividends declared by Comdisco for the SIP Shares were deposited into accounts at the Bank that each of the SIP Participants had established.  The dividends were to be used to pay the current (non-deferred) interest payments due under the Notes.  Amounts sufficient to pay the current interest payment were withdrawn from each SIP Participant's account on each of the "Interest Payment Dates" specified in the Notes through and including March 13, 2001 and credited to each SIP Participant.  In May 2001, Comdisco suspended making quarterly dividend payments.  Comdisco made an additional payment to the Bank on June 21, 2001 that was sufficient to pay the current interest payment due on June 12, 2001.  (Stmt. Uncontested Facts ¶ 31.)

1123.   Defendants did not make any payments of principal, and no payments of interest were made by the SIP Participants after on or about June 21, 2001.  (Stmt. Uncontested Facts ¶ 32.)

265

1124.    Martin testified that pursuant to the Facility and Guaranty Agreement and the participating agreements between the Bank and the participating lenders, the Bank kept and maintained the SIP Notes and was responsible for keeping and maintaining, and kept and maintained, the books and records relating to the SIP loans, including records of payments against principal and interest on the SIP loans, the accrual of interest, penalties, and charges against the SIP loans, and the balances of the SIP loans. (Stipulation Regarding Use of Declaration of Phillip Martin, Ex. 1 ¶ 18.)

1125.    DiPasquale testified that Section 4 of the Notes required each Defendant to open a deposit account ("Borrower Account") at the Bank.  DiPasquale testified that based on JP Morgan Chase's review of the Bank's business records, it appears that a Borrower Account was opened at the Bank in the name of each Defendant.  (DiPasquale Decl. ¶ 4.)

1126.    DiPasquale testified that there was a pre-default Interest Rate per annum equal to 7.8054 percent.  (DiPasquale Decl. ¶ 5.)

1127.    DiPasquale testified that this pre-default interest consisted of two components: (1) accrued and current interest, payable quarterly in arrears on each of the quarterly interest payment dates set forth in Schedule 1 of each Note (the "Interest Payment Dates"), at a significantly reduced "Current Payment Rate" as set forth in the Note (*i.e.*, a fraction of 7.8054 percent) (the "Current Interest Payment"); and (2) accrued but deferred interest, payable in full on the earlier of the "Maturity Date" (defined as the earlier of February 10, 2003 and the date of any Comdisco, Inc. Change of Control) and the acceleration of the Note as provided by Section 6(a) of the Note ("Accrued Deferred Interest").  (DiPasquale Decl. ¶ 6.)

1128.    DiPasquale testified that the Accrued Deferred Interest component of the Notes comprised the difference between the total amount of interest accrued over the term of the Notes,

266

less the Current Interest Payments made over the term of the Notes.  (DiPasquale Decl. ¶ 7.)

1129.  DiPasquale testified that, based on her review of the Bank's business records, Comdisco tendered payment of $151,000 by wire transfer to the Bank on or about June 21, 2001. DiPasquale testified that the Bank's records indicate that the Current Interest Payments due from the Defendants on or about that date were, respectively:  Brunner: $799.99; Poisella: $1,199.98; Scozzafava:  $799.99; and Weiss:  $799.99.  (DiPasquale Decl. ¶ 8.)

1130.  DiPasquale testified that, from her review of the Bank's business records, it appears that the Bank as Agent sent a notice of Acceleration of Promissory Note ("Acceleration") to each Defendant on or about July 16, 2001.  (DiPasquale Decl. ¶ 10.)

1131.  DiPasquale testified that, assuming for purposes of her testimony that Comdisco's June 21, 2001 payment is credited to each Defendant's account (and without commenting on the legal effect of Comdisco's payment),  and assuming that each of the Notes is enforceable and that the Trustee is entitled to enforce each of the Notes in accordance with its terms, the amount of interest that remained unpaid for the period to and including July 15, 2001 for each Defendant's Note (the "Pre-July 16 Unpaid Interest") includes the following components: (a) Accrued Deferred Interest accrued prior to June 12, 2001 and (b) interest that accrued at a rate of 7.8054 percent per annum from June 12, 2001 to but excluding July 16, 2001.  (DiPasquale Decl. ¶ 11.)

