**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JOHN W. COSTELLO, not individually, but as
Litigation Trustee under the Comdisco Litigation
Trust,

                    *Plaintiff*,

      v.

MIKE J. POISELLA,
ROMAN BRUNNER,
JOSEPH J. SCOZZAFAVA, and
GREGORY A. WEISS,

                    *Defendants*.

<u>**Honorable Robert W. Gettleman**</u>

Magistrate Judge Mary M. Rowland

Civil Case No.  05-736
Civil Case No.  05-740
Civil Case No.  05-746
Civil Case No.  05-764

<u>**PLAINTIFF'S POST-TRIAL BRIEF**</u>

AM 25961633.11

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... v

KEY TO CITATIONS AND ABBREVIATIONS ..................................................... xi

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 5

I.     THE TRUSTEE HAS ESTABLISHED HIS *PRIMA FACIE* CASE. .............................. 5

II.    THE LAW AND EVIDENCE DO NOT SUPPORT DEFENDANTS' SECTION 7(d) ILLEGALITY DEFENSE. ........................................................................... 6

    A.    The Notes Did Not Violate the Margin Regulations. ........................... 6

        1.    The Bank Had No Direct or Indirect Security Interest in the Stock. ......... 7

            a.    The Bank Had No Direct Security Interest in the Stock and Could Not Enforce Any of the Purported "Restrictions." .............. 7

            b.    The Bank, in Good Faith, Did Not Rely on the SIP Shares as Collateral for the Notes. ........................................................... 10

        2.    The Court Should Give Deference to the FRBC's Opinion Letter. ......... 12

            a.    The FRBC Letter Reflects the Conclusions of Margin Regulations Experts from the Federal Reserve Board Staff. ....... 13

            b.    The Hale Letter Adequately Described the SIP Transactions. ................................................................................. 14

            c.    Other Considerations Favor Deference to the FRBC Letter. ........ 15

    B.    Any Illegality in Making or Performing Comdisco's *Guaranty* Would Not Impair the Enforceability of the *Notes*. ............................................... 17

        1.    The Notes and Guaranty Are Separate Contracts. .................................... 17

        2.    Even if the Trustee Were Asserting Subrogation Claims (Which He Is Not), Defendants Would Still Need to Show the Notes Are Illegal. ...................................................................................................... 19

    C.    The Bank's Belief that Comdisco Had Shareholder Approval for the 1998 Option Plan Precludes Defendants' Illegality Defense Based on the Guaranty. .......................................................................................... 20

        1.    Section 29(b) Cannot Apply Because the Bank Did Not Act with Actual Knowledge of the Facts Giving Rise to the Alleged Violation. .................................................................................................. 20

        2.    The Bank Made a "Mistake in Good Faith" With Respect to a Key Fact and Therefore Could Not Have Violated Regulation U. .................. 23

III.   THE LAW AND EVIDENCE DO NOT SUPPORT DEFENDANTS' SECURITIES FRAUD AND MISREPRESENTATION DEFENSES. .......................... 23

A.     Defendants' Illegality Defense Based on Section 10(b) and Rule 10b-5 Fails. ...................................................................................................... 24

      1.     The Bank and Comdisco Did Not Act With Scienter. ............................ 24

      2.     The Bank Did Not Make Many of the Alleged False and Misleading Statements. ....................................................................... 26

      3.     The Alleged False and Misleading Statements Are Otherwise Not a Viable Basis for a Securities Fraud Defense. ........................................... 27

B.     Section 17(a) Does Not Provide a Basis to Avoid Repaying the Notes. ............ 30

C.     Defendants' Fraud and Misrepresentation in the Inducement Defenses Fail. ................................................................................................................... 32

      1.     Defendants' Common Law Inducement Defenses Suffer from the Same Infirmities as Their Securities Fraud Defenses. ........................... 33

      2.     Defendants Cannot Show the Bank Had the Requisite Level of Intent. ................................................................................................. 33

      3.     Defendants Cannot Show Causation and Injury. .................................. 34

      4.     Defendants Fail to Satisfy the Requirements for Rescission and Would, in Any Case, Be Required to Return the Principal. ................... 34

      5.     Defendants' Negligent Misrepresentation Defense is Barred by the Economic Loss Doctrine. ....................................................................... 35

IV.     EVEN IF THE COURT FINDS TECHNICAL ILLEGALITY, IT SHOULD STILL ENFORCE THE NOTES OR AWARD RESTITUTION. .................................. 37

A.     Under Federal Law, the Court May Enforce the Notes or Award Restitution Even If It Finds Technical Violations of the Margin Regulations. ...................................................................................................... 37

      1.     Illegality Does Not Preclude Enforcement if Non-Enforcement Would Produce a Sanction Disproportionate to the Wrong .................... 38

      2.     Even if the Court Determines Not to Enforce the Notes, It May Still Award Restitution or Other Equitable Relief. ................................. 39

B.     The Equitable Factors in this Case Support Enforcement (or at Least Restitution), Regardless of Any Alleged Technical Violations. .......................... 41

V.     THE LAW AND EVIDENCE DO NOT SUPPORT DEFENDANTS' PURPORTED CONTRACT DEFENSES. ...................................................................... 43

A.     Defendants' Excuse of Non-Performance Defense Fails. ...................................... 43

B.     Defendants' Lack of Consideration Defense Fails Because the Loan Funds Were Ample Consideration to Support Defendants' Repayment Obligations. ........................................................................................................ 45

C.     Defendants' Conditions Precedent Defense Fails Because Compliance with Federal Regulations Was Not a Condition Precedent to the Notes. ............ 45

VI.    PLAINTIFF'S DAMAGES ................................................................................. 46

    A.    The Court Should Reject the Alternative Measures of Damages Suggested by Defendants' Eleventh and Twelfth Affirmative Defenses. ............................ 46

        1.    Defendants' Purported "Subrogation" Defense Is Inapplicable. ............ 46

        2.    Defendants' "Payment" Defense Has Been Rejected (Twice) by the Circuit Court and Should Be Rejected Here. ..................................... 48

    B.    The Amounts of Principal and Interest Owed Under the Notes. ......................... 49

    C.    The Court Should Award Reasonable Attorneys' Fees and Costs in an Amount to be Determined through Subsequent Proceedings. ............................. 49

CONCLUSION ............................................................................................................... 50

## Table of Authorities

Page(s)

CASES

*3700 S. Kedzie Bldg. Corp. v. Chicago Steel Foundry Co.*,
    20 Ill. App. 2d 483 (1st Dist. 1959) ....................................................................33

*A.A. Conte v. Campbell-Lowrie-Lautermilch*,
    132 Ill. App. 3d 325 (1st Dist. 1985) ..................................................................45

*Aaron v. SEC*,
    446 U.S. 680 (1980).............................................................................................30

*Abbott-Interfast Corp. v. Harkabus*,
    250 Ill. App. 3d 13 (2d Dist. 1993).................................................................17, 19

*Affco Investments, LLC v. KPMG, LLP*,
    No. H-07-3379, 2009 U.S. Dist. LEXIS 89595 (S.D. Tex. Sept. 28, 2009)............28

*Alaska Interstate Co. v. McMillian, et al*,
    402 F. Supp. 532 (D. Del. 1975)..........................................................................10

*Am. Tank & Installation co. v. The Rudolph Wurlitzer Co.*,
    254 Ill. App. 514 (1st Dist. 1929) .......................................................................44

*Ambrosino v. Rodman & Renshaw, Inc.*,
    972 F.2d 776 (7th Cir. 1992) ...............................................................................24

*Amoco Oil Co. v. Toppert*,
    56 Ill. App. 3d 595 (1978) ...................................................................................38

*Ario v. Am. Patriot Ins. Agency, Inc.*,
    No. 05 C 1049, 2007 U.S. Dist. LEXIS 67012 (N.D. Ill. Sept. 7, 2007)...............35

*Bankers Life and Cas. Co. v. Bellanca Corp.*,
    288 F.2d 784 (7th Cir. 1961) ...............................................................................39

*Catholic Charities of the Archdiocese of Chicago v. Thorpe*,
    318 Ill. App. 3d 304 (1st Dist. 2000) ...................................................................45

*City of Aurora v. Green*,
    126 Ill. App. 3d 684 (2d Dist. 1984).....................................................................28

*Cooper v. Union Bank*,
    527 F.2d 762 (9th Cir. 1975) .................................................................................9

*Costello v. Grundon*,
    651 F.3d 614 (7th Cir. 2011) ...................................................................... passim

v

*Crop-Maker Soil Services, Inc. v. Fairmount State Bank*,
    881 F.2d 436 (7th Cir. 1989) ...................................................................................48

*Dearborn Maple Venture, LLC v. SCI Illinois Services, Inc.*,
    2012 IL App (1st) 103513 (1st Dist. 2012)...........................................................18

*Draney v. Wilson, Morton, Assaf & McElligott*,
    592 F. Supp. 9 (D. Ariz. 1984) ..............................................................................30

*Drasner v. Thomson McKinnon Securities, Inc.*,
    433 F. Supp. 485 (S.D.N.Y. 1977) ..........................................................................7

*Dvore v. Casmay*,
    No. 06-CV-3076, 2008 U.S. Dist. LEXIS 75104 (N.D. Ill. Sept. 29, 2008) ....................35, 36

*Eber Bros. Wine and Liquor Corp. v. Rare Spirits, Inc.*,
    864 N.Y.S. 2d 236 (N.Y. Sup. Ct. 2008) ..........................................................17, 38

*Eby v. Reb Realty, Inc.*,
    495 F. 2d 646 (9th Cir. 1974) ...........................................................................13, 14

*Franklin Cnty. Bldg. Ass'n v. Cravens*,
    285 Ill. App. 415 (4th Dist. 1936)...........................................................................19

*Freeman v. Marine Midland Bank New York*,
    419 F. Supp. 440 (E.D.N.Y. 1976) ....................................................................38, 39

*Frenkel v. Ragen*,
    257 Ill. App. 110 (1st Dist. 1930) ...........................................................................18

*Gavery v. Altheimer & Gray*,
    No. 95 C 2747, 1996 U.S. Dist. LEXIS 13240 (N.D. Ill. Sep. 10, 1996)..............................28

*Georgou v. Fritzshall*,
    178 F.3d 453 (7th Cir. 1999) ...................................................................................33

*Henderson v. Palmer*,
    71 Ill. 579 (Ill. 1874).............................................................................................45

*Howard v. SEC*,
    376 F.3d 1136 (D.D.C. 2004) ..................................................................................25

*Ill. State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*,
    355 Ill. App. 3d 156 (1st Dist. 2004) ......................................................................34

*In re E.F. Hutton Southwest Properties II, Ltd.*,
    953 F.2d 963 (5th Cir. 1992) ...................................................................................30

*Instituto De Prevision Militar v. Merrill Lynch & Co.*,
    No. 05-22721, 2007 U.S. Dist. LEXIS 72742 (S.D. Fla. Sept. 28, 2007) .........................24, 28

*InsureOne Indep. Ins. Agency, LLC v. Hallberg*,
    2012 IL App (1st) 092385 (1st Dist. 2013).............................................................44

*Int'l Profit Assocs. v. Bradley M. Griffin, Inc.*,
    2012 IL App (2d) 110434-U (2nd Dist. 2012).......................................................32

*Interstate Bankers Cas. Co. v. Hernandez*,
    2013 IL App (1st) 123035 (1st Dist. 2013)...........................................................20

*James v. Cadillac Co. (In re James)*,
    2010 Bankr. LEXIS 713 (N.D. Ill. Mar. 3, 2010)...................................................34

*Janus Capital Group v. First Deriv. Traders*,
    131 S. Ct. 2296 (2011) .................................................................................. passim

*Kelly v. Kosuga*,
    358 U.S. 516 (1959)..............................................................................................17, 37

*Kosuga v. Kelly*,
    257 F.2d 48 (7th Cir. 1958), *aff'd Kelly*, 358 U.S. 516 .......................................17

*Lasalle Bank Nat'l Ass'n v. Epstein*,
    No. 99 C 7820, 2001 U.S. Dist. LEXIS 12016 (N.D. Ill. Aug. 15, 2001)..............36

*Lyons v. Schanbacher*,
    316 Ill. 569 (1925) ................................................................................................45

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970)................................................................................................6

*Mollihan v. Stephany*,
    35 Ill. App. 3d 101 (1975) .....................................................................................34

*N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.*,
    799 F.2d 265 (7th Cir. 1986) ("*NIPSCO*") .................................................31, 38, 39

*Nagel v. ADM Investor Servs.*,
    217 F.3d 436 (7th Cir. 2000) ................................................................................38

*Nolan v. Sloan*,
    305 Ill. App. 71 (3d Dist. 1940).......................................................................18, 49

*Northwestern Corp. v. Gabriel Mfg. Co.*,
    No. 95 C 2004, 1996 U.S. Dist. LEXIS 19275 (N.D. Ill. Dec. 10, 1996) ..............24

*Occidental Life Ins. Co. of North Carolina v. Pat Ryan & Assoc., Inc.*,
   496 F.2d 1255 (4th Cir. 1974) ................................................................................38

*Olson v. Paine, Webber, Jackson & Curtis, Inc.*,
   806 F.2d 731 (7th Cir. 1986) .................................................................................38

*Palmer v. Thomson & McKinnon Auchincloss, Inc.*,
   474 F. Supp. 286 (D. Conn. 1979) .........................................................................18

*Pirelli Armstrong Tire Corp. v. Titan Tire Corp.*,
   4 F. Supp. 2d 786 (C.D. Ill. 1998) .........................................................................32

*Puskar v. Hughes*,
   179 Ill. App. 3d 522 (2d Dist. 1989).......................................................................35

*Real Estate Value Co. v. USAir, Inc.*,
   979 F. Supp. 731 (N.D. Ill. 1997) .....................................................................32, 34

*Regional Prop., Inc. v. Fin. and Real Estate Consulting Co.*,
   678 F.2d 552 (5th Cir. 1982) .................................................................................18

*Ronzani v. Sanofi S.A.*,
   899 F.2d 195 (2d Cir. 1990)...................................................................................30

*Rosenstein v. Standard & Poor's Corp.*,
   264 Ill. App. 3d 818 (1st Dist. 1993) ......................................................................32

*Rush-Presbyterian-St. Luke's Medical Center v. Hellenic Republic*,
   980 F.2d 449 (7th Cir. 1992) .............................................................................38, 39

*Scheiber v. Dolby Lab. Licens. Corp.*,
   293 F.3d 1014 (7th Cir. 2002) ...............................................................................39

*Schlifke v. Seafirst Corp.*,
   866 F.2d 935 (7th Cir. 1989) .......................................................................24, 30, 31

*SEC v. Holschuh*,
   694 F.2d 130 (7th Cir. 1981) .............................................................................30, 31

*SEC v. Stoker*,
   873 F. Supp. 2d 605 (S.D.N.Y. 2012).....................................................................31

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944)...................................................................................3, 12, 13

*Slomiak v. Bear Sterns & Co.*,
   597 F. Supp. 676 (S.D.N.Y 1984) ......................................................................7, 18

*Sola Elec. Co. v. Jefferson Elec. Co.*,
   317 U.S. 173 (1942) .............................................................................................38

*Steed Finance LDC v. Nomura Securities Int'l, Inc.*,
   No. 00 Civ. 8058, 2004 U.S. Dist. LEXIS 18580 (S.D.N.Y. Sept. 14, 2004) .........................25

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008) .............................................................................................26

*Tannebaum v. Clark*,
   No. 88 C 7312, 1993 U.S. Dist. LEXIS 4071 (N.D. Ill. Mar. 31, 1993) ................................29

*T-Bill Option Club v. Brown * Co. Sec. Corp.*,
   No. 88 C 8461, 1989 U.S. Dist. LEXIS 12839 (N.D. Ill. Oct. 25, 1989) ..............................44

*The Northern Trust Co. v. VIII South Michigan Assoc. Corp.*,
   276 Ill. App. 3d 355 (1st Dist. 1995) .....................................................................18

*Tolan & Son v. KLLM Architects*,
   308 Ill. App. 3d 18 (1st Dist. 1999) ......................................................................36

