**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JOHN W. COSTELLO, not individually, but as
Litigation Trustee under the Comdisco Litigation
Trust,

**Honorable Robert W. Gettleman**

*Plaintiff*,

Magistrate Judge Mary M. Rowland

v.

Civil Case No. 05-736

MIKE J. POISELLA,
ROMAN BRUNNER,
JOSEPH J. SCOZZAFAVA, and
GREGORY A. WEISS,

Civil Case No. 05-740
Civil Case No. 05-746
Civil Case No. 05-764

*Defendants.*

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
POST-TRIAL BRIEF AND MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iii

KEY TO CITATIONS AND ABBREVIATIONS ..................................................................x

I.  DEFENDANTS FAILED TO PROVE THEIR SECTION 7(d) DEFENSE. ...................1

    A.  The Bank Had No Direct or Indirect Security Interest in the Stock............................1

    B.  The Court Should Give Deference to the FRBC's Opinion Letter..............................4

        1.  The FRBC is a Federal Agency for Purposes of Issuing Opinions.................4

        2.  The FRBC Letter Is Entitled to Deference. .......................................................5

    C.  Any Illegality in Making or Performing Comdisco's *Guaranty* Would Not
        Impair the Enforceability of the *Notes*...................................................................7

    D.  Defendants Mischaracterize the Timing and Content of the Murray Letters. ............8

II.  THE SECURITIES FRAUD AND INDUCEMENT DEFENSES FAIL. ....................... 10

    A.  Defendants Lack Any Compelling Evidence of Scienter. ........................................ 10

        1.  Defendants' "Regulatory Arbitrage" and "Off-Balance-Sheet Loan"
            Theories Do Not Prove Scienter........................................................................ 10

        2.  Defendants' Attack on "Advice of Counsel" Is Ineffective............................ 11

    B.  Defendants Failed to Show Actionable Statements, Omissions or Conduct. ........... 14

    C.  Defendants Have Not Shown a Section 17(a) Violation by the Bank....................... 18

    D.  Defendants Failed to Prove Their Inducement Defenses........................................... 19

III.  EVEN IF THE COURT FINDS TECHNICAL ILLEGALITY, IT SHOULD
     STILL ENFORCE THE NOTES OR AWARD RESTITUTION...................................... 20

    A.  Defendants' Preemption Arguments Disregard Controlling Federal Law. ............... 20

    B.  Defendants Admit that Illinois State Law Prescribes Balancing. .............................. 25

    C.  Defendants' Purported "Motion to Dismiss" the Trustee's Alternate Remedy
        Is Procedurally Flawed and Substantively Meritless. ...................................... 27

    D.  The Equities Support Enforcement or at Least Restitution. ...................................... 30

IV.  DEFENDANTS' CONTRACT DEFENSES FAIL................................................................ 32

    A.  Defendants' Excuse of Nonperformance Defense Has Several Fatal Defects......... 32

    B.  Defendants' Lack of Consideration Defense Is Based on Antiquated Law. ............. 34

    C.  Compliance with Federal Regulations Was Not a Condition Precedent.................... 34

V.  THE COURT SHOULD STAND BY ITS PRIOR RULING THAT EVIDENCE
    OF PROJECT HORIZON AND OTHER ESPs IS INADMISSIBLE.............................. 34

VI.  THE TRUSTEE ESTABLISHED DAMAGES........................................................................ 35

CONCLUSION ...................................................................................................................... 35

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Ackerman v. Schwartz,*
   947 F.2d 841 (7th Cir. 1991).....................................................................................16

*ADM Inv. Servs., Inc. v. Collins,*
   515 F.3d 753 (7th Cir. 2008).....................................................................................23

*American Buyers Club of Mt. Vernon v. Grayling,*
   53 Ill. App. 3d 611 (5th Dist. 1977)...........................................................................24

*Amoco Oil Co. v. Toppert,*
   56 Ill. App. 3d 595 (3d Dist. 1978).............................................................................25

*Arnold v. W.D.L. Investments, Inc.,*
   703 F.2d 848 (5th Cir. 1983).......................................................................................5

*Baker, Watts & Co. v. Miles & Stockbridge,*
   876 F.2d 1101 (4th Cir. 1989)...................................................................................22

*Bankers Life and Casualty Co. v. Bellanca Corp.,*
   288 F.2d 784 (7th Cir. 1961)..............................................................................21, 29

*Brinks Inc. v. Bd. of Governors of the Fed. Reserve Sys.,*
   466 F. Supp. 116 (D.D.C. 1979) .................................................................................4

*Bury v. Marietta,*
   692 F.2d 1335 (11th Cir. 1982) ..................................................................................6

*C.E. Carlson, Inc. v. SEC,*
   859 F.2d 1429 (10th Cir. 1988) ................................................................................12

*Chutich v. Touch Ross & Co.,*
   960 F.2d 721 (8th Cir. 1992).....................................................................................22

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.,*
   399 F.3d 651 (6th Cir. 2005).....................................................................................16

*Cooper v. Union Bank,*
   527 F.2d 762 (9th Cir. 1976).....................................................................................13

*Costello v. Grundon,*
   651 F.3d 614 (7th Cir. 2011).....................................................................................32

*Crum v. Krol,*
   99 Ill. App. 3d 651 (1st Dist. 1981) ..........................................................................27

*Ctr. for Athletic Medic., Ltd. v. Independent Medical Billers of Ill., Inc.,*
   383 Ill. App. 3d 104 (1st Dist. 2008) ............................................................ 29, 30

*Dugan v. Quanstrom,*
   No. 03 C 0254, 2004 U.S. Dist. LEXIS 1209 (N.D. Ill. Jan. 29, 2004) ........................... 27

*Eby v. Reb Realty, Inc.,*
   495 F. 2d 646 (9th Cir. 1974) ...................................................................... 5

*Elda Arnbold and Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.,*
   284 F.3d 693 (7th Cir. 2002) ................................................................. 32, 33

*FDIC v. Wabick,*
   335 F.3d 620 (7th Cir. 2003) .................................................................... 23

*Federal Reserve Bank of Boston v. Comm'r of Corp. & Taxation,*
   499 F.2d 60 (1st Cir. 1974) ................................................................. 1, 4, 3

*Freeman v. Marine Midland Bank New York,*
   419 F. Supp. 440 (E.D.N.Y. 1976) ......................................................22, 23, 26, 29

*Frigo v. Silver Cross Hosp. and Med. Ctr.,*
   377 Ill. App. 3d 43 (1st Dist. 2007) .............................................................. 30

*Georgou v. Fritzshall,*
   178 F.3d 453 (7th Cir. 1999) .................................................................... 12

*Goldman v. Bank of the Commonwealth,*
   467 F.2d 439 (6th Cir. 1972) .................................................................... 24

*Goldstein v. Lustig,*
   154 Ill. App. 3d 595 (1st Dist. 1987) ............................................................ 33

*Grove v. First Nat'l Bank of Herminie,*
   489 F.2d 512 (3d Cir. 1973) .................................................................... 24

*Gulley v. Markoff & Krasny,*
   664 F.3d 1073 (7th Cir. 2011) ................................................................... 5

*Howard v. SEC,*
   376 F.3d 1136 (D.D.C. 2004) ............................................................... 11, 12

*In re H&R Block Sec. Litig.,*
   527 F. Supp. 2d 922 (W.D. Mo. 2007) ........................................................... 16

*In re Omnicare, Inc. Sec. Litig.,*
   No. 11-cv-173, 2013 U.S. Dist. LEXIS 42973 (E.D. Ky. March 27, 2013) ........................ 16

*In re Sofamor Danek Grp, Inc. (Murphy v. Sofamor Danek Grp., Inc.),*
    123 F.3d 394 (6th Cir. 1997) ........................................................................................16

*Janus Capital Group v. First Deriv. Traders,*
    131 S. Ct. 2296 (2011) ...............................................................................................15

*K. Miller Constr. Co v. McGinnis,*
    238 Ill. 2d 284 (Ill. 2010) ...................................................................................... 25, 26

*Kedzie & 103rd Curr. Exch. Inc. v. Hodge,*
    234 Ill. App. 3d 1017 (1st Dist. 1992) .......................................................................29

*Kelly v. Kosuga,*
    358 U.S. 516 (1959) .............................................................................................21, 22, 23

*King v. Gibbs,*
    876 F.2 1275, 1280 (7th Cir. 1989) ...........................................................................22

*Kowal v. MCI Comm'n Corp.,*
    16 F.3d 1271 (D.D.C. 1994) .....................................................................................16

*Kushner v. Beverly Enters., Inc.,*
    317 F.3d 820 (8th Cir. 2003) .....................................................................................16

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005) .....................................................................................17

*Lewis v. United States,*
    680 F.2d 1239 (9th Cir. 1982) ..................................................................................4, 5

*LIT Am., Inc. v. Liberty Fund VI,*
    No. 89 C 6747, 1991 U.S. Dist. LEXIS 4915 (N.D. Ill. April 8, 1991) ...........................................26

*Markowski v. SEC,*
    34 F.3d 99 (2d Cir. 1999) .........................................................................................12

*Merch. Nat'l Bank v. Kolber,*
    50 Ill. App. 3d 365 (1st Dist. 1977) ...........................................................................25

*Miller v. Champion Enter. Inc.,*
    346 F.3d 660 (6th Cir. 2003) .....................................................................................11

*Mills v. Elec. Auto-Lite Co.,*
    396 U.S. 375 (1970) .............................................................................................22, 23, 26

*Mobil Oil Corp. v. Higginbotham,*
    436 U.S. 618 (1978) .................................................................................................23

*N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.,*
  799 F.2d 265 (7th Cir. 1986)................................................20, 21, 22, 24

*O'Melveny & Myers v. FDIC,*
  512 U.S. 79 (1994)................................................................................23

*Occidental Life Ins. Co. of North Carolina v. Pat Ryan & Assoc.,*
  496 F.2d 1255 (4th Cir. 1974) ...............................................22, 23, 26

*Olson v. Paine, Webber, Jackson & Curtis, Inc.,*
  806 F.2d 731 (7th Cir. 1986)................................................................22

*Pearlstein v. Scudder & German,*
  429 F.2d 1136 (2d Cir. 1970)...............................................................22

*People ex rel. Hartigan v. E & E Hauling, Inc.,*
  153 Ill. 2d 473 (Ill. 1992)....................................................................30

*Peoples Nat'l Bank of N.J. v. Fowler,*
  372 A.2d 1096 (N.J. 1977) ..................................................................24

*Polaroid Corp. v. Disney,*
  862 F.2d 987 (3d Cir. 1988)................................................................16

*Rubin v. Schottenstein, Zox & Dunn,*
  143 F.3d 263 (6th Cir. 1998)...............................................................16

*Rush-Presbyterian-St. Luke's Medic. Ctr. v. Hellenic Republic,*
  980 F.2d 449 (7th Cir. 1992) .......................................................25, 33

*Scheiber v. Dolby Labs., Inc.,*
  293 F.3d 1014 (7th Cir. 2002) .............................................................29

*Schlifke v. Seafirst Corp.,*
  866 F.2d 935 (7th Cir. 1989)...............................................................17

*SEC v. Goldfield Deep Mines Co.,*
  758 F.2d 459 (9th Cir. 1985)...............................................................12

*SEC v. Kelly,*
  817 F. Supp. 2d 340 (S.D.N.Y. 2011)..................................................17

*SEC v. McNamee,*
  481 F.3d 451 (7th Cir. 2007)...............................................................12

*SEC v. Savoy Indus., Inc.,*
  665 F.2d 1310 (D.D.C. 1981) .............................................................11

*SEC v. St. Anselm Exploration Co.,*
    936 F. Supp. 2d 1281 (D. Colo. 2013) ............................................................. 17

*Shaw v. Hyatt Int'l Corp.,*
    461 F.3d 899 (7th Cir. 2006) ............................................................................ 30

*Slomiak v. Bear Stearns & Co.,*
    597 F. Supp. 676 (S.D.N.Y. 1984) ................................................................... 18

*Sola Elec. Co. v. Jefferson Elec. Co.,*
    317 U.S. 173 (1942) ......................................................................................... 21

*South Ctr. Plumbing & Heating Supply Co. v. Charles,*
    90 Ill. App. 2d 15 (1st Dist. 1967) ................................................................... 25

*Stonehill v. Security Nat'l Bank,*
    68 F.R.D. 24 (S.D.N.Y. 1975) .......................................................................... 24

*U.S. Bank Nat'l Ass'n v. Clark,*
    216 Ill. 2d 334 (2005) ...................................................................................... 26

*U.S. v. Lindo,*
    18 F.3d 353 (6th Cir. 1994) .............................................................................. 12

*U.S. v. Mead Corp.,*
    533 U.S. 218 (2001) ........................................................................................... 5

*U.S. v. Peterson,*
    101 F.3d 375 (5th Cir. 1996) ............................................................................ 12

*U.S. v. United Medic. & Surgical Supply Corp.,*
    989 F.2d 1390 (4th Cir. 1993) .......................................................................... 12

*UFITEC, S.A. v. Carter,*
    571 P.2d 990 (Cal. 1977) .................................................................................. 24

*Useden v. Acker,*
    947 F.2d 1563 (11th Cir. 1991) ........................................................................ 18

*Vine Street Clinic v. Healthlink, Inc.,*
    222 Ill.2d 276 (Ill. 2006) ........................................................................... 27, 29

*Walsh v. Schlecht,*
    429 U.S. 401 (1977) ......................................................................................... 21

*West v. The Western Casualty,*
    846 F.2d 387 (7th Cir. 1988) ............................................................................ 16

*Wright v. IBM Corp.*,
    796 F. Supp. 1120 (N.D. Ill. 1992) ..........................................................................16

**STATUTES**

810 ILCS 5/8-101 ..................................................................................................................2

810 ILCS 5/8-106(b) ...........................................................................................................2

810 ILCS 5/8-301(b) ...........................................................................................................2

810 ILCS 5/8-305 ..................................................................................................................2

810 ILCS 5/9-106(a) ...........................................................................................................2

15 U.S.C. § 78g .........................................................................................................passim

15 U.S.C. § 78j ..........................................................................................................passim

15 U.S.C. § 78cc ........................................................................................................passim

**OTHER AUTHORITIES**

12 C.F.R. § 207.3(e) ...........................................................................................................18

12 C.F.R. § 221.3(b) ...........................................................................................................18

12 C.F.R. § 207.103(g) .....................................................................................................7, 8

12 C.F.R. §221.3 ................................................................................................................1, 2

12 C.F.R. § 221.113 ...........................................................................................................2, 3

Fed. R. Civ. P. 8(a) ...........................................................................................................27

Fed. R. Civ. P. 9(b) ...........................................................................................................15

Fed. R. Civ. P. 10(b) .........................................................................................................27

Fed. R. Civ. P. 12(c) .........................................................................................................28

Rule 10b-5 ................................................................................................................passim

Rule 12(h)(2) ......................................................................................................................28

Rule 407 .........................................................................................................................34, 35

KEY TO CITATIONS AND ABBREVIATIONS

- <u>Citations to the Docketed Court Record</u>.  In virtually all instances, pleadings, motions, and other filings were docketed contemporaneously on the ECF system in each of the above-captioned cases.  Unless otherwise indicated, references to the case docket will refer to the filings in *Costello v. Poisella*, 05-cv-736, and appear herein in the form **(Dkt. 000)**. Defendant's Answer and Affirmative Defenses to Corrected Second Amended Complaint is referenced by paragraph number with respect to background facts, and by defense number (with or without a paragraph number) with respect to affirmative defenses all in the forms **(Aff. Def. ¶ 00), (Aff. Def. No. 0),** or **(Aff. Def. No. 0, ¶ 0)**.

