```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   JOHN W. COSTELLO, not          )
     individually, but as          )
 4   Litigation Trustee under the  )
     Comdisco Litigation Trust,    )
 5                                 ) No. 05 C 736
                   Plaintiff,      )    05 C 740
 6                                 )    05 C 746
              vs.                  )    05 C 764
 7                                 )
     MIKE J. POISELLA, ROMAN       )
 8   BRUNNER, JOSEPH J. SCOZZAFAVA,)
     and GREGORY A. WEISS,         ) Chicago, Illinois
 9                                 ) October 21, 2014
                   Defendants.     ) 3:00 p.m.
10

11              TRANSCRIPT OF PROCEEDINGS - Ruling

12         BEFORE THE HONORABLE ROBERT W. GETTLEMAN

13   APPEARANCES:

14   For the Plaintiff:      EDWARDS WILDMAN PALMER LLP
                             BY:  MR. JONATHAN W. YOUNG
15                                MR. W. ALLEN WOOLLEY
                             225 West Wacker Drive, Suite 3000
16                           Chicago, Illinois 60606

17   For the Defendants:     FIGLIULO & SILVERMAN, P.C.
                             BY:  MR. JEFF D. HARRIS
18                                MR. GREGORY L. STELZER
                             Ten South LaSalle Street, Suite 3600
19                           Chicago, Illinois 60603

20                           DAVIS McGRATH LLC
                             BY:  MS. GINI S. MARZIANI
21                           125 South Wacker Drive, Suite 1700
                             Chicago, Illinois 60606
22

23   Official Court Reporter:  NANCY L. BISTANY, CSR, RPR, FCRR
                               219 South Dearborn Street, Room 1706
24                             Chicago, Illinois 60604
                               (312)435-7626
25                             nancy_bistany@ilnd.uscourts.gov
```

1    (Proceedings in open court.)

2    THE CLERK:  05 C 736, Costello versus Poisella.

3    MR. HARRIS:  Good morning -- good afternoon, I should

4    say, your Honor.

5    MR. YOUNG:  Good afternoon, Judge.

6    Jonathan Young and Allen Woolley for the plaintiff.

7    MR. HARRIS:  And Jeff Harris, Gini Marziani, and

8    Gregory Stelzer for the defendants, your Honor.

9    MS. MARZIANI:  Good afternoon, your Honor.

10   THE COURT:  Good afternoon, folks.

11   All right.  I am prepared to make an oral ruling on

12   this case.  I got that 52(c) thing from you, which I don't know

13   why you filed, the defendants, because I told you I didn't want

14   to see that until after this ruling, so that's why I struck it.

15   But I'm going to orally give you my findings and

16   conclusions under 52(a)(1).  And to the extent, as you know the

17   law here, that any findings may be deemed to be conclusions,

18   they will be considered conclusions.  And corollary to that, to

19   the extent that any conclusions might be deemed findings of

20   fact, they will be considered findings under the rule.

21   Now, I just want to begin by saying that I had

22   requested the parties after the trial, a very extensive trial,

23   was concluded to prepare a stipulation of uncontested facts.

24   And instead of that, I got a voluminous combination of a

25   stipulation of facts and a summary of the evidence, which is

1    document 355.  I appreciate the effort that went into that

2    document.  I'm sure it was quite extensive, and I think you

3    should be complimented for the work you put into it.

4         It would have been better to have separated the

5    stipulated facts from those that were contested, and there were

6    not many that were contested.  A summary of those facts might

7    have been helpful, but I've been able to separate them on my

8    own.  And I've also taken, as you know, extensive notes, and

9    I'm quite familiar with the record in this case.

10        So just for the record, I will incorporate as

11   findings of fact those facts that are contained in document 355

12   that the parties have agreed are uncontested, so we don't have

13   to repeat all of that today.

14        I will note that the principal transactional facts in

15   this case are not and really never have been contested.  It's

16   the inferences and conclusions drawn from those transactional

17   facts that have been contested and were the subject of my

18   previous ruling and the ruling by the Court of Appeals in the

19   *Grundon* case, which was the appeal from my previous ruling.