1132.  DiPasquale testified that, assuming that each of the Notes is enforceable and that the Trustee is entitled to enforce each of the Notes in accordance with its terms, the total amount of Pre-July 16 Unpaid Interest for the time period from February 10, 1998 to and including July 15, 2001 is as follows:

267

| Defendant | Unpaid Pre-default Interest |
|---|---|
| Brunner | $138,643.03 |
| Poisella | $207,964.55 |
| Scozzafava | $138,643.03 |
| Weiss | $138,643.03 |

DiPasquale testified that each Defendant has made no payments to the Bank of the foregoing Pre-July 16 Unpaid Interest on his Note. (DiPasquale Decl. ¶ 12.)

1133.   DiPasquale testified that, under the terms of the Notes, the default interest rate is based on the Corporate Base Rate ("CBR") plus 2 percentage points per annum. The CBR is also sometimes referred to as the prime rate interest. DiPasquale testified that the current and historical prime rates of interest are published daily on the JPMorgan Chase & Co. website at the following URL address: http://www.jpmorganchase.com/corporate/About-JPMC/historical-prime-rate.htm. (DiPasquale Decl. ¶ 13.)

1134.   DiPasquale testified that, based on these published rates, the applicable Corporate Base Rate (including number of days within each time period) through June 30, 2013 is set forth in the following chart:

| From and Including | To but Excluding | # of Days | Corporate Base Rate |
|---|---|---|---|
| 23-Jul-01 | 22-Aug-01 | 30 | 6.75% |
| 22-Aug-01 | 17-Sep-01 | 26 | 6.50% |
| 17-Sep-01 | 3-Oct-01 | 16 | 6.00% |
| 3-Oct-01 | 7-Nov-01 | 35 | 5.50% |
| 7-Nov-01 | 12-Dec-01 | 35 | 5.00% |
| 12-Dec-01 | 7-Nov-02 | 330 | 4.75% |
| 7-Nov-02 | 27-Jun-03 | 232 | 4.25% |
| 27-Jun-03 | 30-Jun-04 | 369 | 4.00% |
| 30-Jun-04 | 10-Aug-04 | 41 | 4.25% |
| 10-Aug-04 | 21-Sep-04 | 42 | 4.50% |
| 21-Sep-04 | 10-Nov-04 | 50 | 4.75% |
| 10-Nov-04 | 14-Dec-04 | 34 | 5.00% |
| 14-Dec-04 | 22-Dec-04 | 8 | 5.25% |
| 22-Dec-04 | 2-Feb-05 | 42 | 5.25% |

268

| From and Including | To but Excluding | # of Days | Corporate Base Rate |
|---|---|---|---|
| 2-Feb-05 | 22-Mar-05 | 48 | 5.50% |
| 22-Mar-05 | 3-May-05 | 42 | 5.75% |
| 3-May-05 | 30-Jun-05 | 58 | 6.00% |
| 30-Jun-05 | 9-Aug-05 | 40 | 6.25% |
| 9-Aug-05 | 20-Sep-05 | 42 | 6.50% |
| 20-Sep-05 | 1-Nov-05 | 42 | 6.75% |
| 1-Nov-05 | 13-Dec-05 | 42 | 7.00% |
| 13-Dec-05 | 31-Jan-06 | 49 | 7.25% |
| 31-Jan-06 | 1-Mar-06 | 29 | 7.50% |
| 1-Mar-06 | 28-Mar-06 | 27 | 7.50% |
| 28-Mar-06 | 10-May-06 | 43 | 7.75% |
| 10-May-06 | 29-Jun-06 | 50 | 8.00% |
| 29-Jun-06 | 28-Feb-07 | 244 | 8.25% |
| 28-Feb-07 | 18-Sep-07 | 202 | 8.25% |
| 18-Sep-07 | 31-Oct-07 | 43 | 7.75% |
| 31-Oct-07 | 11-Dec-07 | 41 | 7.50% |
| 11-Dec-07 | 22-Jan-08 | 42 | 7.25% |
| 22-Jan-08 | 30-Jan-08 | 8 | 6.50% |
| 30-Jan-08 | 18-Mar-08 | 48 | 6.00% |
| 18-Mar-08 | 30-Apr-08 | 43 | 5.25% |
| 30-Apr-08 | 8-Oct-08 | 161 | 5.00% |
| 8-Oct-08 | 29-Oct-08 | 21 | 4.50% |
| 29-Oct-08 | 16-Dec-08 | 48 | 4.00% |
| 16-Dec-08 | 30-June-13 | 1657 | 3.25% |

(DiPasquale Decl. ¶ 14.)