*U.S. v. Mead Corp.*,
   533 U.S. 218 (2001) .............................................................................................13

*Unicapital Funding Corp. v. Foxley*,
   2002 U.S. Dist. LEXIS 21239 (N.D. Ill. Oct. 31, 2002) .................................................33

*US Airways, Inc. v. McCutchen*,
   133 S. Ct. 1537 (2013) .........................................................................................20

**STATUTES**

15 U.S.C. § 77q(a) .................................................................................28, 30, 31, 50

15 U.S.C. § 78cc ...........................................................................6, 17, 21, 28, 23

15 U.S.C. § 78g .......................................................................................................18

**OTHER AUTHORITIES**

12 C.F.R. § 207.5 ...........................................................................................21, 42

12 C.F.R. § 221.2 ...............................................................................7, 9, 10, 12, 23

12 C.F.R. § 224.3 ....................................................................................................41

17 C.F.R 240.10b-5 .................................................................................................28

Fed. R. Civ. P. 9(b) ...........................................................................................24

Local Rule 16.1 ................................................................................................24

Restatement (Second) of Contracts § 178 (1981) .........................................39

Restatement (Second) of Contracts § 197 (1981) .........................................40

Restatement (Third) of Restitution § 32 (2011) ......................................39, 40

<u>**KEY TO CITATIONS AND ABBREVIATIONS**</u>

- <u>Citations to the Docketed Court Record</u>.  In virtually all instances, pleadings, motions, and other filings were docketed contemporaneously on the ECF system in each of the above-captioned cases.  Unless otherwise indicated, references to the case docket will refer to the filings in *Costello v. Poisella*, 05-cv-736, and appear herein in the form **(Dkt. 000)**.  Defendant's Answer and Affirmative Defenses to Corrected Second Amended Complaint is referenced by paragraph number with respect to background facts, and by defense number (with or without a paragraph number) with respect to affirmative defenses all in the forms **(Aff. Def. ¶ 00), (Aff. Def. No. 0),** or **(Aff. Def. No. 0, ¶ 0).**

- <u>Citations to the Trial Record</u>.  At the Court's direction, the parties submitted a Joint Summary of Trial Record and Testimony ("Joint Summary") summarizing the trial record and selected trial exhibits.  (Dkt. 355)  Because the Joint Summary provides a comprehensive summary, this brief does not contain a separate statement of facts.  Citations to the numbered paragraphs of the Joint Summary appear herein in the form **(JS 000)**.  Citations to volumes 1 and 2 of the Appendix to the Joint Summary appear herein in the form **(JS Appx. 1, Tab 00)** or **(JS Appx. 2, Tab 00)**.

- <u>Appendix to this Brief</u>.  The Trustee is concurrently filing an appendix containing unpublished authority and certain other materials referenced in this brief. Exhibits included in the appendix are referenced by exhibit number in the form **(Ex. 00)** or **Exhibit 00**.  In addition, there are two figures, referenced as **(Fig. 0)** or **Figure 0**, attached to this brief.

- <u>References to 1998 Statutes and Regulations</u>.  Unless otherwise indicated, references to the following regulations and statutes are to the versions in effect in February 1998:  Regulation G (12 C.F.R. § 207) (Ex. 1); Regulation U (12 C.F.R. § 221) (Ex. 2); Regulation X (12

C.F.R. § 224) (Ex. 3); section 7 of the Exchange Act of 1934 (15 U.S.C. § 78g) (Ex. 4);

section 10 of the Exchange Act (15 U.S.C. § 78j) (Ex. 5); Rule 10b-5 (17 C.F.R. § 240.10b-

5) (Ex. 6); section 29 of the Exchange Act (15 U.S.C. § 78cc) (Ex. 7); section 17 of the

Securities Act of 1933 (15 U.S.C. § 77q) (Ex. 8).

- <u>References to SIP Program Documents</u>.  Comdisco's Shared Investment Plan is referred to herein as the "**SIP**."  SIP program participants' notes are referred to herein as the "**Notes**." The Facility and Guaranty Agreement, dated February 2, 1998, is referred to herein as the "**Facility Agreement**."  Comdisco's guaranty of the SIP loans under the Facility Agreement is referred to as the "**Guaranty**."

- <u>References to the Parties</u>.  Plaintiff John W. Costello, not individually, but as Litigation Trustee under the Comdisco Litigation Trust, is referred to as the "**Trustee**."  Defendants Mike J. Poisella, Roman Brunner, Joseph J. Scozzafava, and Gregory A. Weiss are collectively referred to as "**Defendants**."

**INTRODUCTION**

In February 1998, Defendants and approximately 100 other top-level executives and managers at Comdisco decided to participate in the company's SIP, which offered the opportunity to purchase Comdisco stock with the purchase price to be financed by company-guaranteed loans. Because one of the purposes of the SIP was to incentivize top management by giving them "skin in the game," the loans were full recourse. If the SIP participants made the company successful, they could potentially reap significant profits from the stock price increases—as ten SIP participants who exited the program before 2001 ultimately did. If Comdisco's stock price dropped, the SIP participants would lose their own money. The terms of the SIP program – including participants' personal liability – were fully disclosed to participants in a comprehensive SIP binder and further explained and discussed during two days of meetings and question and answer sessions.

Regrettably, the stock lost nearly all of its value after Comdisco filed for bankruptcy in July 2002. Following the bankruptcy filing, the Bank sought to recover the amounts owing under the Guaranty. Comdisco and the Bank settled the Bank's Guaranty claim in late-2004 for $126,350,000. As part of the settlement, the Bank assigned the SIP participants' Notes, including the Defendants' Notes, to the court-appointed Trustee for collection on behalf of Comdisco's C-4 unsecured creditors. The Trustee brought Note collection actions against Defendants and approximately 60 other SIP participants in February 2005, in this Court and in the Circuit Court of Cook County.

Although they never complained about margin regulations when Comdisco's stock price was increasing, Defendants now argue that their Note obligations should be excused because the Bank's loans and Comdisco's Guaranty were "directly or indirectly" secured by the SIP stock and therefore, in Defendants' view, violated the Federal Reserve Board's Regulations G and U.

Defendants further argue that the Notes and Guaranty are unenforceable because the Bank and Comdisco misleadingly represented that the SIP program complied with the margin regulations.

After seven days of trial testimony, this Court now has a full trial record, which supports the conclusions reached when summary judgment was granted in favor of the Trustee in 2008. As in 2008, it is beyond dispute that Defendants signed their Notes, the loans were made, the proceeds were disbursed to Comdisco at Defendants' direction, and Comdisco issued common stock for the benefit of Defendants. The trial further demonstrated that none of Defendants' affirmative defenses can be sustained. In particular, the evidence demonstrated the following:

1.      **The Notes were not directly or indirectly secured by the SIP stock**. The Bank had no rights to the SIP stock in the event of default and no right to enforce the "restrictions" Comdisco imposed on the stock. Furthermore, the Bank underwrote, approved and priced the loans based entirely on Comdisco's investment-grade, BBB+ credit rating. Because the Bank relied solely on its guarantor's independent ability to pay the Guaranty ***without resorting to the stock***, the Bank's loans fall under the "good faith non-reliance" exclusion from the definition of "indirectly secured" in Regulation U. Accordingly, the Notes were neither directly or indirectly secured by the stock, and the Bank could lend 100 percent of the stock's value without violating the margin regulations.

2.      **The Notes and Guaranty are separate instruments**. Because the Trustee is only seeking to enforce the Notes in these cases, Defendants cannot avoid their obligations by claiming the ***Guaranty*** violated the margin regulations.

3.      **There is no evidence Bank or Comdisco personnel knew of a violation**. The testimony at trial unequivocally demonstrated that no one at the Bank or Comdisco knew or believed in February 1998 that the SIP program violated the margin regulations. In addition, the

evidence showed that the Bank and Comdisco both retained reputable law firms to advise them with respect to the SIP transaction. The Bank relied on its counsel, Winston & Strawn ("Winston"), to address compliance issues and obtained a formal opinion from Comdisco's counsel, McBride, Baker & Coles ("McBride"), certifying that the transaction complied. For its part, Comdisco received advice from McBride that the transaction would not violate the margin regulations.

4. **McBride obtained concurrence from the Federal Reserve Bank of Chicago ("FRBC") that the loans would comply**. To confirm its conclusion that the SIP program would not run afoul of the margin regulations, McBride obtained a written concurrence from the FRBC (the "FRBC Letter") that the loans were not directly or indirectly secured by the SIP stock. The evidence at trial demonstrated that Federal Reserve banks act as regional offices of the Federal Reserve Board in responding to bank and attorney inquiries, and that the FRBC Letter reflects the analyses of two Federal Reserve Board Staff attorneys, one of whom was the Board Staff's foremost authority on the margin regulations. The FRBC Letter is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), because it was the product of experienced, reasoned and informed judgment from both the FRBC and Board Staff attorneys.

5. **The Bank went forward with the SIP transaction based on a mistaken belief that Comdisco had obtained shareholder approval**. The Bank's lead counsel, Greg Murray, testified that he believed—based on representations in the Facility Agreement—that Comdisco had obtained shareholder approval and therefore gave its Guaranty under the "plan lender" exception to the margin regulations. If Comdisco had obtained shareholder approval, the Guaranty would have been exempt from the 50 percent limit. Because of Murray's mistaken belief of fact, the Guaranty is subject to section 29(c)'s safe harbor for innocent violations and

falls within the "good faith mistake" exception in the margin regulations. Thus, not only is the Guaranty not a basis to invalidate the Notes, but it is not subject to a section 7(d) defense at all.

6. **Defendants' fraud and misrepresentation allegations suffer from a myriad of deficiencies**. Among other things, the evidence at trial demonstrated that: (i) the Bank and Comdisco lacked the requisite scienter for fraud claims; (ii) nearly all of the alleged misrepresentations are attributable to Comdisco, not the Bank, and therefore cannot be the basis for defenses to the Bank's Notes; (iii) the specific statements alleged in Defendants' affirmative defenses are either not material, not false, not statements of fact, or not made until after the SIP closed; (iv) Defendants have not shown negligence by Bank personnel, who relied on advice of counsel to ensure compliance; and (v) the Bank was not in the business of supplying information and therefore cannot be subject to a negligent misrepresentation defense.

7. **The equities in this case favor enforcement (or at least restitution), even if the Notes violated the margin regulations**. A statutory or regulatory violation does not automatically preclude enforcement. If the Notes are illegal, the Court must balance the public interest that would be served by non-enforcement against the forfeiture the Trustee would suffer if the Court invalidated the Notes. Here, that balance overwhelmingly favors enforcement, or at least restitution. The Federal Reserve Board concluded before 1998 that the margin regulations no longer serve their original purpose, and the Board Staff's leading margin regulation expert concluded this very transaction complied. Furthermore, there is no evidence of intentional wrongdoing, and the Trustee would suffer a substantial forfeiture if the Notes were invalidated.

8. **Defendants' three "contract defenses" are illegality defenses in disguise**. Defendants seek to use these defenses to avoid the requirements and limitations of federal law illegality defenses, which (among other things) place the burden of proof on defendants and

4

determine the appropriate remedy for illegality based on equitable balancing. Defendants cannot avoid these well-established rules by framing their illegality defenses as novel contract defenses, and in any event have failed to establish a predicate for these defenses.

9.     **The Bank assigned the Notes to the Trustee with bankruptcy court approval**. Accordingly, the Trustee is entitled to enforce the Notes, rather than pursue a subrogation theory. Moreover, as the Cook County Circuit Court previously held, the Notes and Guaranty are separate obligations, and settlement of the Bank's Guaranty claim did not "pay" off the Notes.

For these reasons, and as demonstrated more fully below, the Court should enter judgment in favor of the Trustee and order Defendants to pay the full amounts due on their Notes, plus reasonable attorneys' fees and costs of collection.

## ARGUMENT

## I.     THE TRUSTEE HAS ESTABLISHED HIS *PRIMA FACIE* CASE.

In granting summary judgment in 2008, the Court ruled that the Trustee had established his *prima facie* case for enforcement of the Notes by showing that Defendants:

> executed their respective SIP notes; they directed that the proceeds of the loans be paid directly to Comdisco; Comdisco received those proceeds; shares were issued to defendants but held by Comdisco's transfer agent on defendants' behalf; and the notes have not been paid.

(9/24/08 Mem. Op. & Order at 5-6 (Dkt. 57) (Ex. 9).)[1]  Defendants successfully appealed other aspects of the Court's summary judgment ruling. But they never challenged the Court's ruling with respect to the *prima facie* case, and the Seventh Circuit did not address that ruling.

Defendants have no valid basis to ask the Court to reconsider its prior ruling now, as the trial testimony confirmed the Court's findings on summary judgment. Defendants executed their

---

[1] Judge Winkler in the corresponding Cook County Circuit Court cases also found that the Trustee has established his *prima facie* case. (6/15/10 Mem. Op. & Order at 5 (Ex. 10).)  Judge Tailor granted the state court defendants' motion to reconsider Judge Winkler's summary judgment ruling with respect to certain defenses (based on the *Grundon* opinion) but not with respect to the *prima facie* case.  (5/17/12 Order (Ex. 11).)

respective SIP Notes in consideration for those loans. (JS 479, 484) The Bank fulfilled its obligations by making loans, the proceeds of which, pursuant to Defendants' directions, were paid directly to Comdisco in payment for the shares. (JS 494, 831) SIP shares were issued to Defendants, and held by Comdisco's transfer agent on their behalf. (JS 532, 535, 831) Defendants did not repay the loans. (JS 1122- 1123, 1130-1138) Defendants now seek to re-cast their "excuse of non-performance" affirmative defenses as a defect in the Trustee's *prima facie* case. But, as discussed below (§ V.A), this is an improper effort to evade the limitations of illegality defenses by pretending the Trustee must prove compliance with every single law and regulation as part of his *prima facie* case. The law does not support this novel theory. As this Court correctly observed, "all elements of plaintiff's claim have been undeniably established and, absent a viable affirmative defense . . . plaintiff is entitled to judgment." (Ex. 9 at 5-6)

## II. THE LAW AND EVIDENCE DO NOT SUPPORT DEFENDANTS' SECTION 7(d) ILLEGALITY DEFENSE.

Defendants' First Affirmative Defense is based on alleged "extending," "arranging" and "purpose statement" violations of Regulations G and U. A chart showing the five specific violations claimed is attached as **Figure 1**. Defendants argue that these alleged violations excuse their repayment obligations under section 29(b) of the Exchange Act, which makes voidable at the option of an "unwilling innocent party" a contract made or performed in violation of the Exchange Act or its regulations. 15 U.S.C. § 78cc(b)(2); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 387-88 (1970). Defendants have not carried their burden of proving that the Notes violate the margin regulations. In fact, the trial record affirmatively demonstrates the opposite.

### A. The Notes Did Not Violate the Margin Regulations.

The Trustee is suing to collect the Notes. Section 29(b) therefore requires Defendants to prove that the ***Notes***—as opposed to the Guaranty—violated the margin regulations. 15 U.S.C.

§78cc(b)(2) (providing for voidability of "[e]very **contract**" made or performed in violation of Act or regulation (emphasis added)); *Drasner v. Thomson McKinnon Securities, Inc.*, 433 F. Supp. 485, 501-02 (S.D.N.Y. 1977) (section 29(b) "only renders void those contracts which by their terms violate the Act or the rules and regulations thereunder"); *Slomiak v. Bear Sterns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y 1984) (same). Defendants have failed to carry their burden because: (i) the Notes were not directly or indirectly secured by the SIP shares; and (ii) the FRBC Letter, which reaches the same conclusion, is entitled to deference.