- <u>Citations to the Trial Record</u>.  At the Court's direction, the parties submitted a Joint Summary of Trial Record and Testimony ("Joint Summary") summarizing the trial record and selected trial exhibits.  (Dkt. 355)  Because the Joint Summary provides a comprehensive summary, this brief does not contain a separate statement of facts.  Citations to the numbered paragraphs of the Joint Summary appear herein in the form **(JS 000)**.  Citations to volumes 1 and 2 of the Appendix to the Joint Summary appear herein in the form **(JS Appx. 1, Tab 00)** or **(JS Appx. 2, Tab 00)**.  Citations directly to Joint, Plaintiff or Defendant trial exhibits appear in the form **(JX 00)**, **(PX 00)** or **(DX 00)**.  Citations directly to the trial transcript indicate the date and the page of the transcript and appear in the form **(00/00/13 Tr. at 000)**.  At the Court's direction, trial exhibits and excerpts from the trial transcript that are cited directly are included as exhibits in the appendix filed herewith.

- <u>Appendix to the Trustee's Post-Trial Briefs</u>.  The Trustee filed an appendix containing unpublished authority and certain other materials concurrently with his initial Post-Trial Brief.  The Trustee is filing a supplement to that appendix concurrently with this brief.  Exhibits from the appendix and supplement are referenced by exhibit number in the form **(Ex. 00)** or **Exhibit 00**.  The appendix to the initial brief contained Exhibits 1 through 37, and the supplement filed with this brief contains the remaining exhibits.  In addition, there are two figures (Figures 1 and 2), referenced as **(Fig. 0)** or **Figure 0**, attached to the initial Post-Trial Brief.  Two additional figures (Figures 3 and 4), referenced in the same format, are attached to this brief.

- <u>References to 1998 Statutes and Regulations</u>.  Unless otherwise indicated, references to the following regulations and statutes are to the versions in effect in February 1998:  Regulation G (12 C.F.R. § 207) (Ex. 1); Regulation U (12 C.F.R. § 221) (Ex. 2); Regulation X (12 C.F.R. § 224)

(Ex. 3); section 7 of the Exchange Act of 1934 (15 U.S.C. § 78g) (Ex. 4); section 10 of the Exchange Act (15 U.S.C. § 78j) (Ex. 5); Rule 10b-5 (17 C.F.R. § 240.10b-5) (Ex. 6); section 29 of the Exchange Act (15 U.S.C. § 78cc) (Ex. 7); section 17 of the Securities Act of 1933 (15 U.S.C. § 77q) (Ex. 8).

- <u>References to SIP Program Documents</u>. Comdisco's Shared Investment Plan is referred to herein as the "**SIP**." SIP program participants' notes are referred to herein as the "**Notes**." The Facility and Guaranty Agreement, dated February 2, 1998, is referred to herein as the "**Facility Agreement**." Comdisco's guaranty of the SIP loans under the Facility Agreement is referred to as the "**Guaranty**."

- <u>References to the Parties</u>. Plaintiff John W. Costello, not individually, but as Litigation Trustee under the Comdisco Litigation Trust, is referred to as the "**Trustee**." Defendants Mike J. Poisella, Roman Brunner, Joseph J. Scozzafava, and Gregory A. Weiss is collectively referred to as "**Defendants**."

- <u>References to Restatements</u>. References to **Restatement §§ 178, 197, and 344** are to those sections in the Restatement (Second) of Contracts (1981) (Exs. 30, 32, 38). References to **Restatement § 32** is to that section in the Restatement (Third) of Restitution and Unjust Enrichment (2011) (Ex. 31).

- <u>References to the Plaintiff's and Defendants' Opening Post-Trial Briefs</u>. Plaintiff's Post-Trial Brief is referenced by page number in the form "**PxBr 00**" and Defendants' Post-Trial Brief in the form "**DxBr 00**."

I.    **DEFENDANTS FAILED TO PROVE THEIR SECTION 7(d) DEFENSE.**

A.    **The Bank Had No Direct or Indirect Security Interest in the Stock.**

Despite their exhaustive attention to Regulations G and U (DxBr 1-8), Defendants make no effort to rebut either of the Trustee's key arguments showing compliance.  If the Bank, in good faith, did not rely on the SIP stock as collateral, this conclusively establishes the Notes were not indirectly secured.  (PxBr 10-12) 12 C.F.R. §221.3(g)(2)(iv).  Yet Defendants do not even attempt to challenge Clarke's testimony that the Bank approved and priced the SIP loans based exclusively on Comdisco's Guaranty and financial strength, not the SIP stock.  (PxBr 10-12)  Likewise, Defendants argue that "restrictions were imposed" on the SIP stock, but they cannot show that any of the restrictions appear in the ***Notes***, or that the ***Bank*** imposed or could enforce the restrictions.  (PxBr 7-10)  In short, the trial established conclusively that the ***Notes***—which are the only instruments the Trustee seeks to enforce—were not directly or indirectly secured by the SIP stock.  None of Defendants' arguments in any way alter this conclusion.

<u>First</u>, Defendants assert that "the sale proceeds of SIP stock would benefit FNBC following a default by an individual borrower."  (DxBr 6)  But the unrebutted evidence showed that Comdisco was a $6.4 billion company with access to cash far in excess of the amount of its Guaranty.  (JS 335-338; PxBr 10-12)  If a borrower defaulted, the Bank could proceed immediately with a Guaranty claim against Comdisco, which had more than sufficient assets without the SIP stock to cover any Guaranty claim.  (JS 508, Appx 2 § 7.01)  (Indeed, Comdisco's estate ultimately paid $123 million to settle the Bank's Guaranty claim on the entire SIP.)  As purported evidence that the Bank was relying on the stock proceeds, Defendants point to Harvey's testimony that if the Bank made a demand under the Guaranty, Comdisco would either tell the borrower to sell the stock or "exercise its rights and sell the stock" in order to pay the Bank or reimburse itself.  (DxBr 3)  But this testimony (from a state court defendant with a significant stake in the outcome of these cases)

suggests only that **Comdisco** might sell the stock to cover its own losses (which it did not actually have a legal right to do).[1] Because of Comdisco's substantial non-stock assets, the Bank would get paid regardless of whether Comdisco used the proceeds from the stock to make itself whole.

Second, Defendants misinterpret references in the Facility Agreement to "collateral securing the guaranteed debt," suggesting that these are a tacit admission that the SIP stock secured the loans. (DxBr 6) The references come from language designed to ensure that the Bank could proceed directly against Comdisco on the Guaranty, even if the Bank later acquired collateral for the loans. (*See* JS Appx 2, Tab 11 §§ 7.02, 7.03) The actual language is "**any** collateral securing the guaranteed debt" (*Id.* (emphasis added)), which is consistent with the Bank acquiring collateral for one or more of the loans at a **future time**. The Facility Agreement expressly disclaimed that there was any collateral—including the SIP stock—**as of the date of the Facility Agreement**:

> No Collateral. Notwithstanding any reference herein to any collateral securing any of the Guaranteed Debt, it is acknowledged that, on the date hereof, neither the Company nor any Borrower has granted, or has any obligation to grant, any security interest in or other lien on any of its property (including, without limitation, the Restricted Stock) to the Lenders as security for the Guaranteed Debt.

(JS Appx 2, Tab 11 § 7.06) The trial record confirms that the Bank never had any lien, security interest, or right to proceed against the stock in the event of the default. (JS 314-315, 511, 569)

Third, Defendants point to the three factors listed in 12 C.F.R. § 221.113(g) to argue the SIP

---

[1] Defendants' contention that the stock **directly** secured the Guaranty is legally wrong. None of the provisions cited by Defendants gave Comdisco the right to foreclose on the stock in the event of a default. The right of first refusal only gave Comdisco the right to "decide whether or not to purchase" the SIP shares, not a right to foreclose or sell the stock in the event of a default. The reservation of the right to take action in section 7(d) of the SIP was solely a reservation of the right to bring a lawsuit to collect, not a creation of a security interest. And, as Sabel testified, the stock power did not give the legal right to foreclose. (JS 550-551) Under the UCC, such a stock power was ineffective because Comdisco ultimately decided to use **uncertificated** shares. (JS 532) "Indorsements," such as the blank stock powers signed by Defendants, are effective for the purpose of granting "a power to assign, transfer, or redeem [a certificated security]," whereas an "instruction" is the means by which the transfer or redemption of an uncertificated is accomplished. *See* 810 ILCS 5/8-101(11), (12). There is no evidence in the record that Comdisco followed the UCC's provisions for attaching and perfecting a security in the uncertificated SIP shares. *See* 810 ILCS 5/8-106(b), 301(b), 305, 9-106(a).

loans were indirectly secured. (DxBr 7) But they take § 221.113 out of context. Section 221.113 was based on the specific facts of a certain non-guaranteed, two-party credit transaction. 12 C.F.R. § 221.113(a), (b). The Board did not consider whether the presence of a guarantor altered its analysis, nor did it address good faith non-reliance. Furthermore, Defendants rely on parts (f) and (g) of § 221.113, but disregard the holding in § 221.113(e) that indirect security contemplates "any arrangement under which the stock is more readily available as security to the **lending bank**." *Id.* at § 221.113(e) (emphasis added). Comdisco's restrictions did not make the stock more accessible to the **Bank**. (PxBr 7-8)

Defendants contend the Bank meets the second factor of 12 C.F.R. § 221.113 because the Bank "insisted upon the arrangement," including the restrictions. (DxBr 7) The evidence does not support this contention. Comdisco, in consultation with McBride, made the decision to include the SIP restrictions. (JS 555-558) There is no evidence the Bank insisted on any of the restrictions. Defendants cite language from the Facility Agreement indicating that the loans must be used to buy the "Restricted Stock," which was issued pursuant to the terms and conditions of the SIP. (DxBr 7; JS 477) But they ignore language in the same document making clear that the SIP could be "**amended, supplemented, restated or otherwise modified**" at the "**sole discretion**" of Comdisco. (JS Appx 2, Tab 11 at 9 (emphasis added)) Far from insisting on restrictions, the Bank permitted Comdisco to amend the SIP restrictions at any time, at its sole discretion. (*Id.*)

Fourth, there is no basis in the trial record for Defendants' bald assertion that the "SIP likely would have been described by FRBC's staff attorney as illegal under G and U, had Hale not concealed its offending features." (DxBr 7) Hale fully disclosed to the FRBC that the loans were guaranteed, that proceeds from the loans would be used to purchase the stock, that proceeds from sales must be used to repay the loans, that Comdisco would hold the stock, that participants could not sell in the first year of the program, and that each participant would sign a letter of direction

authorizing Comdisco to pay dividends on the stock directly to the Bank. (JS 346) The evidence at trial showed that the purported "omissions" from Hale's letter would *not* have impacted FRBC's conclusion that the loans were not secured, and that the FRBC (after consulting Board Staff margin regulation experts) signed off on the transaction. (PxBr 7-10, 14-15) There is no evidence the SIP was ever "criticized by supervisory authorities," even after Defendants raised their illegality defenses.

### B. The Court Should Give Deference to the FRBC's Opinion Letter.

Defendants contend that the Court should give no weight to FRBC Letter because it is "unentitled to" and "unworthy of" judicial deference. (DxBr 12) They are wrong on both counts.

### 1. The FRBC is a Federal Agency for Purposes of Issuing Opinions.

Defendants suggest that a court could never defer to an interpretation from a regional reserve bank because it is not a "federal agency." (DxBr 13-14) But as Defendant's own cases make clear, courts have held that regional reserve banks are federal "instrumentalities" or "agencies" in many contexts. *Lewis v. United States*, 680 F.2d 1239, 1242-43 (9th Cir. 1982) (regional reserve bank considered federal instrumentality where it performs an "important government function") (DxBr 13); *see also Brinks Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 466 F. Supp. 116 (D.D.C. 1979) (regional reserve bank is federal agency for purposes of the Service Contract Act); *Federal Reserve Bank of Boston v. Comm'r of Corp. & Taxation*, 499 F.2d 60 (1st Cir. 1974) (federal instrumentality for purposes of immunity from state and local taxation laws). The test of whether a regional reserve bank should be considered a "federal instrumentality" is whether the reserve bank is performing an "important government function." *Lewis*, 680 F.2d at 1242-43. The undisputed evidence is that the Federal Reserve Board and Staff empowered regional banks to provide interpretations of Board regulations, with the expectation that regional banks would follow existing Federal Reserve interpretations and consult Board staff on complex matters of interpretation. (PxBr 13) This is an important government function; the Board and Staff cannot respond directly to every request for

guidance and therefore rely on regional banks to respond to inquiries in the first instance. (JS 55)

## 2.     The FRBC Letter Is Entitled to Deference.

As the Trustee's initial brief demonstrated, the FRBC Letter is entitled to deference under the *Skidmore* standard. (PxBr 12-16)  Defendants suggest the FRBC Letter is unworthy of deference under any standard because it reflects the conclusions of a "junior" FRBC attorney. (DxBr 13)  But the FRBC Letter was based on consultation with Scott Holz and Oliver Ireland, who were margin regulation experts on the Board Staff. (PxBr 13-14; JS 380)  Defendants say McCauley has no recollection of this event (fifteen years later), but the FRBC Letter itself states that "[t]he legal staff of the Board of Governors has been consulted." (JS 403)  There is no evidence suggesting this statement is not true, and notes on the bottom of the FRBC's copy of the Hale Letter identified the Staff members consulted and recorded their comments. (JS 380-381)

Defendants also argue that the FRBC Letter resulted from an "*ad hoc*" process rather than a formal rulemaking process. (DxBr 15-16)  But Defendants' cases are inapposite because they address the applicability of controlling *Chevron*-style deference. (*Id.*)  *Skidmore* specifically permits courts to defer to "less formal" agency interpretations. *See U.S. v. Mead Corp.*, 533 U.S. 218, 234-235 (2001).  Under *Skidmore*, several circuits have deferred to "informal" opinions from Board Staff attorneys, observing that such opinions "represent an 'experience(d) and informed judgment.'" *Eby v. Reb Realty, Inc.*, 495 F. 2d 646, 650 (9th Cir. 1974); *Arnold v. W.D.L. Investments, Inc.*, 703 F.2d 848, 851 (5th Cir. 1983); *see also Gulley v. Markoff & Krasny*, 664 F.3d 1073, 1075 (7th Cir. 2011) (FTC informal staff letters entitled to respect).  FRBC's practice in preparing such letters included diligent review of relevant sources and, where appropriate, consultation with Board Staff. (JS 70-71, 79)  The FRBC Letter was circulated and maintained in the FRBC's "Visual Memory" system to be used as precedent in preparing future interpretations. (JS 410-411)

Defendants next assert that the FRBC Letter is not persuasive because "the FRBC has

significantly less expertise, if any, regarding G or U." (DxBr 19) But the "relative expertness" of the FRBC is irrelevant because, following its custom and practice, the FRBC consulted with the Board Staff's margin regulations experts, Holz and Ireland. (JS 65, 70, 73, 381, 394) Conceding that "someone at the FRBC apparently spoke to at least one attorney with the Board's legal staff," Defendants argue, citing *Bury*, that "it is surely impermissible to defer to an opinion of the FRBC" that incorporates Board Staff conclusions. (DxBr 19) But *Bury* only considered whether an unofficial staff interpretation should be entitled to ***dispositive*** deference; it did not consider *Skidmore* deference. *See Bury v. Marietta*, 692 F.2d 1335, 1340 (11th Cir. 1982).