20        There are some contested facts, but there are very

21   few, and I'll mention them as I go along.

22        To summarize my holding today, I do find that the

23   plaintiff has established a prima facie case for enforcement of

24   the notes, that the bank has not committed an extending or

25   maintaining Regulation U violation, that the defendants have

1    failed to establish a violation of Section 17(a) or 10(b), the

2    fraud claims, but I also find that the bank and therefore its

3    assignee, the plaintiff in this case, did commit an arranging

4    violation of Regulation U that renders the notes unenforceable.

5            So I will be entering a judgment for the defendants

6    today for these reasons.

7            I could get right to that conclusion, but I want to

8    address some of the other issues because you've put so much

9    time into it, and I think if there is an appeal of this ruling,

10   which I expect, the Court of Appeals should at least know where

11   I'm coming from on those preliminary findings.

12           First of all -- and these are all contested issues

13   that were argued about in the briefs -- the plaintiff has

14   established a prima facie case for enforcing the notes executed

15   pursuant to the Shared Investment Plan or the SIP, as we call

16   it.

17           The defendants executed notes to First National Bank.

18   Comdisco received the proceeds of the notes that were paid by

19   the bank.  The stock was issued to each defendant and held by

20   Comdisco's transfer agent, and the notes have not been paid.

21   That to me is a prima facie case.

22           As far as the 17(a) and 10(b) claims are concerned, I

23   find that there's no evidence of a scheme or artifice to

24   defraud.

25           The Court found that the plaintiff's witnesses were

1  highly credible, that there was no evidence to support the

2  notion that anybody involved in this SIP knew or intended that

3  the transaction violated any of the margin regulations.

4       Both the bank and Comdisco retained competent

5  counsel -- as we know, they were experienced lawyers -- to

6  ensure that the transaction complied with all the laws and

7  regulations, and they took significant steps in doing that.

8       Comdisco's counsel contacted the Federal Reserve Bank

9  of Chicago, the FRBC as it's called.  And I'll get into this in

10  a little more detail in a moment.  They did that to obtain an

11  opinion that the transaction complied with Regulations G and U.

12       Both Comdisco and the bank and, indeed, the

13  defendants themselves, these shareholders themselves, had every

14  reason to believe that the transaction was compliant and that

15  no impediment to the enforcement of the SIP terms existed.  It

16  would have defeated the entire exercise.

17       So the Court finds a total lack of scienter on the

18  part of the bank or Comdisco with respect to the SIP, and the

19  defendants' fraud defense fails for that reason alone.

20       So that leads us to the extending or maintaining

21  violations of Regulation U by the bank, which I find against

22  the defendants on.  I don't find such violations.

23       First of all, it's important to remember that,

24  pursuant to the *Grundon* decision by the Seventh Circuit, the

25  defendants bear the burden of proof for all of these defenses.

1    It's also important to remember -- and this is

2   throughout this entire discussion -- that at the time of the

3   SIP in 1998, Comdisco had just completed its most profitable

4   year ever.  It was riding high; it had excellent credit rating;

5   it had a $300 million line of credit from Citibank.  And things

6   were looking pretty good for Comdisco when this happened.

7    The notes I find were not directly secured by the

8   Comdisco stock.  First of all, the bank had no ability to sell

9   the stock or force the sale of the stock, but rather, it was

10  looking only to Comdisco's guaranty in the event a note was

11  defaulted.  I think that's clear from the evidence in this

12  case.

13    So as long as Comdisco was doing well, as it had been

14  at the time, Comdisco would have been able to pay the bank for

15  any defaulted note pursuant to its guaranty, and the bank would

16  have no reason to look to the stock as direct security.  And if

17  Comdisco was doing poorly or was failing, as unfortunately it

18  happened in this case, the stock would diminish in value or it

19  would be worthless, and it would be unlikely that there would

20  be enough value in any borrower's stock to secure the note.