1135.  DiPasquale testified that interest accrued beginning on July 16, 2001 is referred to in her testimony as "Post-Default Interest" and that  Post-Default Interest accrued on each Defendant's Note at the default rate of interest.  Each Defendant has made no payments to the Bank of Post-Default Interest on his Note since the Accelerations were sent on July 16, 2001. (DiPasquale Decl. ¶ 15.)

1136.  DiPasquale testified that, assuming that each of the Notes is enforceable and that the Trustee is entitled to enforce each of the Notes in accordance with its terms, the total amount

269

of unpaid Post-Default Interest for each Defendant from July 16, 2001 to and including June 30, 2013 is truly and correctly set forth in the following table:

| Defendant | Unpaid Post-default Interest |
|---|---|
| Brunner | $456,966.11 |
| Poisella | $685,449.17 |
| Scozzafava | $456,966.11 |
| Weiss | $456,966.11 |

(DiPasquale Decl. ¶ 16.)

1137.  DiPasquale testified that the total amount of unpaid principal and interest under each Defendant's Note includes (a) Principal plus (b) Pre-July 16 Unpaid Interest plus (c) Post-Default Interest.  Assuming that each of the Notes is enforceable and that the Trustee is entitled to enforce each of the Notes in accordance with its terms, DiPasquale testified that the following table truly and correctly sets forth the amounts due and owing under the Notes as of June 30, 2013:

| Defendant | Principal | Pre-July 16 Unpaid Interest | Post-default Interest | Unpaid Principal and Interest |
|---|---|---|---|---|
| Brunner | $552,000.00 | $138,643.03 | $456,966.11 | $1,147,609.14 |
| Poisella | $828,000.00 | $207,964.55 | $685,449.17 | $1,721,413.72 |
| Scozzafava | $552,000.00 | $138,643.03 | $456,966.11 | $1,147,609.14 |
| Weiss | $552,000.00 | $138,643.03 | $456,966.11 | $1,147,609.14 |

(DiPasquale Decl. ¶ 17.)

1138.  DiPasquale testified that, assuming that each of the Notes is enforceable and that the Trustee is entitled to enforce each of the Notes in accordance with its terms, additional interest continues to accrue after June 30, 2013 at the CBR plus 2 percentage points per annum. (DiPasquale Decl. ¶ 18.)

270

Dated: January 27, 2014

Respectfully submitted,


/s/ *Jeff D. Harris*
Jeff D. Harris
Gregory L. Stelzer
FIGLIULO & SLIVERMAN, PC
10 South LaSalle Street
Suite 3600
Chicago, Illinois 60603
Telephone: (312) 251-4600
Facsimile: (312) 251-4610


Gini S. Marziani
Davis McGrath LLC
125 S. Wacker Drive
Suite 1700
Chicago, Illinois 60606
Phone: (312) 332-3033
Fax: (312) 332-6376
*Attorneys for Defendants Mike J. Poisella,*
*Roman Brunner, Joseph J. Scozzafava, and*
*Gregory A. Weiss*

/s/ *Erin L. Brechtelsbauer*
Jonathan W. Young
W. Allen Woolley
Bilal Zaheer
Erin L. Brechtelsbauer
EDWARDS WILDMAN PALMER LLP
225 West Wacker Drive, Suite 3000
Chicago, Illinois 60606-1229
Telephone: (312) 201-2000
Facsimile: (312) 201-2555
*Attorneys for Plaintiff John W. Costello, not*
*individually, but as Litigation Trustee under*
*the Comdisco Litigation Trust*

271

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on January 27, 2014, a true and correct copy of the foregoing **JOINT SUMMARY OF TRIAL RECORD AND TESTIMONY** was filed with the Clerk of the Court using the CM/ECF system, which sent notification to:

James R. Figliulo
Jeff D. Harris
Gregory L. Stelzer
FIGLIULO & SILVERMAN, PC
10 South LaSalle Street
Suite 3600
Chicago, Illinois 60603
Telephone:  (312) 251-4600
Facsimile:  (312) 251-4610

Gini S. Marziani
Davis McGrath LLC
125 S. Wacker Drive
Suite 1700
Chicago, Illinois 60606
Phone: (312) 332-3033
Fax:  (312) 332-6376

*/s/ Erin L. Brechtelsbauer*
Erin L. Brechtelsbauer

272