    **1. The Bank Had No Direct or Indirect Security Interest in the Stock.**

    Under Regulation U, the Bank was not permitted to extend purpose credit in excess of the "maximum loan value" of the SIP stock (50 percent of the market value) if the credit was "secured directly or indirectly" by the stock. 12 C.F.R. §§ 221.3(a), 221.8. The evidence at trial demonstrated that the Notes were not directly or indirectly secured for two reasons:

      **a. The Bank Had No Direct Security Interest in the Stock and Could Not Enforce Any of the Purported "Restrictions."**

    There is no evidence the Bank had a **direct** security interest in the SIP stock: Participants did not pledge the stock, and the Bank had no right to the stock in the event of default. (JS 314-315, 511, 569) *See also Costello v. Grundon*, 651 F.3d 614, 633 (7th Cir. 2011) (direct security is a non-issue for the notes). Defendants contend instead that the loans were secured "indirectly." Under Regulation U, indirect security includes any arrangement under which "[t]he customer's right or ability to sell, pledge, or otherwise dispose of margin stock owned by the customer is in any way restricted while the credit remains outstanding." 12 C.F.R. § 221.2(g)(1)(i). Defendants argue that the loans fall within that definition because there were certain "restrictions" on the stock—e.g. the prohibition on sales during the first year, the right of first refusal, the requirement that proceeds from sales be used to repay the loans, and the profit

sharing requirements.  (*See* JS 554, 556.)  But the evidence at trial showed that the Bank issued

the loans based solely on Comdisco's guaranty (JS 313-315), and the purported "restrictions"

were imposed for Comdisco's benefit and were only enforceable by Comdisco.

For instance, Scott Harvey, Comdisco's principal in-house attorney responsible for the

SIP, testified that various restrictions in the SIP were enacted to protect specific business

interests of Comdisco.  (JS 229, 559, 563)  As examples:

- The provision limiting sales of the SIP shares during the first year was designed to prevent a mass exodus from the SIP program that could put downward pressure on Comdisco's share price.  (JS 559)

- Comdisco's right of first refusal and its ability to impose restrictions on the timing, amount and form of sale were implemented to address issues of insider trading, potential acquisitions of or by the company, and maintenance of Comdisco's share price.  (JS 563)

- The profit sharing requirements were designed to incentivize the SIP participants to stay with the company and maintain their shares.  (JS 229)

The requirement in section 7(b) of the SIP that proceeds from sale of the SIP shares be used to

pay off the Notes likewise protected Comdisco, because Comdisco would be liable on its

Guaranty if a participant sold stock without repaying his or her loan.  (JS 508, 554)

More importantly, the purported "restrictions" arose (if at all) from the provisions of the

SIP, the stock powers, and other terms between Comdisco and participants, and not from the

Notes or Facility Agreement.  (*See* JS 554, Appx. 2, Tab 11, 12)  ***None of these purported***

***restrictions was enforceable by the Bank***.  Indeed, the very existence of the restrictions on the

SIP shares was entirely under Comdisco's control.  The Facility Agreement expressly states that

Comdisco had the right, at its "***sole discretion***," to amend, supplement, restate or otherwise

modify the SIP at any time.  (JS Appx. Vol 2, Tab 11 at 9 (emphasis added).)

Under these circumstances, the existence of "restrictions" in favor of Comdisco does

not, in itself, create an indirect security interest in the Bank.  *See* FRRS 5-908.1 (Ex. 12) (loan

was not indirectly secured by stock where bank loaned money to employee stock option plan, company guaranteed bank loan, bank relied upon guarantee and provisions of note, and note did not contain any restrictions on stock).  The Regulation U definition of "indirectly secured" refers to stock being "in any way restricted," but that language was drafted to address two-party credit transactions, where a lender extends credit to a borrower who uses that money to purchase margin stock.  In two-party transactions, a restriction on the margin stock that is co-extensive with the term of the loan likely "serves to protect the interest of the bank," resulting in indirect security, because it makes the stock more readily available as security to the lending bank and increases the bank's likelihood of repayment.  *See* 12 C.F.R. § 221.113(e) (indirect security contemplates "any arrangement under which the stock is more readily available as security to the lending bank"), 113(f).  But where, as here, the bank relies on a guarantor, and the restrictions are enforceable by the guarantor and designed to protect the guarantor's business interests (including reimbursement if it pays on the Guaranty), "restrictions" the bank cannot enforce do not make the stock more readily available to the bank and do not equate to "indirect security."[2]

Recognizing this distinction, Scott Holz, the Federal Reserve Board's leading expert on Regulation U, concluded that the Notes were not indirectly secured by the SIP shares because none of the plan documents gave **the Bank** any rights in the SIP shares in the event of default. (JS 380-381, 391)  Holz's conclusion is consistent with case law and correctly interpreted the reality of the three-party transaction here.  *See Cooper v. Union Bank*, 527 F.2d 762, 765 (9th Cir. 1975) (loan not indirectly secured where stock was pledged to and in the possession of a

---

[2] Furthermore, for a "restriction" to result in an indirect security, Regulation U requires that it be temporally tied to the credit remaining outstanding.  12 C.F.R. § 221.2(g)(1)(i) (definition of "indirectly secured" refers to restrictions "while the credit remains outstanding").  With the possible exception of the requirement that proceeds from a sale be used to repay the loans, none of the "restrictions" here are temporally tied to continued existence of the Bank loans. And even in the case of the repayment requirement, Comdisco had the right at any time to modify, delete or make exceptions to that requirement.

third-party guarantor, but the note did not provide bank with access to the margin stock).

### b. The Bank, in Good Faith, Did Not Rely on the SIP Shares as Collateral for the Notes.

Regulation U's definition of "indirectly secured" also specifically *excludes* arrangements where "[t]he bank, in good faith, has not relied upon the margin stock as collateral in extending or maintaining the particular credit." 12 C.F.R. § 221.2(g)(2)(iv). Where a bank demonstrates good faith non-reliance, the credit extended is not indirectly secured, regardless of whether the borrower's ability to dispose of the stock is be restricted in some way. *See Alaska Interstate Co. v. McMillian, et al*, 402 F. Supp. 532, 560-561 (D. Del. 1975) (good faith non-reliance is the "touchstone" in evaluating indirect security for arrangements alleged to be indirectly secured "solely because of restrictions on the borrower's right to alienate his assets").

In remanding these cases, the Seventh Circuit concluded that the summary judgment record disclosed "genuine issues of material fact as to whether the Bank satisfied" the criteria for good faith non-reliance. *Grundon*, 651 F.3d at 630. The trial record has resolved these questions resoundingly in the Trustee's favor. Dan Clarke, the Bank's relationship manager for the SIP, reviewed exhibits and described in detail how the underwriting and pricing for the loans worked. Clark's unrebutted testimony was that the Bank underwrote and priced the loans solely based upon Comdisco's promise to provide an unconditional guaranty. (JS 311-315) In doing so, the Bank thoroughly vetted Comdisco's financial condition. (JS 309-315, 461-468) The credit approval and underwriting process treated the aggregate amount of the SIP loan as unsecured credit and did not take into account the value of the SIP shares or any other collateral. (JS 314-315) Instead, the Bank focused on Comdisco's existing $300 million credit facility with Citibank and on whether the company's credit rating would support the loans. (JS 310, 463)

Comdisco's credit rating was particularly important because it formed the basis for

pricing the loan syndication. (JS 310) In June 1997, when the Bank performed its initial underwriting, and then again in January 1998, Comdisco had earned a BBB+ credit rating from S&P, which was a high quality, investment grade rating. (JS 309, 311, 468) This rating resulted from Comdisco's historic year leading up to implementation of the SIP, during which the company reported record revenues, earnings, equipment volume and cash flow from its operating activities and was actively buying back its outstanding common stock. (JS 335, 340) At the conclusion of the fiscal quarter ending in December 31, 1997, just weeks before the SIP was implemented, Comdisco reported assets of approximately $6.5 billion, stockholder equity of $827 million, and access to credit lines of $1.6 billion, of which $729 million was unused as of September 1997. (JS 337-338) All of this demonstrated that Comdisco had more than sufficient resources to cover the Guaranty without resorting to liquidation of the SIP shares.

In noting that good faith non-reliance presented disputed issues of fact, *Grundon* asked (i) whether the evidence shows that Bank relied upon both Comdisco's Guaranty and the SIP shares for repayment, and (ii) whether the evidence supports a reasonable inference that "the Bank indirectly relied on the stock as collateral for the loans" because "[t]he Bank relied on Comdisco's guaranty, which one could reasonably find was secured by the stock." 615 F.3d at 634. The unrebutted evidence regarding the Bank's underwriting process and Comdisco's financial position squarely responds to both of these questions. The Bank did ***not*** rely on both the Guaranty and the stock; the Bank relied ***solely*** on the Guaranty in approving and pricing the loans. Furthermore, the evidence made clear that the Bank was not relying on Comdisco's alleged indirect security interest in the shares to ensure payment. Rather, as discussed above, the Bank's underwriting was based on the fact that Comdisco was a very large company, with investment grade credit ratings and access to funds far in excess of the amount of the Guaranteed

loans. The credit ratings (which were done before the SIP closed or became public knowledge) and the Bank's analysis did not take into account Comdisco's alleged access to the SIP shares.

Finally, as *Grundon*, 651 F.3d at 630, observed, the Federal Reserve Board stated that "some indication" of good faith non-reliance is whether a bank "obtained a reasonably current financial statement of the borrower and this statement could reasonably support the loan." 12 C.F.R. § 221.117(b)(1). The rationale for this is significant: a lender may demonstrate good faith non-reliance by showing that it examined the borrower's financial ability to repay the loan and granted the loan on terms supported by the financial statement, independent of the margin stock. Defendants suggest that this factor cuts against good faith non-reliance because the Bank did not focus on ***Defendants'*** financial statements. But this argument once again ignores that the SIP program was a three-party transaction, where the Bank approved and priced the loans based on the ***guarantor's*** credit. The unrebutted evidence demonstrates that the Bank took a thorough look at Comdisco's financial statements and approved the loans as unsecured. (JS 309-315)

> ## 2.     The Court Should Give Deference to the FRBC's Opinion Letter.

Before issuing its opinion that the SIP transaction would not violate the margin regulations, McBride sought and obtained a concurrence from the FRBC that it "does not constitute a loan secured 'directly or indirectly' by the purchased stock as contemplated by Regulations G and U." (JS 345, 401, 403) When it granted summary judgment, this Court accorded the FRBC Letter "substantial weight" in reaching its conclusion that the Notes did not violate Regulation U. (Ex. 9 at 11) Citing the Supreme Court's decision in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), the Seventh Circuit remanded the deference issue, holding that the FRBC Letter provides "some indication that the regulations were not violated," and charged this Court with assessing "how much deference, if any, is due." *Grundon*, 651 F.3d at 632-33.

Under *Skidmore*, an agency's interpretation of a rule or regulation, "whatever its form," is

entitled to a level of deference due to the "'specialized experience and broader investigations and information' available to the agency … and … the value of uniformity in its administrative and judicial understandings of what a national law requires." *U.S. v. Mead Corp.*, 533 U.S. 218, 234-235 (2001) (quoting *Skidmore*). The degree of deference accorded to "less formal" agency interpretations depends on a number of factors, including "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. Courts have applied *Skidmore* to accord deference to informal opinion letters from Federal Reserve Board Staff attorneys, observing that such letters "represent an 'experience(d) and informed judgment to which courts … may properly resort for guidance.'" *See Eby v. Reb Realty, Inc.*, 495 F. 2d 646, 650 (9th Cir. 1974). The evidence presented at trial demonstrates that the FRBC Letter was the result of "experienced and informed judgment," of FRBC and Board Staff attorneys, to which this Court may properly resort for guidance.

### a. The FRBC Letter Reflects the Conclusions of Margin Regulations Experts from the Federal Reserve Board Staff.

The Federal Reserve Board and its Staff have empowered regional reserve banks to offer interpretations of Board regulations, with the expectation that regional banks will follow existing Federal Reserve interpretations and communicate with Board staff on more complex matters of interpretation. (JS 55, 63, 65, 67, 71, 73, 77, 79, 83-84, 86, 88, 97, 98) For their part, regional Federal Reserve banks expect that inquiring parties will rely on their advice so they take care to ensure their advice is correct and consistent with the positions of the Board. (JS 98, 105) In 1998, the FRBC's custom and practice in responding to requests for guidance was to review the regulation in question, review the Federal Reserve Regulatory Service ("FRRS") and any internal letters for relevant precedent, consult with Board staff attorneys, and ensure that

interpretations offered were consistent with existing Board interpretations.  (JS 71-74, 77, 79-80)

The FRBC Letter's author, Brent McCauley, followed the FRBC's customs and practice in drafting the FRBC Letter.  (JS 61, 70)  The FRBC Letter states that "[t]he legal staff of the Board of Governors has been consulted about the facts set forth" in the Hale Letter and that "[t]he staff members consulted have concurred" in the opinion.  (JS 403)  The Federal Reserve Board Staff attorneys consulted were Oliver Ireland and Scott Holz; Holz was considered to be the Board Staff's foremost Regulation U expert.  (JS 77, 80, 100-103)  Notes on the bottom of the FRBC's copy of the Hale Letter reflect Ireland's and Holz's conclusions regarding whether the Notes indirectly secured the SIP shares:

> Ollie said it was okay because the bank is relying on the guarantee of the company, not pledge of shares.  S. Holz agrees unless the documents, note, or facility agreement establishes any rights in the shares in the event of default.

(JS 380-381, 394)  Ireland's conclusion that the Bank had satisfied the good faith non-reliance exception by relying upon Comdisco's guarantee is reflected in the fourth paragraph of the FRBC Letter.  (JS 403)  Holz's conclusion that the Notes would not be indirectly secured by the SIP shares so long as the Note, Facility Agreement or other SIP documents did not establish any rights in the SIP shares in the event of default is reflected in the third paragraph of the FRBC Letter.  (JS 403)  Because the FRBC letter reflects the experienced judgment, reasoning and conclusions of the Board's Staff attorneys, including its Regulation U expert, this Court may rely upon it for guidance.  *Eby*, 495 F.2d at 650.

### b.  The Hale Letter Adequately Described the SIP Transactions.

For the reasons discussed above (§ II.A), FRBC Letter's conclusion that the Notes were not indirectly secured by the SIP shares is correct.  Defendants respond that the FRBC Letter's reasoning is flawed because the Hale Letter, in Defendants' view, did not disclose every aspect

of the SIP. But the evidence at trial does not support this argument for several reasons:

First, the Trustee's expert, Bradley K. Sabel, opined that the Hale Letter provided a level of detail regarding the proposed transaction that was adequate and customary for an attorney seeking guidance from a regional federal reserve bank. (JS 348-351) Sabel further testified that he saw no issues with the restrictions that the Hale Letter omitted, as most of these restrictions were either very general, not significant in light of other restrictions, or included in the SIP to serve business interests unrelated to the margin regulations. Even if they had been disclosed, they would not have impacted the analysis of indirect security for the Notes. (JS 357-379)

Second, as discussed above (§ II.A.1.a), the omitted restrictions (the right of first refusal, Comdisco's ability to impose certain restrictions on sale of the SIP shares, and the profit sharing provision) are not enforceable by the Bank and do not protect the Bank's interests. Thus, regardless of whether these restrictions are important to whether the *Guaranty* was indirectly secured, they would not have altered the FRBC letter's conclusion regarding the *Notes*.

Third, the omission of certain restrictions from the Hale Letter does not mean the FRBC was never informed of those provisions. It was customary for attorneys seeking guidance from a regional reserve bank to provide a more detailed verbal preview of the proposed transaction than what was provided in a subsequent letter. (JS 92) Here, the record shows that McBride had at least two conversations with the FRBC before receiving the Hale Letter. (JS 263-267, 349)

### c. Other Considerations Favor Deference to the FRBC Letter.

Finally, several other considerations favor deference to the FRBC letter. First, the FRBC letter reflects the Federal Reserve Board's approach to the margin regulations in 1998, and the Court should defer to that approach. The margin regulations were created as part of the response to the Depression and stock market crash of 1929. (JS 143) By 1984, following significant changes in the global financial and credit system, the Federal Reserve Board had concluded that

the margin regulations were not serving their original purpose. (JS 146-147) By the mid-1990s, the Federal Reserve Board's approach to the margin regulations was to continue to enforce them, but to make sure that these regulations were not an impediment to transactions. (JS 147) The Federal Reserve Board Staff instructed regional reserve banks reviewing transactions for compliance to err on the side of liberality. (JS 147) Against this backdrop, the FRBC's ultimate conclusion regarding the Notes, with which the Board Staff agreed, was in line with the Federal Reserve Board's broader position on the margin regulations. That view is entitled to deference.