Finally, Defendants charge that Hale's and McCauley's letters were incomplete and unpersuasive. But Hale disclosed the key features and restrictions of the SIP program, and there is no legitimate basis to attack the FRBC's conclusion that the Notes were not indirectly secured:

- Defendants say Hale's letter "did not ask whether CDO's guaranty would be directly or indirectly secured by the stock" or whether the Bank might commit an "arranging violation of U." (DxBr 16) But Hale's letter specifically disclosed the Guaranty and asked for concurrence under "G or U." (JS Appx 2, Tab G) Even if McCauley was not aware of the "guarantee-as-extension-of-credit" and "arranging" concepts in January 1998, it would be surprising if Holz and Ireland were not. Furthermore, Defendants' criticism has no bearing on the FRBC's conclusion (in consultation with Board Staff) that the ***Notes*** were not indirectly secured by the shares.

- Defendants argue that Hale's letter did not disclose the right of first refusal; right to impose restrictions on the timing, amount and form of sales; purported prohibition on pledging; reservation of right to take action against participants or their assets to obtain reimbursement; and right to take 50% of sales within 3 years. (DxBr 16-17) But as Sabel opined, these provisions would not have changed the outcome in light of the disclosed restrictions. (JS 357-379) Moreover, the Hale letter did not disclose the entire communication between Hale and the FRBC; Cathcart and Hale had multiple telephone conversations with the FRBC (JS 263-266, 349, 426), and Sabel testified his practice was to verbally preview and narrow the issues covered in the follow-up letter. (JS 350)

- Defendants contend the Hale Letter did not disclose that the Notes and Facility Agreement use the terms "Restricted Stock" and "collateral securing the Guaranteed Debt." (DxBr 18) These would be strange disclosures in a letter summarizing the SIP program. The Notes and Facility Agreement refer to "Restricted Stock" as a defined term to identify the purchased shares as those "shares of the Company's Common Stock ... issued pursuant to the terms and conditions of the Shared Investment Plan." (JS Appx 2, Tab 11 at 9) They do not, as

Defendants suggest, "incorporate[] the restrictions placed on the stock by the SIP." (DxBr 18)  As discussed above (§ I.A), the phrase "any collateral securing the Guaranteed Debt" does not include the SIP stock, which the Facility Agreement expressly states is not "collateral." (JS Appx 2 § 7.06)

- Defendants say the Hale letter failed to disclose that the Notes used an "exotic" repayment structure and that the Bank was not basing its decision to extend credit on the individual participants' ability to repay.  (DxBr 18)  But the Hale letter made clear that the Bank was relying on the Guaranty, which is sufficient to satisfy the good faith non-reliance provision. (PxBr 10-12)  The FRBC Letter specifically observes that the Notes are secured "solely by the company's guaranty" and concludes there is good faith non-reliance, reflecting Ireland's conclusion (shown in the handwritten notes) that the Notes would not be indirectly secured because the Bank was relying on Guaranty and "not [the] pledge of shares" for repayment. (JS 380, 403)

- Defendants fault the FRBC Letter for not citing § 207.103, which Defendants characterize as "identical to the instant cases."  (DxBr 19)  But § 207.103 is **not** "identical" to the SIP—it only concluded that where the company guarantor holds the stock and the bank arranges for the guaranty, the bank could be liable for an arranging violation.  *See* 12 C.F.R. § 207.103(g). It is silent on the separate question of whether the note at issue would be considered indirectly secured by the margin stock.

- Defendants complain that the FRBC Letter's conclusion, that the SIP's requirement of proceeds from sale of the stock going first to repay the Notes did not give rise to an indirect security, was wrong and inconsistent with prior Board interpretations stating that "[r]eliance on the proceeds from sale of securities is the same as reliance on the stock itself."  (DxBr 21) As discussed above, the Bank was not relying on proceeds for repayment any more than on the SIP shares themselves.  It was relying on Comdisco's more-than-adequate ability to pay on any Guaranty claim without resorting to stock proceeds.

In summary, it is this Court that must ultimately determine whether the Notes were indirectly secured.  However, the input of margin regulation experts on the Federal Reserve Board Staff provides critical insight into how the Federal Reserve Board interpreted the margin regulations in 1998, in the context of the Board's policies regarding protection of the nation's credit system. The FRBC interpretation (reflecting Board Staff input) should be accorded *Skidmore*-level deference.

### C.    Any Illegality in Making or Performing Comdisco's *Guaranty* Would Not Impair the Enforceability of the *Notes*.

Defendants argue at length that the **Guaranty** was an extending violation by Comdisco and an arranging violation by the Bank.  (DxBr 1-4, 8)  But the Bank's Guaranty claims were settled a decade ago, and the Trustee is now seeking only to enforce the **Notes**.  As shown in the Trustee's

initial brief, any violation in extending or arranging the Guaranty is therefore irrelevant. (PxBr 17-20) Defendants suggest that their Illinois *pari delicto* defense (which they never pled) "will operate to bar enforcement so long as that wrongdoing had a causal effect in causing the damages, even if the plaintiff's wrongdoing occurred in connection with a contract *other* than the one the plaintiff actually seeks to enforce." (DxBr 32) But if Defendants mean to suggest that they can maintain a so-called *pari delicto* defense to the Notes based on a violation in the Guaranty, they are wrong. As discussed below (§ III.A) and in the Trustee's initial brief (PxBr 17-18, 37-39), federal law determines the effect on a contract of a violation of a federal statute or regulation on a contract, and federal law does not permit broad-based non-enforcement of legal contracts merely because they relate to the same set of transactions as a contract that violates a regulation. Furthermore, even if state law applied, as Defendants contend, Illinois law would not authorize voiding legal contracts.[2]

## D. Defendants Mischaracterize the Timing and Content of the Murray Letters.

Murray's testimony shows that the Bank made the SIP loans based on an actual mistake of *fact*: Murray believed Comdisco had obtained shareholder approval and therefore extended the Guaranty under the "plan lender" exception to the margin regulations. As shown in the Trustee's opening brief, the Bank cannot be charged with improperly arranging the Guaranty, because (i) the factual mistake brings the Bank's conduct within the safe harbor of section 29(c)(1); and (ii) the Bank made a "mistake in good faith" under § 221.3(k). (PxBr 20-23)

Defendants argue that "[i]rrespective of Murray's 'surprise' testimony, the evidence demonstrates that he and [the Bank] knew in 1998 that it was exposed to an arranging violation under U even if a corporate guarantor in CDO's position actually was a plan lender" and therefore

---

[2] As discussed below (§ III.B), Illinois courts follow Restatement § 178 in deciding whether a contract is unenforceable as a matter of policy. Restatement § 178 provides only for non-enforcement of a "promise or other term of an agreement" on grounds of public policy. It does not provide for non-enforcement of "the rest of the agreement," *id.* cmt. a, let alone for voiding completely legal contracts merely because they are part of the same transaction as the illegal contract.

must have known the Bank was subject to an arranging violation if Comdisco was not a plan lender. (DxBr 9)  Murray's two June 1998 letters do not support this argument.  First, the letters corroborate that as of June 1998, Murray still believed the Bank's corporate counterparties in the ESP programs were extending their guaranties under the "plan lender" exception to Regulation G— with shareholder approval.  (DX 244 ("corporate guarantor would be a 'plan lender' as defined in Section 221.4(a)"))  Defendants' assertion that Murray must have known the Bank was subject to an arranging violation if the exception **did not** apply is beside the point—the letters and Murray's uncontroverted testimony show that he believed the "plan lender" exception **did** apply.

Second, nothing in the June 1998 letters suggests Murray knew in February 1998 that the Bank was exposed to an arranging violation.  Murray wrote these letters **four months after** the SIP. (JS 869, 873)  The letters and Murray's testimony make clear that Murray flagged the arranging violation issue following the April 1, 1998 effective date of the newly-merged Regulation U due to the re-promulgation of a 1969 Regulation G Board interpretation under Regulation U.  (JS 863, 871, 873, 875-876)  Murray's purpose in writing to the Board Staff in June 1998 was to raise a potential conflict between the re-promulgated 1969 interpretation, which could be read to prohibit plan lenders from offering corporate guaranties, and its 1986 interpretation, which permitted corporate guaranties.  (JS 871, DX 243-244)  The letters make clear Murray did **not** believe the Bank would be committing arranging violations by participating in guaranteed ESPs.  His intention in the letters was to confirm that his interpretation was correct, not to seek an "exemption" to "protect FNBC from an 'arranging violation'" he did not believe had occurred.  (DxBr 11; JS 871)  Thus, the Murray letters confirm that Murray believed in June 1998 that (i) the Guaranty was not an extending violation because of the plan lender exception; (ii) correctly interpreted, Regulation U did not make the Guaranty and an arranging violation; and (iii) there was **no issue with respect to the Notes** because the good faith non-reliance exclusion applied.  (DX 244 (Ex. 39) ("loans would not be

directly or indirectly secured … [and] would be guaranteed by the corporation"))

## II. THE SECURITIES FRAUD AND INDUCEMENT DEFENSES FAIL.

### A. Defendants Lack Any Compelling Evidence of Scienter.

The trial record showed that **no one** at Comdisco or the Bank believed the SIP program would violate the margin regulations and that the Bank and Comdisco relied on prominent law firms to advise them on compliance. (PxBr 25-26) Defendants fail to rebut these points and cannot establish the scienter required to support their securities fraud and inducement defenses.

#### 1. Defendants' "Regulatory Arbitrage" and "Off-Balance-Sheet Loan" Theories Do Not Prove Scienter.

Defendants ask the Court to infer scienter from three pieces of circumstantial evidence, none of which compellingly refutes testimony that the Bank and Comdisco believed the SIP program complied. First, Defendants argue that the Bank included references to "collateral securing the guaranteed debt" in the Facility Agreement because it knew the stock secured the loans and was attempting to ensure that this "collateral" would not impede enforcement of the Guaranty. (DxBr 38-39) As discussed above (§ I.A), these references are designed to ensure the Bank could enforce the Guaranty regardless of any collateral the Bank might take on in the future. The Facility Agreement specifically states that the stock was not collateral, and the trial testimony confirms that the Bank never had any pledge, lien, or security interest against the stock. (JS 314-315, 511, 569)

Second, Defendants argue that the Bank required McBride to provide a compliance opinion and Comdisco to warrant compliance because the Bank "was willing to violate U, [and] it was planning to get away with it." (DxBr 39) This preposterous assertion flies in the face of the **evidence** that Comdisco's warranty was a typical, borrower-side covenant, and that the Baxter and Allegiance programs required the same assurances. (JS 182-183) In any event, the witnesses testified that the Bank and Comdisco did **not** know of any violation. Defendants' unsupported suggestion that the Bank would knowingly make and syndicate $100 million in illegal (and therefore

potentially voidable) loans is implausible and wholly lacking in record support. *Cf. Miller v. Champion Enter. Inc.*, 346 F.3d 660, 688 (6th Cir. 2003) (implausible to allege defendants knowingly continued to advance millions of dollars in unsecured loans to an entity about to file for bankruptcy).

Third, Defendants argue that the SIP was a $109 million "direct cash infusion" that Pacewicz characterized as an "off-balance-sheet loan." (DxBr 39-40) Putting aside that Pacewicz is a state court defendant with a stake in the outcome of these lawsuits (10/2/13 Tr. at 573-74 (Ex. 40)), he admitted that no member of Comdisco's management ever said the purpose of the SIP was "to raise money," and he never objected to statements in the Facility Agreement that the purpose of the SIP was to "provide incentive to the eligible employees in performing their jobs so as to more closely align the interests of the eligible employees with those of the stockholders of the company." (JS 202) Pacewicz also testified that Comdisco's total revenue for fiscal year 1997 was $2.819 billion and that Comdisco had $729 million in unused credit lines (JS 335, 337), undercutting any suggestion that Comdisco was in need of a "direct cash infusion." But regardless of whether raising money was a primary purpose or merely an anticipated consequence of the SIP, Pacewicz's testimony regarding Comdisco's motives proves nothing about the Bank's scienter or Comdisco's beliefs regarding compliance with the margin regulations.

### 2. Defendants' Attack on "Advice of Counsel" Is Ineffective.

The Bank and Comdisco relied on advice from reputable counsel, which "constitute[es] powerful evidence" negating scienter. (PxBr 25-26) *Howard v. SEC*, 376 F.3d 1136, 1147-48 (D.D.C. 2004). Defendants challenge that reliance on two grounds, neither of which is persuasive.

First, Defendants assert that the Bank failed to meet the four-part test for an advice of counsel affirmative defense. (DxBr 40) But the four-part test does not apply where, as here, advice of counsel is offered to negate scienter rather than as a formal affirmative defense. *Howard*, 376 F.3d at 1147 (proof of 4 prongs not required; "[d]espite dicta in [*SEC v. Savoy Indus., Inc.*, 665 F.2d 1310

(D.D.C. 1981) (DxBr 40 n.25)], reliance on the advice of counsel need not be a formal defense; it is simply evidence of good faith, a relevant consideration in evaluating a defendant's scienter") In any event, the evidence easily satisfies all four prongs: (1) there is no evidence to suggest the Bank or Comdisco withheld material facts from McBride or Winston; (2) the Bank sought a compliance opinion from McBride and looked to Winston to evaluate that opinion (JS 631), while Comdisco looked to McBride; (3) the Bank and Comdisco both received copies of McBride's compliance opinion, and McBride advised the Comdisco Board that the SIP would comply; and (4) the Bank and Comdisco went forward with the transaction with the belief that it complied.[3] (PxBr 25-26)

Second, Defendants attack McBride's legal work, arguing that "Hale had acquired no reasonable basis for believing that CDO and FNBC would not violate G and U." (DxBr 41) But whether or not McBride had a reasonable basis for its advice, the relevant inquiry is whether the Bank and Comdisco reasonably relied on that advice. *E.g., Howard,* 376 F.3d at 1148-1149 (defendant not reckless in relying upon advice of counsel even if advice proved wrong). Furthermore, even if McBride's scienter were relevant (which it is not), Defendants failed to prove at trial that McBride acted recklessly or intentionally. The law requires expert testimony to prove that a lawyer acted negligently, let alone recklessly. *See, e.g., Georgou v. Fritzshall,* 178 F.3d 453, 456 (7th Cir. 1999). Defendants introduced no such testimony, and the Trustee's expert opined that McBride acted "consistent with custom and practice." (JS 450)

---

[3] Several of Defendants' cases are distinguishable because they involved withholding material information from counsel. *See C.E. Carlson, Inc. v. SEC,* 859 F.2d 1429 (10th Cir. 1988) (defendants did not provide counsel with all material information); *U.S. v. United Medic. & Surgical Supply Corp.,* 989 F.2d 1390 (4th Cir. 1993) (defendant failed to disclose all material information to his counsel); *U.S. v. Lindo,* 18 F.3d 353 (6th Cir. 1994) (defendant failed to provide evidence of full disclosure to counsel). Defendants' remaining cases are distinguishable because, unlike here, the relying party either could not identify any advice or could not show it had relied on that advice. (DxBr 40 n.25) *See Markowski v. SEC,* 34 F.3d 99 (2d Cir. 1999) (alleged assurance by counsel did not constitute "advice" and therefore could not give rise to an advice of counsel defense); *SEC v. Goldfield Deep Mines Co.,* 758 F.2d 459 (9th Cir. 1985) (advice of counsel was not a defense where clear evidence defendants knew statements were false or misleading); *SEC v. McNamee,* 481 F.3d 451 (7th Cir. 2007) (no evidence defendant received any advice of counsel); *U.S. v. Peterson,* 101 F.3d 375 (5th Cir. 1996) (jury instruction for defense of reliance on counsel).