21    I also find that the notes were not indirectly

22  secured by the stock.  The bank, again, had no control over the

23  stock, didn't hold it, didn't hold the stock powers.  They were

24  held by Comdisco or its agent.  It could not force a sale of

25  the stock.  If there were a default in any of the notes, the

1    restrictions on the stock benefited Comdisco and not the bank,
2    either directly or indirectly.

3           I found that Scott Harvey, Comdisco's Deputy General
4    Counsel, was highly credible.  He testified about the purposes
5    of the restrictions on the stock.  And those purposes were as
6    follows:

7           First of all, the one-year limit on the sale of the
8    stock was to keep key employees who were part of the SIP with
9    the company and to preserve the success of the team.  That was
10   one of the main purposes of the SIP, in addition to generating
11   some cash for Comdisco.  The company legitimately wanted to
12   keep these people in the fold, and that was the purpose of that
13   restriction and a number of other restrictions.

14          The right of first refusal and the ability of
15   Comdisco to impose further restrictions was meant to prevent
16   insider trading.  The provision of profit sharing on the stock
17   where they split the profits in the event of a sale was
18   designed to provide an incentive to the employees to stay with
19   the company again.  And the fact that a number of employees
20   actually did leave the company and were able to sell their
21   stock and realize a profit even with these restrictions
22   reinforces my conclusion that the restrictions were there for
23   the benefit of Comdisco and the employees themselves, including
24   these defendants.  That's why maybe it's called a "Shared
25   Investment Plan," but it's shared in more ways than one.

1    The fact that Comdisco's transfer agent held the
2    stock and Comdisco had the power to control the agent and the
3    stock powers that were held was obviously for the benefit of
4    Comdisco.  The bank could not enforce Comdisco -- or could not
5    force Comdisco to sell the stock or execute those stock powers.
6    And the fact that any dividends went towards payments of the
7    notes benefitted Comdisco and the shareholders themselves and
8    limited their exposure under the notes.

9    Dan Clarke, whose testimony I found to be very
10   credible and reliable -- he was the bank's relationship
11   manager -- he testified that this restriction eliminated the
12   need to get payments from the SIP participants directly and was
13   a trade-off to balance the fixed interest rates that these
14   borrowers got with the floating rate that the bank would
15   typically provide.

16   The same is true with respect to the provision in the
17   SIP that the proceeds in the event of a sale went first to pay
18   the loans.  This reduced Comdisco's risk and was for its
19   benefit.

20   Now, with respect to Hale's letter to the FRBC and
21   the response by Mr. McCauley of the FRBC, the Court does find
22   that that opinion that he expressed was entitled or is entitled
23   to *Skidmore* deference, although frankly it doesn't make a great
24   deal of difference in my conclusions.  I just want to talk
25   about that for a moment since we spent so much time on it.

1    Although Hale's letter didn't identify every
2 restriction that there was in the SIP, the restrictions that it
3 did identify indicated that Comdisco was inquiring about
4 whether the stock directly or indirectly secured the notes
5 themselves.
6    I found that Mr. Sabel's expert testimony on behalf
7 of the plaintiff was very impressive and credible and helped
8 put a lot of this into context.  He explained how the letter
9 from Hale referenced both Regulations G and U, which would have
10 triggered an inquiry into both direct and indirect security
11 issues, and whether those issues involved both the notes and
12 Comdisco's guaranty.
13    As he explained, Mr. Hale -- Mr. Sabel, rather, I'm
14 sorry, Ms. Hale followed the accepted procedure in contacting
15 the local Federal Reserve Bank to obtain an opinion about this
16 specific transaction.
17    The evidence presented by the plaintiff clearly
18 demonstrates to me that the FRBC, in responding to the Hale
19 letter, would speak with the Federal Reserve Board attorney, a
20 man named Scott Holz, who was the board's in-house expert on
21 Regulations G and U compliance.  The evidence is also clear
22 that Ms. Hale spoke orally with the FRBC before McCauley
23 responded to her inquiry and that in following these
24 procedures, Hale and her client, Comdisco, were entitled to
25 rely on the opinion.  I know that that was contested -- that is

1   a contested fact to some extent, but I was convinced by the

2   evidence I saw and heard that that happened in the way that the

3   plaintiffs claim it happened.  I think it's pretty clear that

4   happened that way.