Second, the FRBC prepared its letter after consultation with the Federal Reserve Board's leading experts on Regulation U, and the letter reflects Board Staff reasoning. The fact that the letter was not formally published in the FRRS does not diminish its authoritativeness because the decision on whether to publish staff interpretations is based on the importance or novelty of the interpretation, not on whether it is authoritative. (JS 111, 115) Furthermore, the evidence shows that the FRBC Letter was circulated to the FRBC legal department and filed in its Visual Memory System, indicating that the document was included in the FRBC's precedent repository to be consulted in the future; the FRBNY followed a similar practice. (JS 79, 116-117, 410-411)

Third, the concept of "indirect security" in Regulations G and U presents complex legal issues on which there is sparse precedent. (JS 118, 127) While there are Board or Board Staff interpretations opining on unrelated transactions, there is only one interpretation reflecting the Board Staff's analysis of the unique features of *this particular SIP program*. That is the FRBC Letter. As this Court's summary judgment opinion recognized, it is significant that the FRBC in consultation with Board Staff has already weighed in on this very transaction. The Court can and should give deference to its conclusion that the Notes are not directly or indirectly secured by the stock.

**B.** **Any Illegality in Making or Performing Comdisco's *Guaranty* Would Not Impair the Enforceability of the *Notes*.**

These lawsuits seek only to enforce the *Notes*. They do not seek to enforce Comdisco's separate *Guaranty*, settled a decade ago. Thus, even if the making or performance of the Guaranty violated the margin regulations (which the Trustee does not concede), that violation would not be a defense to enforcement of the Notes.

**1.** **The Notes and Guaranty Are Separate Contracts.**

Defendants suggest that a Guaranty violation could infect the Notes because all of the contracts were part of the same SIP program. But illegality defenses do not apply so broadly. To the contrary, the Supreme Court has long stressed "the overriding general policy of preventing people from getting other people's property for nothing when they purport to be buying it." *Kelly v. Kosuga*, 358 U.S. 516, 520-521 (1959). Under this rationale, federal courts enforce legal obligations when they are severable from illegal obligations, ***even within the same contract***. *See Kosuga v. Kelly*, 257 F.2d 48, 54 (7th Cir. 1958), *aff'd Kelly*, 358 U.S. 516 (dividing contract between legal and illegal portions and enforcing promise to pay as legal portion); *Abbott-Interfast Corp. v. Harkabus*, 250 Ill. App. 3d 13, 21 (2d Dist. 1993) (trial court has discretion to sever unenforceable provisions from a contract); *Eber Bros. Wine and Liquor Corp. v. Rare Spirits, Inc.*, 864 N.Y.S. 2d 236, 243 (N.Y. Sup. Ct. 2008)(Ex. 13)(where promisee gives lawful consideration for one legal and one illegal promise, "enforcement of the legal promise may be permitted").

Here, Defendants seek to void the Notes under section 29(b). But the plain language of that section provides for the voidability of "[e]very *contract*" made or performed in violation of the Exchange Act or regulations under that Act. 15 U.S.C. § 78cc(b) (emphasis added). This language does ***not*** provide a basis to void legal Notes merely because they are part of the same

overall SIP program as the allegedly illegal Guaranty. *See Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 474 F. Supp. 286, 291 (D. Conn. 1979) (section 29(b) "authorizes rescission of unlawful contracts, not unlawful transactions that were consummated under lawful agreements"); *see also Slomiak,* 597 F. Supp. at 682; *Regional Prop., Inc. v. Fin. and Real Estate Consulting Co.*, 678 F.2d 552, 560 (5th Cir. 1982) (rendering voidable "those **contracts** that are either illegal when made or as in fact performed" (emphasis added)).

There is no basis to argue that the Notes and the Guaranty are the same contract. Rather, each of the Notes was a stand-alone contract, evidencing obligations between the Bank and the SIP participant, signed by the SIP participants on or about February 10, 1998. (JS 479) The Guaranty was a separate contract document signed a week earlier, on or about February 2, 1998, which memorialized the different obligations between the Bank and Comdisco. (JS 495) Comdisco was not a party to the Notes, and the SIP participants were not parties to the Guaranty.[3] (JS 479, 495, Appx. 2 at Tab 11, 12); *see Dearborn Maple Venture, LLC v. SCI Illinois Services, Inc.*, 2012 IL App (1st) 103513 at ¶¶ 31-32 (1st Dist. 2012) (contracts executed as part of same transaction were separate contracts where executed for different purposes).

Moreover, Illinois courts have held that a guaranty and a corresponding guaranteed note represent "separate and distinct" liabilities, *Nolan v. Sloan*, 305 Ill. App. 71, 75 (3d Dist. 1940), and that "[t]he undertaking of the guarantor … is [a] separate and independent contract, distinct from that of the principal debtor." *Frenkel v. Ragen*, 257 Ill. App. 110, 115 (1st Dist. 1930); *see also The Northern Trust Co. v. VIII South Michigan Assoc. Corp.*, 276 Ill. App. 3d 355, 369 (1st

---

[3] The Notes refer to the Facility and Guaranty Agreement, but only for the limited purpose of adopting the definitions and incorporating the conditions under which a "Program Event of Default" occurs. (JS 489, JS Appx. Vol 2, Tab 11, § 6.) In the Notes, Defendants consented to be governed by the Facility Agreement only "to the extent the terms thereof are applicable to the Loan evidenced hereby." (JS 491) The terms of the Guaranty (§ 7) are not applicable to the loans, and therefore are not binding on Defendants. For example, Defendants did not agree to guarantee or be liable for one another's obligations.

Dist. 1995) (action against a guarantor of a note is separate from one against principal debtor). For that reason, the Circuit Court has held twice in the parallel state court SIP litigation that the Guaranty and Notes are separate and distinct contracts. (*See* Ex. 10 at 7 ("The guaranty of these loans by Comdisco is an entirely separate and distinct contract"); Ex. 11 at 6 (the Guaranty is "a separate agreement" from the Notes).)

Finally, the parties expressed a clear intent that the remainder of their mutual obligations would remain enforceable even if some term is deemed illegal. Each Note contains a severability provision stating that "[a]ny provision in this Note that is held to be … unenforceable, or invalid … shall be … unenforceable, or invalid without affecting the remaining provisions, … and to this end the provisions of this Note are declared to be severable." (JS 493) The Guaranty contains a similar provision for any portion of the Guaranty or the Notes that is determined to be unenforceable or invalid. (JS Appx. 2, Tab 11 § 12.11) Severability provisions are enforceable under Illinois law, and the existence of one in a contract "strengthens the case for the severance of unenforceable provisions because it indicates that the parties intended for the lawful portions of the contract to be enforced in the absence of the unlawful portions." *Abbott-Interfast*, 250 Ill. App. 3d at 21. Thus, even if the Court agreed that the Notes and Guaranty constitute one "contract" for illegality purposes (which it should not), it must still give effect to the severability provisions and enforce the Notes' legal contractual obligations.[4]

**2. Even if the Trustee Were Asserting Subrogation Claims (Which He Is Not), Defendants Would Still Need to Show the Notes Are Illegal.**

Defendants argue that the Trustee stands in Comdisco's shoes as subrogee, and not in the

---

[4] For similar reasons, even if the Court were to determine the Bank's loans were limited to 50 percent of the value of the stock, Defendants should still remain obligated to repay principal and interest on the 50 percent that was legally loaned. *See Franklin Cnty. Bldg. Ass'n v. Cravens*, 285 Ill. App. 415, 422 (4th Dist. 1936) (borrower who sought to avoid note obligations by claiming that note charged usurious interest rate still required to repay principal and legal interest rate).

Bank's shoes as assignee under the Notes. This is incorrect. As shown below (VI.A.1), the Court long ago decided this issue against Defendants. But regardless of whose "shoes" the Trustee now fills, Defendants can only succeed on an illegality defense if the *Notes* violated the margin regulations. When a party is subrogated to the rights of another, as is the case when a guarantor involuntarily pays money owed by the principal debtor, that party "is allowed to stand in the shoes" of the creditor and assert *that creditor's rights* against the principal debtor. *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1546 (2013); *Interstate Bankers Cas. Co. v. Hernandez*, 2013 IL App (1st) 123035, ¶16 (1st Dist. 2013). Even if the Trustee were suing under a subrogation theory, he would still be suing based on the Bank's contract rights against Defendants under the *Notes* (and not on the Guaranty). Thus, to succeed on their illegality defenses, Defendants must show that the *Notes* were illegal.

### C. The Bank's Belief that Comdisco Had Shareholder Approval for the 1998 Option Plan Precludes Defendants' Illegality Defense Based on the Guaranty.

The trial record provides another reason why the alleged illegality of the Guaranty cannot impair the Notes: at the time the SIP closed, the Bank had an actual and good faith belief that Comdisco had obtained shareholder approval and was extending credit under the "plan lender" exception to Regulation G. Because of this belief, section 29(b) does not apply, and the Bank cannot have committed an "arranging" violation in connection with the Guaranty.

#### 1. Section 29(b) Cannot Apply Because the Bank Did Not Act with Actual Knowledge of the Facts Giving Rise to the Alleged Violation.

Section 29(c)(1) contains a safe harbor from the section 29(b) voidability provisions for violations made without actual knowledge of facts. That section provides:

> (c) Nothing in this title shall be construed (1) to affect the validity of any loan or extension of credit … unless at the time of the making of such loan or extension of credit … the person making such loan … shall have actual knowledge of facts by reason of which the making of such

> loan or extension of credit … is a violation of the provisions of this title or any rule or regulation thereunder.

15 U.S.C. § 78cc(c)(1). Here, even if the Court were to conclude that the Guaranty violated the margin regulations (and even if that illegality could somehow impact the Notes), Defendants still could not void the Notes under section 29(b) because the Bank lacked "actual knowledge" of critical facts by reason of which the Guaranty is alleged to have been in violation.

At trial, the Bank's lead outside counsel, Greg Murray, testified that he believed in February 1998 that Comdisco had obtained shareholder approval for its plan and was surprised to learn at a meeting in 2002 that it had not. (JS 647, 660-663) Shareholder approval is significant because Regulation G contains an exception to the usual 50 percent limit on purpose credit for "plan lenders" extending credit under an "eligible plan." "If a plan-lender extends or maintains credit under an eligible plan, any margin security that directly or indirectly secures that credit shall have good faith loan value [i.e. the amount a lender exercising sound credit judgment would lend, not to exceed 100 percent]." 12 C.F.R. § 207.5(b)(2), 207.2(e). A "plan lender" is "any corporation … that extends or maintains credit to finance the acquisition of margin stock of the corporation," and an "eligible plan" is "any employee stock option … plan adopted by a corporation *and approved by its stockholders* that provides for the purchase of margin stock of the corporation." *Id.* at § 207.5 (a)(1), (a)(2) (emphasis added). Thus, if Comdisco had obtained shareholder approval for the SIP or the underlying 1998 Option Plan—as Murray believed—it could have extended the Guaranty for up to 100 percent of the value of the SIP stock, even if that stock directly or indirectly secured the Guaranty.[5]

---

[5] To employ the plan-lender provisions of § 207.5, Comdisco did not need to obtain shareholder approval for the SIP itself (which would have been impractical because of the need for confidentiality). Rather, the "eligible plan" could have been the 1998 Option Program, pursuant to which the SIP shares were ultimately issued. *See* FRRS 5-882.19 (Ex. 14)(company shareholders adopted stock plan, and company was permitted to offer program to finance exercise of options under that plan three years later; company was not required to obtain shareholder approval for credit terms). As Murray stated in his June 1998 letter to Holz, the most reasonable reading of Regulation U is that a bank

Murray had represented the Bank in two previous SIP transactions for Baxter (1994) and Allegiance (1997) that provided the template for Comdisco's SIP. (JS 211, 213, 294) These programs were developed by Skadden, and Skadden had provided formal opinion letters certifying that the programs complied with the margin regulations. (JS 166, 183-188) However, both the Baxter and Allegiance SIPs were governed by each respective company's pre-existing stock option plans; neither company had to adopt a new stock option plan. (JS 436) Comdisco, on the other hand, did not have adequate shares available under its existing stock option plan and therefore adopted the new 1998 Option Plan to authorize the SIP shares. (JS 436, 522, 525, 526) Based on New York Stock Exchange rules regarding "broad-based" option plans, McBride advised Comdisco that no shareholder approval was required. (JS 437, 523) McBride did not conclude shareholder approval or "eligible plan" status was necessary, and it provided a formal opinion to the Bank certifying compliance with the margin regulations. (JS 225, 523, 838-839) It also permitted Comdisco to sign the Facility Agreement, which contained an express representation by Comdisco in section 4.01(k) that the "Company Incentive Stock Option Program," i.e. the 1998 Option Program, "has been duly adopted and approved by all requisite corporate action (including stockholder approval if necessary)." (JS 501) Based in large part on this representation, Murray believed Comdisco had obtained shareholder approval. (JS 647-650) There was no evidence that Bank personnel had other knowledge or even considered the issue.

If Murray's belief had been correct, the 50 percent purpose credit limit would not have applied. Thus, the Bank lacked "actual knowledge of facts by reason of which the making of [the Guaranty]" is alleged to be a violation. Even if the Court finds that the Guaranty violated the margin regulations, the safe harbor of section 29(c)(1) protects the validity of the Notes.

is permitted to arrange for a company guaranty of bank loans used to finance employee stock option programs, where the guarantor company qualifies as a plan lender. (JS 869, 871, 873, 884); *see also* FRRS 5-900.53 (Ex. 15)(plan lender permitted to guaranty bank loan to employees to purchase company stock under Regulation G).

### 2.   The Bank Made a "Mistake in Good Faith" With Respect to a Key Fact and Therefore Could Not Have Violated Regulation U.

Regulation U provides that a "mistake in good faith in connection with the extension or maintenance of credit shall not be a violation of this part." 12 C.F.R. § 221.3(k). The "mistake in good faith" exception includes factual mistakes, FRRS 5-942.2 at 3 (Ex. 16), and applies to so-called "arranging" violations through section 221.3(a)(3), which permits "arranging" the extension of credit on "the same terms and conditions under which the bank itself may extend or maintain purpose credit under this part." 12 C.F.R. § 221.3(a)(3).

The Bank's belief that Comdisco had obtained shareholder approval was a "mistake in good faith" for purposes of the margin regulations. Thus, even if Comdisco's Guaranty was directly or indirectly secured by the SIP stock, the Bank did not commit an "arranging" violation because it believed facts, in good faith, that would have exempted the Guaranty from the 50 percent purpose credit limit. If the Bank did not commit a violation, Defendants cannot void the Bank's rights under section 29(b), which only provides a basis for voiding the rights "of any person who, in violation of [an Exchange Act] provision, rule or regulation, shall have made or engaged in the performance of any such contract." 15 U.S.C. § 78cc(b).[6]

## III.   THE LAW AND EVIDENCE DO NOT SUPPORT DEFENDANTS' SECURITIES FRAUD AND MISREPRESENTATION DEFENSES.

Defendants' affirmative defenses include four fraud and misrepresentation-related defenses: (i) an illegality defense based on Section 10(b) of the Exchange Act and Rule 10b-5 (Aff. Def. No. 2); (ii) an illegality defense based on section 17(a) of the Securities Act (*id*. No.

---

[6] In addition to the arguments set forth herein, the Trustee reasserts for the record the arguments set forth in his summary judgment briefs and in briefing before the Seventh Circuit that Defendants lack standing to raise alleged violations of Regulations G and U as a defense to the Notes. The evidence received at trial demonstrates that Defendants are not within the class of individuals intended to be protected by Regulations G and U and that the purpose of these regulations will not be advanced by allowing Defendants to use the regulations to avoid their Note obligations. (JS 143-149)

3); (iii) a defense based on alleged negligent misrepresentation in the inducement (*id*. No. 8); and (iv) a defense based on alleged fraud in the inducement (*id*. No. 10).  Defendants did not argue these defenses in their trial brief, as required by Local Rule 16.1 and the Northern District of Illinois Standing Order Establishing Pretrial Procedure.  If the Court considers these defenses, it must limit consideration to statements (and omitted facts allegedly needed to make those statements non-misleading) that Defendants pled with particularity.  Fed. R. Civ. P. 9(b); *Northwestern Corp. v. Gabriel Mfg. Co.*, 1996 U.S. Dist. LEXIS 19275, at *39-40 (N.D. Ill. Dec. 10, 1996) (Ex. 17) ("an affirmative defense involving fraud … must state with particularity the circumstances involving fraud" under Rule 9(b)).  Defendants have alleged that the statements listed in the chart attached as **Figure 2** were false or misleading.[7]  But none of those alleged statements (or the associated omissions) can support any of Defendants' four defenses.