In addition, Defendants' attack on McBride also ignores key evidence:

- Defendants point out that Cathcart (the associate assigned to research the margin regulations early in the SIP project) thought Hale was difficult to work with. (DxBr 36) But Cathcart testified that Hale wanted her to do her best work and that Hale was a perfectionist who would make sure the transaction complied. (JS 248, 260)

- Defendants criticize Cathcart for citing a case in her June 1997 memorandum that was reversed on appeal. (DxBr 36) But that reversal supported, rather than undermined, Cathcart's conclusion that the SIP loans complied with Regulation U. *Cooper v. Union Bank*, 527 F.2d 762, 766 (9th Cir. 1976), held that the lower court had too broadly construed the term "indirectly secured" and thus reversed the lower court's holding that the loan violated Regulation U. (PxBr 9-10.)

- Defendants suggest Hale did minimal work on margin regulation issues, but the McBride time records show that Hale spent extensive time reviewing legal issues raised by the SIP and opinion letter. (JS 208, 242, 344, 835; JS Appx 1, Tabs A, D, F, K) A summary chart showing time entries is attached as **Figure 3**.

- Defendants ignore that both Cathcart and Hale communicated with the FRBC to obtain additional confirmation that the SIP would comply with the margin regulations. (JS 263, 267, 345; JS Appx 1, Tabs G, H)

<u>Third</u>, Defendants assert that Murray's June 1998 letters "call into question" what Winston "did, or didn't do." (DxBr 36) **Winston's** scienter is not at issue. Clark, the Bank's relationship manager, testified that he believed the transaction was lawful, and that the Bank never would have closed it if it had not received all the required representations and opinions regarding compliance. (JS 632) Defendants presented no evidence that any Bank personnel knew of or recklessly disregarded a margin violation. Furthermore, it was readily apparent from Murray's testimony and letters that Murray is a sophisticated and careful lawyer who **believed the program complied** when he permitted the SIP loans to close. (JS 647-48) Notwithstanding Defendants' aspersions on Winston's level of care, the evidence demonstrates that Winston handled the Comdisco SIP appropriately. This was not a transaction where Murray and Winston needed to re-invent the wheel. The SIP followed the nearly identical Baxter and Allegiance ESPs, which Skadden designed and certified to be compliant (JS 166, 183-186), and the Bank required and obtained strong borrower-

side assurances that the Comdisco program also complied with margin regulations and had all required shareholder certifications.[4] (JS 500-01, 838, 844)  Defendants point to the Murray letters as evidence that Murray thought there was a problem in 1998.  But as discussed above (§ I.C), the June 1998 Murray letters do not demonstrate that Murray believed in **February 1998** that the Comdisco SIP did not comply.  Murray testified that he wrote the letters because of the re-promulgation of a Regulation interpretation with Regulation U in April 1998, months after the SIP closed, and that they related to proposed future ESPs, not Comdisco.[5]  Moreover, the letters confirm that Winston believed even in June 1998 that the **Notes** fell within the good faith non-reliance exclusion, and believed the Guaranty complied based on the "plan lender" exception.

## B. Defendants Failed to Show Actionable Statements, Omissions or Conduct.

As Table 1 to their brief, Defendants attach a chart listing the various purported statements, omissions, schemes and conduct that they now contend violated the securities fraud laws.  Because their list has changed since they pled their affirmative defenses, the Trustee has revised his Figure 2 to respond to Defendants' new list.  The Trustee's revised chart is attached as **Figure 4**.  As Figure 4 shows, the alleged violations are not actionable for several reasons.

First, the specific alleged false and misleading statements were, as Defendants admit, "supplied by Comdisco."  (DxBr 33; Fig. 4 ##1, 2, 3, 6, 7)  Defendants argue that the Bank had representatives on the Bulldog Team and participated in drafting certain of the SIP materials.  (DxBr 33)  But none of the specific alleged false or misleading statements is a Bank statement in a

---

[4] As Murray explained, the statement in the McBride opinion that the "Loan Documents" did "not require consent of the Company's stockholders" did not refer to the SIP or the 1998 Option Plan.  "Loan Documents" included only the Facility Agreement, form of Notes, and form of Letter of Direction.  (JS 838)  These did not need shareholder approval in order for the "plan lender" exception to apply.

[5] Defendants point out that the Federal Reserve Board issued a press release with a link to the final rule that would be adopted in April 1998.  (JS 866)  Murray does not recall being aware of this (JS 888), and there is no evidence that Murray read the final Rule or analyzed the issues raised in his June 1998 letters before the Comdisco SIP closed.

document the Bank prepared. Two statements appear in the Facility Agreement (Fig. 4 ##1, 2), but both of these were Comdisco representations to the Bank and could not have been understood to be representations by the Bank or to the non-party SIP participants. The remaining specific statements were statements in the SIP Question and Answer document prepared and supplied by Comdisco (##6, 7), and an oral statement at the SIP presentation (#3), which the Bank did not attend. (PxBr 27) Because it was not the "maker" of Comdisco's statements, the Bank could not have violated securities laws based on these statements. *See, e.g., Janus Capital Group v. First Deriv. Traders,* 131 S. Ct. 2296, 2302 (2011) (company's advisor could not be liable for fraudulent statements in company's prospectus because "[o]ne who prepares or publishes a statement on behalf of another is not its maker" for purposes of 10b-5).

Second, Defendants' alleged statements are true and non-misleading (and there were no omissions, schemes or fraudulent conduct) because the SIP program did not violate the margin regulations. (PxBr 27-28; Fig. 4 ##1, 2, 3, 6, 7, A, B, C, D, E) Moreover, even if the Guaranty violated the margin regulations, only one of the specific statements (#1) pertains to the Guaranty. The remaining specific statements (##2, 3, 6, 7) relate strictly to the Notes and are true and non-misleading regardless of the legality of the Guaranty. Defendants also assert generally (and in violation of Fed. R. Civ. P. 9(b)) that the Bank and Comdisco disclosed "multiple times and in multiple ways that Comdisco would be guaranteeing Defendants' indebtedness under the SIP Notes." (Fig. 4 #A) Those statements say nothing about compliance and are true.

Third, it is ***not*** the case, as Defendants attempt to suggest (DxBr 32), that a company's opinion regarding its compliance with law is equivalent to a statement of "hard" (objectively verifiable) information for purposes of the securities laws. Courts addressing a company's statement that it was in compliance, when it later turned out not to be, have held that "there is no duty to disclose 'soft information,' such as a matter of opinion … or a belief as to the legality of the

company's own actions" unless the information is "virtually as certain as hard facts." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003); *In re Sofamor Danek Grp, Inc. (Murphy v. Sofamor Danek Grp., Inc.)*, 123 F.3d 394, 401-02 (6th Cir. 1997). This is true even where the company makes affirmative statements that it complied, unless the company had actual knowledge the statements were not true. *Kushner*, 317 F.3d at 831; *In re H&R Block Sec. Litig.*, 527 F. Supp. 2d 922, 929 (W.D. Mo. 2007); *In re Omnicare, Inc. Sec. Litig.*, No. 11-cv-173, 2013 U.S. Dist. LEXIS 42973, *25-*26 (E.D. Ky. March 27, 2013) (Ex. 41). Here, the Bank and Comdisco believed the transaction complied in February 1998. And but far from being "virtually as certain as hard facts," whether there was a regulatory violation in this case is still the subject of vigorous litigation more than fifteen years after the SIP.[6]

Fourth, the Bank's agreement to the "structure of the SIP Program" (Fig. 4 #D) is not a "scheme" or "conduct operating as a fraud" for purposes of Rule 10b-5(a), (c) or section 17(a)(1), (3). (*See* DxBr Table 1 at 1-E) Where the primary purpose and effect of a purported "scheme" is to make a misrepresentation or omission, courts do not permit bypassing the elements necessary to

---

[6] Defendants' purported "legal opinion" cases (DxBr 32-33) are inapposite because they did not involve "soft information." *Polaroid Corp. v. Disney*, 862 F.2d 987 (3d Cir. 1988), dealt with the defendant's representation that it could consummate a tender offer in compliance with the margin regulations without disclosing that a violation would arise if the company exercised rights expressly reserved to it under the offer. Unlike this case, the legal compliance issue in *Polaroid* was clear-cut and never in dispute; rather, the defendant argued that because the violations would be so serious, it would never have gone forward with the transaction without an adjudication from the court, settlement, or alternative financing. 862 F.2d at 1005. The fraud was not a misinterpretation of the law, but a failure to disclose the delay that the adjudication or settlement addressing the margin violation issue would cause—an issue of known fact rather than uncertain legal opinion. *Id.*; *see also Ackerman v. Schwartz*, 947 F.2d 841 (7th Cir. 1991) (legal opinion reciting fictitious hard facts that made transaction appear legitimate); *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998) (omission of material fact that company was in default on bank financing agreement). Defendants also cite several non-legal opinion cases, which similarly do not hold that "soft" opinions are actionable. *See City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 674 (6th Cir. 2005) (statement that "objective data" reinforced belief that tires were safe was not mere puffery); *Wright v. IBM Corp.*, 796 F. Supp. 1120, 1125 (N.D. Ill. 1992) (financial projections not generally actionable, but plaintiff alleged undisclosed factual information known or recklessly disregarded by defendants that seriously undermined projections); *Kowal v. MCI Comm'n Corp.*, 16 F.3d 1271 (D.D.C. 1994) (financial projections actionable where they represent "management's opinion of how the company is expected to perform"). *West v. The Western Casualty*, 846 F.2d 387 (7th Cir. 1988), was neither a securities fraud nor a legal opinion case but recognized that opinion testimony is generally not actionable.

impose "misstatement" liability under Rule 10b-5(b) by labeling the alleged misconduct a "scheme" rather than a "misstatement." *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005). Rather, "scheme liability requires proof of participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance." *SEC v. St. Anselm Exploration Co.*, 936 F. Supp. 2d 1281, 1298-99 (D. Colo. 2013); *see Kelly*, 817 F. Supp. 2d at 344 (performance of an inherently deceptive act that is distinct from an alleged misstatement). There is no evidence here that the Bank engaged in an affirmative "scheme" to create a false appearance. Defendants charge that the Bank was on the "Bulldog Team" and had the opportunity to review and comment on the SIP structure. But scheme liability does not attach to a party who did no more than facilitate preparation of material misrepresentations or omissions communicated by others. *Kelly, 817 F. Supp. 2d at* 343.

Fifth, Defendants assert that the Bank and Comdisco supplied a misleading representation and/or omission because they "did not disclose to Defendants at the time of the SIP the estimated fair market value of the stock with the restrictions in place." (Fig. 4 #12) An omission arises only where there is a particular statement that would otherwise be misleading without disclosure of the omitted fact. *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 944 (7th Cir. 1989). If this purported omission arises from Comdisco's statement in the section 83(b) election forms that the fair market value of the stock was $34.50, this was Comdisco's, not the Bank's statement, and the statement was non-misleading because it included an express statement that the "fair market value" was determined without regard to the restrictions. (PxBr 29; JS 613)

Sixth, Defendants allege that the Bank and Comdisco made material omissions and engaged in a fraudulent scheme and conduct by failing to provide Form G-3 and U-1 purpose statements. (DxBr 37; Fig. 4 ##B, C) These statements were only required for extensions of credit that were

directly or indirectly secured by the stock, 12 C.F.R. §§ 207.3(e), 221.3(b), and were therefore not required here. Furthermore, Forms G-3 and U-1 are record-keeping requirements for the benefit of the Federal Reserve Board, not the borrower. *See Useden v. Acker*, 947 F.2d 1563, 1576, n.17 (11th Cir. 1991). They did not create a duty to disclose to Defendants. Finally, the inadvertent failure to provide purpose statements (believing they were not required) was, at most, a regulatory violation, not fraud. Failure to comply with this administrative requirement would not make the Notes or Guaranty (neither of which say anything one way or the other about providing purpose statements) inherently illegal and therefore cannot be a basis to void the Notes. *See Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676 (S.D.N.Y. 1984) (failure to provide credit disclosure statement in violation of Rule 10b-6 did not make contracts unlawful and was therefore not a basis for rescission under § 29(b)).

Seventh, Defendants allege that "the evidence is alternatively susceptible to inference" that the false and misleading nature of earlier statements was "revealed" to Bank and Comdisco "for the first time" after the SIP closed and they failed to correct their statements within a reasonable time. (DxBr 41; Fig. 4 #E) As an initial matter, this defense is based on evidence (other ESPs, "inculpatory statements," Project Horizon) that the Court has already ruled is inadmissible. (Dkt. 311) More important, Defendants formally withdrew their set-off defenses prior to trial (Dkt. 321) and have asserted no other defense that could be based on an after-the-fact duty to correct. As discussed in the Trustee's initial brief, conduct months or years after the SIP closed cannot support illegality or inducement defenses. (PxBr 28-29, 33)

### C.    Defendants Have Not Shown a Section 17(a) Violation by the Bank.

Defendants fail to rebut the defects in their section 17(a) defense raised in the Trustee's initial brief: (i) 17(a) applies only to offerors or sellers, when the Bank was neither; (ii) 17(a)(1) requires proof of scienter, which does not exist in this record; (iii) 17(a)(2) requires a material untrue statement or omission, but the Bank made neither; and (iv) as discussed above (§ II.B), 17(a)(1) and

(3) require proof of "scheme liability," which also does not exist in this record.  (PxBr 30-31)

### D.    Defendants Failed to Prove Their Inducement Defenses.

Defendants also fail to answer the defects in their inducement defenses: (i) the Bank did not have the requisite scienter; (ii) there is no causation or injury; and (iii) they disregard their obligation to return the parties to the *status quo* before proceeding on an inducement theory.  (PxBr 34-35)

Defendants' negligent inducement theory fails for the additional reason that it is barred by the economic loss doctrine.  Defendants say the Bank was in the "business of supplying information for the guidance of others" because it was engaged in a "self-styled 'ESP advisory' service."  (DxBr 42)  But Defendants' supporting evidence relates almost entirely to post-Comdisco ESPs.  This evidence was excluded by the Court's ruling on the Trustee's Motion *in Limine* No. 6 (Dkt. 311) because it relates to differently structured programs the Bank implemented between 9 months and 2 years after the Comdisco SIP.  (JS 902)  As the (excluded) materials Defendants cite indicate, the Bank had developed a package of ESP documents by March 1999 that it was contemplating providing to potential customers.  (DX 123 (Ex. 42))  The Bank did not do this for Comdisco, which analyzed and obtained the Baxter and Allegiance program documents on its own.  (JS 189-190; 10/1/13 Tr. at 327-28 (Ex. 43))  Furthermore, whatever information the Bank may have supplied to Comdisco, it did not supply information regarding margin regulation compliance.  Rather, the Bank required **Comdisco** to warrant and provide an opinion of counsel that the transaction complied.  (JS 500-01, 838, 845)  Finally, the Bank did not supply information **to SIP participants** at all.  The Bank did not supply SIP documents or attend the SIP presentation. Clarke testified he had no contact with participants (except those who worked on the SIP), and that the Bank did not provide the participants with any financial counseling or advice on the suitability of the transaction for them.  (JS 572, 821)

## III. EVEN IF THE COURT FINDS TECHNICAL ILLEGALITY, IT SHOULD STILL ENFORCE THE NOTES OR AWARD RESTITUTION.

The defense of illegality is an "equitable and remedial doctrine," which is not automatic but requires a comparison of the pros and cons of enforcement. (PxBr 38) *N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.*, 799 F.2d 265, 273 (7th Cir. 1986) ("*NIPSCO*"). As shown in the Trustee's initial brief, the equities here overwhelmingly favor granting enforcement, or at least restitution. (PxBr 41-43) Rather than attempting to rebut these equitable considerations with evidence of their own, Defendants argue that (i) they can avoid the balancing approach altogether by asserting concurrent state law illegality and "*pari delicto*" defenses that absolutely bar any remedy, and (ii) the Trustee cannot claim restitution as a matter of law. These arguments are wholly inconsistent with modern authority and would lead to a judicially-created, zero-tolerance regulatory regime far more punitive than Congress or the Federal Reserve Board intended.