5            So I conclude that the FRBC's opinion as to

6   compliance by the bank with the margin regulations is entitled

7   to *Skidmore* deference, but this simply reinforces my conclusion

8   that the restrictions on the Comdisco stock involved in the SIP

9   were for the benefit of Comdisco and did not directly or

10  indirectly secure the notes.

11           In addition, even if I were to find that the notes

12  were somehow indirectly secured or that the stock somehow

13  indirectly secured the notes -- and the only way I could do

14  that is to rely on the dividends and proceeds going, in part,

15  to pay the bank -- the plaintiff I think has carried its burden

16  of establishing that the bank in good faith did not rely on the

17  stock as collateral for the notes, which under the regulations

18  allows the bank to avoid a margin violation.  That's 12 C.F.R.

19  Section 221.2(g)(2)(iv).

20           Again, I credit Mr. Clarke's testimony that the bank

21  didn't rely on the stock at all or even the individual

22  borrower's creditworthiness in issuing the notes, because

23  Comdisco had guaranteed all the notes and was coming off its

24  best year flush with capital and able to make good on its

25  guaranty.  As Mr. Clarke testified, the bank treated the loans

1    basically as unsecured and relied on the guaranty by Comdisco

2    rather than the borrowers or their stock to secure payment.

3           Consequently, I find that there was no extending or

4    maintaining violation of Regulation U by the bank on the stock

5    either directly or indirectly securing the notes.

6           That being said, I do find, however, that the bank

7    committed an arranging violation of Regulation U because

8    Comdisco violated Regulation G by extending improper credit,

9    because the amount of the loans exceeded 50 percent of the

10   value of the stock.  And I'm following -- a lot of this follows

11   the *Grundon* -- the direction that the *Grundon* opinion pointed

12   the Court in.

13          As I previously mentioned, I find that all the

14   restrictions on the stock were for Comdisco's benefit.  Some of

15   those restrictions, as I also mentioned earlier, were to keep

16   the employees incentivized to stay with the company and prevent

17   fluctuation in the stock price if there were a large number of

18   sales by SIP participants.

19          Because Comdisco had the ability through its

20   possession of the stock powers to sell the stock in the event

21   of a default and the obligation to pay on a guaranty, this

22   indicates that the stock indirectly secured the guaranty.  In

23   fact, Mr. Sabel confirmed that Comdisco had the ability to sell

24   the stock if it was forced to pay on the guaranty.

25          In addition, Comdisco's Deputy General Counsel, Scott

1    Harvey, testified that in the event of a default by a SIP

2    participant and a demand by the bank on Comdisco to pay under

3    the guaranty, Comdisco would either tell the SIP participant to

4    sell the stock and pay the bank or it would exercise its powers

5    to sell the stock and pay the bank from the proceeds.  If

6    Comdisco chose to pay the bank first, it would tell the

7    participant to sell the stock and reimburse Comdisco; and if

8    the participant didn't do so, it would sell the stock itself

9    and apply the proceeds to reimburse itself.

10            So because the stock indirectly or perhaps even

11   directly secured the guaranty the loan was more than 50 percent

12   of the value -- and the loan was for more than 50 percent of

13   the value of the stock, Comdisco committed an extending

14   violation under Regulation G.  And, again, this is directed by

15   the *Grundon* opinion.  It's basically discussed mostly at 651

16   F.3d at 634, 635, in that area.

17            So because Comdisco committed an extending violation

18   under Regulation G, the Court finds that the bank, under the

19   *Grundon* ruling and rationale, committed an arranging violation

20   under Regulation U.

21            Because the bank committed an arranging violation

22   under Regulation U, Section 29(b) of the Exchange Act provides

23   that the contracts made in violation of the regulation -- in

24   this case, the notes that we're talking about -- are void.