### A.     Defendants' Illegality Defense Based on Section 10(b) and Rule 10b-5 Fails.

Defendants first assert that section 29(b) precludes enforcement of the Notes because the Bank or Comdisco violated section 10(b) and Rule 10b-5.  This defense fails for several reasons.

### 1.     The Bank and Comdisco Did Not Act With Scienter.

Defendants must prove that the alleged misrepresentations or omissions were made with the requisite scienter, that is with intent to deceive or reckless indifference to the truth.  *Janus Capital Group v. First Deriv. Traders*, 131 S. Ct. 2296, 2301 (2011); *Ambrosino v. Rodman & Renshaw, Inc.*, 972 F.2d 776, 789 (7th Cir. 1992).  *Grundon* vacated this Court's grant of summary judgment on 10b-5 in part because the Trustee first raised scienter arguments in his

---

[7] Defendants also allege a number of "omissions."  To support a 10b-5 claim, however, an omission must be based on a duty to disclose.  *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989).  Such a duty only arises if (i) there is an independent fiduciary duty between the parties, which was not the case here; or (ii) a particular statement would otherwise be misleading without disclosure of the omitted fact.  *Id.*  Defendants have suggested that the Bank's and Comdisco's sophistication or reputation might give rise to a misleading suggestion that they would only sponsor a legal program that had been thoroughly vetted.  But reputation is not enough, without a particular misleading statement, to create any duty to disclose.  *Instituto De Prevision Militar v. Merrill Lynch & Co.*, No. 05-22721, 2007 U.S. Dist. LEXIS 72742, at *18-*20 (S.D. Fla. Sept. 28, 2007) (Ex. 18).

reply, 651 F.3d at 634-35, leaving the scienter issue open for this Court to decide following trial.

The trial record could not have been clearer: No trial witness believed in 1998 the SIP violated any law or regulation; no trial witness testified that anyone else at Comdisco or the Bank thought there was a violation; and no trial witness believed Comdisco or Bank personnel had any reason to know of the purported violation at the time. For example, Scott Harvey, Comdisco's Deputy General Counsel who oversaw development and implementation of the SIP (JS 18), testified that: (i) he did not believe, and had no reason to believe, the SIP violated the margin regulations at the time the SIP closed; (ii) he is not aware of anyone at Comdisco who knew or believed that the transaction violated the margin regulations; (iii) if any doubt had been raised with respect to compliance with the margin regulations, he would have satisfied himself that there was not a problem before permitting the SIP to go forward; and (v) he had no information that anyone at the Bank or Winston believed that the SIP program violated the margin regulations. (JS 621, 626-629) Likewise, Phil Hewes, Comdisco's Chief Legal Officer, testified that he believed the SIP complied with applicable law and he was not aware of any violations of the margin regulations. (JS 17, 622) Dan Clarke, the Bank's relationship manager for Comdisco, testified that he believed the SIP was lawful, and that the Bank would never have closed the transaction if it did not receive all of the appropriate legal documents and opinions. (JS 2, 632)

In addition, both the Bank and Comdisco relied on advice of counsel, which "constitute[es] powerful evidence" negating scienter. *Howard v. SEC*, 376 F.3d 1136, 1147-48 (D.D.C. 2004); *Steed Finance LDC v. Nomura Securities Int'l, Inc.*, No. 00 Civ. 8058, 2004 U.S. Dist. LEXIS 18580, at *31-33 (S.D.N.Y. Sept. 14, 2004) (Ex. 19). The Bank and Comdisco retained well-respected law firms to structure the SIP and advise them on compliance. (JS 6, 23-26, 444) Comdisco's counsel, McBride, advised the Comdisco Board of Directors that "the

Loan and program even though for 100% of the purchase price do not violate federal margin regulations regarding 'purpose credit'." (JS 432, 439) The Bank relied on its outside counsel to ensure compliance with margin regulations and also received a "clean" opinion from McBride that the "execution and delivery of the Loan Documents by the Company and the Borrowers and the performance by the Company and the Borrowers [of] all of the obligations under each such Loan Document" do not violate Regulations G, U or X. (JS 501, 631, 838, 842) The Bank had previously financed nearly identical SIP programs for Baxter and Allegiance and had received opinions from Skadden concluding that the programs complied. (JS 165, 170-177, 182-188) As discussed above (II.C), the Bank's lead outside counsel, Greg Murray, believed at the time that Comdisco had shareholder approval for the SIP program and could therefore rely on the "plan lender" exception. (JS 6-7, 302, 646-647, 660-662) There was no evidence rebutting Murray's testimony that he first learned Comdisco was not a plan lender in 2002 (JS 662), nor was there evidence that internal Bank personnel ever considered the issue.

### 2. The Bank Did Not Make Many of the Alleged False and Misleading Statements.

As discussed above (§ II.B.), the Trustee is suing as the Bank's assignee, based on Defendants' contractual obligations under the Notes. Consequently, Comdisco's alleged misstatements are not a basis for a 10(b) or 10b-5 defense. Nor can the Bank have committed a violation merely by "aiding and abetting" Comdisco's alleged violations. *Janus Capital Group*, 131 S. Ct. at 2301 (no third-party liability or aiding and abetting under Rule 10b-5); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008) ("The *§ 10(b)* implied private right of action does not extend to aiders and abettors"). As set forth in the chart attached as Figure 2, only two of Defendants' alleged misrepresentations, at most, were made by the Bank (and, as set forth below, neither of those statements can be a basis for a fraud defense).

For instance, two of Defendants' central fraud contentions are based on statements in the Facility Agreement that are actually borrower-side representations by Comdisco to the Bank, which the Bank and its counsel relied upon. (Fig. 2 ##1, 2; JS 501, 631, 838, 844) Comdisco's representations and warranties were explicitly identified as Comdisco's in the Facility Agreement and are not statements by the Bank. Defendants also point to oral statements by Comdisco personnel allegedly made during the SIP presentation and elsewhere. (Fig. 2 ##3, 8, 9, 10; JS 610, 985-988) No Bank representatives were present for the SIP presentation (JS 572, 594-595), nor is there any evidence that the Bank had any role in the other oral statements. (*See* JS 572, 594-595, 600) Similarly, two of the alleged misrepresentations appear in Comdisco's Q&A materials, one appears in Comdisco's 1998 Stock Option Program, and one appears in the 83(b) election form, all of which were part of the materials Comdisco prepared and provided to SIP participants. (Fig. 2 ##4, 6, 7, 12; JS 571, 575, 598, 600)

### 3. The Alleged False and Misleading Statements Are Otherwise Not a Viable Basis for a Securities Fraud Defense.

Finally, the particular statements defendants contend are false or misleading are not actionable—and cannot be the basis for an illegality defense—for several additional reasons:

First, for the reasons discussed above (§ II), the statements pertaining to compliance with the margin regulations and related issues are generally true and non-misleading. (Fig. 2 ##1-7) In fact, even if the Court were to determine that Comdisco's *Guaranty* violated the margin regulations, nearly all of the statements deal with the loans and would still be true. For instance, it would still be true that: "[n]o part of the proceeds of any Loan will be used in a manner which would violate" the margin regulations (#2); "the loan is not technically secured by the securities" and "this is not a margin account" (#3); no "security interest or other lien" was granted to the Bank as security for the loans (#5); "the Loan is not secured by the stock" (#6); participants

would not receive margin calls, as "the SIP shares do not serve as collateral for the loan" (#7).

<u>Second</u>, Defendants contend the statements are misleading because they suggest incorrect legal opinions regarding the margin regulations (i.e. that the loans and SIP were legal or that there was no collateral), not because they contain false statements of fact. But the evidence at trial demonstrated that the ***facts*** on which Defendants base their position were fully disclosed. Statements of legal opinion, rather than fact, are not actionable as fraud. *Gavery v. Altheimer & Gray*, No. 95 C 2747, 1996 U.S. Dist. LEXIS 13240, at *14 (N.D. Ill. Sep. 10, 1996) (Ex. 20) (representation that the structure of a sale transaction did not violate the law was not an actionable statement of fact where both parties had copies of transaction documents); *City of Aurora v. Green*, 126 Ill. App. 3d 684, 688–89 (2d Dist. 1984).[8]

<u>Third</u>, three of the purported false or misleading statements were allegedly made years after the SIP closed. (Fig. 2 ##9, 10, 11) Because 10b-5 only applies to fraud in connection with the purchase or sale of a security and 17(a) only applies in connection with the offer or sale of securities, statements after the SIP program closed cannot support securities fraud defenses. 17 C.F.R 240.10b-5; 15 U.S.C. § 77q(a); *Affco Investments, LLC v. KPMG, LLP*, No. H-07-3379, 2009 U.S. Dist. LEXIS 89595, at *10-*11, *16 (S.D. Tex. Sept. 28, 2009) (Ex. 21) (after-the-fact representations are not in connection with purchase or sale of securities); *Instituto De Prevision Militar*, 2007 U.S. Dist. LEXIS 72747, at *15-*17. Moreover, section 29(b) only provides a basis to void contracts that were "made in violation" of the Exchange Act (or its regulations) or "the performance of which involves" such a violation. 15 U.S.C. § 78cc. After-the-fact

---

[8] A statement of opinion might, depending on the circumstances, become an affirmation of fact if it is stated as an expression of "affirmative fact" and that is how it is reasonably understood. 651 F.3d at 639. However, the Bank's alleged statements were not stated as expressions of affirmative fact, but as contractual positions between the Bank and Comdisco. The acknowledgment by the Bank and Comdisco that neither party had granted a security interest or other lien in the stock (Fig. 2 #5) was a contractual acknowledgement between Comdisco and the Bank.

violations could not retroactively create violations in the making or performance of the Notes.[9]

Fourth, two of the statements purport to relate to un-kept future promises that (i) Comdisco would protect SIP participants from losses (Fig. 2 #10); and (ii) the Bank "presently intend[ed] to further assess the situation prior to commencing any collection procedures" (#11). Promises of future action cannot be a basis for a fraud claim unless the party making the promise did not intend to perform promise at the time. *Tannebaum v. Clark*, No. 88 C 7312, 1993 U.S. Dist. LEXIS 4071, at *18 (N.D. Ill. Mar. 31, 1993) (Ex. 22). There was no such evidence at trial. Nor was there any evidence that the Bank did not "further assess" the situation, and Hewes testified that he merely said that the company was looking at options. (JS 986, 988)

Fifth, Comdisco's purported statement that it "significantly weighed [each employee's] ability to assume the substantial personal financial risk that is associated with this [SIP] program" cannot be the basis for a fraud claim. (Fig. 2 #8) Defendants admit that "Comdisco stated that it would not look at an individual's personal financial information and that only [the Bank] would have access to these documents." (Aff. Def. ¶ 23) Defendants—who were high-level Comdisco executives and managers—could not reasonably have understood Comdisco to be representing that it had assessed their financial ability to take on the loans. (*See* JS 818)

Sixth, Defendants allege that Comdisco misrepresented that the SIP stock was worth the same as publicly traded common stock, when in fact the stock was subject to various "restrictive terms" that reduced its value. (Fig. 2 #12) But this purported misstatement was part of a pre-printed section 83(b) election form that also expressly stated the "fair market value" was "determined without regard to any restrictions other than restrictions which by their terms will never lapse." (JS 613) Defendants' own witness, Harvey, testified that he believed that the

---

[9] For the same reasons, Defendants cannot base their illegality defenses on allegations that the Bank or Comdisco failed to correct earlier purported misstatements when they later allegedly learned of the purported violations.

purported misstatement to be true because of this qualification.  (JS 614)

**B.  Section 17(a) Does Not Provide a Basis to Avoid Repaying the Notes.**

Apparently recognizing the flaws in their 10(b) and 10b-5 defenses, Defendants also

assert an illegality defense based on purported violations of section 17(a) of the Securities Act.

(Aff. Def. No. 3)  The section 17(a) defense fails because there is no private right of action under

section 17(a), *Schlifke*, 866 F.2d at 942-43, and for several additional reasons:

First, section 17(a) applies only to offerors or sellers of securities.  *See* 15 U.S.C. §

77q(a); *Aaron v. SEC*, 446 U.S. 680, 687 (1980) (Section 17(a) "applies only to sellers…");

*Ronzani v. Sanofi S.A.*, 899 F.2d 195 (2d Cir. 1990) ("Federal courts at all levels have agreed …

that § 17(a) is limited in its application to offerors or sellers").  Defendants seek to use section

17(a) as a defense to the Bank's rights under the Notes.  But the Bank was the lender that

provided loans for the purchase of the SIP stock.  The Bank did not sell the stock; it did not

select the potential SIP participants; and it did not participate in presenting the SIP to participants

or have any contact with participants during the decision-making process.  (JS 572, 574, 594-95,

600, 821)  Under these circumstances, the Bank was neither an offeror nor seller of securities.

*See Schlifke*, 866 F.2d at 940-41 (bank that provided financing was not seller).

Second, Defendants cannot establish the requisite mental state for any 17(a) violation.

Section 17(a)(1) requires proof of scienter.  *Grundon*, 651 F.3d  at 638 n.6.  As shown above (§

III.A.1), there was no evidence of scienter.  For sections 17(a)(2) and (3), Defendants must at

least establish negligence.  *SEC v. Holschuh*, 694 F.2d 130, 143 (7th Cir. 1981).  As discussed

above (§ III.A.1), the Bank and Comdisco both retained and relied on advice from reputable law

firms, which prepared the SIP documents.  Reliance on advice of counsel rebuts any claim of

negligence. *See In re E.F. Hutton Southwest Properties II, Ltd*., 953 F.2d 963, 973 (5th Cir.

1992); *Draney v. Wilson, Morton, Assaf & McElligott*, 592 F. Supp. 9, 11 (D. Ariz. 1984).

Third, section 17(a)(2) requires the Bank to obtain money or property by means of an "untrue statement of a material fact" or an "omission to state a material fact" necessary to make the statements made non-misleading. 15 U.S.C. § 77q(a)(2). But as shown above (§§ III.A.2, 3) and in Figure 2, the Bank only made *two* of the purported misstatements. Those statements, and the remaining Comdisco statements, are not actionable for the reasons identified in Figure 2.

Fourth, section 17(a)(3) applies only if the Bank engaged in a "transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(2). This requires proof of a deceptive scheme encompassing a course of conduct "beyond the [17(a)(2)] misrepresentations." *SEC v. Stoker*, 873 F. Supp. 2d 605, 614 (S.D.N.Y. 2012). At most, the evidence at trial demonstrated that Comdisco inadvertently made misleading statements in the course of an otherwise valid stock purchase program. There was no evidence of a transaction, practice or course of business beyond this that operated as a fraud or deceit.

Fifth, a section 17(a) illegality defense with no scienter—even if the violation were shown—is an exceptionally flimsy basis to avoid repaying a loan. As discussed in greater detail below (§ IV.A.1), the defense of illegality is an "equitable and remedial doctrine," which is not automatic but requires a comparison of the pros and cons of enforcement. *N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.*, 799 F.2d 265, 273 (7th Cir. 1986) ("*NIPSCO*"). Although violations of section 17(a) may theoretically occur where there is no scienter and no corresponding Rule 10b-5 violation, such a violation would makes a weak equitable case for voiding an unperformed obligation. This is particularly true because section 17(a) provides for no private right of action, is subject to no statutory voidability provision equivalent to section 29(b), and in the case of subsections (a)(2) and (a)(3), does not require scienter. *Schlifke*, 866 F.2d at 942-43; *Holschuh*, 694 F.2d at 143. In light of these factors and the balancing approach prescribed by *NIPSCO*, it is

not surprising the Trustee has been ***unable to locate a single case where a section 17(a) defense without an accompanying 10b-5 violation and scienter has ever successfully been used to invalidate a contractual obligation***. *See Reid v. Mann*, 381 F. Supp. 525, 528 (N.D. Ill. 1974) (noting lack of 17(a) cases). Even if the Bank technically violated section 17(a) (which it did not), that violation should not result in a forfeiture of the right to repayment of the loans.