### A. Defendants' Preemption Arguments Disregard Controlling Federal Law.

Defendants' illegality defenses are based solely on alleged violations of **federal law**. Defendants contend that even if federal law requires balancing, federal law does not preempt them from asserting Illinois common law illegality and *pari delicto* defenses that, in their view, absolutely preclude enforcement or restitution even for minor and inadvertent regulatory violations. This position is directly at odds with Defendants' position in 2010, when they relied heavily on what they termed "[t]he modern balancing approach, described in *NIPSCO*" in arguing to the Seventh Circuit that they should be permitted to assert illegality defenses to further public policy, even though they were not among the group "the statute at issue was designed to protect." (Defs.-Appellants' Pet. Panel Reh'g at 3-10 (Ex. 44).) The gist of Defendants' 8-page argument—comprising the bulk of their Petition for Panel Rehearing—is that the "modern balancing approach" embodied in the Restatement permits illegality defenses for violations of regulations "designed to protect the general public" as a deterrent, while avoiding "overdeterrence" by balancing. (Ex. 44 at 9-10.)

20

After convincing the Seventh Circuit to reinstate their cases based on the "modern balancing approach," defendants now ask this Court to override *NIPSCO* and the Restatement by arguing that state law defenses purporting to dictate a different result are still available despite the applicable federal law. The U.S. Supreme Court has unequivocally rejected their position: "***the effect of illegality under a federal statute is a matter of federal law*** … even in diversity actions in federal courts after *Erie R. Co. v. Tompkins*." *Kelly v. Kosuga*, 358 U.S. 516, 519 (1959) (emphasis added); *Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 176 (1942); *Walsh v. Schlecht*, 429 U.S. 401, 407-08 (1977); *NIPSCO*, 799 F.2d at 273 ("[w]hen the statute is federal, federal law determines … the effect of the violation on the enforceability of the contract"). Despite this clear mandate, Defendants seek to mate federal violations with state remedies by arguing that federal law does not preempt their Illinois common law defenses. But Defendants concede it is possible "for a State's substantive law to be displaced by a contrary, uniform federal common law rule." (DxBr 28) Federal Courts have repeatedly held that notwithstanding *Erie*, federal law determines the effect of federal violations, and conflicting state law ***must yield***.[7] As the Supreme Court stated in *Sola Electric*:

> the doctrine of [*Erie*] is inapplicable to those areas of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes. When a federal statute condemns an act as unlawful the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield.

317 U.S. at 176. Thus, Defendants' argument that there is no "enclave of specialized federal common law" permitting federal courts to establish a law of illegality, is directly contrary to

---

[7] Defendants argue that the Seventh Circuit's 53-year-old opinion in *Bankers Life and Casualty Co. v. Bellanca Corp.*, 288 F.2d 784, 787 (7th Cir. 1961), singlehandedly "destroys [the Trustee's] position that federal law governs." (DxBr 47) This case was decided before the Seventh Circuit held unequivocally in *NIPSCO* that "[w]hen the statute is federal, federal law determines … the effect of the violation on the enforceability of the contract." *NIPSCO*, 799 F.2d at 273. In addition, *Bellanca* was decided primarily on the parallel theory that the seller's breach prevented enforcement. The court's pronouncement that state law applied was dicta, was unsupported by authority, and has effectively been supplanted by the more recent holding in *NIPSCO*.

controlling Supreme Court precedent.  Courts can and do follow federal common law prescribing a balancing approach to decide the appropriate remedy for illegality.[8]  *See, e.g.*, *Kelly*, 358 U.S. at 519-21; *NIPSCO*, 799 F.2d at 273-275; *Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731, 743 (7th Cir. 1986); *Occidental Life Ins. Co. of North Carolina v. Pat Ryan & Assoc.*, 496 F.2d 1255, 1266-67 (4th Cir. 1974); *Freeman v. Marine Midland Bank New York*, 419 F. Supp. 440, 453 (E.D.N.Y. 1976).

Defendants urge that section 29(b) "squarely prohibits enforcement of every contract made or performed in violation of that Act" and therefore leaves no "interstitial gap" within which courts can permit balancing.  (DxBr 29)  This argument does not, of course, apply to Defendants' section 17(a) defense (which is not subject to section 29(b)), nor does it have any bearing on the availability of restitution (as opposed to enforcement), which is specifically premised on a finding of non-enforceability.[9]  But, even with respect to enforcement, Defendants disregard federal case law interpreting section 29(b) to permit equitable balancing.  Section 29(b) "was a legislative direction to apply common-law principles of illegal bargain, enacted at a time when it seemed much more likely than it might now that courts would fail to do this without explicit legislative instruction."  *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir. 1970); *Occidental*, 496 F.2d at 1266 ("Section 29(b) itself is but a general provision which codified the common-law principles").  Accordingly, the Supreme Court has made clear that courts must apply principles of equity when considering remedies under section 29(b).  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 388 (1970) (merger achieved

---

[8] Defendants argue that the securities statutes contain no "interstitial gap" for judicial rule-making.  But their supporting cases address judicial creation of **affirmative rights of action**, not determination of the remedy for violating existing federal statutes and regulations.  *See Chutich v. Touch Ross & Co.*, 960 F.2d 721, 722-23 (8th Cir. 1992) (no implied private right of action for contribution under 10(b) or 10b-5); *King v. Gibbs*, 876 F.2 1275, 1280 (7th Cir. 1989) (no implied private right of action for indemnification under 10(b) or 10b-5); *Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101, 1102, 1106 (4th Cir. 1989) (no implied private right of action for indemnification or contribution under § 12(2)).

[9] As Restatement § 178 explains, legislation providing that a promise or term of a contract is unenforceable does not preclude the possibility of restitution, which is determined by the rules applicable to restitution.  Restatement § 178 cmt a; *see also* Restatement § 32 (statute making contract unenforceable or void does not resolve the possibility of restitution).

using misleading proxy statements should be set aside under § 29(b) only if equitable to do so);
*Freeman*, 419 F. Supp. at 453 (now settled that court should apply principles of equity when
considering § 29(b) rescission action); *Occidental*, 496 F.2d at 1266. Thus, as *Occidental* concluded,
determining how to fashion a remedy in the area of illegal bargains—even under 29(b)—requires
consideration of the type and degree of illegality and does not automatically require nullification of
the contract. *Occidental*, 496 F.2d at 1266-67.[10]

 Defendants next argue that *Erie* requires the Court to use state law as the federal rule of
decision unless use of the state law would result in a "significant conflict" with the federal interests
at issue. (DxBr 29-30)  According to Defendants, adoption of state illegality and *pari delicto* defenses
as the federal rule of decision would not create a conflict because barring enforcement of the Notes
would deter violations and protect the borrowers.  (DxBr 26-27)  Defendants are right about the
lack of a conflict (albeit for the wrong reason):  As discussed in the next section (III.B), Illinois has
now adopted the Restatement balancing approach, so federal and state law would reach essentially
the same result.  But they are **wrong** to suggest that a state law defense categorically precluding
enforcement or restitution would present no significant conflict with federal law and policy.  In
making this argument, Defendants ignore the broader federal policy disfavoring illegality defenses
and seeking to avoid cancelling contracts where doing so would produce a windfall or
disproportionately harsh sanction.  (PxBr 38)  As the Supreme Court stated in *Kelly v. Kosuga*, "the
courts are to be guided by the overriding general policy … 'of preventing people from getting other
people's property for nothing when they purport to be buying it.'"  *Kelly*, 358 U.S. at 520-521; *ADM*

---

[10] Defendants cite several cases discouraging the judicial creation of common law "exceptions" or
"supplements" to federal statutes.  But none of these cases deals with the ***interpretation*** of section 29(b) in
*Mills*, *Freeman*, *Occidental* and similar cases, as requiring consideration of principles of equity.  *See O'Melveny &
Myers v. FDIC*, 512 U.S. 79, 87 (1994) (declining to create common law rights for FDIC not contained in
Financial Institutions Reform, Recovery and Enforcement Act); *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618,
625 (1978) (courts not free to supplement Death on the High Seas Act on issues where Congress has
spoken); *FDIC v. Wabick*, 335 F.3d 620, 625 (7th Cir. 2003) (choice of law for statute of limitations where
Congress had already legislated limitation).

*Inv. Servs., Inc. v. Collins*, 515 F.3d 753, 757 (7th Cir. 2008). For this reason, federal courts have

determined not to impose the penalty of forfeiture for federal regulatory violations without first

weighing the policy interest against the degree of forfeiture. State court defenses requiring forfeiture

for any violation (no matter how minor, technical, or unintentional) would directly conflict with this

approach. Thus, as discussed above, federal courts have ***not*** adopted state law as the federal rule of

decision, but have overwhelmingly applied equitable balancing as a matter of federal common law.[11]

     Finally, despite clear controlling authority that federal law determines the effect of a federal

violation, Defendants cite two state cases that they say support application of state law. These cases

do not change the analysis. In *American Buyers Club of Mt. Vernon v. Grayling*, 53 Ill. App. 3d 611, 613

(5th Dist. 1977), the Illinois Court of Appeals held that Illinois law provides a defense to

enforcement based on a violation of Illinois or federal law. Putting aside that the Illinois Court of

Appeals cannot override a United States Supreme Court preemption determination, *American Buyers*

*Club* was decided before *NIPSCO*, and addressed violations of the Truth in Lending Act involving a

note the trial court found to be "unconscionable" and "obviously written in a manner to evade

federal law." *Am. Buyers Club*, 53 Ill. App. 3d at 616. The equities in *American Buyers Club* strongly

favored non-enforcement, and the court did not address whether balancing would be appropriate in

a case, such as this, involving an inadvertent violation of a regulation that was not designed to

protect the defendant, nor did the court address the preemption issues that would arise from

---

[11] Defendants suggest that several federal (and other) cases support automatic voiding under 29(b), but each of these cases either considered equitable factors or simply did not address whether balancing was required in appropriate circumstances. *See Goldman v. Bank of the Commonwealth*, 467 F.2d 439, 441, 447 (6th Cir. 1972) (balanced equities and required parties be returned to the *status quo ante*, including allowing the Bank to recover money loaned in violation of Regulation U); *Grove v. First Nat'l Bank of Herminie*, 489 F.2d 512, 515-16 (3d Cir. 1973) (did not address balancing or request for restitution); *Stonehill v. Security Nat'l Bank*, 68 F.R.D. 24, 45 (S.D.N.Y. 1975) (did not rule on validity of loans but requested additional information on knowledge and state of mind); *UFITEC, S.A. v. Carter*, 571 P.2d 990, 996-997 (Cal. 1977) (addressed good faith and noted that under California law prohibition on recovery under illegal contract is not automatic); *Peoples Nat'l Bank of N.J. v. Fowler*, 372 A.2d 1096, 1103-1104 (N.J. 1977) (potential remedy for Regulation U violation includes allowing lender to recover principal of the loan).

conflicting federal common law. Defendants' other case, *Merch. Nat'l Bank v. Kolber*, 50 Ill. App. 3d 365, 370 n.1 (1st Dist. 1977), noted the agreement in question might have violated federal law, but made no determination on that basis.

**B.     Defendants Admit that Illinois State Law Prescribes Balancing.**

After arguing at length that federal law does not preempt their state law defenses, Defendants effectively concede it makes no difference. As they admit, "***Illinois courts follow the Restatement (Second) of Contracts § 178*** in deciding whether a contract is unenforceable as a matter of policy." (DxBr 30 (emphasis added)) *See K. Miller Constr. Co v. McGinnis*, 238 Ill. 2d 284, 293 (Ill. 2010). Restatement § 178 applies the same balancing test Defendants' preemption argument appeared to be designed to avoid:

> A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms.

Restatement § 178(1); *see also Rush-Presbyterian-St. Luke's Medic. Ctr. v. Hellenic Republic*, 980 F.2d 449, 455-56 (7th Cir. 1992) (forfeiture not warranted by violation of Illinois law with minimal public harm); *Amoco Oil Co. v. Toppert*, 56 Ill. App. 3d 595, 599 (3d Dist. 1978) (violation that was not a serious affront to public policy did not justify refusal to enforce); *South Ctr. Plumbing & Heating Supply Co. v. Charles*, 90 Ill. App. 2d 15, 20 (1st Dist. 1967) (violation was not serious affront to public policy and did not require declaring contract illegal). Thus, regardless of whether federal or state law applies, the Court must balance the equities.

Defendants argue that section 29(b) constitutes "legislation provid[ing the term] is unenforceable" under the first part of section 178(1), and that the Court is therefore "bound to carry out the legislative mandate" of unenforceability. (DxBr 30) As discussed above (§ III.A), this purported "legislative mandate" does not affect Defendants' section 17(a) defense or the Trustee's alternative request for restitution. And, even with respect to enforcement, federal courts have

interpreted section 29(b) to be "a legislative direction to apply common-law principles of illegal

bargain," and required courts to apply principles of equity when considering remedies. *Mills*, 396

U.S. at 388 (1970); *Occidental*, 496 F.2d at 1266; *Freeman*, 419 F. Supp. at 453. Regardless of whether

state or federal illegality rules apply, the interpretation of section 29(b) remains a matter for the

federal courts, which have determined that this section permits equitable balancing. *U.S. Bank Nat'l*

*Ass'n v. Clark*, 216 Ill. 2d 334, 352 (2005) (in construing federal statutes Illinois courts "must look to

the Federal decisions for its interpretation").

Defendants attempt to avoid balancing by arguing that, in addition to their state law

"illegality" defense, they have a second Illinois common law defense, "*pari delicto*." (DxBr 23, 31)

*Pari delicto*, according to Defendants, provides a "complete State law defense of general applicability"

based on the principle that "a plaintiff who has participated in wrongdoing may not recover

damages resulting from the wrongdoing." (DxBr 31) But if defendants mean to suggest that *pari*

*delicto* avoids *K. Miller Constr.* and Restatement § 178, there are several flaws in their position. First,

as discussed above (§ III.A), this defense would be preempted by conflicting federal common law.