25            The Court rejects plaintiff's position that because

1    it made a good-faith mistake in believing that Comdisco had

2    shareholder approval, Section 29(c)(1)'s safe harbor provision

3    prevents application of the voidability provision of 29(b).

4    Section 29(c)(1) provides that nothing in the Title shall

5    affect the validity of any extension of credit unless the

6    person making the extension had actual knowledge of facts that

7    would make the extension a violation.

8           And much of plaintiff's argument is based on the

9    misconception that Comdisco qualified as a plan lender because

10   it had shareholder approval when, in fact, it had not gotten

11   shareholder approval for the SIP.  Mr. Murray testified that he

12   thought Comdisco had shareholder approval, which if true would

13   have allowed Comdisco to lend up to 100 percent of the stock

14   value.  But Murray's letter to Wiles indicates that he was

15   aware, Murray, that even if Comdisco qualified as a plan lender

16   and could lend up to 100 percent without committing an

17   extending violation, the bank would still be committing an

18   arranging violation by letting Comdisco lend more than the bank

19   could lend.

20          It's complicated, but I think we know what we're

21   talking about here.

22          So I find no evidence to support the notion that the

23   bank itself was acting under a belief that Comdisco had

24   shareholder approval or was relying on the plan lender

25   exception.  And the letter from Mr. Murray of Winston & Strawn

1    of June 29, 1998, supports this conclusion.

2            And so I must also reject plaintiff's reliance on

3    Regulation U's good-faith mistake exception which provides that

4    a mistake made in good faith in connection with the extension

5    or maintenance of credit shall not be violation of the act.

6    This is 12 C.F.R. Section 221.3(k).

7            There's no evidence that the bank, as opposed to its

8    lawyer perhaps, was acting under any good-faith mistake of

9    fact, and the Court finds no evidence to support the argument

10   that the bank was acting under a good-faith mistake of fact,

11   even though it might have acted under a mistaken interpretation

12   of law.  So it just doesn't fall under the safe harbor

13   provision.

14           I also have to reject the plaintiff's equitable

15   arguments, which are fairly compelling from an equitable

16   standpoint, but enforcing the contract would condone the

17   conduct prohibited by the margin regulations.  The *Grundon*

18   court, I think, was very specific in its findings about that.

19           And I'm concerned, very frankly -- and I've mentioned

20   this to you before -- that a judgment for the defendants in

21   this case might appear to be inequitable, because if Comdisco

22   had remained profitable and successful, the Court's conclusions

23   would have allowed shareholders to avoid a perfectly legitimate

24   obligation -- otherwise legitimate obligation, I should say, to

25   the bank under the notes even if their shares had increased in

1    value.  But I believe that a clear interpretation of the law as

2    I've expressed it requires a judgment for the defendants under

3    the guidance of the Court of Appeals that had dealt with this

4    issue before.

5            So I will be entering judgment for the defendants for

6    the reasons stated in court today.  And I think that concludes

7    my work on this case.

8            I want to congratulate all of you for your

9    professional attitude and conduct throughout this case.  It's

10   been a pleasure.  It's been difficult.  It's been challenging.

11   These are complicated legal areas, and this is a result,

12   contrary to what my gut told me and my mind told me at one

13   point, but I think that this is the result that the findings

14   that I've made compels.

15           So with that, we will be entering judgment today.

16   Okay, ladies and gentlemen.

17           MR. YOUNG:  Thank you, your Honor.

18           MR. HARRIS:  Thank you, Judge.

19           MR. STELZER:  Thank you, your Honor.

20           MS. MARZIANI:  Thank you.

21           MR. WOOLLEY:  Thank you.

22       (Proceedings concluded.)

1          C E R T I F I C A T E

2          I, Nancy L. Bistany, certify that the foregoing is a

3    complete, true, and accurate transcript from the record of

4    proceedings in the above-entitled matter.

5

6    /s/ Nancy L. Bistany, CSR, RPR, FCRR          October 22, 2014

7    Official Court Reporter                              Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25