### C. Defendants' Fraud and Misrepresentation in the Inducement Defenses Fail.

Defendants' final two misrepresentation defenses are based on theories of fraud and negligent misrepresentation in the inducement. (Aff. Def. Nos. 8, 10) To void their SIP Notes based on fraudulent inducement, Defendants must prove (1) a statement of a material fact, as opposed to an opinion, (2) that was false, (3) that was known or believed by the Bank to be untrue, (4) that was reasonably relied on by Defendants to their detriment, (5) that was made for the purpose of inducing reliance, and (6) that generated detrimental reliance leading to Defendants' injury. *Real Estate Value Co. v. USAir, Inc.*, 979 F. Supp. 731, 740 (N.D. Ill. 1997) (elements of affirmative defense). The party asserting a fraudulent inducement defense must prove it by clear and convincing evidence. *See Int'l Profit Assocs. v. Bradley M. Griffin, Inc.*, 2012 IL App (2d) 110434-U, ¶ 26 (2d Dist. 2012) (Ex. 37). To prove a negligent inducement defense, Defendants must show the same elements, except that the scienter requirement is replaced by "carelessness or negligence in ascertaining the truth of the statement," and Defendants must show a duty owed to them by the Bank to communicate accurate information. *Rosenstein v. Standard & Poor's Corp.*, 264 Ill. App. 3d 818, 821 (1st Dist. 1993); *see also Pirelli Armstrong Tire Corp. v. Titan Tire Corp.*, 4 F. Supp. 2d 786, 791 (C.D. Ill. 1998). These two common law defenses fare no better than Defendants' securities fraud defenses.

### 1. Defendants' Common Law Inducement Defenses Suffer from the Same Infirmities as Their Securities Fraud Defenses.

Like Defendants' securities fraud defenses, both inducement defenses fail because none of the alleged misrepresentations are properly actionable against the Bank. As detailed above (III.A.2) and in Figure 2, all but two of the alleged misrepresentations were made by Comdisco, not the Bank. *See, e.g., Unicapital Funding Corp. v. Foxley*, 2002 U.S. Dist. LEXIS 21239, at *9 (N.D. Ill. Oct. 31, 2002) (Ex. 23) (misrepresentations by a non-party to the contract could not support a fraudulent inducement defense). The only alleged misstatements by the Bank (Fig. 2 ##5, 11) cannot support an inducement defense because they were both true statements and because #11 was made long after Defendants entered into the SIP transaction. *See, e.g., 3700 S. Kedzie Bldg. Corp. v. Chicago Steel Foundry Co.*, 20 Ill. App. 2d 483, 486 (1st Dist. 1959) (representations made after the execution of the contract are immaterial to an inducement claim).[10] The remaining statements were made by Comdisco and, even if somehow attributable to the Bank, are not actionable for one or more of the reasons detailed above (§ III.A.2) and in Figure 2: (i) they are true and not misleading; (ii) they concern statements of legal opinion, not fact; and (iii) they were made after the SIP closed.

### 2. Defendants Cannot Show the Bank Had the Requisite Level of Intent.

For the reasons detailed above (§ III.A.1), Defendants failed to prove the Bank had the requisite scienter for a fraudulent inducement defense and likewise failed to establish the Bank acted carelessly or negligently, given the Bank's reasonable reliance on the advice of counsel. Moreover, even if Defendants could establish a negligent inducement based on the purported negligence of McBride or Winston, they cannot establish negligence by a law firm without expert testimony to establish the standard of care. *See, e.g., Georgou v. Fritzshall*, 178 F.3d 453,

---

[10] Significantly, Defendants withdrew both of their **set-off** defenses. (Dkt. No. 321) These were the only defenses that might have permitted Defendants to rely on after-the-fact statements.

456 (7th Cir. 1999) (party asserting legal malpractice must "establish through expert testimony the standard of care to which the accused lawyer should have adhered"). The Trustee presented the only expert at trial, and that expert testified that McBride reached its legal opinions "consistent with custom and practice." (JS 450-460)

### 3.    Defendants Cannot Show Causation and Injury.

The defense of inducement to invalidate a contract is tantamount to an affirmative claim of fraud or negligent misrepresentation and therefore requires proof of causation and injury. *See, e.g., Real Estate Value Co.,* 979 F. Supp. at 740 (defense of fraudulent inducement requires proof of elements of common law fraud). Defendants' injuries from the SIP resulted from the loss in value of their SIP stock following Comdisco's bankruptcy, which had absolutely nothing to do with alleged misrepresentations in 1997 and 1998 concerning compliance with margin regulations. Indeed, if Defendants had exited the SIP program earlier—as did ten of their co-participants who made a substantial amount of money (JS 939)—or if Comdisco had continued to be a successful company, they would not have lost money.

### 4.    Defendants Fail to Satisfy the Requirements for Rescission and Would, in Any Case, Be Required to Return the Principal.

Defendants' fraudulent and negligent inducement defenses fail for the additional reason that Defendants have not satisfied the requirements for maintaining a rescission claim. When a party claims inducement as a defense to a contract, "that party may either seek to rescind the contract or choose to waive the defect, ratify the contract, and enforce it." *James v. Cadillac Co. (In re James)*, 2010 Bankr. LEXIS 713, at *22 (N.D. Ill. Mar. 3, 2010) (Ex. 24). A party seeking to rescind a transaction on "the ground of fraud or misrepresentation must elect to do so promptly after learning of the fraud or misrepresentation, must announce his purpose and must adhere to it." *Mollihan v. Stephany*, 35 Ill. App. 3d 101, 103 (1975); *see also Ill. State Bar Ass'n*

*Mut. Ins. Co. v. Coregis Ins. Co.*, 355 Ill. App. 3d 156, 165 (1st Dist. 2004) ("An unreasonable delay in taking the necessary steps to set aside a fraudulent contract will have the effect of affirming it"). Additionally, a party seeking rescission must restore the other party to the *status quo* existing at the time the contract was made. *See Puskar v. Hughes*, 179 Ill. App. 3d 522, 528 (2d Dist. 1989) (for rescission, the proper measure of recovery is restitution of the consideration and other benefits received by the parties under the contract). This rule applies even where the party against whom rescission is sought has committed fraud. *Id.*

Defendants have been aware of the alleged misrepresentations since 2002, based on the Bank's proof of claim and Comdisco's objection to the proof of claim in its bankruptcy proceeding. (JS 1031, 1037) Defendants did not elect then or at any time prior to this litigation to rescind the SIP Notes. In fact, Defendants did not plead their inducement defenses until their response to the Trustee's Corrected Second Amended Complaint in May 2012. Moreover, there is no evidence that Defendants have returned, or ever tried to return, the parties to their pre-SIP *status quo*. Defendants have thereby waived any right to rescind their SIP Notes. *See, e.g., Ario v. Am. Patriot Ins. Agency, Inc.*, No. 05 C 1049, 2007 U.S. Dist. LEXIS 67012, at *26-27 (N.D. Ill. Sept. 7, 2007) (Ex. 25).

Moreover, even if the Court were to permit Defendants to pursue their inducement defenses now, those defenses would be, at most, partial defenses. If the Court invalidates the Notes under an inducement defense, Defendants must still at least refund the principal of the Notes to the Trustee. *Id.* at * 26.

### 5. Defendants' Negligent Misrepresentation Defense is Barred by the Economic Loss Doctrine.

The economic loss doctrine bars Defendants' negligent misrepresentation defense because Defendants failed to prove that the Bank was in the business of supplying information

for the guidance of others in business transactions. *See Dvore v. Casmay*, No. 06-CV-3076, 2008 U.S. Dist. LEXIS 75104, at * 18 (N.D. Ill. Sept. 29, 2008) (Ex. 26); *see also Grundon,* 651 F.3d at 640 (Defendants must show the Bank was in the business of supplying information for the guidance of others to sustain their negligent misrepresentation defense). The requirement that the party be in the business of supplying information must be strictly construed. *See Lasalle Bank Nat'l Ass'n v. Epstein*, No. 99 C 7820, 2001 U.S. Dist. LEXIS 12016, at *13 (N.D. Ill. Aug. 15, 2001) (Ex. 27). Banks and financial service providers fall "in between" the two extreme categories of pure information providers and pure tangible good providers; thus, whether a bank is in the business of supplying information turns on the case-specific "nature of the information and its relation to the particular type of business conducted." *See Dvore,* 2008 U.S. Dist. Lexis 75104, at * 24-25. If the information supplied is central to the particular business conducted, then the "supplying information" prong is met. *Id.* However, if the end result of the transaction "is some sort of tangible object," then any information supplied is merely incidental and the "supplying information" prong is not met. *See Tolan & Son v. KLLM Architects,* 308 Ill. App. 3d 18, 29-30 (1st Dist. 1999).

As the Circuit Court of Cook County previously found, in the circumstances of this case, the Bank was solely a "lending institution" vis à vis Defendants and therefore was not engaged in the business of supplying information to Defendants for their guidance in business transactions. (*See* Ex. 10 at 11; 3/9/12 Tailor Transcript, Ex. 28 at 70).) The Circuit Court was correct on this point of Illinois law. The only transaction between the Bank and Defendants was the lending of money by the Bank; thus, the end result of the parties' transaction was a tangible product. Any information the Bank may have supplied to Defendants was therefore merely incidental, and not central, to the loan. *See Tolan, supra.* Moreover, Defendants failed to show that the Bank

supplied any misinformation to them. The alleged misrepresentations in Figure 2 were made either to or by Comdisco. (*See* Figure 2.) The unrefuted evidence at trial showed that the Bank did not provide Defendants with any financial counseling and did not advise Defendants in any way regarding the suitability of the SIP or the loans. (JS 821) Comdisco alone presented the SIP program and materials to Defendants; the Bank did not attend the presentation. (JS 572, 594-595, 600) The Bank was not in the business of supplying information, and did not supply any information, for the purpose of guiding Defendants in their transactions. The economic loss doctrine thereby bars Defendants' negligent misrepresentation defense.

## IV. EVEN IF THE COURT FINDS TECHNICAL ILLEGALITY, IT SHOULD STILL ENFORCE THE NOTES OR AWARD RESTITUTION.

In March 2012, this Court stated that analysis of an illegality defense is a two-step process, looking first at whether the contract is illegal and, second, at the appropriate remedy:

> It would seem to me that the remedy, you know, depending on the success or failure of your illegality defense is something that we would talk about down the line someplace. … First we would see whether or not these contracts are enforceable, whether there is a good defense to them. And then we would see what the remedy was depending on how I ruled on that.

(3/27/12 Hg. Tr. at 6 (Ex. 29).) The Court's approach is consistent with the case law in this circuit and elsewhere, which directs courts first to determine whether there is a violation a federal law or regulation and then, if so, to consider the equities and determine whether to (i) enforce the contract despite the illegality or (ii) award restitution or other equitable relief. Here, the evidence adduced at trial overwhelmingly favors enforcing the Notes or, at the very least, awarding restitution notwithstanding any finding of illegality.

### A. Under Federal Law, the Court May Enforce the Notes or Award Restitution Even If It Finds Technical Violations of the Margin Regulations.

Defendants' illegality defenses are all based on alleged violations of *federal law*—i.e. sections 7(d) and 10(b) of the Exchange Act, section 17(a) of the Securities Act, and the margin

regulations. (Aff. Def. Nos. 1, 2, 3) The effect of a violation of a federal statute or regulation on the enforceability of a contract is a matter of federal law. *Kelly v. Kosuga*, 358 U.S. 516 at 519; *Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 174 (1942); *NIPSCO*, 799 F.2d at 273.

### 1. Illegality Does Not Preclude Enforcement if Non-Enforcement Would Produce a Sanction Disproportionate to the Wrong.

The defense of illegality is an "equitable and remedial doctrine," which is not automatic but requires a comparison of the pros and cons of enforcement. *NIPSCO*, 799 F.2d at 273; *see also Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731, 743 (7th Cir. 1986) (it is not the law that "if a contractual provision is illegal … the contract cannot be enforced, regardless of the nature and consequences of the illegality").[11] Courts disfavor illegality defenses and seek to avoid cancelling contracts where doing so would result in a windfall to the party asserting an illegality defense or impose a disproportionately harsh sanction on the part seeking to enforce the contract. *Nagel v. ADM Investor Servs.*, 217 F.3d 436, 440 (7th Cir. 2000); *see also Amoco Oil Co. v. Toppert*, 56 Ill. App. 3d 595, 598-99 (1978) (where violation is not a "serious affront to public policy or … seriously injurious to the public welfare," contract will be enforced); *Eber Bros.*, 864 N.Y.S. 2d 236 at 243 (contracts enforceable where the party is "attempting to improperly use public policy as a sword for personal gain rather than a shield for public good").

Accordingly, an illegality defense should not render a contract unenforceable "where it would ***produce a sanction disproportionate to the wrong***." *Olson*, 806 F.2d at 743 (emphasis added); *see also Rush-Presbyterian-St. Luke's Medical Center v. Hellenic Republic*, 980 F.2d

---

[11] The balancing approach prescribed by *NIPSCO* and *Olson* applies not just to Defendants' common law illegality defense based on section 17(a) of the Securities Act, but also to their Section 7(d) and 10(b) defenses based on the voidability provision of section 29(b). This provision does not categorically preclude enforcement of illegal contracts but rather serves to confirm that common law illegality principles apply to Exchange Act violations. *Occidental Life Ins. Co. of North Carolina v. Pat Ryan & Assoc., Inc.*, 496 F.2d 1255, 1267 (4th Cir. 1974) (§29(b) merely makes explicit that common law doctrine of illegal bargains applies to violations of the Exchange Act and did not preclude enforcement); *Freeman v. Marine Midland Bank New York*, 419 F. Supp. 440, 453 (E.D.N.Y. 1976) (§ 29(b) was "a legislative direction to apply common-law principles of illegal bargain").

449, 455-456 (7th Cir. 1992) (in considering whether to enforce, "[p]roportionality is the cornerstone of a rational system"). In balancing the severity of the sanction against the magnitude of the wrong, courts consider the magnitude of the sanction resulting from non-enforcement, the harm the violation caused the other party, and the obscurity or obsolescence of the statute. *See id.*; *NIPSCO*, 799 F.2d at 273-74; *see also* Restatement (Second) of Contracts § 178 (1981) (Ex. 30) (listing factors considered in determining whether interest in enforcement is clearly outweighed by public policy against enforcement).[12]

### 2. Even if the Court Determines Not to Enforce the Notes, It May Still Award Restitution or Other Equitable Relief.

If, despite the balancing approach outlined above, a court determines not to enforce an illegal contract, it must then balance the equities to determine whether it should also deny restitution. *See, e.g., Freeman*, 419 F. Supp. at 453 (determination of whether lender who violated Regulation U was entitled to return of principal would require "careful balancing of the equities"); *Scheiber v. Dolby Lab. Licens. Corp.*, 293 F.3d 1014, 1021 (7th Cir. 2002) (contract voided on grounds of illegality is ordinarily treated as rescinded, requiring parties to be put in position they would have occupied if contract never made); *Bankers Life and Cas. Co. v. Bellanca Corp.*, 288 F.2d 784, 787 (7th Cir. 1961) (contract for sale of stock unenforceable under § 29(b), but purchaser could not retain shares without paying value).