Second, Defendants' current position is a 180-degree change from their position before the Seventh

Circuit, where they sought standing to assert their illegality defenses based on arguments that they

would serve the public interest, ***not*** based on the "Illinois common-law notion that a plaintiff's

recovery may be barred by his own wrongful conduct" they press now. Third, Defendants never

pled *pari delicto* as a separate defense,[12] nor did they argue it in their trial brief. They have therefore

waived any ability to assert it as a new defense. *See* L.R. 16.1; Standing Order Establishing Pretrial

---

[12] In attempting to suggest they properly pled *pari delicto*, Defendants cite their "unclean hands" defense. (DxBr 53; Aff. Def. No. 23) But the "unclean hands" defense is ***not*** the *pari delicto* defense Defendants now purport to assert. It is based on alleged culpable conduct (e.g. scheming to defraud, attempting to evade margin regulations) and not the mere violation of the margin regulations. It is also directed only at the "Alternative Claim" for restitution, and not the enforcement remedy. Moreover, if *pari delicto* is equivalent to "unclean hands," Defendants must demonstrate that the equities warrant the forfeiture they seek—exactly the result they seek to avoid. *LIT Am., Inc. v. Liberty Fund VI*, No. 89 C 6747, 1991 U.S. Dist. LEXIS 4915, at *2-*3 (N.D. Ill. April 8, 1991) (Ex. 45).

Procedure.  Fourth, even under Illinois law, *in pari delicto* is not a separate, stand-alone defense,

providing for automatic non-enforcement even where "illegality" defenses would require balancing.

*See Vine Street Clinic v. Healthlink, Inc.*, 222 Ill.2d 276, 297-300 (Ill. 2006) (treating *pari delicto* as part of

illegality discussion).  As discussed above, modern cases applying Illinois law do not permit, under

**any** theory, draconian forfeitures for minor regulatory violations that do not significantly implicate

public policy.

### C. Defendants' Purported "Motion to Dismiss" the Trustee's Alternate Remedy Is Procedurally Flawed and Substantively Meritless.

Defendants' purported motion to dismiss the Trustee's alternate remedy is improper and

should be denied for at least six reasons:

**1. Defendants Have No Basis to Request that the Trustee's Claims Be Dismissed on the Pleadings.**  Defendants have no basis to argue **after trial** that restitution is unavailable because

the Trustee did not plead a separate count with an independent cause of action giving rise to that

remedy.  (DxBr 46)  First, as the Restatement explains, a promisee's "restitution interest" (i.e. his

"interest in having restored the benefit conferred on the other party") is one of the three protected

interests of a promisee **under a contract**.  Restatement § 344.[13]  Because restitution is a potential

**remedy** flowing from the Trustee's contract interests under the Notes, the Trustee's request for

restitution is not a separate, stand-alone cause of action and does not need to be pled as such.

Second, even if the Trustee's alternative remedy were a separate cause of action (which it is

not), Federal pleading standards do not require claims based on the same transaction or occurrence

to be pled as separate counts.  *See* Fed. R. Civ. P. 8(a), 10(b); *see also Dugan v. Quanstrom*, No. 03 C

---

[13] The only case Defendants cite in support of their argument, *Crum v. Krol*, supports the Trustee's position. *Crum* says "a plaintiff's restitutionary interest (including expenses incurred in reliance on the contract) is usually protected or included in a damages award."  *Crum v. Krol*, 99 Ill. App. 3d 651, 663 (1st Dist. 1981). The court did not prohibit restitution, but merely held that the plaintiff is limited to recovering for his expenses under his breach of contract or based on unjust enrichment, and could not recover the same damages under both theories. *Id.* at 663-64.

0254, 2004 U.S. Dist. LEXIS 1209, at *13-*14 (N.D. Ill. Jan. 29, 2004) (Ex. 46) (claims not based on separate transaction or occurrence and so did not need to be set forth in separate counts).[14]

Third, Defendants are too late to attack the sufficiency of the **_pleadings_**. Rule 12(h)(2) permits a defendant to assert a defense based on failure to state a claim at trial, but does not authorize motions for judgment on the pleadings based on pleading deficiencies. _Compare_ Fed. R. Civ. P. 12(c) ("After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings") _with_ Fed. R. Civ. P. 12(h)(2) ("Failure to state a claim upon which relief can be granted . . . may be raised: … (B) by motion under Rule 12(c); or (C) at trial"). Defendants' 12(h)(2) cases deal with substantive deficiencies, not defects in pleadings. Indeed, it would be a waste of resources to debate pleading sufficiency following a seven-day trial that yielded an ample record to determine the availability of the Trustee's requested alternate remedy.

**2. Restitution Is Not Limited to Affirmative Rescission Actions.** Defendants concede restitution is available in rescission actions but contend it is not available where illegality is asserted as an affirmative defense.[15] (DxBr 49) This is a distinction without a difference—a party who seeks to avoid performing a contract by affirmatively suing for rescission should not get a drastically different result than a party who waits to be sued and then asserts illegality as an affirmative defense. Defendants have cited no cases making this distinction; whereas, the Trustee has cited several cases in which restitution was granted (or considered) based on an affirmative defense of illegality.

---

[14] If the Court decides that there is a pleading deficiency, the Trustee requests the opportunity to amend his complaint. Defendants should not, by waiting until the last moment to raise the issue, be allowed to prejudice the Trustee's remedies by virtue of a pleading defect, which, if properly raised could have been addressed before trial.

[15] Defendants argue that the Trustee abandoned the right to assert an affirmative rescission action under 29(b) during discovery. (DxBr 50 n.27) The Trustee did not plead an affirmative claim for rescission because he is seeking to enforce the Notes and only seeks restitution in the event Defendants successfully void the Notes through their illegality defenses. However, contrary to what Defendants suggest, the Trustee has never abandoned the right to rely, if necessary, on a section 29(b) rescission claim. The Trustee made his position clear in his responses to Defendants' First Set of Requests to Admit. (Pls.' Resp. to Defs.' 1st Set Requests to Admit, No. 6 (Ex. 47))

*Bellanca*, 288 F.2d at 787, 789; *Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1021 (7th Cir. 2002). The one case Defendants cite, *Freeman*, happened to be a rescission case because the case was brought by the borrower, not the lender. But *Freeman* does not suggest that the parties' rights would be different if the lender had sued to recover from the borrower. *Freeman*, 419 F. Supp. at 443-44.[16]

**3. Illinois Common Law Does Not Control and, In Any Case, Would Not Preclude Restitution.** Defendants also argue that Illinois courts have not adopted Restatement (Second) of Contracts § 197 or its approach to restitution. As discussed above (III.A), this argument is beside the point because federal law, not Illinois law, controls the remedy for a violation of federal law. But even if Illinois law applied, the Illinois Court of Appeals cited section 197 with approval, *Kedzie & 103rd Curr. Exch. Inc. v. Hodge*, 234 Ill. App. 3d 1017, 1026 (1st Dist. 1992) (dissent), and no Illinois case has rejected that section.[17] Furthermore, Defendants' position ignores the Illinois Supreme Court's adoption of Restatement § 178, which expressly permits enforcement of illegal contracts if the equities warrant, and is part of an integrated framework providing for restitution in proper circumstances even where contracts are unenforceable. The comments to Restatement § 178 specifically refer to the rules for restitution and state that even where a contract term is unenforceable, "with respect to … the possibility of restitution (Topic 5), a court will be guided by the same rules that apply to other terms unenforceable on grounds of public policy." Restatement § 178 cmt. a. Defendants suggest that Illinois will not likely formally adopt Restatement § 197 because

---

[16] Defendants also attempt to argue that courts cannot create a federal common law restitution remedy because section 29(b) creates an express right of action for rescission and therefore leaves no "interstitial gap" to fill. (DxBr 48) But the words "any action maintained in reliance upon this subsection" in 29(b) merely refer to the limitations period for rescission actions and in no way suggest that restitution is not available where 29(b) is asserted as an affirmative defense. Defendants do not, and cannot, contend that the voidability language in 29(b) has any impact on the availability of restitution (which is premised on non-enforceability).

[17] Nor do Defendants' Illinois cases cite reject the possibility of restitution where the equities warrant. *Vine Street*, 222 Ill.2d at 297-300, applied a balancing approach but determined returning the parties to the status quo was not appropriate based on the policy underlying the violated law. *Id.* at 299. *Ctr. for Athletic Medic., Ltd. v. Independent Medical Billers of Ill., Inc.*, 383 Ill. App. 3d 104, 111-14 (1st Dist. 2008), followed *Vine Street*.

that section was updated by the 2011 adoption of Restatement § 32. However, the updated Restatement § 32 provides an even clearer articulation of the policy that restitution may be appropriate as a limited penalty where complete forfeiture is not warranted.

**4. Restitution Is Not Barred in Illegality Cases By the Existence of an Express But Unenforceable Contract.** Defendants also argue that unjust enrichment is not available where there is an express contract between the parties. (DxBr 51) But the Trustee's alternate remedy is not a stand-alone, common law unjust enrichment claim, like the claims at issue in the cases Defendants cite. *See Shaw v. Hyatt Int'l Corp.*, 461 F.3d 899, 900-901 (7th Cir. 2006); *People ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill. 2d 473, 480 (Ill. 1992); *Ctr. for Athl. Medic.*, 383 Ill. App. 3d at 106. Furthermore, if Defendants' argument were correct, it would bar restitution in *every* illegality case, because illegality cases by definition involve illegal contracts. The Restatement sections and case law cited herein make clear that this is not, and cannot be, the law.

**5. The Trustee's Alternative Remedy Is Not Time-Barred.** Defendants argue that the Trustee's alternative request for restitution is time-barred. But, again, the Trustee is not bringing a stand-alone unjust enrichment or an affirmative clam under 29(b). Any limitations periods applicable to such claims are irrelevant. Furthermore, even if the Trustee were bringing a stand-alone claim, it would relate back to the filing of these actions in 2005. *See Frigo v. Silver Cross Hosp. and Med. Ctr.*, 377 Ill. App. 3d 43, 59 (1st Dist. 2007). Given that no default or failure to make timely payments occurred until July 2001 (and Defendants asserted no illegality defenses until after that) (JS 1122-1123), a five year limitation period would not bar the Trustee's claim. Judge Tailor rejected this same argument in the related state-court cases. (12/7/12 Order (Ex. 48); 12/7/12 Tr. at 26:8-16 (Ex. 49))

**D. The Equities Support Enforcement or at Least Restitution.**

The evidence at trial overwhelmingly supports enforcement (or at least restitution), in spite

of any illegality.  As discussed in the Trustee's opening brief, any violation of the margin regulations was unintentional; the Federal Reserve Board did not make strict compliance a high priority in 1998; the FRBC (after consulting Board Staff) signed off on this transaction; and the Trustee would suffer a significant forfeiture if the Court grants no relief.  (PxBr 41-43)  Rather than dispute this evidence, Defendants again attempt to make **_legal_** arguments that restitution is unavailable.  Judge Tailor already rejected these same arguments in the state court cases, and they fare no better here.

Defendants first assert that the Trustee cannot support a *prima facie* unjust enrichment claim because the borrowers did not retain any benefit and were therefore not unjustly enriched.  (DxBr 53-55)  But, setting aside that the Trustee is not bringing common law unjust enrichment claims and therefore need not prove this element, it is undisputed that Defendants directed payment of their loan proceeds to Comdisco, for purchase of stock in their names, and that they would have benefitted from any increase in stock price—as did the ten SIP participants who sold early.  (JS 479, 484, 494, 532, 535, 831, 939)  The fact that Comdisco's demise three years after the SIP "wiped out" the value of Defendants' investments does not mean they received no benefit.  Judge Tailor rejected this same argument in state court. (5/3/13 Tr. at 30:19-41:22 (Ex. 50))[18]  Defendants also argue— again, wrongly assuming the Trustee must prove the elements of common law unjust enrichment— that the Trustee suffered no detriment because the Bank, not the Trustee, loaned the money.  (DxBr 54-55)  This argument fails because the Trustee is suing as the Bank's assignee.  Furthermore, Defendants concede that a plaintiff can recover a benefit transferred by a third party if the plaintiff

---

[18] Defendants suggest that the Court's turnover order following summary judgment in 2008 effectively undid the benefit they received by putting the CDRs in the Trustee's possession.  (DxBr 54; 12/23/08 Order (Dkt. 80))  But Defendants offered no evidence that they ever requested that the CDRs be provided to them after the Seventh Circuit vacated the summary judgment order.  Moreover, while Defendants characterize the CDRs as "our only conceivable 'retained benefit'," the benefit of the loans was enabling Defendants to buy stock that everyone expected in 1998 would go up in value—and which initially did go up in value, resulting in substantial profits for 10 participants.  (JS 939)  That the Court ordered the CDRs to be turned over to the Trustee three years after this litigation commenced does not mean Defendants received no value from the loans.

"had a better claim to the benefit than the defendant." (DxBr 55) That is exactly the situation here. Defendants did not repay their loans, and Comdisco's estate had to pay the Bank's Guaranty claims from other estate assets. The Trustee seeks to recover on behalf of Comdisco's unsecured creditors and has a better claim than SIP participants who received, and never repaid, their loans.

## IV.  DEFENDANTS' CONTRACT DEFENSES FAIL.

In yet another effort to avoid the limitations of their illegality defenses, Defendants assert in their "contract" defenses that the alleged violations prevent the Trustee from proving his *prima facie* case. If true, this would effectively render every contract made in violation of a regulation categorically unenforceable—in direct conflict with controlling federal law (as well as Illinois law) requiring a balancing approach. None of Defendants' arguments support their novel position.

### A.  Defendants' Excuse of Nonperformance Defense Has Several Fatal Defects.

Citing *Costello v. Grundon*, 651 F.3d 614, 640 (7th Cir. 2011), Defendants argue that their repayment obligation is excused because compliance with the margin regulations and securities laws was a material term of the Notes. (DxBr 44) This defense fails in the first instance because no terms of the **Notes** were illegal or fraudulent. Even if the Guaranty violated the margin regulations, or Comdisco's statements in documents other than the Notes violated Rule 10b-5 or section 17(a), Defendants cannot prevent enforcement of the Notes based on excuse of non-performance.

Furthermore, *Grundon* does not, as Defendants attempt to suggest, endorse the use of "excuse of nonperformance" as a shortcut around the burden of proof and equitable balancing required for an illegality defense. To the contrary, the authority on which *Grundon* relies makes clear that there is a significant **materiality** component beyond what an illegality defense would require. To be sufficiently material, the performance of the disputed provision must have been the "*sine qua non* of the agreement." *Elda Arnhold and Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 700 (7th Cir. 2002) (cited in *Grundon*, 651 F.3d at 640). Defendants' (transparently coached)

testimony that they would not have participated in the SIP if they had known of the illegality does not rise to this level. (DxBr 44-45; JS 722-727, 732-761, 764-779)

In analyzing materiality, the Court must consider both (i) "the intent of the parties with respect to the disputed provision"; and (ii) "the equitable factors and circumstances surrounding the breach of the provision." *Elda Arnhold*, 284 Ill. App. 3d at 700. With respect to intent, the evidence established that, far from being the "*sine qua non*" of the Notes, margin regulation compliance was never considered. (JS 668, 680, 681) Defendants say they would not have entered into the Notes if they were only permitted to borrow 50 percent of the stock price or if the interest rate was higher because Comdisco did not provide a Guaranty. (DxBr 43-44) But these there is no evidence the parties ever even considered these alternative terms. Nor would bringing the SIP program into compliance (if there was a violation) require limiting the loans to 50 percent or eliminating the Guaranty. It would merely have required Comdisco to qualify for the "plan lender" exception or eliminate the offending restrictions, neither of which would have been a "*sine qua non*" of the Notes.