The recent (2011) update to the Restatement of Restitution discusses in detail the award of restitution for transactions that are "intrinsically unobjectionable, but that fail[] in some

---

[12] Section 178 of the Restatement provides that a promise or other term of an agreement is unenforceable only if legislation provides it is unenforceable (which, as discussed in the previous footnote, is not the case here) or if "the interest in its enforcement is clearly outweighed" by a "public policy against the enforcement." In weighing the interest in enforcement, the Court should consider (a) the parties' justified expectations; (b) any forfeiture that would result if enforcement is denied; and (c) any special public interest in enforcement. In weighing the public policy, the Court should consider: (i) the strength of the policy; (ii) the likelihood that refusal to enforce would further the policy; (iii) the seriousness and deliberateness of the misconduct; and (iv) the directness of the connection between the misconduct and contract term. Restatement (Second) of Contracts § 178 (Ex. 30).

respect to comply with applicable regulatory requirements." Restatement (Third) of Restitution § 32 (2011) (Ex. 31).[13] Section 32(2) articulates the general rule that: "Restitution will also be allowed, as necessary to prevent unjust enrichment, if the allowance of restitution will not defeat or frustrate the policy of the underlying prohibition." *Id*. § 32(2). The Restatement recognizes that the law does not condemn mere regulatory violations in the same way as, for example, agreements to commit a crime. Regulatory violations generally do not warrant the "penalty" of denying restitution for performance rendered by one party:

> The contrast in either case is to a transaction that the law condemns under any and all circumstances, such as an agreement to commit a crime. Where the illegality of the underlying transaction consists in a failure to satisfy regulatory requirements, the fact of noncompliance—with rare exceptions—will not be evidence of the moral turpitude or inequitable conduct that forecloses a claim in restitution by the rule of § 32(3). Restitution is accordingly available in regulatory cases, by the rule of this Restatement, unless the court concludes that the allowance of restitution would defeat the policy in question. That conclusion is an appropriate inference only when judicial respect for the regulatory scheme reasonably requires forfeiture as a penalty for noncompliance.

*Id*. § 32 cmt. e. Thus, under the Restatement framework, the first step in determining the appropriate remedy for an illegal contract is to weigh enforceability in the context of policy objectives and remedial consequences, "taking into account the nature of the violation and the effect of the potential penalty." *Id*. Modern American decisions "do not automatically deny enforcement to a contract that fails to comply with applicable regulations." *Id*. But where the circumstances warrant, courts may "split[] the difference" by imposing a partial penalty—i.e. by

---

[13] Section 32 of the 2011 Restatement of Restitution (Third) notes that rules governing restitution for benefits conferred in performance of an illegal bargain are also stated in section 197 of the Restatement of Contracts and that "[t]he present section reformulates the applicable rules without proposing to alter specific outcomes." *Id*. § 32 cmt. a. Like Section 32, section 197 prescribes an equitable balance: "a party has no claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy ***unless denial of restitution would cause disproportionate forfeiture***." Restatement (Second) of Contracts § 197 (1981) (Ex. 32) (emphasis added). In determining whether a forfeiture is "disproportionate," section 197 looks at "the extent of that denial of compensation as compared with the gravity of the public interest involved and the extent of the contravention." *Id*. cmt. b.

awarding restitution rather than enforcing the illegal contract.  *Id.*

**B.**    **The Equitable Factors in this Case Support Enforcement (or at Least Restitution), Regardless of Any Alleged Technical Violations.**

In this case, the alleged regulatory violation (if it occurred at all) was unintentional, technical, and did not threaten an important public policy.  Imposing even a "partial penalty" on the Bank's assignee is therefore not warranted, and even if the Court were to conclude that some penalty is appropriate, the equities in this case would not support forfeiture of the entire principal of the loans.  In particular, the evidence at trial demonstrated the following:

- **Any violation of the margin regulations was unintentional, and the Bank and Comdisco believed the Notes and the SIP program complied**.  As discussed above (§ III.A.1), the trial witnesses uniformly testified that personnel at the Bank and Comdisco did not believe there was any violation, and both the Bank and Comdisco retained well-respected law firms to structure the SIP and advise them on compliance.  (JS 6, 23-26, 443, 444, 448, 621-645)  The Bank had previously financed nearly identical SIP programs for Baxter and Allegiance and had received Skadden opinion letters certifying compliance.  (JS 165, 170-177, 182-188)  If there was a violation, it was unintentional and does not warrant a "penalty."

- **If Comdisco or the Bank violated the margin regulations, Defendants also violated Regulation X**.  If the margin regulations were violated, Defendants themselves violated Regulation X[14] by willfully causing the Bank and Comdisco to extend them credit for 100 percent of the purchase price of the SIP stock with full knowledge of the facts.  They cannot use Comdisco's or the Bank's alleged violations as an equitable basis to avoid repaying the loans.

- **Strict enforcement of the margin regulations was not a Federal Reserve Board**

---

[14] Regulation X provides that "[a]ny borrower who willfully causes credit to be extended in contravention of Regulations G, T, or U … must conform the credit to the margin regulation that applies to the lender."  12 C.F.R. § 224.3(b).  A borrower who inadvertently violates Regulation X and "who acts to remedy the violation as soon as practicable" is not deemed in violation.  12 C.F.R. § 224.3(c).

**priority**.  As discussed above (§ II.A.2.c), the Federal Reserve Board had concluded by the 1990s that the margin regulations were no longer fulfilling their intended purposes and was advising regional Federal Reserve banks not to allow them to become an impediment to transactions.  Against this backdrop, the public interest in deterring violations does not warrant the draconian forfeiture Defendants seek.

- **The FRBC signed off on the SIP, based on guidance from the Board Staff**.  As discussed above (§ II.A.2), McBride vetted the SIP transaction with an FRBC lawyer, who consulted the foremost margin regulation expert on the Federal Reserve Board Staff and provided a written concurrence that the loans would not violate Regulations G and U.  The fact that the SIP raised no flags with the Board Staff further confirms that the transaction did not have significant public policy ramifications and that any violation was, at most, a close call.

- **Comdisco could have avoided Defendants' illegality defenses entirely by using a shareholder-approved option plan**.  As discussed above (§ II.C.1), Regulation G contains a specific exception for eligible employee stock option plans.  12 C.F.R. § 207.5.  That provision was "designed to encourage their use in recognition of their value in giving an employee a proprietary interest in the business."  FRRS 5-798.52 (Ex. 33).  Comdisco's SIP would have been an "eligible plan" exempt from the 50 percent limit if it had merely used shares authorized under a shareholder-approved stock option plan.  If mere shareholder approval would have rendered this entire transaction immune from challenge, it necessarily follows that the complained of regulatory violations are entirely technical in nature and do not implicate substantial public policy concerns.

- **The Trustee would suffer a significant forfeiture if denied relief, whereas Defendants would realize a substantial windfall**.  The Bank loaned millions of dollars to

Defendants and was never repaid. Denying the Trustee (as the Bank's assignee) the ability to recover even the principal of the loans would be a substantial forfeiture. On the other hand, Defendants had the opportunity to purchase substantial amounts of Comdisco stock and profit from any gains in stock price. The Comdisco bankruptcy 3 years later (after 10 participants exited the SIP at a profit) does not negate the benefit that Defendants received from their loans.

In short, if there was a regulatory violation in this case (which the Trustee denies), it was unintentional, and awarding enforcement or restitution would not undermine a significant public policy. Such a violation would not warrant a judicially-imposed penalty. The Court should enforce the Notes, or at least grant restitution, regardless of any regulatory violation.

## V.    THE LAW AND EVIDENCE DO NOT SUPPORT DEFENDANTS' PURPORTED CONTRACT DEFENSES.

Defendants also assert three contract defenses: (i) material breach excusing non-performance; (ii) lack of consideration; and (iii) failure to satisfy conditions precedent. (Aff. Def. Nos. 4, 5, 6) These defenses are based on the same alleged statutory and regulatory violations as Defendants' illegality defenses. However, Defendants suggest these defenses excuse them from limitations applicable to illegality defenses under federal law. They do not. Nor are they viable in light of the other problems with Defendants' illegality defenses.

### A.    Defendants' Excuse of Non-Performance Defense Fails.

Defendants assert that the securities laws and regulations on which they base their illegality defenses are incorporated into the Note as "implied contractual terms." (Aff. Def. No. 4 ¶ 26) As such, Defendants contend the Trustee has the burden of proving compliance as an element of his contract claim, and they presumably also believe the defense is not subject to equitable balancing. But requiring the plaintiff in a breach of contract case to prove compliance with every existing state and federal statute and regulation as part of his or her case in chief

would be extraordinary and preposterous.  There are several fatal defects in this "defense."

First, none of Defendants' cases support it.  Defendants cite cases for the premise that laws and regulations are implied terms of contracts.  But those same cases either include express representations regarding compliance or confirm that the proper legal paradigm is the law of illegality, not excuse of non-performance.  *See, e.g., T-Bill Option Club v. Brown * Co. Sec. Corp.*, No. 88 C 8461, 1989 U.S. Dist. LEXIS 12839, at *8-*10 (N.D. Ill. Oct. 25, 1989) (Ex. 34) (contract included express representation that broker's transactions would be conducted in accordance with his duties under the margin regulations); *Am. Tank & Installation co. v. The Rudolph Wurlitzer Co.*, 254 Ill. App. 514, (1st Dist. 1929) (applying law of illegality to contract that violated law).

Second, as discussed above (§ II.A), Defendants have not shown that the ***Notes*** violated the margin regulations.  Even if the Guaranty violated the margin regulations, Defendants do not, and cannot, argue that the Guaranty's compliance is an implicit term of the Notes.

Third, Defendants have not demonstrated a ***material*** breach.  The test of whether a breach is " material" is whether it is "so substantial and fundamental as to defeat the objects of the parties in making the agreement, or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement."  *InsureOne Indep. Ins. Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 43 (1st Dist. 2013).  The alleged violations here had no such effect.  Whether or not there was a violation of the margin regulations, Defendants still received the full amounts of their loans.  Indeed, until the bankruptcy, Defendants had no experience or familiarity with Regulation G or U or did not even know there were potential margin regulation issues.  (JS 668, 680-681, 1032, 1037)  If the stock had gone up in value, it is likely the issue never would have arisen, just as it did not arise

44

for the 10 participants who sold their stock for a profit before 2001. (JS 931-936, 939)

Fourth, Defendants' excuse of performance defense wrongly presumes that if there was a violation of the margin regulations, only the Bank was in violation. As discussed above (§ IV.B), if there was a violation, Defendants were also in violation of Regulation X. Such a mutual breach cannot provide a basis for an excuse of non-performance defense.

### B. Defendants' Lack of Consideration Defense Fails Because the Loan Funds Were Ample Consideration to Support Defendants' Repayment Obligations.

In their Fifth Defense, Defendants claim that the loans were illegal consideration, rendering the Notes unenforceable. As discussed above, the loans were not illegal. Furthermore, as with the excuse of non-performance defense, Defendants' cases do not support using failure of consideration as an end-run around the requirements and limitations of an illegality defense, but rather stand for the premise that an illegal contract may be invalidated where the illegality taints the entire basis for the contract. *Lyons v. Schanbacher*, 316 Ill. 569, 574 (1925) (contract invalidated where illegality tainted entire contract); *Henderson v. Palmer*, 71 Ill. 579, 582 (Ill. 1874) (where purpose of contract amounted to bribery entire contract invalidated).

### C. Defendants' Conditions Precedent Defense Fails Because Compliance with Federal Regulations Was Not a Condition Precedent to the Notes.

Defendants' Sixth Defense asserts that advancing the loan proceeds in compliance with the margin regulations was a condition precedent to the Notes. Once again, this defense fails because the loans did not violate the margin regulations and because the defense is another improper attempt to avoid the law of illegality. It also fails because there was no such condition precedent. Conditions precedent are disfavored in Illinois, and courts will not interpret a contract to include a condition precedent unless the contract expressly states one. *See A.A. Conte v. Campbell-Lowrie-Lautermilch*, 132 Ill. App. 3d 325, 329 (1st Dist. 1985). Here, there was no language in the Notes creating a condition precedent, and the mere mention of compliance with

Regulations U and G in the SIP documents is not sufficient to create a condition. *Catholic Charities of the Archdiocese of Chicago v. Thorpe*, 318 Ill. App. 3d 304, 308 (1st Dist. 2000) (express contractual language generally required to establish a condition precedent).

## VI. PLAINTIFF'S DAMAGES

### A. The Court Should Reject the Alternative Measures of Damages Suggested by Defendants' Eleventh and Twelfth Affirmative Defenses.

If successful in this note enforcement action, the Trustee, as assignee of the Notes and the underlying contractual obligations, is entitled to full recovery of the amounts owed by Defendants on their respective Notes. Defendants' Eleventh and Twelfth Defenses seek to limit the measure of the Trustee's recovery based on theories this Court and the Circuit Court of Cook County have already rejected. This Court should now reach the same conclusions that it and the Circuit Court have reached previously.

#### 1. Defendants' Purported "Subrogation" Defense Is Inapplicable.

Defendants' Twelfth Defense for "Limitation on Recovery" asserts that the Trustee's damages are limited to what the Trustee could recover on a subrogation claim. But the Trustee is not suing on a subrogation theory. The Trustee is suing as the assignee of the Notes and is entitled to enforce them in their entirety. The evidence at trial confirmed the Trustee's position. In November 2004, Comdisco and the Bank settled Comdisco's Guaranty obligations in the Comdisco bankruptcy proceeding. (JS 1067) Under that settlement, Comdisco agreed to pay $126,350,000 on its Guaranty in exchange for assignment by the Bank of "the Notes and all rights against the Borrowers attendant thereto" to the Trustee. (JS 1069, 1070) To reflect the assignment, the Trust Agreement was amended to include both SIP Note Claims, defined as "any and all claims of the holders of the SIP Notes (other than those SIP Notes previously compromised and/or transferred to Comdisco Holding Company) against the makers thereof…"

46

and SIP Subrogation Claims. (JS 1079 ¶ 2) The Trust Assets were similarly defined as (i) the SIP Note Claims, *and* (ii) the SIP Subrogation Claims. (JS 1079 ¶ 4)

The Bankruptcy Court confirmed the Settlement and the Trustee's assignment rights in December 2004. (JS 1088-1089) The court entered a Stipulation, Findings, and Agreed Order ("SFAO") approving the settlement and providing, as follows: "[N]othing contained in [the Settlement Agreement or Settlement Order] shall be deemed to release, discharge, ***modify, impair or affect in any way*** the Litigation Trustee's rights (whether now existing or to be acquired in the future) to enforce the SIP Notes…." (JS 1090 ¶ 3 (emphasis added)) The SFAO further provided that nothing in the Settlement Agreement or SFAO "shall release the Borrowers from any liability with respect to the SIP Notes." (JS 1089 ¶ J) The SFAO thereby expressly preserved the Trustee's unfettered right to enforce the SIP Notes against each of the delinquent Borrowers, including Defendants.

Following the SFAO, the Bank and Trustee executed the Assignment Agreement under which the Bank and other SIP lenders assigned the SIP Notes (including Defendants') to the Trustee (the "Assignment"). (JS 1097) Comdisco, the guarantor, was neither a party nor signatory to the Assignment Agreement. (JS 1097) The Trustee testified at trial that the principal purpose of the assignment was to provide the Trustee with a contractual right to sue under the Notes, and not merely subrogation rights. (JS 1101) This Court confirmed the Trustee's standing to sue as an assignee when it denied Defendants motion to dismiss this action, finding that the governing documents "***anticipate collection of the SIP Notes, not just SIP Subrogation Claims***." (*Costello v. Haller,* 9/23/05 Mem. Op. & Order at 5-6 (Ex. 35).). As an assignee, the Trustee's recovery is not limited by subrogation principles. Defendants' Twelfth Defense fails.

**2.** **Defendants' "Payment" Defense Has Been Rejected (Twice) by the Circuit Court and Should Be Rejected Here.**

Defendants' Eleventh Defense for "Discharge or Diminishment of Note Indebtedness" seeks, in the alternative, to limit the amount of the Trustee's recovery to the difference between the amount of the Guaranty Settlement and the remaining amounts due on Defendants' SIP Notes. Though they did not assert the so-called "payment" defense until recently in this Court, Defendants asserted and the Trustee moved for summary judgment on the defense in the related state court action. Judge Winkler granted summary judgment on the defense, and Judge Tailor affirmed that decision in denying Defendants motion to reconsider. (Exs. 10, 11.)