Moreover, even if the parties consciously intended compliance to be a central, indispensable term of the Notes (which they clearly did not), the Court would still need to examine equitable factors to determine whether the breach was sufficiently material "as to justify [Defendants'] subsequent refusal to perform, based on the totality of the circumstances." *Elda Arnhold*, 284 F.3d at 704. Thus, the excuse of nonperformance framework effectively leads to the same result as the balancing approach under the Restatement and *Hellenic Republic*, 980 F.2d at 455-56. As discussed above, any violation here was minor, technical and unintentional, and it did not defeat the bargained-for objective. Defendants got exactly what they bargained for, as the profits gained by the ten participants who left the SIP early demonstrate. (JS 939)[19]

---

[19] As discussed in the Trustee's initial brief, Defendants also cannot recover because if there was a margin regulation violation, they willfully caused the Bank to extend loans and/or Comdisco to extend the Guaranty in violation of Regulation X. (PxBr 41, 45) *See Goldstein v. Lustig*, 154 Ill. App. 3d 595, 599 (1st Dist. 1987)

### B.   Defendants' Lack of Consideration Defense Is Based on Antiquated Law.

Defendants also argue that the Notes are unenforceable because the consideration was illegal.  But their only support for this argument is a series of antiquated cases, decided between 1874 and 1925, that are inconsistent with recent illegality cases and the "modern balancing approach."

### C.   Compliance with Federal Regulations Was Not a Condition Precedent.

Again relying on 100-plus-year-old precedent, Defendants attempt to make strict regulatory compliance an implicit "condition precedent" of the Notes.  (DxBr 45)  Their cases do not support this theory, nor do modern cases recognize conditions precedent except where they are expressly stated.  Defendants contend that "it cannot be imagined consistent with good sense" that repayment would begin before the disbursement of the loans.  But this anticipated sequence of performance cannot not create an express condition precedent in the Notes where none exists.

## V.   THE COURT SHOULD STAND BY ITS PRIOR RULING THAT EVIDENCE OF PROJECT HORIZON AND OTHER ESPs IS INADMISSIBLE.

Defendants ask the Court to reconsider its October 3, 2013 ruling granting the Trustee's Motion *in Limine* 6 to exclude evidence regarding (i) Project Horizon; and (ii) the Bank's post-Comdisco ESPs.  (DxBr 55; Dkt. 311; 10/3/13 Tr. at 640 (Ex. 51))  Defendants argue that the Bank "decided to change the structure of the ESPs" after Murray learned that the Federal Reserve Board would not accommodate his request for a Staff opinion or amendment to Regulation U.  (DxBr 55-56)  But this argument only serves to confirm what the Court already found:  Defendants are seeking to use the post-Comdisco ESPs as evidence of the Bank's remedial measures, contrary to Rule 407.  (Ex. 51 at 641)  It also does not address the Court's further observation, that "what happens after the fact, after [the Comdisco] SIP is just not terribly important."  (*Id.* 641-642)  Defendants identify five purported "other purposes" that they claim are not covered by Rule 407.  (DxBr 57-58)  But

---

(party who materially breaches cannot take advantage of terms that benefit him).

none of these avoids the reasoning behind the Court's initial ruling:

- (1) As discussed above (§ II.D), evidence regarding ESPs developed **after** the Comdisco SIP are not evidence that the Bank was "in the business of supplying information" at the time of the SIP—particularly when Defendants say the Bank changed the terms of the later ESPs and prepared a package of standard ESP materials to be used with these ESPs.

- (2), (3), (4) Defendants suggest the other ESPs show "regulatory arbitrage" and the reasons why the Bank purportedly violated Regulations G and U. However, if Defendants articulate any reason post-Comdisco ESPs (which occurred 9 months to 2 years after Comdisco) may be marginally relevant, it is to prove culpable conduct, negligence or a defect in the design of the SIP, all of which are prohibited by Rule 407.

- (5) Post-Comdisco ESPs should not be admitted to explain Project Horizon, which the Court also excluded and described as a "sales pitch" that "went nowhere." (Ex. 51 at 641) Project Horizon is itself irrelevant and barred by Rule 407.

For these reasons, and for the reasons set forth in the Trustee's briefing on Motion *in Limine* No. 6 (Dkt. 276, 301), which is incorporated by reference, the Court should deny Defendants' request to reconsider the Court's prior ruling regarding the inadmissibility of evidence regarding post-Comdisco ESPs.

## VI. THE TRUSTEE ESTABLISHED DAMAGES.

For the reasons set forth in the Trustee's initial brief (PxBr 48-49), Defendants' payment defenses fail and do not limit the Trustee's recovery.

## CONCLUSION

For the reasons set forth herein and in the Trustee's Post-Trial Brief, the Court should enter judgment and award relief as set forth in the Trustee's Post-Trial Brief. In addition, the Court should deny Defendants' (i) purported Motion to Dismiss Plaintiff's Alternative Claim for Failure to State a Claim Upon Which Relief May Be Granted [Dkt. 363] and (ii) request to reconsider the Court's ruling on the Trustee's Motion *In Limine* No. 6.

Dated: March 26, 2014            Respectfully submitted,

           */s/   Erin L. Brechtelsbauer*
           Jonathan W. Young (#6204590)
           W. Allen Woolley (#6227238)
           Bilal Zaheer (#6291119)
           Erin L. Brechtelsbauer (#6301510)
           EDWARDS WILDMAN PALMER LLP
           225 West Wacker Drive, Suite 3000
           Chicago, Illinois  60606-1229
           Telephone:  (312) 201-2000
           Facsimile:  (312) 201-2555
           *Attorneys for John W. Costello, not individually, but as*
           *Litigation Trustee under the Comdisco Litigation Trust*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 26, 2014, a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANTS' POST-TRIAL BRIEF AND MOTION TO DISMISS**, along with accompanying exhibits, was filed with the Clerk of the Court using the CM/ECF system, which sent notification to:

James R. Figliulo
Jeff D. Harris
Gregory L. Stelzer
FIGLIULO & SILVERMAN, PC
10 South LaSalle Street
Suite 3600
Chicago, Illinois 60603
Telephone:  (312) 251-4600
Facsimile:  (312) 251-4610

Gini S. Marziani
Davis McGrath LLC
125 S. Wacker Drive
Suite 1700
Chicago, Illinois 60606
Phone: (312) 332-3033
Fax:  (312) 332-6376

*/s/ Erin L. Brechtelsbauer*
Erin L. Brechtelsbauer

# FIGURE 3

### COMPILATION OF SELECTED MCBRIDE BAKER COLES TIME ENTRIES[1]

| Date | Billing Attorney | Hours | Description |
|------|------------------|-------|-------------|
| 6/12/1997 | CAC | 8 | **REVIEW SEC RULES AND REGULATIONS REGARDING REGISTRATION FORM S-8, AND REGULATION U IN CONNECTION WITH PROPOSED 1997 INCENTIVE STOCK OPTION PROGRAM**; REVIEW INSTRUCTIONS FOR S-8 RELATING TO INFORMATION TO BE DISCLOSED INCLUDED IN THE REGISTRATION STATEMENT. |
| 6/18/1997 | CAC | 7 | REVIEW NYSE RULES REGARDING REQUIREMENT OF SHAREHOLDER APPROVAL; DRAFT MEMO REGARDING SHAREHOLDER APPROVAL REQUIREMENT; **REVIEW REGULATION U AND RELATED CASES REGARDING DEFINITION INDIRECTLY SECURED: CALL TO FEDERAL RESERVE BANK REGARDING THE DEFINITION OF INDIRECTLY SECURED** DRAFT CHECKLIST FOR S-8 FILING. |
| 6/19/1997 | CAC | 9.5 | REVIEW CDO LOAN AGREEMENTS AND RESTRICTIVE LOAN COVENANTS; DRAFT MEMO REGARDING RESTRICTIVE LOAN COVENANTS AND HOW IT RELATES TO ENTERING INTO GUARANTEE WITH FIRST CHICAGO; **DRAFT MEMO REGARDING INTERPRETATION OF INDIRECTLY SECURED IN REGULATION U**; REVIEW AND REVISE SIP WITH INFORMATION REGARDING, ALLOCATION OF GAIN AND LOSS; REVIEW SHAREHOLDER RIGHTS AGREEMENT AND DEFINITION OF CHANGE OF CONTROL TO VERIFY THAT SAME DEFINITION IS BEING USED IN 1997 INCENTIVE STOCK OPTION PLAN. |
| 6/20/1997 | CAC | 9.5 | REVIEW AND REVISE INFORMATION CONCERNING ALLOCATION OF GAIN AND LOSS ON SALE OF SHARES; REVIEW AND REVISE DRAFT OF MATERIALS TO BE DISTRIBUTED TO FIRST LEVEL MANAGERS; REVIEW AND REVISE INFORMATION TO BE DISTRIBUTED TO INDIVIDUALS REGARDING A SUMMARY OF THE PLAN **REVIEW AND REVISE RESEARCH MEMOS REGARDING RESTRICTIVE LOAN COVENANTS, NYSE LISTING REQUIREMENTS AND REGULATION U RESTRICTIONS: PREPARE DRAFTS OF DOCUMENTS FOR DISTRIBUTION**. |
| 6/20/1997 | LMH | 9 | REVISE DOCUMENTATION; **VARIOUS CALLS AND CONFERENCES RE: VARIOUS SECURITIES AND CORPORATE ISSUES RE SAME**. |
| 6/23/1997 | LMH | 4 | REVISE DOCUMENTATION; **CONSIDER VARIOUS SECURITIES ISSUES**; VARIOUS CALLS AND CONFERENCES WITH HEWES AND HARVEY. |
| 6/24/1997 | LMH | 4 | CALL FROM SCOTT HARVEY RE: BOARD MEETING AND ADVISE RE: NOTICE PROVISIONS. CONFERENCE WITH TOM KINAS REGARDING VARIOUS TAX MATTERS AND MISCELLANEOUS FOLLOW-UP. |

---

[1] Source: JS Appx. 2, Tabs A, D, F, K. Selected time entries from McBride's invoices are included in their entirety. Relevant portions of the entries are highlighted in **bold** font. McBride attorneys included are Lola Hale (LMH), Corlene Cathcart (CAC), and Jerry Holisky (JXH).

| Date | Billing Attorney | Hours | Description |
|---|---|---|---|
| 6/26/1997 | LMH | 12 | PREPARE FOR MEETING WITH SCOTT HARVEY AND MADONNA HOUSER; ATTEND MEETING AND DO VARIOUS FOLLOW-UPS. |
| 6/30/1997 | CAC | 8.7 | REVIEW FACILITY AND GUARANTEE AGREEMENT, MASTER PROMISSORY NOTE AND LEGAL OPINION TO BE PROVIDED BY MBC. COMPARE AGREEMENTS TO THE AGREEMENTS DRAFTED FOR THE ALLEGIANCE TRANSACTION. **REVIEW FEDERAL SECURITIES LAWS AND THE PROVISIONS OF REGULATIONS G, T, U AND X TO DETERMINE IF THE TRANSACTION WILL BE SUBJECT TO ANY PROVISIONS OF THE REGULATIONS**. |
| 6/30/1997 | JXH | [illeg.] | CONFERENCE WITH LOLA M. HALE REGARDING CHOICE OF LAW AND ENFORCEABILITY ISSUES IN BANK REQUESTED LEGAL OPINION IN CONNECTION WITH EMPLOYEE STOCK PURCHASE PROGRAM; STUDY AND ANALYSIS OF SAME; PREPARATION OF MEMO REGARDING RESEARCH ASSIGNMENT. |
| 6/30/1997 | LMH | 7 | CALL FROM HARVEY AND MADONNA; CALL FROM ENGLISH COUNSEL; CALL FROM BRIAN HART AND GIVING COMMENTS RE: LOAN AGREEMENT; REVIEW FAXES FROM FRANCE AND GERMANY; MISCELLANEOUS FOLLOW-UP WORK RE: SAME. REVIEW OPINION AND OFFICE CONFERENCE RE: SAME. |
| 7/2/1997 | CAC | 5 | **DRAFT MEMORANDUM REGARDING REGULATIONS D, G, T, U, X AND Z AND THE EFFECTS THE REGULATIONS MAY HAVE ON THE TRANSACTIONS CONTEMPLATED BY THE COMPANY'S OPTION PLAN**; DRAFT MEMO REGARDING THE CHANGE OF CONTROL PROVISIONS IN THE SHAREHOLDERS RIGHTS AGREEMENT AND RELATED PROVISIONS CONTAINED IN THE 1997 INCENTIVE STOCK OPTION PROGRAM AND OPTION PLAN; REVIEW FORM 10—K TO CONSIDER ON THE TYPE OF DISCLOSURE COMDISCO WILL HAVE TO MAKE IN FUTURE SEC FILINGS. |
| 7/3/1997 | CAC | 2.3 | **REVIEW MEMORANDUM REGARDING THE EFFECT REGULATIONS G, T, U, X AND Z MAY HAVE ON THE TRANSACTIONS CONTEMPLATED BY THE OPTION PLAN; REVIEW REGULATIONS REGARDING PLEDGING STOCK AS SECURITY FOR THE GUARANTY; REVIEW INTERPRETIVE RELEASE OF THE FEDERAL RESERVE REGARDING PLEDGING STOCK** |
| 7/3/1997 | LMH | 5 | **WORK ON PROGRAM** AND CALL TO SCOTT HARVEY. |
| 7/7/1997 | CAC | 5 | CONFIRM WITH NEW YORK STOCK EXCHANGE SHAREHOLDER APPROVAL IS NOT NEEDED FOR THE OPTION PLAN; REVIEW MOF AND VERIFY REFERENCES PROVIDED IN FACILITY AGREEMENT PREPARED BY FIRST CHICAGO. |
| 7/9/1997 | LMH | 4.5 | CALL TO BRIAN HART AT WINSTON & STRAWN RE COMMENTS TO FACILITY AGREEMENT. CALL FROM SCOTT HARVEY. OFFICE CONFERENCE. REVISE DOCUMENT. **REVIEW AND REVISE LETTER TO THE BOARD.** |