Defendants' theory would turn basic principles of commercial law upside down and should be rejected. As set forth above, Comdisco agreed in 2004 to settle its Guaranty obligations with the Bank in exchange for full assignment of the SIP Notes to the Trustee. (JS 1069, 1070) Thus, the Settlement effectuated a sale by the Bank to the Trustee of the Bank's claims against the SIP Borrowers under their Notes. The sale and assignment of a claim to a third party is a valid commercial transaction that does not discharge the underlying debt. If it did, parties could not buy and sell their claims.

Defendants contend that, rather than preserve the underlying debt, the assignment of a claim actually extinguishes it. But far from extinguishing Defendants' obligations under their SIP Notes, the Guaranty Settlement expressly preserved and confirmed those obligations. The SFAO provides that the Guaranty Settlement does not "release the Borrowers from *any liability* with respect to the SIP Notes" and that payment of the Settlement satisfied only the Guaranty, "without releasing, modifying, discharging or impacting in any way the SIP Notes." (JS 1089 ¶ J, 1090 ¶ 7 (emphasis added)) The SFAO constitutes a final judgment binding on all parties to the Comdisco Chapter 11 case, including Defendants, and therefore precludes relitigation of the

payment issue under the doctrine of *res judicata*. *See Crop-Maker Soil Services, Inc. v. Fairmount State Bank*, 881 F.2d 436, 439 (7th Cir. 1989).

Moreover, under governing Illinois law, the obligation of a guarantor under a note is independent from the debt that is owed by the principal obligor. *See, e.g., Nolan,* 305 Ill. App. at 75 ("The liability of the maker of the note and the guarantor were separate and distinct."). As the Circuit Court found, Comdisco's settlement of its Guaranty with the Bank did not discharge or diminish the separate and distinct liability of Defendants—the principal obligors—on their SIP Notes. (Ex. 10 at 6-7; Ex. 11 at 4-5.) This Court should likewise reject the Eleventh Defense and hold Defendants liable for the full amounts due on their Notes.

**B.      The Amounts of Principal and Interest Owed Under the Notes.**

By executing the SIP Notes, Defendants promised to repay the principal amounts due, plus interest on the outstanding principal at an interest rate equal to 7.8054 percent per annum until the principal amount is paid in full. (JS 484, JX 10, 14, 11, 12 at 1) If a "Program Event of Default" occurred and continued, then the Notes permitted the Bank to accelerate payment of any outstanding amounts due under the Notes. (JS 489, JX 10, 14, 11, 12 § 6(a)) In the Event of Default, interest accrues on the Notes at a default interest rate based on the Corporate Base Rate ("CBR") plus 2 percentage points per annum. (JS 1133) A Program Event of Default occurred on or about July 16, 2001 when Comdisco filed for bankruptcy. (JS 1024-1025) As of June 30, 2013, the amounts of Defendants' "Unpaid Principal and Interest" are: (i) Brunner - $1,147,609.14; (ii) Poisella - $1,721,413.72; (iii) Scozzafava - $1,147,609.14; and (iv) Weiss - $1,147,609.14. (JS 1137) The Court should award judgment in favor of the Trustee in the amount of each plus the accrued interest on these amounts from June 30, 2013 to the date of judgment at the rate of CBR plus 2 percentage points per annum. (JS 1127-1138)

**C.      The Court Should Award Reasonable Attorneys' Fees and Costs in an**

**Amount to be Determined through Subsequent Proceedings.**

Defendants' SIP Notes obligate Defendants to (i) reimburse "costs, internal charges and out-of-pocket expenses," including reasonable attorneys' fees, paid or incurred in connection with the "collection and enforcement" of the Notes; and (ii) indemnify all expenses (including expenses of litigation or preparation therefor) incurred that arise out of or relate to the Notes.  (JS 492; JX 10, 14, 11, 12 § 17)  The Trustee has brought this action to collect and enforce each Defendant's SIP Note and has incurred expenses arising from and relating to the Notes.  The Court should therefore award the Trustee his reasonable attorneys' fees and costs incurred in connection with this action and other activities undertaken to collect and enforce Defendants' Notes or that otherwise arise from or relate to the Notes.  The Trustee will provide the amount and proof of his reasonable attorneys' fees and costs claimed in a subsequent proceeding, as instructed by the Court.  (10/15/13 Tr. at 976 (Dkt. 345) (Ex. 36).)

## <u>CONCLUSION</u>

For the foregoing reasons, and based on the law and argument presented in open Court, the Court should enter judgment in favor of the Trustee, and against each Defendant:  (i) individually in the amount of each Defendant's "Unpaid Principal and Interest," plus the accrued interest on these amounts from June 30, 2013 to the date of judgment at the rate of CBR plus 2 percentage points per annum; and (ii) jointly and severally in the amount of the Trustee's reasonable attorneys' fees and costs incurred in connection with this action and other activities undertaken to collect and enforce Defendants' Notes or that otherwise arise from or relate to the Notes.  In the alternative, the Court should enter judgment in favor of the Trustee, and against each Defendant, and order each Defendant to pay restitution or other appropriate equitable relief in an amount to be determined by the Court.  Finally, the Court should award such additional pre-judgment interest, attorneys' fees and costs, and other relief as the Court deems appropriate.

Dated: February 25, 2014                    Respectfully submitted,


                                            /s/  Bilal Zaheer
                                            Jonathan W. Young (#6204590)
                                            W. Allen Woolley (#6227238)
                                            Bilal Zaheer (#6291119)
                                            Erin L. Brechtelsbauer (#6301510)
                                            EDWARDS WILDMAN PALMER LLP
                                            225 West Wacker Drive, Suite 3000
                                            Chicago, Illinois  60606-1229
                                            Telephone:  (312) 201-2000
                                            Facsimile:  (312) 201-2555
                                            *Attorneys for John W. Costello, not individually,
                                            but as Litigation Trustee under the Comdisco
                                            Litigation Trust*

# FIGURE 1

## DEFENDANTS' ALLEGED VIOLATIONS OF REGULATIONS G AND U

| | |
|---|---|
| **Notes** | (1) **"Extending Violation" by the Bank**: Defendants contend that the Notes violate Regulation U because the Notes are indirectly secured by the SIP shares in an amount that exceeds 50% of the SIP share value. |
| | (2) **"Purpose Statement Violation" by the Bank**: Defendants contend that the Bank was required to obtain Form FR U-1 purpose statements in connection with the Notes, and its failure to do so constitutes a violation of Regulation U. |
| **Guaranty** | (3) **"Extending Violation" by Comdisco**: Defendants contend that the Guaranty violates Regulation G because it is indirectly secured by the SIP shares in an amount that exceeds 50% of the SIP share value. |
| | (4) **"Arranging Violation" by the Bank**:  Defendants contend that the Bank "arranged" for Comdisco's Guaranty of the Notes in violation of Regulation U. |
| | (5) **"Purpose Statement Violation" by Comdisco**: Defendants contend that Comdisco was required to obtain form FR G-3 purpose statements in connection with the Guaranty, and its failure to do so constitutes a violation of Regulation G. |

# FIGURE 2

## PURPORTED FALSE OR MISLEADING STATEMENTS ALLEGED IN AFFIRMATIVE DEFENSES

| # | Alleged Misrepresentation | Source | Reasons Not Actionable |
|---|---|---|---|
| 1 | The execution and delivery of, and performance by the Company of its obligations under, each Loan Document to which it is a party will not result in a breach or violation of, conflict with, or constitute a default under the certificate of incorporation or by-laws of the Company, any Requirement of Law … (Aff. Defs. ¶ 30) | Facility Agreement §4.01(c) | • Not false or misleading<br>• Representation by Comdisco to the Bank<br>• Legal opinion<br>• Facts Defendants claim make this a misleading statement were all fully disclosed (JS Appx. 2) |
| 2 | No part of the proceeds of any Loan will be used in a manner which would violate, or result in a violation of, Regulation G, Regulation T, Regulation U or Regulation X. Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate or be inconsistent with the provisions of Regulation G, Regulation T, Regulation U or Regulation X. (Aff. Defs. ¶ 31) | Facility Agreement §4.01(h) | • Not false or misleading<br>• Representation by Comdisco to the Bank<br>• Even if Comdisco's guaranty violated the margin regulations, no proceeds of the *loan* were used in any manner that violated the margin regulations<br>• Legal opinion<br>• Facts Defendants claim make this a misleading statement were all fully disclosed (JS Appx. 2) |
| 3 | The loan is not technically secured by the securities because we get into a margin account and this is not a margin account. It is an unsecured loan that actually you could pay off, you could sell your house, who cares. It doesn't require that you sell the stock. (Aff. Defs. ¶ 44) | SIP Presentation | • Not false or misleading—there is no margin account and the loan could be paid off by whatever means the participant had<br>• Representation by Comdisco, not the Bank. Bank had no knowledge of this statement as it did not attend the SIP Presentation (JS 572, 594-95)<br>• Even if Comdisco's guaranty violated the margin regulations, the loans were not technically secured by the securities; no claim of "direct" security<br>• Legal opinion<br>• Facts which Defendants claim make this a misleading statement were fully disclosed to participants (JS Appx. 2) |
| 4 | **No Illegal Transactions.** The Program and all Stock Options granted pursuant to it are subject to all laws and regulations of any governmental authority which may be applicable thereto; and notwithstanding any provision of the Program or any Stock Options, Participants shall not be entitled to exercise Stock Options or receive the benefits thereof and the Company shall not be obligated to deliver any Common Stock or pay any benefits to a Participant if such exercise, delivery, or payment of benefits would constitute a violation by the Participant or the Company of any provision of any such law or regulation. (Aff. Defs. ¶ 29) | 1998 Comdisco Stock Option Program §6.11 | • Not false or misleading<br>• Contract term between Bank and Comdisco, not a representation<br>• Legal opinion<br>• Comdisco's document, not the Bank's<br>• Facts which Defendants claim make this a misleading statement were fully disclosed to participants (JS Appx. 2) |
| 5 | <u>No Collateral.</u> Notwithstanding any reference herein to any collateral securing any of the Guaranteed Debt, it is acknowledged that, on the date hereof, neither the Company nor any Borrower has granted, or has obligation to grant, any security interest or other lien on any of its property (including, without limitation, the Restricted Stock) to the Lenders as security for the Guaranteed Debt. (Aff. Defs. ¶¶ 35, 45) | Facility Agreement §7.06 | • Not false or misleading; neither Comdisco nor the Borrower granted any security interest or lien on any of its property<br>• Contract term between Bank and Comdisco, not representation<br>• Legal opinion<br>• Facts which Defendants claim make this a misleading statement were fully disclosed to participants (JS Appx. 2) |

| **#** | **Alleged Misrepresentation** | **Source** | **Reasons Not Actionable** |
|---|---|---|---|
| 6 | **Q: Is the Loan secured by the stock purchased?**<br><br>A: No, the Loan is not secured by the stock. The Loan will be full recourse obligation of each participant. However, Comdisco holds the actual stock certificates and the sale of the stock is restricted by the terms of the Shared Investment Plan such that proceeds must first be used to repay the Loan obligation. The Certificates representing the SIP shares will contain a legend reflecting the restrictions on transfer, use of sale proceeds and Comdisco's right of first refusal. (*not in Aff. Defs.*) | Comdisco SIP Prospectus, Q&A at 00034 | • Not false or misleading; does not address guaranty, and "however" clause qualifies statement with disclosure of pertinent facts<br>• Not alleged in affirmative defenses as required by FRCP 9(b)<br>• Representation by Comdisco, not the Bank<br>• Legal opinion<br>• Facts which Defendants claim make this a misleading statement were fully disclosed to participants (JS Appx. 2) |
| 7 | **Q: If the price of Comdisco stock were to drop below the purchase price, would I receive a margin call?**<br><br>A: No. Since the purchased SIP shares do not serve as collateral for the loan from The First National Bank of Chicago, the loan is not a margin loan. (Aff. Defs. ¶ 12) | Comdisco SIP Prospectus, Q&A at 00034 | • Representation by Comdisco, not the Bank<br>• Not false or misleading; no margin calls, and SIP shares were not collateral for loans (even if guaranty violated margin regulations)<br>• Legal opinion<br>• Facts which Defendants claim make this a misleading statement were fully disclosed to participants (JS Appx. 2) |
| 8 | Comdisco falsely represented that it 'significantly weighed [each employee's] ability to assume the substantial personal financial risk that is associated with this [SIP] program.' (Aff. Defs. ¶ 52) | *Not Disclosed* | • Representation by Comdisco, not the Bank<br>• Inadequate pleading under FRCP 9(b)<br>• Bank had no knowledge of this statement<br>• Not misleading in light of allegation that "Comdisco stated that it would not look at an individual's personal financial statement" (Aff. Def. ¶ 23) |
| 9 | [D]uring 2000, Nicholas Pontikes conducted private meetings with [unidentified] SIP Participants at which he made affirmative representations that the stock was undervalued. (Aff. Defs. ¶ 79) | Alleged Oral Statements by Pontikes to unidentified SIP participants | • Representation by Comdisco; Bank had no knowledge of this statement<br>• Allegedly occurred after the closing of the SIP program |
| 10 | In order to discourage the sale of the SIP stock, on one or more occasions in January or February 2001, after the price of the stock began to fall, Phil Hewes, a member of the Board of Directors and then CEO of Comdisco, also represented to [unidentified] SIP Participants, on behalf of Comdisco, that Comdisco would protect them from any losses in connection with the SIP. (Aff. Defs. ¶ 80) | Alleged Oral Statement by Hewes to unidentified SIP participants | • Representation by Comdisco; Bank had no knowledge of this statement<br>• Hewes testified that he never made this statement (JS 986, 988)<br>• Allegedly occurred after the closing of the SIP program<br>• Subject to exclusion for the reasons set forth in Plaintiff's Motion *In Limine* No. 5<br>• Future promise and Defendants did not offer any evidence at trial that the Comdisco did not intend to perform this promise |
| 11 | FNBC's subsequent default notices to Defendant and other SIP Participants stated that the lenders, 'presently intend to further assess the situation prior to commencing any collection procedures against you. (Aff. Defs. ¶ 84) | FNBC Default Notices | • Occurred after the closing of the SIP program<br>• Did not occur in connection with sale or purchase of security<br>• Not false or misleading; no evidence that the Bank did not further assess the situation prior to commencing any collection procedures<br>• Subject to exclusion for the reasons set forth in Plaintiff's Motion *In Limine* No. 5<br>• Future promise and Defendants did not offer any evidence at trial that the Comdisco did not intend to perform this promise |

| # | Alleged Misrepresentation | Source | Reasons Not Actionable |
|---|---|---|---|
| 12 | Comdisco represented to the Prospective SIP Participants that the Comdisco stock they were acquiring pursuant to the SIP Program was worth the same amount as Comdisco's publicly traded stock. This representation was not true because notwithstanding that the SIP stock was offered and acquired at the current public market price of $34.50 cents per share, it could not be sold for one year, and thereafter the stock was subject to other restrictive terms, all of which made the stock artificially overpriced at the time it was issued. (Aff. Defs. ¶ 57) | Section 83(b) Tax Election Form | • Facts which Defendants allege make this a misleading statement, the restrictions on the stock, were fully disclosed—Tax election form specifically stated that the value was determined exclusive of restrictions on the stock (*see, e.g.*, PX 670)<br>• Defendants did not offer any evidence of alleged true value of SIP stock |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 25, 2014, a true and correct copy of the foregoing **PLAINTIFF'S POST-TRIAL BRIEF**, along with accompanying exhibits, was filed with the Clerk of the Court using the CM/ECF system, which sent notification to:

James R. Figliulo
Jeff D. Harris
Gregory L. Stelzer
FIGLIULO & SILVERMAN, PC
10 South LaSalle Street
Suite 3600
Chicago, Illinois 60603
Telephone: (312) 251-4600
Facsimile: (312) 251-4610

Gini S. Marziani
Davis McGrath LLC
125 S. Wacker Drive
Suite 1700
Chicago, Illinois 60606
Phone: (312) 332-3033
Fax: (312) 332-6376

*/s/ Bilal Zaheer*
Bilal Zaheer

AM 25961633.11