| Date | Billing Attorney | Hours | Description |
|---|---|---|---|
| 7/10/1997 | CAC | 1.1 | CONFER REGARDING THE ISSUE OF PROVIDING THE SHARES FROM AUTHORIZED BUT UNISSUED SHARES NECESSITATES A LISTING APPLICATION AND SHAREHOLDER APPROVAL; REVIEW NYSE LISTED COMPANY MANUAL; DISCUSS WHETHER A SEPARATE S-8 WILL BE FILED FOR THE OUTSIDE DIRECTORS DEFERRED COMPENSATION PLAN WITH L. HALE AND M. MOUSER. |
| 7/14/1997 | LMH | 2.5 | CALL FROM HEWES. CONFERENCE RE CONFIDENTIALLY ISSUES. CALL TO BRIAN HART. CALL TO SCOTT HARVEY. |
| 7/15/1997 | CAC | 6 | REVIEW AND REVISE MATERIALS RELATING TO STOCK OPTION PLAN AND STOCK OPTION AGREEMENT; ADD COMMENTS FROM S. HARVEY AND T. KINASZ; TRANSMIT DOCUMENTATION; REVIEW MATERIALS AND HIGHLIGHT INFORMATION THAT NEEDS TO BE UPDATED BEFORE THE DOCUMENTS ARE FINALIZED; **DISCUSS REGULATIONS D, G, T, U, X AND Z WITH J. HOLISKY IN CONNECTION WITH HIS DRAFTING THE LEGAL OPINION**. |
| 7/15/1997 | LMH | 4 | CALL FROM SCOTT HARVEY. REVISE DOCUMENTS RE SAME; CONFERENCE WITH TOM KINASZ RE TAX ASPECTS. CALL TO BRIAN HART. REVIEW COMDISCO EXISTING LOAN AGREEMENTS. REVIEW FACILITY AGREEMENT. |
| 7/16/1997 | CAC | 3 | REVIEW AND REVISE FORM S-8 FOR DIRECTORS DEFERRED FEE OPTION PLAN; PREPARE AND TRANSMIT COPIES OF STOCK OPTION PLAN MATERIALS TO BRIAN HART AT WINSTON AND STRAWN; **REVIEW AND REVISE MEMORANDUM REGARDING FEDERAL RESERVE REGULATIONS** AND THEIR APPLICATION TO STOCK OPTION PLAN; REVIEW AND REVISE NYSE LISTING APPLICATION FOR DIRECTORS DEFERRED FEE OPTION PLAN; PREPARE DRAFTS OF FORM 5-8 AND NYSE MADONNA HOUSER. |
| 7/16/1997 | LMH | 3.5 | CALLS FROM BRIAN HART AND SCOTT HARVEY; **WORK ON OPINION**. |
| 7/17/1997 | JXH | 6.25 | REVISION OF DRAFT OPINION LETTER TO FIRST CHICAGO BANK REGARDING OPTION LOAN PROGRAM; **RESEARCH MISCELLANEOUS ISSUES WITH RESPECT TO ENFORCEABILITY, USURY, ETC.**; PREPARATION OF LETTER TO MR. MURRAY AT WINSTON & STRAWN REGARDING MARKED DRAFT, RATIONALE FOR CHANGES, ETC.; **CONFERENCE WITH LOLA M. HALE REGARDING MISCELLANEOUS OPEN OPINION ISSUES**; FURTHER REVISION OF OPINION AND LETTER FOR DELIVERY TO MR. MURRAY; CONFERENCE REGARDING RESEARCH TOPICS; TELEPHONE CONFERENCE WITH MR. MURRAY. |
| 7/17/1997 | LMH | 2 | **CONFERENCE RE MB&C OPINION**. |
| 7/17/1997 | LMH | 2 | CALL TO SCOTT HARVEY AND **WORK ON PROGRAM**. |
| 7/18/1997 | LMH | 3 | CALL FROM HARVEY AND **WORK ON PROGRAM**. |

| Date | Billing Attorney | Hours | Description |
|---|---|---|---|
| 7/21/1997 | LMH | 12 | CALLS FROM HEWES, KASH, PATRICK, HARVEY. REVIEW PLAN. CALL TO MIKE FELISH. CONFERENCE WITH TOM KINASZ. REVIEW CORPORATE LAW ISSUES AND PREPARE FOR BOARD MEETING. DIRECTOR DEFERRED FEE OPTION PLAN. |
| 7/22/1997 | JXH | 2.75 | **REVIEW OF LEGAL MEMORANDUM RELATED TO STOCK OPTION PLAN, FEDERAL RESERVE RULES, ETC.;** PREPARATION OF DILIGENCE FOR LEGAL OPINION TO BE DELIVERED TO WINSTON & STRAWN; CONFERENCE REGARDING PRELIMINARY RESULTS/TENTATIVE CONCLUSIONS OF RESEARCH INTO ENFORCEABILITY QUESTIONS CONCERNING BORROWERS AND LOAN DOCUMENTS. |
| 7/24/1997 | LMH | 2 | **WORK ON PROGRAM**. |
| 7/24/1997 | LMH | 1 | REVIEW REGULATION C CONCERNING A COMPANY'S ABILITY TO LOAN MONEY TO EMPLOYEES TO PURCHASE STOCK IN THE COMPANY. |
| 1/8/1998 | LMH | 0.5 | CALL FROM SCOTT HARVEY RE: SIP |
| 1/13/1998 | LMH | 6.3 | **WORK ON SIP OVERVIEW REPORT TO DIRECTORS**. CALL SCOTT HARVEY RE: SIP. CONSIDER DIVIDEND ISSUES. |
| 1/15/1998 | LMH | 1 | **PREPARE NEW LETTER TO FEDERAL RESERVE BOARD RE: MARGIN ISSUES. CALLS TO FEDERAL RESERVE BOARD RE: SAME**. |
| 1/19/1998 | LMH | 2 | PREPARE FOR BOARD MEETING RE: SIP. |
| 1/20/1998 | LMH | 10.5 | MEETING AT COMDISCO RE: BOARD MEETING TO CONSIDER SIP. **WORK ON REVISIONS OF' DOCUMENTATION RE: SAME**. |
| 1/22/1998 | LMH | 7 | **WORK ON SIP**. |
| 1/23/1998 | LMH | 10 | CALL TO BRIAN HART. CALL TO SCOTT HARVEY. CONFERENCE WITH TOM KINASZ. REVIEW AND REVISE DOCUMENTATION. |
| 1/24/1998 | LMH | 5.5 | **WORK ON SIP**. |
| 1/25/1998 | LMH | 5 | WORK ON DOCUMENTATION. **REVIEW VARIOUS OPEN ISSUES**. |
| 1/26/1998 | LMH | 10 | REVIEW AND REVISE DOCUMENTS, VARIOUS CALLS AND CONFERENCES WITH LEWES, HART, HOUSER, AND HARVEY. |

| Date | Billing Attorney | Hours | Description |
|---|---|---|---|
| 1/27/1998 | LMH | 7.5 | VARIOUS CALLS AND CONFERENCES WITH HARVEY, FINNOCCHI, BRIAN HART, BANK ATTORNEY AND ED PACEWITZ. REVIEW AND REVISE DOCUMENTATION. CONFERENCE RE: TAX ASPECTS AND FOREIGN SECURITIES LAW ASPECTS. |
| 1/30/1998 | LMH | 10 | PREPARE FOR MEETING. VARIOUS CALLS FROM HARVEY. CONFERENCE RE: TERMS OF LOAN AGREEMENT. CALL TO BANKS ATTORNEY. REVIEW REVISIONS. CONFERENCE RE: LEGAL OPINION. **CALL FROM FEDERAL RESERVE BOARD RE: PURPOSE CREDIT ISSUES**. MEETING AT COMDISCO RE: ANNOUNCEMENT OF PROGRAM TO EXECUTIVES. REVIEW PRESS RELEASE AND LETTER TO EMPLOYEES CONFERENCE WITH JIM HYLAND, MARY MOSTER, HARVEY AND HEWES RE: SAME. |

# FIGURE 4

### ALLEGED FALSE OR MISLEADING STATEMENTS, OMISSIONS
### OR CONDUCT ASSERTED IN DEFENDANTS' POST-TRIAL BRIEF

| # | Alleged Misrepresentation, Omission or Conduct | Source | Reasons Not Actionable |
|---|---|---|---|
| 1[1] | The . . . performance by the Company of its obligations under, each Loan Document to which it is a party will not result in a breach or violation of [or] conflict with . . . any Requirement of Law ….<br><br>Requirements of Law shall mean, as to any Person, . . . any law, rule, or regulation, . . . in each case applicable to or binding upon such Person or any of its property or to which any such Person or any of its property is subject, including, without limitation, the Securities Act of 1933, the Securities Exchange Act of 1934 [and] Regulations G, U, and X of the Board of Governors of the Federal Reserve System . . . .<br><br>(Aff. Defs. ¶ 30) | Facility Agreement §4.01(c) | • No scienter or negligence<br>• Representation by Comdisco to the Bank<br>• Not false or misleading; facts Defendants claim make this misleading (i.e. restrictions) disclosed<br>• Legal opinion/"soft information" |
| 2 | No part of the proceeds of any Loan will be used in a manner which would violate, or result in a violation of, Regulation G, . . . , Regulation U or Regulation X. Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate or be inconsistent with the provisions of Regulation G, . . . , Regulation U or Regulation X.<br><br>(Aff. Defs. ¶ 31) | Facility Agreement §4.01(h) | • No scienter or negligence<br>• Representation by Comdisco to the Bank<br>• Not false or misleading (even if Guaranty violated regulations) ; facts Defendants claim make this misleading (i.e. restrictions) disclosed<br>• Legal opinion/"soft information" |
| 3 | Male Voice: At the end of the five year period when the loan matures, we would be required to liquidate the stock to pay off the loan at that point or can we use other resources to pay it off [?]<br><br>Male Voice: You can do whatever you want to pay off the loan.<br><br>Male Voice: Okay.<br><br>Male Voice: The loan is not technically secured by the securities because we get into a margin account and this is not a margin account. It is an unsecured loan that actually you could pay off, you could sell your house, who cares. It doesn't require that you sell the stock.<br><br>(Aff. Defs. ¶ 44) | SIP Presentation | • No scienter or negligence<br>• Representation by Comdisco. Bank did not attend the SIP Presentation.<br>• Not false or misleading (regardless of any violation by Guaranty)— no margin account and loan could be paid off by whatever means the participant had. Facts Defendants claim make this misleading (i.e. restrictions) disclosed<br>• Legal opinion/"soft information" |
| 4-5 | *Not realleged or argued in Defendants' Post-Trial Brief* | | |

---

[1] The numbering in this Figure 4 corresponds the numbering in Figure 2 to the Trustee's initial Post-Trial Brief. As indicated in this chart, Defendants have not alleged or argued several of the items included in Figure 2. Defendants have asserted several new alleged misstatements, omissions and conduct allegations that are not listed in Figure 2. These are referred to by letters A-E.

| # | Alleged Misrepresentation, Omission or Conduct | Source | Reasons Not Actionable |
|---|---|---|---|
| 6 | **Q: Is the Loan secured by the stock purchased?**<br><br>A: No, the Loan is not secured by the stock. The Loan will be full recourse obligation of each participant. However, Comdisco holds the actual stock certificates and the sale of the stock is restricted by the terms of the Shared Investment Plan such that proceeds must first be used to repay the Loan obligation. The Certificates representing the SIP shares will contain a legend reflecting the restrictions on transfer, use of sale proceeds and Comdisco's right of first refusal.<br><br>*(not alleged in Aff. Defs.)* | Comdisco SIP Prospectus, Q&A at 00034 | • Not alleged in affirmative defenses as required by FRCP 9(b)<br>• No scienter or negligence<br>• Representation by Comdisco, not the Bank<br>• Not false or misleading (regardless of any violation by Guaranty); "however" clause qualifies statement with disclosure of pertinent facts<br>• Other facts Defendants claim make this misleading (i.e. restrictions) disclosed<br>• Legal opinion/"soft information" |
| 7 | **Q: If the price of Comdisco stock were to drop below the purchase price, would I receive a margin call?**<br><br>A: No. Since the purchased SIP shares do not serve as collateral for the loan from The First National Bank of Chicago, the loan is not a margin loan.<br><br>(Aff. Defs. ¶ 12) | Comdisco SIP Prospectus, Q&A at 00034 | • No scienter or negligence<br>• Representation by Comdisco, not the Bank.<br>• Not false or misleading (regardless of any violation by Guaranty); no margin calls, and SIP shares were not collateral for loans<br>• Other facts Defendants claim make this misleading (i.e. restrictions) disclosed<br>• Legal opinion/"soft information" |
| 8-11 | *Not realleged or argued in Defendants' Post-Trial Brief* | | |
| 12 | Comdisco and FNBC did not disclose to Defendants at the time of the SIP the estimated fair market value of the stock with the restrictions in place.<br><br>(Aff. Defs. ¶ 57) | Section 83(b) Tax Election Form | • No scienter or negligence<br>• No alleged misleading statement by Bank that could give rise to duty to disclose. (Comdisco provided 83(b) tax election form.)<br>• Not false or misleading. Tax election form stated that the value was determined exclusive of restrictions on the stock.<br>• Defendants offered no evidence of alleged true value of SIP stock |
| A | The SIP Materials and Presentation disclosed multiple times and in multiple ways that Comdisco would be guaranteeing Defendants' indebtedness under the SIP Notes | No cited sources | • No scienter or negligence<br>• Not false or misleading. Loans were guaranteed, and Defendants got benefit of lower interest rate and greater access to credit from Guaranty.<br>• Alleged violation by Guaranty was legal opinion/"soft information"; no duty to disclose |
| B | Failure to provide Defendants with Form G-3 purpose statements | | • No scienter or negligence<br>• Bank not responsible for supplying G-3 purpose statement, as Comdisco extended Guaranty<br>• Not false or misleading<br>• Not required—no extension of credit directly or indirectly secured by the stock<br>• Determination of whether form was required was, at best, legal opinion/"soft information"<br>• No affirmative "scheme" to convey false appearance<br>• Form requirement administrative, not to protect investors. No duty to speak by virtue of this form. At most, regulatory violation, not fraud. |

| # | Alleged Misrepresentation, Omission or Conduct | Source | Reasons Not Actionable |
|---|---|---|---|
| C | Failure to provide Defendants with Form U-1 purpose statements | | • No scienter or negligence<br>• Not false or misleading (regardless of any violation by Guaranty)<br>• Determination of whether form was required was, at best, legal opinion/"soft information"<br>• Not required—no extension of credit directly or indirectly secured by the stock<br>• No affirmative "scheme" to convey false appearance<br>• Form requirement administrative, not to protect investors. No duty to speak by virtue of this form. At most, regulatory violation, not fraud. |
| D | Comdisco and FNBC agreed to the structure of the SIP Program and to present it to Defendants. The structure of the SIP Program violated G, U and 7(d) of the Exchange Act. The SIP provided Comdisco a direct cash infusion of $109 million from FNBC without having to list any corresponding debt on its books, and temporarily inflated its stock price. The SIP provided FNBC with millions in interest and fees that it could not have obtained hat it not violated U and had not arranged for Comdisco to violate G. | No cited sources | • No scienter or negligence<br>• No affirmative "scheme" to convey false appearance<br>• No particular false or misleading statement alleged. Actionable omission requires particular statement that is misleading without omitted fact<br>• Bank did not make alleged misleading statements relating to compliance<br>• Disclosure of legal opinion/"soft information" not required |
| E | Comdisco and FNBC did not disclose to Defendants in 1998, or at any other time before the value of their SIP stock was destroyed, that the Notes were made, and FNBC's performance under the Notes, and Comdisco's performance under the Facility and Guaranty Agreement, were in violation of G and U and Section 7(d) of the Exchange Act. | No cited sources | • No scienter or negligence<br>• Set-off defenses withdrawn. No illegality or inducement defense based on alleged after-the-fact duty to correct<br>• Bank did not make alleged misleading statements relating to compliance that could give rise to duty to correct; had no duty to speak<br>• Not false or misleading<br>• Disclosure of legal opinion/"soft information" not required. Issue of whether SIP program violated regulations still being litigated. |